## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL JOB CORPS ASSOCIATION, JOCELYN RIVERA, ADAMS AND ASSOCIATES, INC., ALTERNATE PERSPECTIVES, INC., EDUCATION & TRAINING RESOURCES, LLC, STRATEGIX MANAGEMENT, LLC, TRANSPORTATION COMMUNICATIONS UNION/IAM, | Civil Case No. _____ |
| *Plaintiffs*, | |
| v. | |
| DEPARTMENT OF LABOR, LORI CHAVEZ-DEREMER, in her official capacity as Secretary, Department of Labor, | |
| *Defendants*. | |

## <u>INTRODUCTION</u>

This action seeks to halt the U.S. Department of Labor's ("DOL") unlawful efforts to eliminate Job Corps, the nation's largest residential career training program. Congress created Job Corps to connect young Americans, many of whom have faced incredible hardship (homelessness, abuse, poverty, etc.), with employment, by providing employment training and social skills, as well as housing, meals, health care, and other critical benefits.

Nevertheless, starting in mid-March 2025, DOL, at the direction of DOGE, has taken steps to eliminate Job Corps—culminating in its May 29, 2025, decision to cease operations of all contractor-based Job Corps centers. Eliminating the program is illegal: It contravenes the statutory provisions governing Job Corps and DOL's own regulations concerning the program, and it is fundamentally irrational. Shuttering Job Corps will have disastrous, irreparable consequences,

including displacing tens of thousands of vulnerable young people, destroying companies that have long operated Job Corps centers in reliance on the Government's support for the program, and forcing mass layoffs of workers who support the program. Federal courts have recently stepped in to protect against similar efforts to extinguish Congressionally mandated programs. Plaintiffs urge this Court to do the same.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically, the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*., and because Defendants' actions are *ultra vires* in violation of federal law, and pursuant to 28 U.S.C. § 1361.

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391, because a substantial part of the events that give rise to this cause of action occurred in this judicial district. NJCA members operate campuses across the country, including in the Bronx, and the unlawful shutdown of these campuses will result in harm to NJCA. Further, since 2023, nearly 1,000 students from New York County and Bronx County have enrolled in Job Corps programs with NJCA members. In addition, Plaintiff Adams and Associates, Inc., operates a Job Corps campus in Sullivan County that will be shut down as a result of DOL's unlawful cancellation of the Job Corps program.

## PARTIES

3.      Plaintiff National Job Corps Association ("NJCA") is a 501(c)(6) national member trade organization, founded in 1998, comprised of business, labor, volunteer, advocacy, academic and community organizations. NJCA counts nearly every private contractor operating a Job Corps campus as a dues-paying member, and NJCA is virtually exclusively funded by its members. NJCA works with DOL, policymakers on Capitol Hill, Job Corps youth service providers, and Job Corps students to ensure that Job Corps maintains the safest and most supportive living and

learning environments for functionally unemployed youth. DOL's unlawful shuttering of Job Corps will cut off all funding to NJCA, destroy its mission, and cause it to cease its operations.

4.    Plaintiff Adams and Associates, Inc. ("Adams"), is a 100% employee-owned company founded in 1990, with more than 1,900 employee shareholders across the country. Adams has been operating under contracts with DOL since 1992, and its Job Corps operations make up more than 97% of its revenue. Presently, Adams serves 3,668 students across 17 Job Corps centers, including Delaware Job Corps Center in Callicoon, New York. Adams currently provides vocational, education and social training for 159 low-income, residential at-risk youths at the Delaware Valley Center. Approximately 20.6% of Adams' active Job Corps student population would be homeless without the program.

5.    Plaintiff Education & Training Resources, LLC ("ETR") was founded in 1991, and it has been serving as a Job Corps operator since 1997. Operating Job Corps centers is the only and singular purpose of ETR. It currently serves 3,325 students across eleven campuses. Its contractual period with the DOL spans through 2027, with a focus on equipping income disadvantaged, homeless, foster care, and non-college bound students with the academic and career technical skills needed to meet workforce demands.

6.    Plaintiff Alternate Perspectives, Inc. ("API") was founded in 2004. Job Corps makes up over 98% of API's business. API operates the New Orleans Job Corps campus, where it currently serves 112 students, focusing on academic training, career technical training, career counseling, job placement, work readiness and life skills, aiming to equip students with the skills needed to meet workforce demands. The contract for this campus is $6 million with a contract term of from 2022 to 2027. Prior to COVID-19, API operated three other Jobs Corps campuses.

7.    Plaintiff Strategix Management LLC ("Strategix Management") was founded in

2016 and has served as a contractor for DOL since 2021. Currently, Strategix Management serves 1,348 students across four Job Corps Center campuses in four different states. The contracts focus on areas such as technical career training, workforce readiness (soft skills) training, career counseling, academic instructions for high school equivalency, financial literacy training, medical services, dental services, behavioral health, and student housing, aiming to equip students with the skills, resources and infrastructure needed to meet workforce demands.

8.      Plaintiff Transportation Communications Union / IAM ("TCU") is a federal labor union representing approximately 35,000 members in the United States, most employed in the railroad industry. TCU is a National Training Contractor ("NTC") in the Job Corps program and holds a contract with DOL to deliver advanced training to Job Corps students. Currently, TCU has 460 training slots (currently serving 245 students) at 8 campuses across the country. DOL's unlawful shuttering of Job Corps will shut down TCU's Job Corps program.

9.      Plaintiff Jocelyn ("Kota") Rivera is an eighteen-year-old who is currently a student at Glenmont Job Corps Center in Callicoon, New York. Plaintiff Rivera lives at the Center and does not have an alternative residence in the event that the Center closes.

10.     Defendant U.S. Department of Labor ("DOL") is a federal agency with responsibilities governing occupational safety and health, wage and hour standards, unemployment benefits, reemployment services, and economic statistics. DOL administers the Job Corps program.

11.     Defendant Lori Chavez-DeRemer is the Secretary of the Department of Labor. She is sued in her official capacity.

## FACTUAL ALLEGATIONS

**A.      Job Corps is a Longstanding, Successful Career Training Program.**

12.     Job Corps, established by Congress in 1964, is the nation's largest residential

employment and workforce development program for youth.  It trains and educates young people, 16 to 24 years old, from disadvantaged backgrounds, including individuals who dropped out of school; who are homeless; who are in, or have aged out of, the foster care system; and who require additional career and technical instruction to obtain and retain employment.  Job Corps participants face significant barriers to education and employment.  For example, in Program Year 2019, 56.9% of enrollees had no high school diploma or equivalency at program entry.

13.     The program's ultimate objective is to assist eligible youth become more employable, self-sufficient, and responsible citizens.  Accordingly, each Job Corps center provides disadvantaged youth with career technical programs, intensive personal and career counseling, and job placement services into a registered apprenticeship, entry-level job, or the military.  Job Corps also provides most of its students with residential services, as well as meals, health care, child care, driver's education, and counseling.

14.     Job Corps currently serves approximately 25,000 students and has trained and educated over three million individuals since 1964. It is, and has been for decades, the largest job training program in the United States. Job Corps is the only program that leverages performance-based competition among private businesses, nonprofits, and federal agencies to consistently enhance student outcomes and the program's cost-effectiveness.

**B.     DOL Eliminates Jobs Corps**

15.     Since March 2025, DOL has taken a series of actions to shut down Job Corps.

16.     For example, DOL halted applicant background checks, which effectively prevented new enrollment, as students must pass a background check when they are admitted.[1]

---

[1] *Budget Hearing - U.S. Department of Labor: Hearing before the U.S. House Appropriations Subcommittee on Labor, Health and Human Services, Education and Related Agencies*, 119th Cong. (testimony of Secretary of Labor Lori Chavez-DeRemer).

17.     On April 11, 2025, DOL discontinued dedicated student Career Transition Readiness ("CTR") programs and student medical testing requirements.

18.     On April 23, 2025, all pending or outstanding Job Corps procurements except for three were abruptly canceled.

19.     On April 25, 2025, DOL released a "Job Corps Transparency Report,"[2] which applies a flawed methodology and reflects selective and inaccurate performance measures, costs, and statistics, intended to significantly understate Job Corps' performance and overstate its costs. To take one glaring example, the report incorrectly allocates overhead costs of 38.65%, including the national costs of certain trade programs, to each Job Corps center, including centers that do not host those programs—thus inflating their reported costs.[3] Perhaps more importantly, the report fails to contextualize costs and outcomes that reflect COVID-19 pandemic restrictions imposed by DOL.[4] The COVID-19 pandemic seriously impacted Job Corps' typical operations, resulting in unprecedented challenges for the program.[5] As DOL has itself previously noted, any reasonable assessment of Job Corps' performance must account for these impacts,[6] including increased cost per student and cost per graduate that resulted from COVID-19 safety measures.[7]

20.     On April 30, 2025, DOL effectively terminated its provision of internet service to Job Corps campuses.[8]

21.     On May 2, 2025, a week after the release of the Transparency Report, Russell T.

---

[2] Job Corps Transparency Report. U.S. Department of Labor. https://www.dol.gov/sites/dolgov/files/ETA/jobcorps/reports/Job-Corps-Transparency-Report-2025.xlsx Accessed May 30, 2025.

[3] https://www.dol.gov/sites/dolgov/files/ETA/jobcorps/reports/Job-Corps-Transparency-Report-2025.xlsx

[4] https://www.dol.gov/sites/dolgov/files/ETA/jobcorps/reports/Job-Corps-Transparency-Report-2025.xlsx

[5] DOL, Job Corps Program Year (PY) 2019 Annual Performance Report. https://jobcorps-gov.s3.us-west-2.amazonaws.com/2023-04/PY%202019%20WIOA%20Job%20Corps%20Annual%20Report%20and%20Appendix.pdf (last visited May 31, 2025).

[6] *Id.*

[7] *Id.*

[8] Job Corps Data Center Notice 24-186 Internet Circuit Helpful Guidance.

Vought, the Director of the White House Office of Management and Budget ("OMB"), submitted President Trump's recommendations on discretionary funding levels to the Senate for fiscal year 2026. These recommendations serve as a foundation for the congressional budget and appropriations process, reflecting the administration's policy priorities and funding goals for the upcoming fiscal year. The budgeted recommendations included proposals to "Make America Skilled Again" by drastically cutting DOL's discretionary budget from its current $13.3 billion to $8.6 billion for the 2026 fiscal year.  The bulk of that reduction comes from the revamp of DOL's grant programs and the elimination of Job Corps.

22.    On May 29, 2025, DOL had a call with all Job Corps operators to announce its plan to implement stop work orders on all Job Corps contracts nationwide. Over the next two days, Job Corps operators (including Plaintiffs) received termination and non-renewal notices for the operation of their respective Job Corps centers.

23.    Among other things, the notices state: "You shall begin immediately all work necessary to provide a safe, orderly, and prompt shutdown of center operations." Accordingly, the notices reflect a wholesale cessation of all privately contracted Job Corps centers. For one, they require operators to "immediately take" "all necessary steps to … separate[] and transport[]" students to their home of records. And the notices direct that, by June 4, 2025, operators are to provide DOL with a list of students who will not "arrive home" by June 6, 2024. On May 31, 2025, DOL extended this deadline by one week, without explanation, via email to private operators. Presently, the names of students who will not arrive home on June 13, 2025, must be provided to DOL the day before, on June 12, 2025.

24.    The notices also state that operators must only retain staff that is "necessary to accomplish the shutdown or to comply with the orders of [DOL]." The notices mandate additional

"shutdown" tasks for operators to take "immediate action," including terminating all subcontracts and securing non-expendable property and equipment.

25.    To the extent these requirements leave any doubt as to whether Defendants are effectuating a nationwide cancellation of the program: students "must be told: '*The US Department of Labor has decided to terminate all Job Corps operations contracts at this time.*'" When departing, students are required to take "all personal belongings" and "[t]here should be no expectation of transfer to another center or return to their current center." And students on leave are not permitted to return to gather personal belongisngs.

**C.    DOL's Elimination of Job Corps is Illegal**

26.    DOL's unilateral elimination of Job Corps is illegal.

27.    Congress created Jobs Corps in the Economic Opportunity Act ("EOA") of 1964, an effort of President Lyndon B. Johnson's War on Poverty, to tackle the problem of youth unemployment. The inspiration for Job Corps came from the Civilian Conservative Corps ("CCC"), a 1933 work relief program that gave millions of young men employment on environmental projects as part of President Franklin D. Roosevelt's New Deal. The EOA directed the executive branch to enter into agreements with various types of entities, including private organizations, for the operation of each Job Corps center.  42 U.S.C. §§ 2701-2981 (1964).

28.    Since then, Congress has continued to enact legislation concerning Job Corps. In 2014, the Workplace Innovation and Opportunity Act ("WIOA") stated that: "There *shall* be within the Department of Labor a 'Job Corps.'" 29 U.S.C. § 3193 (emphasis added). WIOA gave DOL certain prescribed powers "incident to the operation and continuing development" of Job Corps, and Congress created specific requirements relating to certain aspects of the program, including the selections, oversight, and termination of Job Corps centers. §§ 3197, 3211.

29.    Congress contemplated that DOL could close individual Job Corps centers, but did not provide authorization for DOL to cancel the program wholesale. And Congress has imposed specific guardrails on the closure of any individual Job Corps campus.

30.    For example, Congress required that DOL must ensure "that the proposed decision to close the center is announced in advance to the general public through publication in the Federal Register or other appropriate means," with a "reasonable comment period," and also ensure "that the Member of Congress who represents the district in which such center is located is notified within a reasonable period of time in advance of any final decision to close the center." 29 U.S.C. § 3209(j).

31.    Furthermore, Congress required that DOL must "establish written criteria to … determine when a Job Corps center … is to be closed and how to carry out such closure," which "shall" be submitted to four Congressional committees. § 3211(c). In 2014, DOL promulgated a "Final Methodology for Selecting a Job Corps Center for Closure and Center Selected for Closure: Comments Request," which identified three primary criteria for selecting a Job Corps center for closure: five-year Outcome Measurement System ("OMS") performance level, five-year On-Board Strength ("OBS"), and five-year Facility Condition Index ("FCI").[9] The methodology also identifies four additional considerations with respect to a closure decision: Continued availability of Job Corps services in each state, the District of Columbia, and Puerto Rico; the sufficiency of

---

[9] OMS is Job Corps' primary tool for performance accountability, composed of fourteen different measures that all Job Corps centers are required to report, including High School Diploma ("HSD") or General Educational Development ("GED") Attainment Rate; Career Technical Training ("CTT"); Completion Rate; Combination HSD or GED; and CTT Attainment Rate; Average Literacy Gain; Average Numeracy Gain; CTT Industry-Recognized Credential Attainment Rate; CTT Completer Job—Training Match/Post-Secondary Credit Placement Rate; Former Enrollee Initial Placement Rate; Graduate Initial Placement Rate; Graduate Average Hourly Wage at Placement; Graduate Full-Time Job Placement Rate; Graduate 6-Month Follow-up Placement Rate; Graduate 6-Month Average Weekly Earnings; Graduate 12-Month Follow-up Placement Rate. OBS measures student capacity utilization on Job Corps centers. FCI takes into account all construction projects completed over the same five-year period as the other two factors.

data available to evaluate center performance over five years; an indication of significant recent performance improvement; and Job Corps' continuing commitment to diversity.

32.    DOL's cancellation decision did not comply with any of the foregoing requirements.

33.    What's more, Congress has funded the Job Corps program through at least June 30, 2026.[10] By de-obligating the funds meant for each currently operating Job Corps center without re-obligating the appropriated funds to other operators or indicating any intent to use those funds to continue operation of the Job Corps program, Defendants have impounded those funds without following the procedures set forth by Congress in the Impoundment Control Act of 1974. In particular, DOL did not send a special message to Congress detailing the money to be deferred and the reasons for deferral, 2 U.S.C. § 683(a), and even then, could only have halted the expenditure of allocated funds if both houses of Congress passed a bill to rescind the funding, *id.* § 683(b).

34.    DOL's cancellation decision is also arbitrary and irrational.

35.    Defendants' termination notices contain no reasoned explanation, at all, for the decision to shutter Job Corps.

36.    Defendants' cursory rationale, provided in informal FAQs concerning the shutdown, underscores the irrationality of the decision. DOL focuses principally on a purported $140 million deficit in the program but offers zero explanation why eliminating the program is a rational response to address the deficit. In an approximately $1.7 billion program, it obviously is not.[11]

37.    DOL also asserts that the "highest graduation rate among all Job Corps centers was 65.4%" and that "[h]igh schools with graduation rates below 67% are generally considered low

---

[10] Full Year Continuing Appropriation and Extensions Act, 2025 (Public Law 119-4).
[11] Feldman Decl. Ex. A ("Job Corps Operations Pause FAQs." U.S. Department of Labor).

performing under federal law." But DOL offers no explanation concerning the connection between that fact and the wholesale cancellation of Job Corps.

38.     More broadly, DOL's decision appears to rest entirely on the fundamentally flawed Transparency Report.

39.     Furthermore, DOL failed to consider the extraordinarily harmful consequences of its decision on Job Corps' students and staff and the companies that operate its campuses. As explained in more detail below, the abrupt halt of the Job Corps program will devastate students, cause widespread job losses, and destroy companies that invested extensive resources into this program in reliance on the government's policies.

**D.    Elimination of the Job Corps Program Has Caused and Will Continue to Cause Severe and Irreversible Injuries to Plaintiffs**

40.     DOL's abrupt, illegal elimination of the Job Corps program will have disastrous consequences on students, operators, employees, and communities.

41.     Job Corps students come from disadvantaged backgrounds. Many have faced extreme hardship and instability and came to Jobs Corps for a chance to change their lives. Indeed, thousands of students enrolled at Jobs Corps campuses were either homeless or in foster care prior to Job Corps enrollment.

42.     Shutting down Job Corps campuses will mean forced displacement of all these students. As noted above, many of these students came from homelessness or foster care and have no place to go. As one student puts it: "I finally feel like I belong somewhere. The program gave me more than an education. It gave me stability. It gave me peace. It gave me purpose. I now feel safe, supported and seen." She adds: "If the center closes, I'll have nowhere to go. No money. No plan. No home. I will be scared for my safety. It makes me feel alone again. This place is the only place where I've ever felt safe and grounded. It's the only reason I have hope."

43.    Furthermore, all Jobs Corps students will lose the opportunity to receive the critical education and training that they came to Job Corps to obtain. Students at Job Corps campuses have the opportunity to earn their high school diploma, GED, and a range of vocational-based certifications and licenses. Students who have worked for months towards certifications will simply lose the opportunity to complete those programs. In addition, Plaintiff TCU's training program, which plays a salutary role in equipping students with the necessary skills and knowledge to succeed in the transportation industry, will end.

44.    Defendants' elimination of Job Corps will also destroy many Job Corps operators' businesses, including Plaintiffs' businesses. Job Corps operators come in different sizes. Some are small businesses that operate one center, others are large companies that may operate dozens of centers. All Job Corps operators, however, depend on DOL for revenue, and the contracts have significant monetary value for their businesses. Once an operator has been selected to participate in Job Corps, DOL agrees to provide them funding for a span of multiple years. Plaintiff operators had years left on their contracts with DOL, when the program was abruptly eliminated. Operators had made significant investments in reliance on DOL's funding. For example, non-party MINACT, Inc. has depended on its existing contracts for funding essential operational expenses. This includes covering payroll for staff, providing medical benefits through self-insured health insurance plans, and managing overall administrative costs necessary for effective organizational functioning. Plaintiff ETR began operating Job Corps centers as a small business over 28 years ago and has since grown to be one of the largest operators of centers, investing tens of millions of dollars over its nearly three decades in the Job Corps program. Plaintiff Adams started as a small business. In 2012, the founding members of Adams sold the Company to its employees and Adams became a 100% employee-owned Company. Many of Adams's executives and senior staff have

dedicated their lives and/or adult careers to the Job Corps program. The historical knowledge and experience they have developed will be lost if Adams is forced to close, which is highly probable if Adams-operated Job Corps centers are closed.

45.     Unsurprisingly, the cancellation will have an enormously destructive impact on Plaintiffs' employees. Plaintiff operators will be forced to terminate their entire workforce—for Adams, for example, that could mean as many 1,900 employees. Layoffs of non-party MINACT's employees would strip away more than $15 million in annual employee salaries and benefits.

46.     The harm caused by DOL's actions will also be felt more broadly in the communities where Job Corps centers are located. Many of the campuses contracted to the Plaintiff operators are in rural communities. They generate valuable revenue for these localities by employing people who pay taxes and by purchasing goods and services from other businesses in the community. Plaintiff Adams spends 70% of its Jobs Corps budget on employee wages and benefits, and 20% on goods and services. This ultimately results in benefits of $155 million per year to the local communities where Adams's centers are located.

47.     Finally, Plaintiff NJCA will be unlikely to survive the cancellation of the Job Corps program. NJCA's entire mission is to represent participants in the Job Corps program, and it is dependent almost exclusively on member dues to fund its operations.

## COUNT ONE

### Administrative Procedure Act–§§ 706(2)(A), (C)
### In Excess of Statutory Authority and Contrary to Law
### (*Against All Defendants*)

48.     Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

49.     Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law [or] . . . in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C).

50.    The Jobs Corps program was created by Congress in 1964. 42 U.S.C. §§ 2701-2981 (1964). Congress signaled its clear intent that DOL was required to create the program and enacted specific provisions indicating that DOL must contract with external entities for the operation of the program. And Congress reaffirmed its commitment to the Job Corps program in 2014 through WIOA, which provides, among others, that "[t]here shall be within the Department of Labor a 'Job Corps.'" 29 U.S.C. § 3193. Congress has also carefully delineated the scope of DOL's authority to shut down Job Corps campuses through certain procedural requirements. *See* 29 U.S.C. § 3209(j). Prior to closing any Jobs Corps center, DOL is required to announce the decision publicly, allow a 30-day comment period, and notify the local Member of Congress in advance. *See id.* Congress has further mandated DOL to establish written criteria to determine when a center is to be closed and how to carry out the closure.

51.    Defendants' decision to shut down all privately operated Job Corps campuses exceeds Defendants' statutory authority and is contrary to law. Nothing in governing statute authorizes DOL to close *all* privately run Job Corps centers. And in any event, DOL did not publish an announcement relating to the closure of a center in the Federal Register. DOL likewise did not follow any written criteria in making its shutdown decision. Defendants have therefore exceeded their statutory authority under 29 U.S.C. § 3209(j). And they have contravened their own regulations. An agency is "bound by its own regulations," *Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks omitted), and an agency's failure to follow them is "contrary to the law," *Fuller v. Winter*, 538 F. Supp. 2d 179, 191 (D.D.C. 2008).

52.    In recent months, multiple federal district courts have found that agency actions

designed to thwart the existence of a Congressionally mandated program violated the APA. *See, e.g.*, *Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, No. 25 Civ. 02847, 2025 WL 1233674, at *8 n.5 (N.D. Cal. Apr. 29, 2025); *Aids Vaccine Advoc. Coalition v. U.S. Dept. of State*, No. 25 Civ. 00400, 2025 WL 752378, at *14 (D.D.C. Mar. 10, 2025).

53.     The Impoundment Control Act of 1974 explicitly prohibits the Executive Branch from impounding appropriated funds without following certain procedures. 2 U.S.C. § 681 *et seq.*; *Aids Vaccine Advoc. Coalition*, 2025 WL 752378, at *14.  If the Executive Branch does not want to spend funds that Congress has appropriated for a specific program, it must send a special message to Congress detailing the money to be deferred and the reasons for deferral. 2 U.S.C. § 683(a). Even then, the Executive Branch is powerless to halt the expenditure of allocated funds unless both houses of Congress pass a bill to rescind the funding. Id. § 683(b). By de-obligating funds meant for currently operating facilities without re-obligating the appropriated funds to other operators or indicating any intent to use those funds to continue operation of the Job Corps program, Defendants have impounded those funds without following the procedures set forth by Congress. Likewise, Defendants' previous actions which were designed to fundamentally impair the operation of the program before announcing their ultimate intent to abolish Jobs Corps on May 29, 2025, were unlawful. By delaying spending or outright refusing to spend funds that Congress has allocated for the Job Corps program, shutting down entire programs, and causing the mass firing of staff, without following the procedural paths set by Congress, Defendants have violated the Impoundment Control Act.

**COUNT TWO**

**Violation of the Administrative Procedure Act—§ 706(2)(A)**
**Arbitrary and Capricious**
(***Against All Defendants***)

54. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

55. Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

56. Agency action is arbitrary and capricious when an agency does not engage in reasoned decision making during the adoption or alteration of its policies. The agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).

57. Defendants have failed to do so here at every stage of the process. They have engaged in a sequence of inexplicable actions for the purpose of eliminating the Job Corps program. DOL's official announcement and its subsequent elimination of the program contained no lawful justification for its action. Instead, in its informal FAQs, Defendants made fleeting references to a purported $140 million deficit, and a vague assertion that the highest graduation rate among all Jobs Corps center is lower than that of graduation rates of high schools that are generally considered low performing.[12]   But there is no connection between these facts and Defendants' choice to impose a wholesale suspension of all private Job Corps operations.

58. More broadly, Defendants' decision is rooted in pretextual and improper justifications. DOL has pointed to the Transparency Report, which used flawed methodologies and inaccurate data. This is an independent basis to vacate DOL's decision.

59. Further, Defendants have failed to consider the severe, adverse consequences of

---

[12] *Id.*

their decision on students, staff, and operators of the Job Corps (as well as the communities Job Corps serves), including the substantial reliance interests of Plaintiffs and other stakeholders. The abrupt elimination of the Job Corps program closure of all program centers will harm countless individuals and communities. Those harmed include displaced students, including formerly homeless youth; experienced professionals serving those students who will be laid off; successful businesses that have long operated Job Corps centers and will have to shut down; and communities that count Job Corps as a key part of their fabric.

## COUNT THREE

### Ultra Vires
### (*Against All Defendants*)

60.     Plaintiffs restate and reallege all paragraphs above as if set forth here.

61.     *First*, there is no statute, Constitutional provision, or other source of law that authorizes the wholesale cancellation of the Job Corps program that Defendants have executed. *See La. Pub. Serv. Com v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless or until Congress confers power upon it."). The equitable power of federal courts to enjoin "violations of federal law by federal officials," *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326–27 (2015), includes cases in which a federal officer has acted unconstitutionally as well as cases in which the officer has acted "beyond th[e] limitations" set by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

62.     *Second*, Defendants failed to follow statutory and regulatory requirements imposed on them for closing *any* Job Corps center.

63.     *Third*, Defendants' impoundment of funds appropriated by Congress violates the Impoundment Control Act of 1974.

64.     Plaintiffs have a non-statutory right of action to declare unlawful and enjoin

17

Defendants' *ultra vires* actions.

## COUNT FOUR

### Separation of Powers
### (*Against All Defendants*)

65.    Plaintiffs restate and reallege all paragraphs above as if set forth here.

66.    Congress is responsible for appropriating federal funds. U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). This exclusive power of the purse is "a bulwark of the Constitution's separation of powers among the three branches of the National Government." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.); *see also Biden v. Nebraska*, 600 U.S. 477, 505 (2023) ("Among Congress's most important authorities is its control of the purse."). The Constitution also allocates to Congress the exclusive power to legislate. U.S. Const. art. I, § 1; *see Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

67.    The President must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Where Congress has legislated on point under express and exclusive constitutional authority, Congress' power is at its apex—and the executive branch's "power is at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

68.    Congress has instructed that there "shall" be a Job Corps program and has appropriated funds, through 2026, in accordance with that mandate. It has outlined specific requirements and restrictions regarding Defendant's execution of the Job Corps programs. §§ 3197, 3211.

69.    Defendants' actions violate the separation-of-powers between Congress and the executive branch, improperly arrogating legislative and appropriations powers to DOL that the

Constitution reserves to Congress.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

a. Declare unlawful Defendants' actions eliminating the Job Corps program, including but not limited to the issuance of termination and non-renewal notices by DOL starting on May 29, 2025;

b. Declare that Defendants' actions eliminating the Job Corps program are arbitrary and capricious, in excess of statutory authority, and a violation of the Administrative Procedure Act;

c. Declare that Defendants' actions eliminating the Job Corps program are *ultra vires*;

d. Declare that Defendants' actions eliminating the Job Corps program violate the separation of powers;

e. Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from enforcing, implementing, maintaining or giving effect to the elimination of the Job Corps program, including the stop work orders and termination and non-renewal notices delivered to Job Corps center operators starting May 29, 2025;

f. Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from issuing, enforcing, implementing, maintaining or giving effect to any shutdown tasks, job terminations, or student removals; and

g. Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from taking any further action to eliminate

the Job Corps program without Congressional authorization;

h.  Award Plaintiffs costs, reasonable attorneys' fees, and other disbursements as appropriate; and

i.  Grant such other relief as the Court deems necessary, just, and proper.

Dated: June 3, 2025
New York, NY

/s/ Maximilian L. Feldman
Maximilian L. Feldman
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Tel.: (212) 763-0883
Fax: (212) 564-0883
mfeldman@heckerfink.com

Amy Jeffress*
Minahil Khan*
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, D.C. 20001
Tel.: (212) 763-0883
Fax: (212) 564-0883
ajeffress@heckerfink.com
mkhan@heckerfink.com

*Counsel for Plaintiff National Job Corps Association*

/s/ Benjamin D. White
Benjamin D. White, Esq.
Michael L. Bloch, Esq.
Arielle Gerber, Esq.**
BLOCH & WHITE LLsP
152 West 57th Street, 8th Floor
New York, NY 10019
(212) 901-3825
bwhite@blochwhite.com
mbloch@blochwhite.com
agerber@blochwhite.com

*Counsel for Plaintiff Jocelyn Rivera*

/s/ Tiffinay Pagni, Esq.*
Vice-President & General Counsel
ADAMS AND ASSOCIATES, INC.
6151 Lakeside Drive, Ste. 1000
Reno, NV 89511
Tel.: (775) 348-0900
tpagni@adamsaai.com

*Counsel for Plaintiffs Adams and Associates, Inc. and Education & Training Resources, LLC*

/s/ Daniel J. Strouse*
CORDATIS LLP
1011 Arlington Blvd. Suite 375
Arlington, VA  22209
Tel.: (202) 342-2550
dstrouse@cordatislaw.com

*Counsel for Plaintiff Alternate Perspectives, Inc.*

/s/ Ambika J. Biggs*
HIRSCHLER FLEISCHER, A PROFESSIONAL CORPORATION
1676 International Drive, Suite 1350
Tysons, VA  22102
Tel.: (703) 584-8361
Fax: (703) 584-8901
abiggs@hirschlerlaw.com

*Counsel for Plaintiff Strategix Management, LLC*

/s/ Carla M. Siegel*
General Counsel
INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO
9000 Machinists Place
Upper Marlboro, MD 20772
Tel.: (301) 967-4510
csiegel@iamaw.org

*Counsel for Plaintiff Transportation Communications Union/IAM*

*\*Pro hac vice application forthcoming*
*\*\* Admission forthcoming*