UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL JOB CORPS ASSOCIATION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF LABOR, et al., <br><br> Defendants. | NO. 1:25-cv-04641-ALC <br><br> BRIEF OF AMICI STATES WASHINGTON, NEVADA, ARIZONA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, RHODE ISLAND, AND VERMONT IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

NICHOLAS W. BROWN
Attorney General
State of Washington

ZANE MULLER
Assistant Attorney General
CRISTINA SEPE
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
Zane.Muller@atg.wa.gov
Cristina.Sepe@atg.wa.gov

AARON D. FORD
Attorney General
State of Nevada

HEIDI P. STERN
Solicitor General
100 North Carson Street
Carson City, NV 89701
702-486-3594
HStern@ag.nv.gov

(Additional Counsel Listed on Signature Page)

**TABLE OF CONTENTS**

I. INTRODUCTION AND INTEREST OF THE AMICI ............................................................. 1

II. ARGUMENT ................................................................................................................. 2

    A. Job Corps Provides a Unique Combination of Services to Young Adults that Promote State Policy Goals and Augment State-Provided Services ................................................. 2

        1. An injunction is necessary to protect the public interest ............................................ 7

        2. The Department of Labor's arbitrary and capricious and *ultra vires* termination of Job Corps should be enjoined ................................................................................................ 7

III. CONCLUSION ............................................................................................................. 8

## TABLE OF AUTHORITIES

### Cases

*Colorado v. U.S. Dep't of Health & Hum. Servs.*,
  No. 1:25-CV-00121-MSM-LDA, 2025 WL 1426226 (D.R.I. 2025) ......................................... 8

*Maryland v. Corp. for Nat'l & Comm. Serv.*,
  No. DLB-25-1363, 2025 WL 1585051 (D. Md. 2025) .............................................................. 8

*New York v. McMahon*,
  No. CV 25-10601-MJJ, 2025 WL 1463009 (D. Mass. 2025) ...................................................... 8

*Nken v. Holder,*
  556 U.S. 418 (2009) ........................................................................................................................ 7

*NML Cap., Ltd. v. Republic of Argentina*,
  727 F.3d 230 (2d Cir. 2013) .......................................................................................................... 7

*Prince v. Massachusetts*,
  321 U.S. 158 (1944) ........................................................................................................................ 1

### Statutes

29 U.S.C. § 3102(36) ............................................................................................................................ 3

29 U.S.C. § 3191 .................................................................................................................................... 3

29 U.S.C. § 3191(1) .............................................................................................................................. 7

Minn. Stat. § 260C.452 ........................................................................................................................ 5

Pub. L. No. 113-128, 128 Stat. 1425 (2014) ...................................................................................... 3

Wash. Rev. Code § 43.330.720 .......................................................................................................... 5

### Other Authorities

Adam K. Edgerton, Cong. Rsch. Serv., R47208, Job Corps: A Primer (2022) ........................... 3, 4

Benjamin Collins, Adam K. Edgerton, Kyle D. Shohfi, Cong. Rsch. Serv., R47099,
  Workforce Innovation and Opportunity Act of 2022 (H.R. 7309) ............................................. 4

Carlos A. Flores, Alfonso Flores-Lagunes, Arturo Gonzalez, Todd C. Neumann,
  *Estimating the Effects of Length of Exposure to Instruction in a Training Program: The
  Case of Job Corps*, 94 Rev. of Econ. and Stat. 153 (2012) ......................................................... 5

David Collins, *'Monumental mistake': Maryland Job Corps Center part of locations to close nationwide,* WBAL TV 11, June 2, 2025 ............................................................................... 6

Jack Belcher, *Cascade Job Corps closure leaves dozens of students searching for a home*, The Bellingham Herald, June 6, 2025 ....................................................................... 6

Job Corps Benefits. ............................................................................................................. 4

Job Corps Policy and Requirements Handbook Chapter 1: Enrollment Services, Exhibit 1-1: Job Corps Eligibility Requirements ..................................................................... 3

Joni Auden Land, *Facing federal closures, Job Corps students and staff in Astoria weigh their futures*, OPB, June 10, 2025 ............................................................................ 6

Maria Staubs, *Job Corps students, staff still in limbo as judge temporarily halts shutdown*, KGUN 9 Tuscon, June 6 2025 ..................................................................... 6

Megan Lebowitz, *'A gut punch': Job Corps alumni and faculty lament Trump administration threats to the program,* NBC News, June 5, 2025 ............................ 6

Peter Z. Schochet, John Burghardt, Sheena McConnell, *Does Job Corps Work? Impact Findings from the National Job Corps Study*, 98 Am. Econ. Rev. 1864 (2008)........................... 4

Peter Z. Schochet, *National Job Corps Study: 20-Year Follow-Up Study Using Tax Data*, Mathematica Pol'y Rsch (2018) ................................................................................ 6

U.S. Dep't of Labor, *Congressional Budget Justification employment and Training Administration: Job Corps*................................................................................................. 4

Wash. Dep't of Soc. and Health Serv., *Homelessness Among Youth Exiting Systems of Case in Washington State*, RDA Rep. No. 11.254 (2024)............................................. 5

I.  **INTRODUCTION AND INTEREST OF THE AMICI**

"A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies." *Prince v. Massachusetts*, 321 U.S. 158, 168 (1944). In the sixty years since Congress created Job Corps, millions of young Americans from low-income backgrounds have been served by the program's unique combination of education, training, housing, healthcare and community. Job Corps furthers many of Amici States' priorities: reducing youth unemployment, re-engaging students who have not completed high school, building a skilled workforce and, in many cases, providing irreplaceable housing and social services to at-risk youth and young adults. By providing no-cost education, vocational training, residence on-campus and wrap-around services to vulnerable young Americans, Job Corps empowers these students and effectively supplements and amplifies state efforts in workforce development, education and public health. Empirical research confirms that the program improves participants' lifetime earnings and supports long-term self-sufficiency, promoting the policy objectives of the Amici States.

The Department of Labor's unlawful termination of Job Corps, if not enjoined, will cause irreparable harm to the Amici States and their residents by closing almost one hundred Job Corps centers across the fifty states and terminating in-progress training and benefits programs in which tens of thousands of young Americans are currently enrolled. Many of these program participants were unhoused or in foster care when they enrolled. Thousands of them rely on housing provided at Job Corps centers and have nowhere else to go, and state social service and housing providers do not have the capacity to meet a sudden influx of young people in need.

Elimination of the Job Corps program appears to be part and parcel of a wide-ranging campaign by the Trump Administration to unlawfully dismantle congressionally mandated

programs it dislikes. The Amici States have sued the federal government in jurisdictions across the country alleging that the Administration has exceeded its statutory authority in terminating federal programs and acting in an arbitrary and capricious manner in violation of the Administrative Procedure Act. The Amici States have a strong interest in vindicating separation of powers principles and enjoining violations of federal law that have caused and, if unchecked, will continue to cause concrete injuries to the States and threaten the constitutional balance of power between the States and the federal government.

For these reasons, the Court should grant Plaintiffs' motion for a preliminary injunction against the Department of Labor's unlawful elimination of the Job Corps program.

## II.   ARGUMENT

### A.   Job Corps Provides a Unique Combination of Services to Young Adults that Promote State Policy Goals and Augment State-Provided Services

Congress created Job Corps by passing the Economic Opportunity Act of 1964, a legislative cornerstone of President Lyndon B. Johnson's War on Poverty, to tackle the problem of youth unemployment. The program was modeled on the Civilian Conservative Corps, a 1933 work relief program that gave millions of young men employment on environmental projects as part of President Franklin D. Roosevelt's New Deal.[1] Congress created Job Corps to:

> (A) assist eligible youth to connect to the labor force by providing them with intensive social, academic, career and technical education, and service-learning opportunities, in primarily residential centers, in order for such youth to obtain secondary school diplomas or recognized postsecondary credentials leading to (i) successful careers, in in-demand industry sectors or occupations or the Armed Forces, that will result in economic self-sufficiency and opportunities for advancement; or (ii) enrollment in postsecondary education, including an apprenticeship program; and (B) support responsible citizenship.

---

[1] Adam K. Edgerton, Cong. Rsch. Serv., R47208, Job Corps: A Primer (2022), https://www.congress.gov/crs-product/R47208.

29 U.S.C. § 3191. The program is currently authorized under Subtitle C, Title I of the Workforce Innovation and Opportunity Act. Pub. L. No. 113-128, 128 Stat. 1425 (2014). Since creating Job Corps over sixty years ago, Congress has appropriated tens of billions of dollars to fund it with bipartisan support.[2]

Job Corps is administered by six regional offices headquartered in Boston, Philadelphia, Atlanta, Dallas, Chicago, and San Francisco, which report to a national office in Washington, D.C. The regional offices oversee close to one hundred Job Corps centers located in each of the fifty states, the District of Columbia, and Puerto Rico.[3] The Amici States and their residents who enroll benefit enormously from the services that these centers provide.

Congress created Job Corps to serve high-need young Americans and established eligibility criteria reflecting this purpose. To be eligible, an applicant must be between the ages of 16 and 24 and be either a U.S. citizen; a lawfully admitted permanent resident alien, refugee, asylee, or parolee, or other alien who has been authorized to work in the United States; or a resident of a U.S. territory. An applicant must also be a "low-income individual," meaning that they must meet certain criteria such as experiencing homelessness, having income below the poverty level, not having graduated from high school, or being a victim of human trafficking.[4]

Job Corps centers function as residential campuses, with at least 80% of program enrollees living on-site.[5] These centers provide wrap-around services to young adults, including career planning, on-the-job training, job placement assistance, housing, food, health and dental care at no

---

[2] Adam K. Edgerton, Cong. Rsch. Serv., R47208, Job Corps: A Primer (2022), https://www.congress.gov/crs-product/R47208.

[3] *Id.*

[4] 29 U.S.C. § 3102(36); *see also* Job Corps Policy and Requirements Handbook Chapter 1: Enrollment Services, Exhibit 1-1: Job Corps Eligibility Requirements, https://prh.jobcorps.gov/Enrollment Services/1.2 Eligibility/Program Requirements/Exhibit 1-1 Job Corps Eligibility Requirements.pdf.

[5] Benjamin Collins, Adam K. Edgerton, Kyle D. Shohfi, Cong. Rsch. Serv., R47099, Workforce Innovation and Opportunity Act of 2022 (H.R. 7309), https://www.congress.gov/crs-product/R47099.

cost to enrollees.[6] While various State-level social programs may seek to provide education, health care or job placement assistance to at-risk young people, Job Corps' wrap-around model providing all of these services in a residential campus setting is unique, and the Job Corps' national job-placement network goes beyond what individual States can provide.[7]

Not only does Job Corps serve residents of the Amici States and promote the States' policy goals, but it also complements and facilitates the work of State agencies that serve young people. Job Corps plays an important complementary role to state education departments by providing education and vocational training to students who have not completed a high school equivalent degree. One national controlled study found that among a cohort of 75,000 program enrollees, 93% of the members enrolled in an education or training program during the first 48 months, and the group saw a 21% increase in GED certificates earned and a 31% increase in vocational certificates earned compared to eligible young people not enrolled in Job Corps.[8]

In particular, Job Corps provides a crucial bridge for young people in State foster care to become independent and self-sufficient. According to the Department of Labor's own Congressional Budget Justification for fiscal year 2025, a significant portion of the approximately 25,000 annual enrollees in Job Corps were either homeless or enrolled in state-administered foster care prior to joining the program, including 14% of enrollees in program year 2022.[9] State foster care agencies and child protective services in the Amici States rely on Job Corps as a critical resource for placement of young people who age out of foster care. Sudden terminations of job

---

[6] Job Corps Benefits, https://www.jobcorps.gov/benefits (last visited June 11, 2025).
[7] Adam K. Edgerton, Cong. Rsch. Serv., R47208, Job Corps: A Primer (2022), https://www.congress.gov/crs-product/R47208.
[8] Peter Schochet, John Burghardt, Sheena McConnell, *Does Job Corps Work? Impact Findings from the National Job Corps Study*, 98 Am. Econ. Rev. 1864 (2008).
[9] U.S. Dep't of Labor, *Congressional Budget Justification employment and Training Administration: Job Corps*, https://www.dol.gov/sites/dolgov/files/general/budget/2025/CBJ-2025-V1-04.pdf.

4

centers, as directed by Defendants, would cause many Amici State agencies to respond quickly to gap-fill resources in order to support their vulnerable residents, avoid youth homelessness, and fulfill requirements under State law. For example, Washington state law requires that the Washington Department of Children, Youth and Families develop a plan to ensure that "no unaccompanied youth is discharged from a publicly funded system of care into homelessness." Wash. Rev. Code § 43.330.720.[10] Minnesota law similarly requires that youth who go through the foster system be provided with services in the areas of employment, daily living skills such as financial literacy and driving instruction, education and training, and housing. Minn. Stat. § 260C.452. Amici State agencies face persistent challenges in tackling youth homelessness—an issue further exacerbated by Defendants' conduct.

The long-run benefits to the Amici States and their residents are no less significant: the same national controlled study found that three years later, program participants earned $1,150 more annually than those in the control group.[11] Follow-up studies showed that more time spent receiving Job Corps training was positively correlated with higher earnings. Participants who spent at least 40 weeks in training saw an increase of $1,612 annually two years after random assignment, which was $462 more than the average impact for all participants.[12] Another follow-up study examining participants' tax records twenty years later found that Jobs Corps enrollees who began at age 20 or older continued to benefit from the program in terms of their earnings over subsequent

---

[10] Wash. Dep't of Soc. and Health Serv., *Homelessness Among Youth Exiting Systems of Case in Washington State*, RDA Rep. No. 11.254 (2024), https://www.dshs.wa.gov/sites/default/files/rda/reports/research-11-254.pdf.

[11] Wash. Dep't of Soc. and Health Serv., *Homelessness Among Youth Exiting Systems of Case in Washington State*, RDA Rep. No. 11.254 (2024), https://www.dshs.wa.gov/sites/default/files/rda/reports/research-11-254.pdf.

[12] Carlos A. Flores, Alfonso Flores-Lagunes, Arturo Gonzalez, Todd C. Neumann, *Estimating the Effects of Length of Exposure to Instruction in a Training Program: The Case of Job Corps*, 94 Rev. of Econ. and Stat. 153 (2012).

decades.[13] In Maryland, the Woodland Job Corps Center has an estimated annual community impact of $17 million, returning $1.91 for every dollar spent.[14]

Abruptly shutting down Job Corps centers and terminating the program, as Defendants seek to do, would have devastating effects for young Americans in the Amici States and create a crisis for Amici State agencies. Not only would termination disrupt the local economies served by the centers and derail the skill training of vulnerable young people, it risks destabilizing access to basic services, including safe places to live and regular meals. At some centers, it already has: at Arizona's Fred G. Acosta Job Corps Center, all but four of the nearly 180 students have been displaced from their dormitories as a result of the Department's announcement; twelve have since been living in a local homeless shelter.[15] At the Cascades Job Corps Center in Sedro-Wooley, Washington, over 250 students are currently enrolled and residing on campus, and an estimated 60 would become homeless if the campus closed.[16] News reports have also highlighted that, prior to this Court's temporary restraining order, the Tongue Point Job Corps Center in Astoria, Oregon, was trying to find housing for more than two dozen students who were homeless before starting the program, with the Department of Labor providing little to no help for students since announcing the closures of centers.[17]

---

[13] Peter Z. Schochet, *National Job Corps Study: 20-Year Follow-Up Study Using Tax Data*, Mathematica Pol'y Rsch (2018), https://www.dol.gov/sites/dolgov/files/OASP/legacy/files/Job-Corps-IRS-Report.pdf.

[14] David Collins, *'Monumental mistake': Maryland Job Corps Center part of locations to close nationwide*, WBAL TV 11, June 2, 2025, https://www.wbaltv.com/article/maryland-job-corps-center-closing-nationwide/64948723.

[15] Maria Staubs, *Job Corps students, staff still in limbo as judge temporarily halts shutdown*, KGUN 9 Tuscon, June 6 2025, https://www.kgun9.com/news/community-inspired-journalism/midtown-news/job-corps-students-staff-still-in-limbo-as-judge-temporarily-halts-shutdown.

[16] Jack Belcher, *Cascade Job Corps closure leaves dozens of students searching for a home*, The Bellingham Herald, June 6, 2025, https://www.msn.com/en-us/money/careers/cascades-job-corps-closure-leaves-dozens-of-students-searching-for-a-home/ar-AA1Ga6P5?ocid=BingNewsSerp.

[17] Megan Lebowitz, *'A gut punch': Job Corps alumni and faculty lament Trump administration threats to the program,* NBC News, June 5, 2025, https://www.nbcnews.com/politics/trump-administration/job-corps-alumni-faculty-lament-trump-administration-cuts-program-rcna210674; Joni Auden Land, *Facing federal closures, Job Corps students and staff in Astoria weigh their futures*, OPB, June 10, 2025, https://www.opb.org/article/2025/06/06/astoria-oregon-job-corps-students-staff-future-uncertain-federal-closures/.

1. **An injunction is necessary to protect the public interest**

In light of the dire consequences of shuttering Job Corps campuses and turning thousands of young Americans out of their homes, the balance of equities and public interest overwhelmingly militate in favor of an injunction.[18] "[C]ourts of equity should pay particular regard to the public consequences of any injunction." *NML Cap., Ltd. v. Republic of Argentina*, 727 F.3d 230, 246 (2d Cir. 2013). Here, the public interest is unusually significant and squarely in favor of the plaintiffs, whose motion aligns with immediate interests of vulnerable citizens of Amici States as well as the States' long-term policy goals. Congress created the Job Corps program to serve the public interest by "support[ing] responsible citizenship" and "assist[ing] eligible youth to connect to the labor force," leading them to "successful careers, in in-demand industry sectors or occupations or the Armed Forces, that will result in economic self-sufficiency and opportunities for advancement" or "enrollment in postsecondary education." 29 U.S.C. § 3191(1). Allowing this unlawful termination to take effect would undermine those goals and cause a profound setback for the vulnerable young people who enrolled in Job Corps on the promise that it offered a path to stability and self-sufficiency.

2. **The Department of Labor's arbitrary and capricious and *ultra vires* termination of Job Corps should be enjoined**

The Amici States agree with Plaintiffs that the Department of Labor's actions since March 2025, culminating in the May 29, 2025 announcement of its plan to shut down all Job Corps centers nationwide, amount to an unlawful effort to terminate Job Corps in violation of federal law and the Constitution. *See* ECF No. 1 ¶¶ 15-69; ECF No. 6. Defendants' efforts to terminate Job Corps without congressional authority represents the latest episode in the Trump Administration's

---

[18] These factors merge "when the government is the opposing party." *Nken v. Holder,* 556 U.S. 418, 435 (2009).

unlawful campaign to dismantle congressionally mandated and appropriated programs it dislikes, which the Amici States have challenged and courts have enjoined. *See, e.g.*, *Maryland v. Corp. for Nat'l & Comm. Serv.*, No. DLB-25-1363, 2025 WL 1585051 (D. Md. June 5, 2025) (preliminary injunction requiring the restoration of AmeriCorps programs in 24 plaintiff states); *New York v. McMahon*, No. CV 25-10601-MJJ, 2025 WL 1463009 (D. Mass. May 22, 2025) (enjoining federal defendants from dismantling the U.S. Department of Education; Defendants have applied to the U.S. Supreme Court for a stay of the injunction); *Colorado v. U.S. Dep't of Health & Hum. Servs.*, No. 1:25-CV-00121-MSM-LDA, 2025 WL 1426226 (D.R.I. May 16, 2025) (preliminary injunction enjoining HHS's decision to terminate billions in congressionally appropriated public health funding). It is Congress—not the Department of Labor—that has the exclusive power to create (or eliminate) the program.

### III. CONCLUSION

This Court should reaffirm the principle that the Amici States have repeatedly sought to vindicate—that the executive branch is bound by federal law and the Constitution—and grant Plaintiffs' motion for a preliminary injunction.

DATED this 13th day of June 2025.

I certify that this memorandum contains 2,442 words, in compliance with the Local Civil Rules.

NICHOLAS W. BROWN
Attorney General
State of Washington

*/s/ Zane Muller*
ZANE MULLER, NYSB #5893987
Assistant Attorney General
CRISTINA SEPE
Deputy Solicitor General
Complex Litigation Division
800 Fifth Avenue, Suite 2000

8

Seattle, WA 98104-3188
206-464-7744
Zane.Muller@atg.wa.gov
Cristina.Sepe@atg.wa.gov
*Attorneys for Amicus State of Washington*


AARON D. FORD
Attorney General
State of Nevada

*/s/ Heidi P. Stern*
HEIDI P. STERN, NVB #8873
Solicitor General
100 North Carson Street
Carson City, NV 89701
702-486-3594
HStern@ag.nv.gov
*Attorney for Amicus State of Nevada*


**List of Additional Amici States Below**

| | |
|---|---|
| KRIS MAYES<br>Attorney General<br>State of Arizona<br>2005 N. Central Ave<br>Phoenix, AZ 85004 | ROB BONTA<br>Attorney General<br>State of California<br>1515 Clay Street<br>Oakland, CA 94612 |
| PHILIP J. WEISER<br>Attorney General<br>State of Colorado<br>1300 Broadway<br>Denver, CO 80203 | WILLIAM TONG<br>Attorney General<br>State of Connecticut<br>165 Capitol Avenue<br>Hartford, CT 06106 |
| KATHLEEN JENNINGS<br>Attorney General<br>State of Delaware<br>820 N. French Street<br>Wilmington, DE 19801 | BRIAN L. SCHWALB<br>Attorney General<br>District of Columbia<br>400 6th Street, NW, Suite 8100<br>Washington, D.C. 20001 |
| ANNE E. LOPEZ<br>Attorney General<br>State of Hawaiʻi<br>425 Queen Street<br>Honolulu, HI 96813 | KWAME RAOUL<br>Attorney General<br>State of Illinois<br>115 South LaSalle Street<br>Chicago, IL 60603 |
| AARON M. FREY<br>Attorney General<br>State of Maine<br>6 State House Station<br>Augusta, ME 04333 | ANTHONY G. BROWN<br>Attorney General<br>State of Maryland<br>200 Saint Paul Place<br>Baltimore, MD 21202 |
| DANA NESSEL<br>Attorney General<br>State of Michigan<br>P.O. Box 30212<br>Lansing, MI 48909 | KEITH ELLISON<br>Attorney General<br>State of Minnesota<br>102 State Capitol<br>75 Rev. Dr. Martin Luther King Jr. Blvd.<br>St. Paul, MN 55155 |
| MATTHEW J. PLATKIN<br>Attorney General<br>State of New Jersey<br>25 Market Street<br>Trenton, NJ 08625 | RAÚL TORREZ<br>Attorney General<br>State of New Mexico<br>408 Galisteo Street<br>Santa Fe, New Mexico 87501 |

| | |
|---|---|
| LETITIA JAMES<br>Attorney General<br>State of New York<br>28 Liberty Street<br>New York, NY 10005 | DAN RAYFIELD<br>Attorney General<br>State of Oregon<br>1162 Court Street NE<br>Salem, OR 97301 |
| PETER F. NERONHA<br>Attorney General<br>State of Rhode Island<br>150 South Main Street<br>Providence, RI 02903 | CHARITY R. CLARK<br>Attorney General<br>State of Vermont<br>109 State Street<br>Montpelier, VT 05609 |