## INJUNCTION BOND

Case No. 1:25-cv-04641-ALC

Bond # 107847869

KNOW ALL BY THESE PRESENTS:

That we, National Job Corps Association

as Principal(s), and Travelers Casualty and Surety Company of America , a

corporation authorized to transact surety business in the State of Connecticut , as Surety, are held

and firmly bound unto United States District Court Southern District of New York , as Obligee, in the maximum

penal sum of Two Hundred Thousand and 00/100

( $200,000.00 ) DOLLARS, lawful money of the United States of America, for the payment of which, well and truly to be made, we bind ourselves, our heirs, legal representatives, successors and assigns, jointly and severally, firmly by these presents.

Whereas, the above named plaintiff has duly applied to this court for a writ of injunction against the defendant in this action, according to the statute in such cases provided.

NOW THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, That, if the said plaintiff shall pay the said defendant such damages as he sustains by reason of said temporary injunction, if the Court finally decided that the said plaintiff is not entitled thereto (or to either or any of them, if more than one defendant), then this obligation shall be void, otherwise to remain in force and effect.

SIGNED AND SEALED this 3rd day of July , 2025 .

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/9/2025

National Job Corps Association

By _____
                                              Principal

Tammi M. Hellwig
Clerk of Court

By _____  Approved ou 7/9/2025
        Deputy Clerk

Travelers Casualty and Surety Company of America

By _____
Stephanie Gross              Attorney-in-Fact

N/A
_____
                          Producer Name
                    (Required in Arizona Only)



| | Travelers Casualty and Surety Company of America<br>Travelers Casualty and Surety Company<br>St. Paul Fire and Marine Insurance Company |

**POWER OF ATTORNEY**

Travelers Casualty and Surety Company of America, Travelers Casualty and Surety Company, and St. Paul Fire and Marine Insurance Company are corporations duly organized under the laws of the State of Connecticut (herein collectively called the "Companies"), and the Companies do hereby make, constitute and appoint **Stephanie Gross** of **HOUSTON** , **Texas** , their true and lawful Attorney(s)-in-Fact to sign, execute, seal and acknowledge any and all bonds, recognizances, conditional undertakings and other writings obligatory in the nature thereof on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

**IN WITNESS WHEREOF**, the Companies have caused this instrument to be signed, and their corporate seals to be hereto affixed, this **16th** day of **February, 2024.**

  

State of Connecticut

By: _Bryce Grissom_
Bryce Grissom, Senior Vice President

City of Hartford ss.

On this the **16th** day of **February, 2024**, before me personally appeared **Bryce Grissom**, who acknowledged himself to be the Senior Vice President of each of the Companies, and that he, as such, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing on behalf of said Companies by himself as a duly authorized officer.

**IN WITNESS WHEREOF**, I hereunto set my hand and official seal.

My Commission expires the **30th** day of **June, 2026**

_Anna P. Nowik_
Anna P. Nowik, Notary Public

This Power of Attorney is granted under and by the authority of the following resolutions adopted by the Boards of Directors of each of the Companies, which resolutions are now in full force and effect, reading as follows:

**RESOLVED,** that the Chairman, the President, any Vice Chairman, any Executive Vice President, any Senior Vice President, any Vice President, any Second Vice President, the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary may appoint Attorneys-in-Fact and Agents to act for and on behalf of the Company and may give such appointee such authority as his or her certificate of authority may prescribe to sign with the Company's name and seal with the Company's seal bonds, recognizances, contracts of indemnity, and other writings obligatory in the nature of a bond, recognizance, or conditional undertaking, and any of said officers or the Board of Directors at any time may remove any such appointee and revoke the power given him or her; and it is

**FURTHER RESOLVED,** that the Chairman, the President, any Vice Chairman, any Executive Vice President, any Senior Vice President or any Vice President may delegate all or any part of the foregoing authority to one or more officers or employees of this Company, provided that each such delegation is in writing and a copy thereof is filed in the office of the Secretary; and it is

**FURTHER RESOLVED,** that any bond, recognizance, contract of indemnity, or writing obligatory in the nature of a bond, recognizance, or conditional undertaking shall be valid and binding upon the Company when (a) signed by the President, any Vice Chairman, any Executive Vice President, any Senior Vice President or any Vice President, any Second Vice President, the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary and duly attested and sealed with the Company's seal by a Secretary or Assistant Secretary; or (b) duly executed (under seal, if required) by one or more Attorneys-in-Fact and Agents pursuant to the power prescribed in his or her certificate or their certificates of authority or by one or more Company officers pursuant to a written delegation of authority; and it is

**FURTHER RESOLVED,** that the signature of each of the following officers: President, any Executive Vice President, any Senior Vice President, any Vice President, any Assistant Vice President, any Secretary, any Assistant Secretary, and the seal of the Company may be affixed by facsimile to any Power of Attorney or to any certificate relating thereto appointing Resident Vice Presidents, Resident Assistant Secretaries or Attorneys-in-Fact for purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, and any such Power of Attorney or certificate bearing such facsimile signature or facsimile seal shall be valid and binding upon the Company and any such power so executed and certified by such facsimile signature and facsimile seal shall be valid and binding on the Company in the future with respect to any bond or understanding to which it is attached.

**I, Kevin E. Hughes,** the undersigned, Assistant Secretary of each of the Companies, do hereby certify that the above and foregoing is a true and correct copy of the Power of Attorney executed by said Companies, which remains in full force and effect.

Dated this   3rd   day of   July   , 2025

 

_Kevin E. Hughes_
Kevin E. Hughes, Assistant Secretary

**To verify the authenticity of this Power of Attorney, please call us at 1-800-421-3880.**
**Please refer to the above-named Attorney(s)-in-Fact and the details of the bond to which this Power of Attorney is attached.**

## State of New York

## DEPARTMENT OF FINANCIAL SERVICES

### WHEREAS IT APPEARS THAT

### Travelers Casualty and Surety Company of America

**Home Office Address**                Hartford, Connecticut

**Organized under the Laws of**        Connecticut

**has complied with the necessary requirements of or pursuant to law, it is hereby**

**licensed to do within this State the business of**

accident and health, fire, miscellaneous property, water damage, burglary and theft, glass, boiler and machinery, elevator, animal, collision, personal injury liability, property damage liability, workers' compensation and employers' liability, fidelity and surety, credit, motor vehicle and aircraft physical damage, marine and inland marine, marine protection and indemnity , residual value, service contract reimbursement, legal services and gap insurance, as specified in paragraph(s) 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 20, 21, 22, 28, 29 and 26(A)(B)(C)(D) of Section 1113(a) of the New York Insurance Law and also such workers' compensation insurance as may be incident to coverages contemplated under paragraphs 20 and 21 of Section 1113(a), including insurances described in the Longshoremen's and Harbor Workers' Compensation Act (Public Law No. 803, 69 Cong. as amended; 33 USC Section 901 et seq. as amended) , and as authorized by Section 4102(c), insurance of every kind or description outside of the United States and reinsurance of every kind or description to the extent permitted by certified copy of its charter document on file in this Department until July 1, 2025.



**In Witness Whereof, I have hereunto set my hand and affixed the official seal of this Department at the City of Albany, New York, this 1st  day of July, 2024**

Adrienne A. Harris
Superintendent

By    

Rawle Lewis
Special Deputy Superintendent

Original on Watermarked Paper

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

NATIONAL JOB CORPS ASSOCIATION,
ET. AL.,

       *Plaintiffs,*

   -against-

DEPARTMENT OF LABOR, and LORI
CHAVEZ-DEREMER, in her official
capacity as Secretary, Department of Labor,

       *Defendants.*

------------------------------------------------------- x

1:25-cv-04641-ALC

<u>OPINION AND ORDER</u>

**ANDREW L. CARTER, JR., United States District Judge:**

  In 1964, Congress passed the law that established the Federal Job Corps Program. Dkt. No. 49 at 2. Pursuant to that program, thousands of impoverished youths, ages 16–24, have been given the opportunity to gain the education, skills, and training necessary to become productive members of society. Dkt. No. 6 at 3–4. Although older generations frequently bemoan the lack of determination and resilience in American youth, the students in the Job Corps program rebut this notion. The participants are all poor, and many resided in homeless shelters, were placed in foster care, or suffered physical, sexual, or emotional abuse. Despite these obstacles, the participants have dedicated themselves to furthering their education with the hope that their efforts will lead to employment.

  Today, the Job Corps program is authorized under Title I, Subtitle C, of the Workforce Innovation and Opportunity Act ("WIOA" or the "Act"), 29 U.S.C. §§ 3191-3212. Dkt. No. 29 at 2. The Act states that "there ***shall*** be within the Department of Labor a 'Job Corps.'" 29 U.S.C. § 3193 (emphasis added). The Act thus explicitly charges the Department of Labor (the "DOL"), an agency within the executive branch, with overseeing the Job Corps program. *Id.*

Once a Job Corps site is established, there are statutorily required protocols established

by Congress that the DOL must follow before closing any Job Corps center. Specifically, the Act

provides that:

> Prior to the closure of any Job Corps center, the Secretary shall ensure—
> (1) that the proposed decision to close the center is announced in advance to the general
> public through publication in the Federal Register or other appropriate means;
> (2) the establishment of a reasonable comment period, not to exceed 30 days, for
> interested individuals to submit written comments to the Secretary; and
> (3) that the Member of Congress who represents the district in which such center is
> located is notified within a reasonable period of time in advance of any final decision to
> close the center.

29 U.S.C. § 3209(j).

On May 29, 2025, the DOL notified 99 private Job Corps centers across the country that

they would have to cease operations by June 30, 2025. Dkt. No. 29 at 4. The DOL admits that it

did not follow any of the congressionally mandated protocols set forth in 29 U.S.C. § 3209(j)

before closing these centers. Dkt. No. 6 at 16–17. Those terminations gave rise to this action. *See*

*generally*, Dkt. No. 1.

Now before the Court is Plaintiffs' Motion for a Preliminary Injunction (the "Motion") to

prevent the DOL from closing the 99 private Job Corps centers (the "Private Job Corps Centers")

Dkt. No. 5. Specifically, Plaintiffs seek an order "declaring that Defendants' May 29, 2025

elimination of the federal Job Corps program violated the Administrative Procedure Act

("APA") and was *ultra vires*, and directing Defendants to halt enforcement of any actions to

eliminate the Job Corps program, including halting enforcement of contract termination notices

and stop work orders issued on or around May 29." Dkt. No. 6 at 1.

Defendants claim that they have not closed the Private Job Corps Centers, but have

simply paused operations by terminating their contracts with those centers. Defendants argue that

2

because they have not closed the Private Job Corps Centers, there was no need to follow the congressionally mandated protocols for center closures. But the way that the DOL is shuttering operations and the context in which the shuttering is taking place make it clear that the DOL is actually attempting to close the centers.

Defendants concede that, as part of the executive branch, they do not have the authority to unilaterally eliminate a congressionally mandated program like Job Corps. Transcript of Hearing at 30:2–10, *National Job Corps Association v. Department of Labor*, No. 25-cv-04641 (S.D.N.Y. June 17, 2025) (hereinafter, "Hearing Tr."). Defendants concede that whether this is a contract-based action (as they contend) or one based on the statute under the APA (as Plaintiffs contend), some portion of the Plaintiffs in this suit have standing to challenge Defendants' decision to shut down the Private Job Corps Centers. *Id.* at 18:18–21:6; 23:3–12. Defendants concede that absent an injunction, thousands of abused children and/or young people will be kicked off Job Corps campuses, rendering them homeless instantly because they have nowhere else to go. *Id.* at 17:9–18:17. Defendants concede that the DOL has articulated no plans for the money that Congress has already set aside for the Job Corps program. *Id.* at 32:7–33:19. For these reasons and those outlined below, the Plaintiffs' motion for a preliminary injunction is granted. Defendants' request for an injunction limited to the parties in this action is granted in part. Defendants' request that Plaintiffs post bond for the injunction is granted. Defendants' request to stay this proceeding is denied.

## BACKGROUND

### I.  Factual Background

The Job Corps is the nation's largest cost-free residential employment and training

3

program for young people between the ages of 16 to 24. Dkt. No 6 at 3; Dkt. No. 29 at 2. Today, there are 123 Job Corps centers nationwide. Dkt. No. 6 at 4. Of the 123 centers, 99 are operated by entities such as Plaintiffs Adams and Associates, Inc., Alternate Perspectives, Inc., Educations & Training Resources, LLC, and Strategix Management, LLC (collectively the "Operator Plaintiffs") under agreements with the DOL. Dkt. 29 at 6. The National Job Corps Association ("NJCA") is a trade organization founded to "represent operators in the Job Corps program." Dkt. No. 12 at ¶ 2. Furthermore, on Job Corps campuses, entities such as Plaintiff Transportation Communications Union/IAM offer job training at certain Job Corps centers pursuant to agreements with the DOL. The remaining 24 centers are Civilian Conservation Centers run by the USDA in accordance with 29 U.S.C. § 3197(d) (the "USDA Job Corps Centers"). The USDA Job Corps Centers are located in just 15 states[1] across the country, all of which operate in rural communities. Dkt. No. 41 at 5.

The Private Job Corps Centers serve over 20,000 students across America. Dkt. No. 6 at 2. Plaintiff Jocelyn Rivera (a.k.a. "Kota") is one such student. Kota, like thousands of other students on these campuses, has nowhere else to call home. For the students like Kota that are homeless, and the ones that have been abused and abandoned, Job Corps provides basic necessities such as food and shelter along with resources for them to complete their high school education. It also helps them pursue vocational training and connects them with employment opportunities so that they can join the workforce and be productive members of society. These resources are not optional; Congress has mandated their provision in the Act and has committed

---

1 These states are Arkansas, Colorado, Kentucky, Missouri, Montana, North Carolina, Nebraska, Oregon, South Dakota, Tennessee, Utah, Virginia, Washington, Wisconsin, and West Virginia.

funding to the DOL for the operation of the program and by extension, provision of these resources.

## II. Procedural Posture

There were a series of events that gave rise to this lawsuit, but two are of particular relevance to Plaintiffs' Motion. First, in March of this year, the DOL decided to halt the statutorily required background checks for new applicants of the Job Corps program. Dkt. No. 6 at 4. This action effectively prevented new enrollment in the program, because, by statute, new enrollees may not begin the program until after they pass these background checks. Dkt. No. 41 at 4–5. Then, on May 29, 2025, the DOL terminated its contracts with each of the Private Job Corps Centers, and informed them that all private Job Corps campuses nationwide must be shut down by June 30, 2025. Dkt. No. 6 at 4.

On June 3, 2025, Plaintiffs initiated this lawsuit. Dkt. No. 1. That same day, Plaintiffs filed a motion seeking a temporary restraining order ("TRO") and preliminary injunction. Dkt. No. 5. On June 4, 2025, this Court granted Plaintiffs' motion for a TRO and set both a briefing schedule and hearing for Plaintiffs' motion for a preliminary injunction. Dkt. No. 23.

On June 10, 2025, Defendants filed their Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. No. 29). That same day, a coalition of states[2] (the "Amici States") filed a letter seeking leave to file an amicus brief in support of Plaintiffs' Motion. Dkt. No. 28. On June 11, 2025, this Court granted the Amici States leave to file their brief. Dkt. No. 38. On June 17, 2025 the Court held a hearing concerning

---

2 These states are Washington, Nevada, Arizona, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, and Vermont.

Plaintiffs' Motion for a Preliminary injunction. At that hearing, the Court extended the TRO until June 25, 2025, while it took the Parties' arguments under submission. Dkt. No. 54. This Opinion and Order rules on Plaintiffs' Motion.

## LEGAL STANDARD

To obtain injunctive relief, a plaintiff must demonstrate (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction. *See New York v. U.S. Dep't of Homeland Security*, 969 F.3d 42, 58 (2d Cir. 2020). "Where, as here, the government is a party to the suit, the final two factors merge." *Id.* at 58–59.

## DISCUSSION

### I.  Subject Matter Jurisdiction

Without subject matter jurisdiction, a court may not hear a case let alone render a decision on the merits of the action. Therefore, subject matter jurisdiction is a gating issue that a court must resolve before reaching its merits.

Here, Defendants assert that this Court lacks subject matter jurisdiction over Plaintiffs' claims in this case. Dkt. No. 29 at 7. Specifically, Defendants contend that at its "core," this is a contract based action, as Plaintiffs Adams and Associates, Inc., Alternate Perspectives, Inc., Educations & Training Resources, LLC, Strategix Management, LLC, and Transportation Communications Union/IAM (collectively, the "Contractor Plaintiffs") are challenging the DOL's decision to terminate the agreements it had with them. *Id.* Defendants further contend that

the termination of the Contractor Plaintiffs' agreements is  subject to the Contract Disputes Act (the "CDA"), and the Court of Federal Claims has exclusive jurisdiction over contract disputes subject to the CDA, therefore, this Court may not hear this case. Dkt. No. 29 at 8.

Plaintiffs disagree with Defendants' characterization of this action and argue that subject matter jurisdiction exists because they are challenging Defendants' elimination of the Job Corps program and closure of the centers in contravention of the Act, not the DOL's termination of its agreements with the Contractor Plaintiffs. Dkt. No 41 at 1. Plaintiffs argue that their claims are derived from statutory law, not the terminated contracts. *Id.* Plaintiffs also argue that reinstatement of the Contractor Plaintiffs contracts with the DOL is not, in itself, the remedy they seek. Instead, reinstatement of the contracts would merely be a by-product of this Court's review of the DOL's interpretation of the law. Dkt. No. 41 at 3. After closely reviewing the Parties' briefs, the documents filed in support thereof, and hearing oral argument on the matter at the hearing held on June 17, 2025, the Court holds that it has subject matter jurisdiction to hear this action.

A suit against the Government falls within the exclusive jurisdiction of the Court of Federal Claims pursuant to the CDA, where it is "at its essence a contract action." *Metro. Transp. Auth. v. Duffy*, No. 25-cv-01413, 2025 WL 1513369, at *24 (S.D.N.Y. May 28, 2025) (citation and internal quotation marks omitted). "Whether a claim is in essence a contract claim over which the Court of Federal Claims has exclusive jurisdiction depends on a two-pronged analysis: a court must examine both 'the source of the rights upon which the plaintiff bases [his] claims, and . . . the type of relief sought.'" *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015) (quoting *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 375 (2d Cir. 1999),

7

and *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 968 (D.C. Cir. 1982)). Where a plaintiff's claims are "not based on rights derived from a contract with the United States, the first prong of the . . . test is determinative." *Id.* at 408.

    *Pacito v. Trump*, No. 25-cv-255, 2025 US Dist. LEXIS 54263, at *14 (W.D. Wash. 2025) recently applied the *Megapulse* test, which the Second Circuit cited in *Atterbury*, and this Court finds it informative. *Pacito* involved, among other things, a challenge to the Administration's decision to eliminate the United States Refugee Admissions Program (USRAP), which was established by the Refugee Act of 1980.[3] *Pacito v Trump*, 2025 US Dist. LEXIS 54263, at *3–4 (W.D. Wash. 2025). There, various agency actions had effectively dismantled USRAP's infrastructure, and the Government had issued termination notices to community organizations that were responsible for administering the program. *Id.* The Plaintiffs in that case, which were a mixture of non-profit organizations and individual refugees, challenged the Government's actions under the APA and sought a preliminary injunction to enjoin the Government's enforcement of termination notices and elimination of the program. *Id.* at *3–5.

    In *Pacito,* the Government argued that the court lacked subject-matter jurisdiction because the plaintiff's claims were based on contracts governed by the Tucker Act which could only be heard by the Court of Federal Claims. *Id.* at *11. The *Pacito* Court employed the two-part test outlined in *Megapulse* and ultimately held that the Plaintiffs were asserting rights derived from statutory mandates, not contractual promises, and thus the Court had jurisdiction to

---

3 As explained by the Court in that case, USRAP is jointly administered by the Department of State (DOS), the Department of Homeland Security (DHS), and the Department of Health and Human Services (DHHS), with support from the United Nations and nonprofit agencies. The DOS administered certain aspects of USRAP through "cooperative agreements" with resettlement agencies.

hear the suit. *Id.* at \*12–14.

With respect to the first part of the *Megapulse* test, the Court concluded that Plaintiffs'
rights stemmed from the APA, "which expressly entitle[s] them to judicial review of agency
action[s] that adversely affect them." *Id.* at \*14–15 (internal quotation marks and citation
omitted) (alteration in original). The Court further held that where the Government's actions are
"contrary to statutory and constitutional law, the Court shall... hold [them] unlawful and set
[them] aside[.]" *Id.* The Court also noted that Defendants' subject-matter jurisdiction argument
ignored the fact that most of the plaintiffs were not parties to any cooperative agreement. *Id.*

On the second prong of the *Megapulse* test, the *Pacito* Court concluded that the relief
plaintiffs sought was "non-contractual" in nature because the relief they requested was "an
injunction compelling the Government to meet its statutory obligations moving forward," not
contractual remedies, such as "compensation for their losses due to the [Government's] failure to
pay them." The Court held that these differences made the *Pacito* case distinguishable from
cases such as *Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985), which the
Defendants in this suit point to for support. *Id.* at \*15–16. The Court further held that "[t]he mere
fact that such relief might require reinstating the cooperative agreements or paying out sums
owed d[id] not transform [plaintiffs'] claims into contract claims." *Id.* at \*17.

Here, like in *Pacito*, Plaintiffs challenge of Defendants' actions comes after those actions
have essentially closed the Private Job Corps Centers and the Government has issued termination
notices and stop work orders to said centers. In addition, Plaintiffs' challenge is based on the
APA, and Plaintiffs claim that the termination of the Private Job Corps Centers is a final agency
action that violates the Act. Nowhere in their Motion do Plaintiffs point to or rely on any of the

contract provisions in the terminated agreements with the Contractor Plaintiffs in support of their claims or their request for relief. Therefore, Plaintiffs' rights stem from the statute, not the Contractor Plaintiffs' agreements with the Government. This Court thus has jurisdiction to hear this dispute, and because the Plaintiffs' rights do not stem from the Contractor Plaintiffs' agreements with the DOL, the Court finds that the first prong under the two-part test set forth in *Megapulse* and reiterated in *Atterbury*, necessary for this Court's jurisdiction is met.[4]

The second factor of the two-prong test also favors Plaintiffs. The relief Plaintiffs seek here is equitable in nature, not monetary.[5] Plaintiffs seek, for example, an order requiring Defendants to comply with their statutory obligations such as resuming background checks for new enrollees in the program. Plaintiffs also seek to prevent the government from enforcing termination orders and stop work orders. These are the same forms of relief that the district court in *Pacito* found to be non-contractual in nature, and thus subject to review by a district court.

---

4 Under *Atterbury*, the first prong is determinative of subject matter jurisdiction here, where the Court has held that this action is not based on contracts between Plaintiffs and the DOL However, the Court proceeds with an analysis of the second prong for completeness.

5 This case is thus distinguishable from *Department of Education v. California*, 604 U.S. __, 145 S.Ct. 966 (2025), which Defendants point to in support of their argument that this Court lacks subject matter jurisdiction. *See* Dkt. No. 51. That case involved a challenge to the Government's termination of certain educational grants administered by the Department of Education. There, the Supreme Court held that the district court erred in finding that it had subject matter jurisdiction to hear a suit brought under the APA, where the requested relief was an order that required the government to pay out the grants. *Id.* at ***2. *See also, California v United States Dept. of Educ.*, No. 25-10548-MJJ, 2025 US Dist LEXIS 46420, at *5 (D. Mass. 2025) ("[Plaintiffs] seek equitable relief in the form of reinstatement of the TQP and SEED grants.") In holding that the case fell within the Tucker Act, and thus only the Court of Federal Claims had jurisdiction, the Court stated that "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." (internal quotation marks and citation omitted). Here, Plaintiffs' request that the Court order Defendants to resume the statutorily required background checks for new program enrollees is a form of equitable relief that is beyond the ability for the Court of Federal Claims to grant, *See Wigdor v. United States*, No. 15-464C, 2015 U.S. Claims LEXIS 1181, at *3 (Fed. Cl. 2015) ("[The Court of Federal Claims] *cannot grant equitable relief* except under very narrow circumstances.") (emphasis added). Therefore, subject matter jurisdiction lies with the district court.

**II. Standing**

Defendants also challenge the standing of Plaintiffs NJCA and Rivera in this action. Dkt.
No. 29 at 8. Specifically, Defendants claim that because Plaintiffs NJCA and Rivera do not have
contracts with the DOL and this is a contract-based action, Plaintiffs NJCA and Rivera lack
standing. As explained above, this action is not based on the DOL's terminated contracts with
the Private Job Corps Centers. Therefore, Defendants' arguments fail.[6]

On a motion for a preliminary injunction, a plaintiff must demonstrate three elements to
have standing: injury in fact, causation, and redressability. *Cacchillo v. Insmed, Inc.*, 638 F3d
401, 404 (2d Cir. 2011). "When a preliminary injunction is sought, a plaintiff's burden to
demonstrate standing will normally be no less than that required on a motion for summary
judgment." *Id.* (internal quotation marks and citation omitted). "Accordingly, to establish
standing for a preliminary injunction, a plaintiff cannot rest on mere allegations, as would be
appropriate at the pleading stage, but must set forth by affidavit or other evidence specific facts,
which for purposes of the [preliminary injunction] will be taken to be true." *Id.* (cleaned up).
Plaintiffs NJCA[7] and Rivera have successfully alleged Article III standing.

A. Injury in Fact

Plaintiffs NJCA and Rivera have successfully alleged actual imminent injuries in fact.
Specifically, Plaintiff NJCA alleges that Defendants' actions threaten the very existence of its

_____

6 There is a lingering question of whether the Contractor Plaintiffs have standing in this suit to the extent that it is
not a contract action. However, this inquiry is not properly before the Court as Defendants concede that they are not
challenging the Contractor Plaintiffs' standing in this case. Hearing Tr. 23:3–12. In any case, because the Court
holds that Plaintiffs NJCA and Rivera have standing to bring this action, the standing or lack thereof of the
Contractor Plaintiffs does not alter the Court's analysis of the preliminary injunction.
7 Based on the testimony provided by Plaintiffs' Counsel at the Hearing held on June 17, 2025, the Court's analysis
of Plaintiff NJCA's standing in this action assumes that Plaintiff NJCA asserts organizational standing.

organization, because the mission for its organization is advocacy of the Job Corps program. Dkt. No. 45 at ¶¶ 13–14. The DOL's elimination of the Private Job Corps Centers thus threatens Plaintiff NJCA's mission, as there will be virtually no Job Corps centers left to advocate for. *Id.* In addition, the NJCA organization is comprised of entities that receive funding from the DOL to administer the Job Corps program. *Id.* Through this funding, Plaintiff NJCA's members pay dues to the association. *Id.* Absent such funding, there will be no funding for members to pay their dues. *Id.*

Plaintiff Rivera's injury is even more compelling than Plaintiff NJCA's. Plaintiff Rivera is a resident at the Glenmont Job Corps center in New York. Dkt. No. 8 at ¶ 2. As a student of the program, Plaintiff Rivera receives housing, educational opportunities, and meals at no cost. *Id.* at ¶¶ 8–10. In addition, she has been studying to receive a certification in a culinary arts program. *Id.* As set forth in her affidavit, if the Job Corps program is eliminated, Plaintiff Rivera will immediately be plunged into homelessness, and she will lose all of the progress she has made in her culinary program. *Id.* at ¶¶ 13–14. She would be forced to leave a stable residence and placed in a homeless shelter.

B. Causation and Redressability

It is undisputed that Plaintiffs NJCA and Rivera's injuries are caused by Defendants. Defendants have even admitted that their actions will cause a "minor upheaval" to Plaintiff Rivera. Hearing Tr. at 18:9–23. While the Court strongly disagrees with the characterization of Plaintiff Rivera's impending homelessness as a "minor upheaval," this admission only further underscores the reality that Defendants are the direct and proximate cause of Plaintiffs' injuries.

Finally, Defendants do not dispute that Plaintiff NJCA and Rivera's injuries are

12

redressable, nor could they, as the relief Plaintiffs seek are equitable in nature and thus within the

Court's authority to order. *See Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 287

(2008) (quoting *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S.

765, 771 (2000)) ("[T]o demonstrate redressability, the plaintiff must show a substantial

likelihood that the requested relief will remedy *the alleged injury in fact*.") (internal quotation

marks omitted); emphasis original). Here, the relief Plaintiffs NJCA and Rivera request includes

enjoining the DOL from enforcing its termination and stop work orders. Dkt. No. 6 at 1. This

relief would undoubtedly remedy the injuries alleged by Plaintiffs NJCA and Rivera, as it would

allow operations at the Job Corps centers to continue. Therefore, Plaintiffs NJCA and Rivera's

injuries are redressable. Because Plaintiffs NJCA and Rivera have demonstrated an injury in fact,

causation, and redressability, they have standing to pursue their motion for a preliminary

injunction.[8] The Court thus turns to an analysis of the merits of the Plaintiffs' request for a

preliminary injunction.

### III. Preliminary Injunction Factors

As a threshold matter, Plaintiffs allege (Dkt. No. 6 at 7-8) that Defendants' decision to

terminate the Job Corps program is a final agency action ripe for judicial review. Final agency

actions are those that (1) "mark the consummation of the agency's decision-making process" and

---

8 Defendants point to *American Association of University Professors v. U.S. Department of Justice*, No. 25-cv-2429
(MKV), Dkt. No. 148 (S.D.N.Y. June 16, 2025) ("AAUP") as further support that Plaintiff NJCA lacks standing.
*See* Dkt. No. 51. This Court remains unconvinced as that case is clearly distinguishable. There, Plaintiffs (two labor
unions), sought a preliminary injunction ordering the Government to pay out approximately $400 million in federal
grants and contracts to Columbia University, who, critically, was not party to the suit. *American Association of
University Professors v. U.S. Department of Justice*, No. 25-cv-2429 (MKV), Dkt. No. 148, at 1 (S.D.N.Y. June 16,
2025). Plaintiffs' claimed injury was that they had to divert internal resources to assist some portion of their
members to prepare to respond to internal changes Columbia had announced it was making. *Id.* at 24. Here, Plaintiff
NJCA's claimed injury is that its mission and likely even its business will cease to exist; this claimed injury thus
extends far beyond the AAUP Plaintiffs' claim of diverted resources.

(2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks and citation omitted). That test is met here, as the DOL's decision to close the Private Job Corps Centers marks the end of Defendants' decision-making and has determined the rights of Plaintiffs and those similarly situated to Plaintiffs. *See Biden v. Texas*, 597 U.S. 785, 808–09 (2022) (The Department of Homeland Security's decision to end the Migrant Protection Protocols program was final agency action because it forbade staff "to continue the program in any way from that moment on" (internal quotations omitted)). Because that threshold inquiry is met here, the Court turns to an analysis of the preliminary injunction factors.

A. The Likelihood of Success on the Merits

To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainty;" instead, they must show that "the probability of [their] prevailing is better than fifty percent." *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 480 (S.D.N.Y. 2019) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)) (alteration in original). Furthermore, a plaintiff "need not demonstrate a likelihood of success on the merits of every claim—rather, they need only show a likelihood of success on the merits of at least one of [their] claims." *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) (internal quotation marks and citation omitted; alteration in original). Plaintiffs claim that they are likely to succeed on the merits here, because Defendants' actions exceed their statutory authority under the Act. This Court agrees.

With respect to their argument that Defendants have exceeded their statutory authority, Plaintiffs argue, among other things, that Defendants have failed to comply with the statutory

procedures set by Congress to shut down the Job Corps centers. Dkt. No. 6 at 6–10. Defendants oppose Plaintiffs position and contend that they have not closed any Job Corps centers, but have instead merely terminated their agreements with Private Job Corps Centers, which they believe is not the same thing. *Id.* at 16. However, Defendants' actions here have had the same effect as a closure. Therefore, as detailed below, Defendants' labeling of these actions as "terminations" creates a distinction without difference.

Defendants contend that there is a difference between termination of an agreement with a Private Job Corps Center (which the statute permits) or stop work orders that result in the "cessation of program activity at the center," and closure of a center. Dkt. No. 29 at 16–17. Defendants also argue that only a closure requires statutory notice, and because the terminations are not closures, they were not required to follow the procedures for the closures of a center set forth in the statute. *Id.* In support of their position, Defendants point to prior instances of Job Corps center closures where the agreement between the DOL was initially terminated and then closed years later. For example, the DOL points to the termination of an agreement with a Job Corps contractor that operated a center in Homestead, Florida in 2015. Dkt. No. 32 at ¶ 11. The termination of that agreement followed a violent crime near the campus. *Id.* Upon termination of the agreement, students were given the option to transfer to a different center. *Id.* There, the DOL did not propose closure of the center until 2017, and the center was not permanently closed until April 2018. *Id.* at ¶ 11 & Exs. 5–6. The DOL also points to three Job Corps facilities in Florida and Puerto Rico that suffered hurricane-related damage in September 2017 and went into "inactive status" thereafter. *Id.* at ¶¶ 12-13. There, again, students were given the option to transfer to separate centers upon notice that the centers would not be operational. *Id.* The DOL

ultimately decided to repair and consolidate two centers and close the third. *Id.* The two centers reopened in 2018 and 2020 respectively. *Id.*

After careful consideration of these examples, the Court disagrees with Defendants' assertion that a distinction between termination and closure exists here and is unpersuaded by the prior instances of terminations Defendants point to, as those instances are clearly distinguishable. There can be no difference between termination and closure here, where the DOL has gutted the Job Corps centers so as to make them inoperable. For example, the DOL has:

- paused the statutorily required background checks for new candidates, which prevents new students from enrolling in the program;

- terminated the agreements with all private job corps centers nationwide (not just a handful) and instructed them to begin winding down their operations;

- prevented students from transferring to the still-operational USDA campuses; and

- conceded that there are no discussions being had concerning the reformation or reopening of any of the centers.

In addition, there is no evidence of any discussions or explorations to establish alternative centers.

Critically, in the examples the DOL points to, only a handful of individual centers were impacted at the time, prospective students were still undergoing background checks, and students impacted by the stop-work-orders were given the option to transfer to other campuses while the DOL decided whether to repair or close the center. Here, all 99 private Job Corps centers are being impacted and the DOL concedes that there are no discussions concerning the consolidation or reopening of any of the centers. There are not even concrete deadlines by which the DOL

16

intends to hold such discussions or make any decisions with respect to the reopening of any of the centers. This is because the future of the centers has already been decided.

The DOL's decision to close the centers is further reflected in their proposed budget for 2026, which eliminates the funding for private Job Corps centers. The DOL seeks the same result now, but the DOL may not circumvent its responsibilities by rendering the private Job Corps centers inoperable while it awaits a decision from Congress on its budget proposal. It is clear from Defendants' actions that the terminations here amount to a closure, and to close any one Job Corps center, the statute requires (and Defendants admit) that the DOL must take certain procedural steps including providing public notice and comment and notifying Members of Congress. *See* 29 U.S.C. § 3209(j). In failing to do so, Defendants violated the statute.

Because this Court has concluded that Defendants have exceeded their statutory authority by closing the centers without following the statutory requirements, the Court holds that Plaintiffs have demonstrated a likelihood of success on the merits of this action.[9]

B. Irreparable Injury

To succeed on a motion for a preliminary injunction, the moving party must show irreparable harm. Harm is irreparable where the injury to the Plaintiff is "neither remote nor speculative, but actual and imminent, and [one that] cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Plaintiffs contend that absent an injunction, they will suffer irreparable harm.

---

9 In addition, because the party moving for an injunction need only demonstrate a likelihood of success on at least one of their claims, the Court declines to rule on Plaintiffs' arguments that Defendants actions violate the Impoundment Control Act, the separation of powers, are arbitrary and capricious, and are *ultra vires* at this stage in the proceedings, as it does not impact the Court's analysis of the preliminary injunction.

Notably, Defendants do not contend that this factor weighs in their favor. Instead, they contend that Plaintiffs have failed to demonstrate irreparable harm because their claims of harm are speculative and conclusory, and with respect to the Operator Plaintiffs, that they could be remedied by monetary damages. Not so.

The harm to Plaintiffs NJCA and Rivera is set forth above. *See supra* § II.A. Plaintiff NJCA's injury is irreparable because Defendants' actions threaten the very existence of the association. *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (finding irreparable harm where "new obstacles unquestionably make it more difficult for the [plaintiffs] to accomplish their primary mission"); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (explaining that even "[r]ecoverable monetary loss may constitute irreparable harm where the loss threatens the very existence of the movant's business"). Plaintiff Rivera's impending homelessness and inability to complete her culinary program are certainly irreparable. Also, in addition to Plaintiffs NJCA and Rivera's claims, the Operator Plaintiffs contend that absent an injunction, they will need to cease operations and lay off staff. This also qualifies as an irreparable injury. *See Cmty. Legal Servs. In E. Palo Alto v. Dep't of Health & Hum. Servs.*, 2025 WL 973318, at *12 (N.D. Cal. Apr. 1, 2025) (holding that laying off staff constitutes irreparable harm).

C. The Balance of Hardships and the Public Interest

"[T]here can be no doubt that the public interest favors requiring the government to comply with the law." *Velesaca v. Decker*, 458 F. Supp. 3d 224, 241 (S.D.N.Y. 2020). An order requiring compliance with the law as requested by Plaintiffs is thus in the public interest. In addition, Defendants' only claimed hardship amounts to little more than a complaint that the

18

DOL will be required to spend funds that Congress has already set aside for the operation of the Job Corps program. Such a "hardship", to the extent it could even be considered one, pales in comparison to the lost livelihood, educational opportunities, shelter, food, and mission of Plaintiffs. This factor thus tilts decidedly in favor of Plaintiffs. Because all factors favor Plaintiffs, the Motion is granted.

### D.  Scope of the Injunctive Relief

Having concluded that a preliminary injunction is appropriate in this matter, the Court must now decide the scope for said injunction. Defendants claim that injunctions must be narrowly tailored and request that any injunction entered in this matter be limited to Plaintiffs. Dkt. No 29 at 25–26. Plaintiffs oppose Defendants' request and argue that the scope of the injunction should not be limited to the Plaintiffs in this action because the normal remedy for a successful APA challenge is to hold unlawful and set aside the agency action for all who would have been subject to it. Dkt. No. 41 at 10. Both arguments are compelling, but this Court is ultimately bound by the Second Circuit and its decision in *New York v United States Dept. of Homeland Sec.*, 969 F3d 42, (2d Cir. 2020).

In *New York v. United States Dept. of Homeland Sec.*, the Second Circuit affirmed the district court's grant of a preliminary injunction in a case involving claims brought under the APA. One of the issues on appeal was whether the district court "abused its discretion by entering a nationwide injunction, rather than a geographically limited measure." 969 F3d 42, 92-93. The Second Circuit ultimately declined to decide whether the district court abused its discretion in entering nationwide injunctions, and instead modified the injunction entered by the district court to limit it to the states of New York, Connecticut, and Vermont given the different

19

rulings on similar issues raised in other circuits. *Id.* at 88. However, before doing so, the Second

Circuit engaged in a lengthy discussion concerning nationwide injunctions that is applicable

here.

In its discussion of nationwide injunctions, the Second Circuit first acknowledged that

"when an agency action is found unlawful under the APA, the ordinary result is that the rules are

vacated — not that their application to the individual petitioners is proscribed." *Id.* at 87 (internal

quotation marks and citation omitted). "This aligns with the general principle that the scope of

injunctive relief is dictated by the extent of the violation established, not by the geographical

extent of the plaintiff class." *Id.* The Second Circuit, however, expressed "concern that a district

judge issuing a nationwide injunction may in effect override contrary decisions from co-equal

and appellate courts, imposing its view of the law within the geographic jurisdiction of courts

that have reached contrary conclusions." *Id.* Despite this, the Second Circuit held that it had "no

doubt that the law, as it stands today, permits district courts to enter nationwide injunctions," and

"agree[d] that such injunctions may be an appropriate remedy in certain circumstances — for

example, where only a single case challenges the action or where multiple courts have spoken

unanimously on the issue." *Id.* at 89. The Second Circuit noted, however, that the "issuance of

unqualified nationwide injunctions is a less desirable practice where . . . numerous challenges to

the same agency action are being litigated simultaneously in district and circuit courts across the

country," and that "[i]t is not clear to us that, where contrary views could be or have been taken

by courts of parallel or superior authority, entitled to determine the law within their own

geographical jurisdictions, the court that imposes the most sweeping injunction should control

the nationwide legal landscape." *Id.*

20

The Second Circuit thus recommended that "[w]hen confronted with [a] volatile litigation landscape . . . district courts . . . consider crafting preliminary injunctions that anticipate the possibility of conflict with other courts and provide for such a contingency." *Id.* The Second Circuit further explained that "[s]uch approaches could take the form of limiting language providing that the injunction would not supersede contrary rulings of other courts, an invitation to the parties to return and request modification as the situation changes, or the limitation of the injunction to the situation of particular plaintiffs or to similarly situated persons within the geographic jurisdiction of the court." *Id.*

Given that this is an action brought under the APA, the Court concludes that a nationwide injunction is appropriate. However, because this Court is aware of at least one other case challenging the DOL's actions (*see Cabrera v. U.S. Department of Labor*, No. 25-cv-1909 (D.D.C. June 18, 2025)), the Court concludes that some tailoring of the language of its injunction is appropriate under *New York v. United States Dept. of Homeland Sec.* Therefore, this Court holds that the injunction in this matter shall be nationwide, including having full force in the District of Columbia pending the outcome of that litigation, except that the injunction will not supersede any contrary ruling by the Court in the District of Columbia or any other federal circuit or district courts outside of the Second Circuit. Defendants are also hereby granted leave to return to this Court and request modification to the injunction should there be other situational changes, including subsequent challenges in other jurisdictions outside of this Circuit that result in contrary rulings.

### IV. Defendants' Request to Stay this Proceeding

Defendants also request that, if a preliminary injunction is entered, the Court enter a stay

21

of this action pending the disposition of any appeal authorized by the Solicitor General. Dkt. No.

29 at 26. Defendants' request to stay these proceedings comes at the very end of its 25-page

brief. and is a solitary sentence without citation to any authority in support of their request. Also,

Plaintiffs have not responded to Defendants' request for a stay in their briefing or otherwise.

Under these circumstances, the Court finds that Defendants' request is not fully briefed and thus

the Court declines to rule on it at this time. Defendants are hereby granted leave to file a motion

to stay these proceedings, if they wish. To the extent Defendants intend to do so, they should

meet and confer with Plaintiffs to propose a briefing schedule for the motion.

**V. Bond**

The only remaining issue for the Court to decide is whether Plaintiffs should be required

to post bond in this matter pursuant to Federal Rule of Civil Procedure 65(c). Defendants argue

that Plaintiffs should be required to post bond here, because the DOL spends approximately $3

million per day to fund the Private Job Corps Centers, and the Government is projected to run an

$84 million dollar deficit in spending for the program this year. Dkt. No. 29 at 25–26; Hearing

Tr. at 14:12–15. Plaintiffs oppose Defendants' request, and seek, in the alternative, that any bond

amount required by the Court be nominal. Dkt. No. 6 at 16; Dkt. No. 41 at 10. Plaintiffs argue

that bond is not required here, where Plaintiffs challenge the legality of an agency's actions and

where Congress has already appropriated the funds for the program at issue. Dkt. No. 41 at 10.

Federal Rule of Civil Procedures 65(c) permits this Court to "issue a preliminary

injunction or a temporary restraining order only if the movant gives security in an amount that

the court considers proper to pay the costs and damages sustained by any party found to have

been wrongfully enjoined or restrained." Therefore, the rule itself commits the amount of bond

22

required in an action, if any, to the discretion of the Court. *See Pacito v Trump*, 2025 US Dist
LEXIS 54263, at *44 (W.D. Wash. 2025) ("Despite the seemingly mandatory language, Rule
65(c) invests the district court with discretion as to the amount of security required, if any.")

Here, Congress has required by statute that the Job Corps program exist and it has already
set aside the funds Defendants are required to spend for the operation of the program. Therefore,
"the allocation of risk for not complying with federal law in [the Job Corps program here,] where
Congress has firmly spoken, properly rests upon the [Defendants] whose administration of the
program is at issue." *Bass v Richardson*, 338 F Supp 478, 491 (S.D.N.Y. 1971). In addition,
"[r]equiring that plaintiffs suing the government to vindicate constitutional and statutory rights
post bonds of over $[3] million a day would ensure that very few individuals could afford to sue
the federal government." *Patsy Widakuswara v Lake*, 2025 US Dist LEXIS 59535, at *30
(S.D.N.Y. 2025). However, Plaintiffs' Counsel has testified that at least some portion of their
clients have some ability to post some bond in this matter. Therefore, the Court finds that a bond
is the amount of $200,000 is appropriate here.

## CONCLUSION

Once Congress has passed legislation stating that a program like the Job Corps must
exist, and set aside funding for that program, the DOL is not free to do as it pleases; it is required
to enforce the law as intended by Congress. For this reason and those stated above, Plaintiffs'
motion for a preliminary injunction (Dkt. No. 5) is GRANTED. Defendants' request for a
tailored injunction is granted to the extent that this injunction may not supersede any contrary
ruling by the district court *in Cabrera v. U.S. Department of Labor*, No. 25-cv-1909 (D.D.C.
June 18, 2025) or any other federal district or circuit court; Defendants' request is otherwise

23

DENIED. Defendants' request to stay these proceedings is DENIED. Defendants' request that Plaintiffs post bond is GRANTED.

Furthermore, UPON CONSIDERATION OF the Plaintiffs' motion for a preliminary injunction (Dkt. Nos. 6 and 41) and accompanying papers, as well as Defendants' Opposition thereto (Dkt. No. 29) and accompanying papers, as well as the arguments made by the Parties at the hearing held on June 17, 2025, it is hereby:

ORDERED that the motion for a Preliminary Injunction is GRANTED; It is further ORDERED that Defendants, their agents, and all persons acting in concert or participation with Defendants are ENJOINED from enforcing, implementing, maintaining or giving effect to the closure of the private Job Corps centers, including the stop work orders and termination and non-renewal notices delivered to Job Corps center operators starting May 29, 2025; from issuing, enforcing, implementing, maintaining or giving effect to any shutdown tasks, job terminations, or student removals; and from taking any further action to eliminate the Job Corps program without Congressional authorization; It is further

ORDERED this injunction shall be nationwide including having full force in the District of Columbia pending the outcome of *Cabrera v. U.S. Department of Labor*, No. 25-cv-1909 (D.D.C. June 18, 2025), except that this injunction will not supersede any contrary ruling by that Court or any other federal circuit court or district court outside of this Circuit; It is further

ORDERED that Plaintiffs post security pursuant to Federal Rule of Civil Procedure 65(c).

The Clerk of Court is respectfully directed to terminate the pending motion at Dkt. No. 5.


**SO ORDERED.**

Dated:   June 25, 2025
         New York, New York

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**

25