# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL JOB CORPS ASSOCIATION, JOCELYN RIVERA, DARIUS HARRIS, DAYSHA QUINONES, ADAMS AND ASSOCIATES, INC., ALTERNATE PERSPECTIVES, INC., EDUCATION & TRAINING RESOURCES, LLC, STRATEGIX MANAGEMENT, LLC, TRANSPORTATION COMMUNICATIONS UNION/IAM, PARADIGM WORKS, INC., SERRATO CORPORATION, INSIGHTS TRAINING GROUP, LLC, HORIZONS YOUTH SERVICES, L.C., MINACT, INC., ARBOR E&T, LLC, DYNAMIC EDUCATIONAL SYSTEMS, INC., CAREER SYSTEMS DEVELOPMENT CORPORATION, DISTINCTION LLC, MANAGEMENT & TRAINING CORPORATION, COVENANT LEARNING SOLUTIONS, LLC, HERITAGE SERVICES CORPORATION, EXCEED LLC, THE BIZZELL GROUP, HUMAN LEARNING SYSTEMS, LLC, ECKERD YOUTH ALTERNATIVES, INC., LIFESKILLS CONNECTION, CHEROKEE NATION, CHUGACH TRAINING AND EDUCATIONAL SOLUTIONS, LLC, | Case No. 1:25-cv-04641 (ALC) |
| *Plaintiffs*, | **FIRST AMENDED COMPLAINT** |
| v. | |
| DEPARTMENT OF LABOR, LORI CHAVEZ-DEREMER, in her official capacity as Secretary, Department of Labor, | |
| *Defendants*. | |

## INTRODUCTION

This action seeks to halt the U.S. Department of Labor's ("DOL") unlawful efforts to eliminate Job Corps, the nation's largest residential career training program. Congress created Job Corps to connect young Americans, many of whom have faced incredible hardship (including homelessness, abuse, and poverty), with employment by providing employment training and social

skills, as well as housing, meals, health care, and other critical benefits.

Nevertheless, starting in mid-March 2025, DOL, at the direction of the Department of Government Efficiency ("DOGE"), has taken steps to eliminate Job Corps, including deciding to cease all new student enrollment by halting the processing of background checks—a decision only recently reversed following the preliminary injunction in this lawsuit. DOL's actions culminated in its May 29, 2025 decision to cease operations of all contractor-operated Job Corps centers. DOL's efforts to eliminate the program are illegal: They contravene the statutory provisions governing Job Corps and DOL's own regulations concerning the program, and they are fundamentally irrational. DOL's actions have already caused severe harm to the thousands of disadvantaged young adults who applied to the program but who have been unable to enroll due to Defendants' refusal to process background checks. Shuttering Job Corps will have additional disastrous, irreparable consequences, including displacing tens of thousands of vulnerable young people, destroying companies that have long operated Job Corps centers in reliance on the Government's support for the program, and forcing mass layoffs of workers who support the program.

## **JURISDICTION AND VENUE**

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically, the Administrative Procedure Act, 5 U.S.C. § 551, *et seq*., and because Defendants' actions are *ultra vires* and contravene the separation of powers in violation of federal law, and pursuant to 28 U.S.C. § 1361. Under 5 U.S.C. § 706, this Court "shall" "hold unlawful and set aside" agency action that is arbitrary and capricious or contrary to law, and 5 U.S.C. § 705 authorizes this Court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391, because a substantial part of the events that give rise to this cause of action occurred in this judicial district. NJCA members operate campuses across the country, including Plaintiff Career Systems Development Corporation, which operates a Job Corps campus in Bronx County, and Plaintiff Adams and Associates, Inc., which operates a Job Corps campus in Sullivan County. The unlawful shutdown of these campuses will result in harm to Plaintiffs. Further, since 2023, nearly 1,000 students from New York County and Bronx County have enrolled in Job Corps programs.

## PARTIES

3.      Plaintiff National Job Corps Association ("NJCA") is a 501(c)(6) national member trade organization, founded in 1998, comprised of business, labor, volunteer, advocacy, academic and community organizations. NJCA's mission is to represent the "Job Corps campuses and their staff, the youth service providers who manage the campuses and the thousands of students who Job Corps annually serves."[1] NJCA counts nearly every private contractor operating a Job Corps campus as a dues-paying member, and NJCA is virtually exclusively funded by its members. In alignment with its mission, NJCA serves communities, taxpayers, at-risk youth, and employers who take part in and support Job Corps. NJCA works with DOL, policymakers on Capitol Hill, Job Corps youth service providers, and Job Corps students to ensure that Job Corps maintains safe and supportive living and learning environments for functionally unemployed youth. DOL's unlawful shuttering of Job Corps will cut off all funding to NJCA, destroy its mission, and cause it to cease its operations. NJCA's members were harmed by Defendants' efforts to shutter Job Corps centers and have standing to challenge Defendants' actions in their own right. This lawsuit is germane to NJCA's purpose. And, although most of NJCA's members are now plaintiffs to this

---

[1] Nat'l Job Corps Ass'n, *Our Mission*, available at: https://njcaweb.org/mission/.

action, neither the claims asserted nor the relief requested in this lawsuit require the individual participation of NJCA's members. Accordingly, NJCA has both organizational and associational standing to bring this lawsuit.

4.    Plaintiff Jocelyn ("Kota") Rivera is an eighteen-year-old who is currently a student at Glenmont Job Corps Center in Callicoon, New York.

5.    Plaintiff Darius Harris is a twenty-one-year-old who is currently a student at the Gary Job Corps Center located in San Marcos, Texas. Plaintiff Harris resides at the Center and is currently enrolled in the Transportation Communications Union program.

6.    Plaintiff Daysha Quinones is a twenty-three-year-old who is a student at the Glenmont Job Corps Center in Callicoon, New York. Plaintiff Quinones resides at the Center and is currently enrolled in the Medical Administrative Assistant trade program.

7.    Plaintiff Adams and Associates, Inc. ("Adams") is a 100% employee-owned company founded in 1990, with more than 1,900 employee shareholders across the country. Adams has been operating under contracts with DOL since 1992, and its Job Corps operations make up more than 97% of its revenue. As of June 2025, Adams serves 3,668 students across 17 Job Corps centers, including Delaware Valley Job Corps Center in Callicoon, New York. Prior to the receipt of the termination notices, Adams provided vocational, educational, and social training for 159 low-income, residential at-risk youths at the Delaware Valley Center. Approximately 20.6% of Adams's active Job Corps student population would be homeless without the program.

8.    Plaintiff Education & Training Resources, LLC ("ETR") was founded in 1991 and has been serving as a Job Corps operator since 1997. Operating Job Corps centers is the only purpose of ETR. As of June 2025, ETR serves 3,325 students across eleven campuses. Its contracts with DOL run through 2027, with a focus on equipping income disadvantaged, homeless, foster

4

care, and non-college bound students with the academic and career technical skills needed to meet workforce demands.

9.    Plaintiff Alternate Perspectives, Inc. ("API") was founded in 2004. Job Corps makes up over 98% of API's business. API operates the New Orleans Job Corps campus, where it serves 112 students as of June 2025. API focuses on academic training, career technical training, career counseling, job placement, work readiness and life skills, aiming to equip students with the skills needed to meet workforce demands. The contract for this campus is $6 million with a contract term running from 2022 to 2027. Prior to COVID-19, API operated three other Job Corps campuses.

10.    Plaintiff Strategix Management LLC ("Strategix Management") was founded in 2016 and has served as a contractor for DOL since 2021. As of June 2025, Strategix Management serves 1,348 students across four Job Corps Center campuses in four different states. Strategix Management's contracts with DOL focus on areas such as technical career training, workforce readiness (soft skills) training, career counseling, academic instructions for high school equivalency, financial literacy training, medical services, dental services, behavioral health, and student housing, aiming to equip students with the skills, resources, and infrastructure needed to meet workforce demands.

11.    Plaintiff Chugach Training and Educational Solutions, LLC ("CTES") has served as a contractor for DOL since 2012. Operating Job Corps Centers is the only purpose of CTES. CTES can serve 679 students across three Job Corps Center campuses in three different states. Under its contracts with DOL, CTES provides education, vocational training, career technical training, career counseling, job placement assistance, life skills training, and health/wellness services.

10.     Plaintiff Eckerd Youth Alternatives, Inc. ("Eckerd") is a non-profit founded in 1968 and has served as a contractor for DOL since 2021. Eckerd has the contractual ability to serve 630 students across two Job Corps Center campuses. Eckerd's Job Corps contracts focus on equipping income-disadvantaged, homeless, foster care, and non-college bound students with the academic and career technical skills needed to meet workforce demands. In addition, Eckerd's wholly owned subsidiary Odle Management Group, LLC ("Odle") has been involved on Job Corps campuses—either as an operator or subcontractor—since its founding in 2004. Under its Job Corps contracts, Odle provides education, vocational training, career technical training, career counseling, job placement assistance, life skills training, and health/wellness services to at-risk young adults. Odle has the contractual ability to serve 3,648 students across ten Job Corps Center campuses. Eckerd, including its subsidiary, Odle, has the capacity to serve 3,998 unduplicated clients across 11 Job Corps Center campuses.

11.     Plaintiff ParadigmWorks Group, Inc. ("ParadigmWorks") was founded in 2008 and has served as a contractor for DOL since 1991. ParadigmWorks can serve 181 students at the Hartford Job Corps center. The contract focuses on areas such as education, vocational training, career technical training, career counseling, job placement assistance, life skills training, and health/wellness services to at-risk young adults. ParadigmWorks has also provided career transition services for Job Corps students in eight states and created Job Corps's first online presence through its Job Corps Job Bank.

12.     Plaintiff Human Learning Systems, LLC ("HLS") was founded in 2011 and has served as a contractor for DOL since its founding. HLS can serve 961 students across four Job Corps Center campuses in four different states. The contracts, which run until 2028, focus on areas

such as equipping income-disadvantaged, homeless, foster care, and non-college bound students with the academic and career technical skills needed to meet workforce demands.

13.     Plaintiff Distinction, LLC ("Distinction") was founded in 2017 and has served as a contractor for DOL since 2021. Distinction can serve 520 students at the St. Louis Job Corps Center in Missouri. DOL awarded the contract to Distinction in February 2025, with contract transition occurring in March 2025, and contract operation beginning in April 2025.

14.     Plaintiff Career Systems Development Corporation ("CSD") was founded in 1964 and has served as a contractor for DOL since its founding. CSD can serve 1,706 students across eight Job Corps Center campuses, including the South Bronx Job Corps Center. Since 2006, over 46,000 students have completed the Job Corps Program at campuses operated by CSD. Over the past 60 years, CSD has remained committed to the Job Corps program, with CSD leadership at times making personal investments of millions of dollars to support the contract financing needs and capabilities required by DOL.

15.     Plaintiff Dynamic Educational Systems, Inc. ("DESI") was founded in 1990 and has been providing services to Job Corps students since 1995. DESI can serve 415 students across two Job Corps Center campuses. The contracts focus on areas such as equipping income-disadvantaged, homeless, foster care, and non-college bound students with the academic and career technical skills needed to meet workforce demands. DESI provides a range of services including education, vocational training, career technical training, career counseling, job placement assistance, life skills training, and health/wellness services to at-risk young adults through the Job Corps program.

16.     Plaintiff Arbor E&T, LLC ("ARBOR") was founded in 1974 and has served as a contractor for DOL since 1976. ARBOR can serve 3,061 students across six Job Corps Center

campuses in four states and Puerto Rico. The contracts focus on areas such as equipping income-disadvantaged, homeless, foster care, and non-college bound students with the academic and career technical skills needed to meet workforce demands.

17.    Plaintiff EXCEED, LLC ("EXCEED") was founded in 1998 and has operated Job Corps campuses since 2017. EXCEED can serve 300 students at the Pinellas County Job Corps Center in Florida. EXCEED serves homeless, foster care, and income-disadvantaged students, as well as those who were not successful in the mainstream educational system.

18.    Plaintiff MINACT, Inc. ("MINACT") was founded in 1978 and has served as a contractor for DOL since its founding. MINACT can serve 1,773 students at the Treasure Island Job Corps Center in California as well as four other Job Corps Center campuses in four different states where it serves as a subcontractor. The contracts focus on areas such as equipping income-disadvantaged, homeless, foster care, and non-college-bound students with the academic and career technical skills needed to meet workforce demands.

19.    Plaintiff Serrato Corporation ("Serrato") was founded in 2001 and has served as a contractor for DOL since 2006. Serrato can serve 1,711 students across six Job Corps Center campuses in four different states. The contracts focus on areas such as education, vocational training, career technical training, career counseling, job placement assistance, life skills training, and health/wellness services for at-risk young adults.

20.    Plaintiff Management & Training Corporation ("MTC") was founded in 1980 and has served as a contractor for DOL since its inception. MTC is contracted to serve 5,358 students across ten Job Corps Center campuses in nine different states. Approximately 18% of MTC's active Job Corps students are otherwise homeless. Typically, MTC Job Corps contracts with DOL span two base years and three option years and focus on equipping students with the skills needed

to meet workforce demands by providing youth and young adults in poverty with the vocational, educational, social skills and personal support needed to get a job and become productive members of society and taxpayers.

21.    Plaintiff The Bizzell Group ("Bizzell US") was founded in 2010 and has served as a contractor for DOL since 2021. Bizzell US can serve 1,224 students across four Job Corps Center campuses in four different states. Under its contracts with DOL, which run until 2028, Bizzell provides a range of services including education, vocational training, career technical training, career counseling, job placement assistance, life skills training, and health/wellness services to at-risk young adults through the Job Corps program.

22.    Plaintiff Insights Training Group, LLC ("Insights") was founded in 2004 and has served as a contractor for DOL since 2006. Insights can serve 780 students across three Job Corps Center campuses in two different states. The contracts focus on equipping income-disadvantaged, homeless, foster care, and non-college bound students with the academic and career technical skills needed to meet workforce demands.

23.    Plaintiff LifeSkills Connection Inc. ("LifeSkills Connection") was founded in 2018 and has been operating Job Corps centers since its founding. In addition, LifeSkills Connection has previously operated outreach and admissions, counseling, and career transition services departments at other Job Corps centers. LifeSkills Connection can serve 300 students at the Cascades Job Corps Center in Washington. LifeSkills Connection provides a range of services including education, vocational training, career technical training, career counseling, job placement assistance, life skills training, and health/wellness services to at-risk young adults through the Job Corps program.

24.    Plaintiff Heritage Services Corporation ("Heritage") was founded in 2012 and has been providing services to Job Corps since 2016. Heritage can serve more than 200 students at the Bamberg Job Corps center in South Carolina. Heritage's present contract with DOL runs until 2028 and focuses on equipping income-disadvantaged, homeless, foster care, and non-college bound students with the academic and career technical skills needed to meet workforce demands.

25.    Plaintiff Cherokee Nation's Career Services department has been operating the Talking Leaves Job Corps center since 1978. Talking Leaves can provide 197 students with a range of services including education, vocational training, career technical training, career counseling, job placement assistance, life skills training, health/wellness services, and residential services that include housing, meals, and uniforms to at-risk young adults through the Job Corps program.

26.    Plaintiff Horizons Youth Services, L.C. ("Horizons") was founded in 1998 and has served as a contractor for DOL since its founding. Horizons can serve 237 students at the Milwaukee Job Corps Center in Wisconsin. The contract focuses on equipping income-disadvantaged, homeless, foster care, and non-college bound students with the academic and career technical skills needed to meet workforce demands.

27.    Plaintiff Covenant Learning Solutions, LLC was founded in 2017 and has been operating Job Corps centers since 2023. Covenant Learning Solutions can serve 650 students across two Job Corps campuses. Under its contracts, which run until 2029, Covenant Learning Solutions provides a range of services including education, vocational training, career technical training, career counseling, job placement assistance, life skills training, and health/wellness services to at-risk young adults through the Job Corps program. Covenant Learning Solutions invested a total of $1.2M to start up operations at its Job Corps centers.

28.     Plaintiff Transportation Communications Union / IAM ("TCU") is a federal labor union representing approximately 35,000 members in the United States, most employed in the railroad industry. TCU is also a National Training Contractor ("NTC") in the Job Corps program and holds a contract with DOL to deliver advanced training to Job Corps students. As of June 2025, TCU has 460 training slots (serving 245 students) at 8 campuses across the country. DOL's unlawful shuttering of Job Corps will terminate TCU's Job Corps program.

29.     Defendant U.S. Department of Labor ("DOL") is a federal agency responsible for governing occupational safety and health, wage and hour standards, unemployment benefits, reemployment services, and economic statistics. By statute, DOL administers the Job Corps program.

30.     Defendant Lori Chavez-DeRemer is the Secretary of the Department of Labor. She is sued in her official capacity.

## FACTUAL ALLEGATIONS

**A.     Job Corps Is a Longstanding, Successful Career Training Program.**

31.     Job Corps, established by Congress in 1964, is the nation's largest residential employment and workforce development program for youth. It trains and educates young people, 16 to 24 years old, from disadvantaged backgrounds, including individuals who dropped out of school; who are homeless; who are in, or have aged out of, the foster care system; and who require additional career and technical instruction to obtain and retain employment. Job Corps participants face significant barriers to education and employment. For example, in Program Year 2019, 56.9% of enrollees had no high school diploma or equivalency at program entry.

32.     The program's ultimate objective is to assist eligible youth in becoming more employable, self-sufficient, and responsible citizens. Accordingly, each Job Corps center provides disadvantaged youth with technical career programs, intensive personal and career counseling, and

job placement services into a registered apprenticeship, entry-level job, or the military. Job Corps also provides most of its students with residential services, as well as meals, health care, childcare, driver's education, and counseling.

33.     Job Corps currently has the capacity to serve approximately 35,000 students and has trained and educated over three million individuals since 1964. It is, and has been for decades, the largest job training program in the United States. Job Corps is the only program that leverages performance-based competition among private businesses, nonprofits, and federal agencies to consistently enhance student outcomes and the program's cost-effectiveness.

**B.    Congress Has Set Out a Detailed Statutory Framework Governing Job Corps.**

34.     Job Corps was created in the Economic Opportunity Act ("EOA") of 1964, an effort of President Lyndon B. Johnson's War on Poverty, to tackle the problem of youth unemployment. The inspiration for Job Corps came from the Civilian Conservative Corps ("CCC"), a 1933 work relief program that gave millions of young men employment on environmental projects as part of President Franklin D. Roosevelt's New Deal. The EOA directed the executive branch to enter into agreements with various types of entities, including private organizations, for the operation of each Job Corps center. 42 U.S.C. §§ 2701-2981 (1964).

35.     In 2014, Congress enacted the Workplace Innovation and Opportunity Act ("WIOA"). WIOA provides: "There *shall* be within the Department of Labor a 'Job Corps.'" 29 U.S.C. § 3193 (emphasis added). Congress requires DOL to "maintain a *national* Job Corps," 29 U.S.C § 3191(1) (emphasis added), and consistent with this mandate, there are Job Corps centers in all 50 states, Puerto Rico, and the District of Columbia.

36.     WIOA also creates strict procedural requirements concerning the closure of an individual Job Corps center, and WIOA does not authorize the closure of *all* privately operated

Job Corps centers. Congress has required DOL to "establish written criteria" to "determine when a Job Corps center . . . is to be closed and how to carry out such closure." 29 U.S.C. § 3211(c). DOL has promulgated regulations pursuant to this requirement, identifying, among others, certain specified, five-year measures as the principal criteria on which to base closure decisions. In addition, "[p]rior to the closure of any Job Corps center," the Secretary of Labor must first ensure "that the proposed decision to close the center is announced in advance to the general public through publication in the Federal Register or other appropriate means," with a "reasonable comment period, not to exceed 30 days, for interested individuals to submit written comments to the Secretary." 29 U.S.C. § 3209(j).

37.    WIOA also requires Job Corps applicants to have "passed a background check conducted in accordance with procedures established by the Secretary." 29 U.S.C. § 3195 (b)(1)(C). Prior to 2022, DOL authorized Job Corps operators to conduct the requisite background checks. Since 2022, however, DOL has only allowed applicants to enter the Job Corps program following a background check conducted by DOL through a DOL-selected contractor.

38.    Congress has funded the Job Corps program through at least June 30, 2026. Full-Year Continuing Appropriations and Extensions Act, Pub. L. No., 119-4 § 138-677 (2025).

39.    On July 29, 2025, the Senate Appropriations Committee passed a bill funding Job Corps through June 30, 2027. The bill also includes a rider precluding DOL from using any appropriated funds to "[c]lose any Job Corps Centers, except if such closure meets the criterion entitled 'Long-Term Center Performance' or the criterion entitled 'Evaluation of Continuing Center Operations' established by 81 FR 12529, the capacity of the program is retained, and the requirements of section 159(j) of the WIOA are met." *Id*. In addition, in the report accompanying the bill, the Committee directs DOL "to immediately resume processing background checks"; to

provide a briefing on the numbers of background checks requested, background checks completed, and new students enrolled in Job Corps programs; and to issue interim guidance authorizing operators to utilize alternative background check and vetting services.[2]

40.     On September 9, 2025, the House Appropriations Committee passed a bill funding Job Corps through June 30, 2027. The bill includes a rider disallowing DOL from using any funding to "close, consolidate, or reduce operations at any Job Corps center" unless the Secretary of Labor certifies that such action will not increase youth unemployment, homelessness, criminality and incarceration or shift costs for housing, education and workforce development, to the State or municipal governments.[3]

**C.    Since Mid-March 2025, DOL Has Taken Steps to Effectively Eliminate Job Corps.**

41.     Since March 2025, DOL has taken a series of actions to choke off new enrollment in Job Corps, close all privately operated Job Corps campuses, and effectively eliminate (and eliminate access to) the Job Corps program.

42.     For example, on March 19, 2025, DOL informed operators that it had halted the statutorily required applicant background checks, which effectively prevented new enrollment in the program, as students must pass a background check before they are admitted.[4] As a result, as of July 2025, Defendants indicated that there was a backlog of approximately 17,000 Job Corps applicants awaiting background checks. DOL has since resumed background check processing, but has warned that there may be continued delays due to this substantial backlog.[5]

---

[2] U.S. Senate Appropriations Committee, Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Bill, 2026, S. 2587.

[3] Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2026, H.R. 5304, 119th Cong. (2025), https://www.congress.gov/bill/119th-congress/house-bill/5304/text.

[4] *Budget Hearing - U.S. Department of Labor: Hearing before the U.S. House Appropriations Subcommittee on Labor, Health and Human Services, Education and Related Agencies*, 119th Cong. (Testimony of Secretary of Labor Lori Chavez-DeRemer).

[5] U.S. Dep't of Labor, *Information for All Job Corps Center Operations Contractors* (August 6, 2025).

43.     On April 11, 2025, DOL discontinued dedicated student Career Transition Readiness ("CTR") programs and student medical testing requirements.

44.     On April 23, 2025, all pending or outstanding procurements for Job Corps centers except for three were abruptly canceled, despite statutory requirements that Defendants "enter into an agreement . . . for the operation of each Job Corps center," 29 U.S.C. § 3197(a)(1)(A), and "select on a competitive basis an entity to operate a Job Corps center," *id.* § 3197(a)(2)(A).

45.     On April 25, 2025, DOL released a "Job Corps Transparency Report."[6] The "Transparency Report"—a spreadsheet lacking any narrative detail—applies a flawed methodology and reflects selective and inaccurate performance measures, costs, and statistics, intended to significantly understate Job Corps's performance and overstate its costs. To take one glaring example, the report incorrectly allocates overhead costs of 38.65%, including the national costs of certain trade programs, to each Job Corps center, including centers that do not host those programs—thus inflating their reported costs.[7] Perhaps more importantly, the report fails to contextualize costs and outcomes that reflect COVID-19 pandemic restrictions imposed by DOL.[8] The COVID-19 pandemic had a serious impact on Job Corps's typical operations, resulting in unprecedented challenges for the program.[9] As DOL has itself previously noted, any reasonable assessment of Job Corps's performance must account for these impacts, including increased cost per student and cost per graduate that resulted from COVID-19 safety measures.[10] But these

---

[6] Job    Corps    Transparency    Report.    U.S.    Dep't    of    Labor, https://www.dol.gov/sites/dolgov/files/ETA/jobcorps/reports/Job-Corps-Transparency-Report-2025.xlsx (last visited May 30, 2025).

[7] *See id.*

[8] *See id.*

[9] DOL, Job Corps Program Year (PY) 2019 Annual Performance Report, at 4, available at https://jobcorps-gov.s3.us-west-2.amazonaws.com/2023-04/PY%202019%20WIOA%20Job%20Corps%20Annual%20Report%20and%20Appendix.pdf (last visited August 7, 2025).

[10] *Id.* at 4-5. 11.

challenges were temporary, and (prior to Defendants' unlawful actions) the program had made significant strides in returning to pre-COVID-19 operations.

46.    On April 30, 2025, DOL effectively terminated its provision of internet service to Job Corps campuses.[11]

47.    On May 2, 2025, a week after the release of the Transparency Report, Russell T. Vought, the Director of the White House Office of Management and Budget ("OMB"), submitted President Trump's recommendations on discretionary funding levels to the Senate for fiscal year 2026. These recommendations serve as a foundation for the congressional budget and appropriations process, reflecting the administration's policy priorities and funding goals for the upcoming fiscal year. The budgeted recommendations included proposals to "Make America Skilled Again" by eliminating Job Corps.

48.    On May 29, 2025, DOL leadership issued an "instruction" that "performance under the operations contracts at the 99 contractor-operated Job Corps Centers should be terminated immediately with all shutdown activities to be completed no later than June 30, 2025."[12]

49.    On May 29, 2025, DOL held a call with all Job Corps operators to announce its plan to implement stop work orders on all Job Corps contracts nationwide. Over the next two days, all Job Corps operators operating private Job Corps centers (including Plaintiffs) received termination and non-renewal notices for the operation of their respective Job Corps centers.[13]

50.    Among other things, the notices stated: "You shall begin immediately all work necessary to provide a safe, orderly, and prompt shutdown of center operations."[14] Accordingly, the notices reflected a wholesale cessation of all privately contracted Job Corps centers. For one,

---

[11] Job Corps Data Center Notice 24-186 Internet Circuit Helpful Guidance.
[12] Matz Decl., ECF No. 31 ¶ 12.
[13] *See generally* Matz Decl. Ex. 5, ECF No. 31-5.
[14] *Id.* at 1.

they required operators to "immediately take" "all necessary steps to . . . separate[] and transport[]" students to their home of record.[15] And the notices directed that, by June 4, 2025, operators were to provide DOL with a list of students who would not "arrive home" by June 6, 2024.[16] On May 31, 2025, DOL extended this deadline by one week, without explanation, via email to private operators. That communication required operators to provide to DOL by June 12, 2025, the names of students who would not arrive home on June 13, 2025.

51.     The notices also stated that operators must only retain staff that is "necessary to accomplish the shutdown or to comply with the orders of [DOL]."[17] The notices mandated additional "shutdown" tasks for operators to take "immediate action," including terminating all subcontracts and securing non-expendable property and equipment.[18] Nothing in the termination notices suggested the campus shutdowns were temporary or that DOL had a plan to resume operations.

52.     To the extent these requirements leave any doubt as to whether Defendants are attempting to effectuate a nationwide elimination of Job Corps, students "must be told: '*The US Department of Labor has decided to terminate all Job Corps operations contracts at this time.*'"[19] When departing, students are required to take "all personal belongings" and "[t]here should be no expectation of transfer to another center or return to their current center."[20] And students on leave are not permitted to return to gather personal belongings.

---

[15] *Id.* at 1, 6.
[16] *Id.* at 6.
[17] *Id.*
[18] *Id.* at 7.
[19] *Id.*
[20] *Id.*

53.     These termination notices had immediate, devastating effects on Job Corps campuses. Many students left their campuses, in response to the termination notices, and Job Corps operators were forced to lay off staff and terminate sub-contractors.

54.     On June 4, 2025, this Court granted Plaintiffs' motion for a temporary restraining order,[21] and on June 25th, this Court granted Plaintiffs' preliminary injunction motion.[22] Among other things, the Court enjoined Defendants from "enforcing, implementing, maintaining or giving effect to the closure of the private Job Corps centers" or otherwise "taking any further action to eliminate the Job Corps program without Congressional authorization."[23]

55.     The Court's Order explained that Defendants exceeded their statutory authority by closing all 99 privately operated Job Corps centers without following the statutory requirements concerning closure. The Court noted, as well, that DOL had "gutted the Job Corps centers so as to make them inoperable," by, among other things, "paus[ing] the statutorily required background checks for new candidates."[24]

56.     DOL's decision to halt background checks has had a substantial (and lasting), adverse effect on the Job Corps program. On-Board Strength ("OBS") is a percentage calculated by dividing the number of students currently enrolled at a Job Corps center by the center's contracted capacity. In March 2025, the national average OBS across all Job Corp centers was

---

[21] *See* Order, ECF No. 23.
[22] *Nat'l Job Corps Ass'n v. Dep't of Lab.*, No. 1:25-CV-04641-ALC, 2025 WL 1752414, at *11 (S.D.N.Y. June 25, 2025) (the "Order") (issuing a "nationwide [injunction] having full force in the District of Columbia pending the outcome of *Cabrera v. U.S. Department of Labor*, No. 25-cv-1909, 2025 WL 1709603 (D.D.C. June 18, 2025), except that this injunction will not supersede any contrary ruling by that Court or any other federal circuit court or district court outside of this Circuit").
[23] *Id.*
[24] *Id.* at *8.

over 70%. At present, as a result of DOL's efforts to shutter the program, the national average OBS across all centers is less than 40%.[25]

**D.    DOL's Actions are Illegal.**

57.    DOL's attempt to close all privately operated Job Corps centers, and its additional efforts aimed at eliminating the Job Corps program, are illegal.

58.    Congress has instructed that "[t]here shall be within the Department of Labor a 'Job Corps,'" 29 U.S.C. § 3193, and that the Job Corps program must be a "national" program, *id.* § 3191(1).

59.    Congress has required that DOL must ensure that any "proposed decision to close [any] center is announced in advance to the general public through publication in the Federal Register or other appropriate means," with a "reasonable comment period," and also ensure "that the Member of Congress who represents the district in which such center is located is notified within a reasonable period of time in advance of any final decision to close the center." 29 U.S.C. § 3209(j)(1)-(3).

60.    Furthermore, Congress has required that DOL must "establish written criteria to . . . determine when a Job Corps center . . . is to be closed and how to carry out such closure," which "shall" be submitted to four Congressional committees. 29 U.S.C. § 3211(c). In 2014, DOL promulgated a "Final Methodology for Selecting a Job Corps Center for Closure and Center Selected for Closure: Comments Request," which identified three primary criteria for selecting a Job Corps center for closure: five-year Outcome Measurement System ("OMS") performance

---

[25] During a July 23, 2025, call, DOL announced its intention to reduce the scope of the program to reflect the current OBS rate—despite the fact that the current OBS rate is the result of DOL's unlawful suspension of the background checks and its unlawful attempted closure of all privately operated Job Corps centers. At present, that decision appears to have been paused.

level, five-year OBS, and five-year Facility Condition Index ("FCI").[26] 79 Fed. Reg. 51198, 51201-03 (Aug. 27, 2014). The methodology also identifies four additional considerations with respect to a closure decision: continued availability of Job Corps services in each state, the District of Columbia, and Puerto Rico; the sufficiency of data available to evaluate center performance over five years; an indication of significant recent performance improvement; and Job Corps's continuing commitment to diversity. In 2016, DOL added two criteria for selecting a Job Corps center for closure: closure of a Civilian Conservation Center "based on a joint decision of the Secretaries of Labor and Agriculture" and closure "based on an evaluation of the effort required to provide a high-quality education and training program at the center." Updated Methodology for Selecting a Job Corps Center for Closure and Center Selected for Closure, 81 Fed. Reg. 12529, 12530-31 (May 9, 2016).

61.    DOL's attempted closure of all privately operated Job Corps centers did not comply with any of the foregoing requirements.

62.    In addition, Congress has funded the Job Corps program through at least June 30, 2026.[27] By de-obligating the funds meant for each currently operating Job Corps center and National Training Contractor without re-obligating the appropriated funds to other operators or indicating any intent to use those funds to continue operation of the Job Corps program, Defendants impounded those funds without following the procedures set forth by Congress in the

---

[26] OMS is Job Corps's primary tool for performance accountability, composed of fourteen different measures that all Job Corps centers are required to report, including High School Diploma ("HSD") or General Educational Development ("GED") Attainment Rate; Career Technical Training ("CTT"); Completion Rate; Combination HSD or GED, and CTT Attainment Rate; Average Literacy Gain; Average Numeracy Gain; CTT Industry-Recognized Credential Attainment Rate; CTT Completer Job—Training Match/Post-Secondary Credit Placement Rate; Former Enrollee Initial Placement Rate; Graduate Initial Placement Rate; Graduate Average Hourly Wage at Placement; Graduate Full-Time Job Placement Rate; Graduate 6-Month Follow-up Placement Rate; Graduate 6-Month Average Weekly Earnings; and Graduate 12-Month Follow-up Placement Rate. OBS measures student capacity utilization on Job Corps centers. FCI takes into account all construction projects completed over the same five-year period as the other two factors.

[27] Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4 (2025).

Impoundment Control Act of 1974. In particular, DOL did not send a special message to Congress detailing the money to be deferred and the reasons for deferral, 2 U.S.C. § 683(a), and even then, could have halted the expenditure of allocated funds only if both houses of Congress passed a bill to rescind the funding, *id.* § 683(b).

63.     DOL's actions are also arbitrary, capricious, and irrational.

64.     Defendants never offered any rationale for their decision to halt background checks and their purported justifications for their broader effort to eliminate the program are clearly pretextual.

65.     Defendants' termination notices contain no reasoned explanation for the decision to shutter all privately operated Job Corps centers without any intention of reopening them.

66.     Defendants' cursory rationale provided in informal FAQs concerning the shutdown underscores the irrationality of the decision. DOL focuses principally on a purported $140 million deficit in the program for Program Year ("PY") 2024 and a projected $213 million deficit in the program for PY 2025, but offers zero explanation why effectively eliminating the program is a rational response to address the deficit. In an approximately $1.7 billion program, it obviously is not.[28] Moreover, DOL has now conceded that the $213 million projection that it used to justify its decision is wholly inaccurate and approximately 150% larger than the actual $84 million deficit, since they failed to incorporate recurring cost savings implemented to address the purported PY 2024 deficit.

67.     DOL also asserts that the "highest graduation rate among all Job Corps centers was 65.4%" and that "[h]igh schools with graduation rates below 67% are generally considered low performing under federal law."[29] But DOL offers no explanation concerning the connection

---

[28] Feldman Decl. Ex. A, ECF 7-1 ("Job Corps Operations Pause FAQs," U.S. Department of Labor).
[29] *Id.*

between these figures and the closure of all privately operated Job Corps centers (or DOL's broader efforts aimed at eliminating Job Corps wholesale). Job Corps was specifically designed to serve vulnerable individuals, including those who are "[b]asic skills deficient" or "a school dropout." 29 U.S.C. § 3194(a)(2), (3). Comparing the Job Corps population to a traditional high school ignores the very purpose of the program and the makeup of the population the program is mandated to serve.

68.     More broadly, DOL's decision appears to rest entirely on the fundamentally flawed Transparency Report. To start, this "Report" is an Excel spreadsheet devoid of any reasoned analysis. Moreover, the data in the spreadsheet does not match the data in DOL's own systems, systematically inflates the program's costs, and understates enrollees' earnings after separation.

69.     Furthermore, DOL failed to consider the extraordinarily harmful consequences of its decision on Job Corps's students, staff, the companies that operate its campuses, and the companies that rely on Job Corps to provide skilled trainees. As explained in more detail below, the abrupt closure of all privately operated Job Corps campuses program will devastate students, cause widespread job losses, and destroy companies that invested extensive resources into this program in reliance on the government's policies.

**E.    DOL's Efforts to Eliminate the Job Corps Program Have Caused and Will Continue to Cause Severe and Irreversible Injuries to Plaintiffs**

70.     DOL's abrupt, illegal closure of all privately operated Job Corps campuses, and its broader efforts aimed at eliminating the Job Corps program, will have disastrous consequences for students, operators, employees, and communities.

71.     Job Corps students come from disadvantaged backgrounds. Many have faced extreme hardship and instability and came to Job Corps for a chance to change their lives. Indeed,

thousands of students enrolled at Job Corps campuses were either homeless or in foster care prior to Job Corps enrollment.

72.    Shutting down Job Corps campuses will mean forced displacement of all these students. As noted above, many of these students come from homelessness or foster care and have no place to go. (Indeed, DOL's attempted shutdown has already resulted in the forced displacement of many students, some of whom became homeless as a result.)

73.    Furthermore, all Job Corps students will lose the opportunity to receive the critical education and training that they came to Job Corps to obtain. Students at Job Corps campuses have the opportunity to earn their high school diploma, GED, and a range of vocational-based certifications and licenses. Students who have worked for months toward certifications will simply lose the opportunity to complete their programs, which often include both coursework and fieldwork components. Plaintiff Daysha Quinones, for instance, is required to complete six weeks of work-based training after she completes the coursework for her Medical Administrative Assistant program at Glenmont Job Corps. If DOL closes her Job Corps campus, she will be unable to complete her work-based training despite having completed the required coursework.

74.    In addition, Plaintiff TCU's training program, which plays a salutary role in equipping students with the necessary skills and knowledge to succeed in the transportation industry, will end. For example, Plaintiff Darius Harris enrolled in Plaintiff TCU's program at Gary Job Corps center to become a rail car repairman and is relying on TCU's support and partnerships with freight and commuter railroads to help find employment in the industry. Without Job Corps, he would not only be unable to find a job in his chosen profession but also would be unlikely to find any type of steady, skilled labor and would be forced to return to working odd jobs.

75.     Many students also receive wrap-around services including mental health services through the Job Corps program. Eliminating the Job Corps program will jeopardize students' ability to seek these services and will inevitably burden already overloaded community health services.

76.     Defendants' termination notices imposed immediate, irreparable damage on Job Corps campuses. Under DOL's initial instructions on May 29, 2025, operator Plaintiffs were required to inform students that they would be forced to leave the Job Corps campus in a matter of days. This caused panic and confusion among Job Corps students, resulting in some students choosing to resign from the program. For example, 80 students left the Pinellas County Job Corps center operated by Plaintiff EXCEED. In addition, the termination notices damaged important relationships between operator Plaintiffs and their subcontractors, vendors, and staff. For instance, Plaintiff CSD experienced high levels of staff attrition, upwards of 30%, and was forced to pause all hiring and recruitment activities due to the termination notices. Plaintiff HLS received demands to bargain for wages, benefits, work schedules, and severance from center staff who began to lack confidence in HLS's ability to provide them with sustainable employment.

77.     In addition, DOL's halting of background checks substantially delayed countless prospective students from enrolling in the program. (Many more students have been deterred by news of DOL's actions and the ensuing uncertainty surrounding the program.) And Job Corps operators have been forced to run Job Corps centers at significantly reduced enrollment, severely impacting their ability to maintain the scope of their operations and to fully serve the students who are already enrolled. Defendants have restarted the background check process, but significant damage has already been done.

78.     Moreover, Defendants' efforts to shutter the program have created a looming sense of fear and uncertainty for Job Corps students, staff, and operators. Students are now concerned that they will be forced to leave Job Corps before completing their course of study, prompting some students to leave Job Corps to avoid the continued uncertainty. Operators are experiencing unusually high levels of staff attrition with many seasoned employees resigning to seek work outside of Job Corps because of the unpredictable environment created by Defendants' efforts to shutter the program.

79.     Defendants' closure of all privately operated Job Corps campuses, and its broader efforts aimed at eliminating the Job Corps program, will also destroy many Job Corps operators' businesses. Job Corps operators come in different sizes. Some are small businesses that operate one center; others are large companies that may operate a dozen or more centers. All Job Corps operators, however, depend on DOL for revenue, and the contracts have significant monetary value for their businesses. Once an operator has been selected to participate in Job Corps, DOL agrees to provide them with funding for a span of multiple years. Plaintiff operators had years left on their contracts with DOL when the program was abruptly eliminated. Operators had made significant investments in reliance on DOL's funding. For example, Plaintiff MINACT has depended on its existing contracts to fund essential operational expenses. This includes covering payroll for staff, providing medical benefits through self-insured health insurance plans, and managing overall administrative costs necessary for effective organizational functioning. Plaintiff ETR began operating Job Corps centers as a small business over 28 years ago and has since grown to be one of the largest operators of centers, investing tens of millions of dollars over its nearly three decades in the Job Corps program. Plaintiff Adams started as a small business. In 2012, the founding members of Adams sold the company to its employees, and Adams became a 100% employee-

owned company. Many of Adams's executives and senior staff have dedicated their lives and/or adult careers to the Job Corps program. The historical knowledge and experience they have developed will be lost if Adams is forced to close, which is highly probable if Adams-operated Job Corps centers are closed.

80.    Unsurprisingly, DOL's efforts to eliminate Job Corps will have an enormously destructive impact on Plaintiffs' employees. Many Plaintiff operators will be forced to terminate their entire workforce—for Adams, for example, that could mean as many 1,900 employees. Layoffs of Plaintiff MINACT's employees would strip away more than $15 million in annual employee salaries and benefits.

81.    The harm caused by DOL's actions will also be felt more broadly in the communities where Job Corps centers are located. Many of the campuses contracted to the Plaintiff operators are in rural communities. They generate valuable revenue for these localities by employing people who pay taxes and by purchasing goods and services from other businesses in the community. Plaintiff Adams spends 70% of its Job Corps budget on employee wages and benefits, and 20% on goods and services. This ultimately results in benefits of $155 million per year to the local communities where Adams's centers are located.

82.    Moreover, Plaintiff NJCA will be unlikely to survive DOL's efforts to eliminate the Job Corps program. NJCA's entire mission is to represent the "Job Corps campuses and their staff, the youth service providers who manage the campuses and the thousands of students who Job Corps annually serves."[30] Any reduction in students and centers fundamentally impedes NJCA's mission. In addition, it is dependent almost exclusively on member dues to fund its operations.

---

[30] Nat'l Job Corps Ass'n, *Our Mission,* available at: https://njcaweb.org/mission/.

83.    Defendants' actions aimed at eliminating the Job Corps program, including issuing termination notices and stop work orders to all privately operated Job Corps centers and National Training Contractors, constitute final agency actions.

## COUNT ONE

### Violation of the Administrative Procedure Act–5 U.S.C. § 706(2)(A), (C)
### Contrary to Law and In Excess of Statutory Authority
### (*Against All Defendants*)

84.    Plaintiffs restate and reallege paragraphs 1-83 as if fully set forth here.

85.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C). Moreover, while proceedings are ongoing "a reviewing court may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights." *Id.* § 705.

86.    The Job Corps program was created by Congress in 1964. 42 U.S.C. §§ 2701-2981 (1964). Congress reaffirmed its commitment to the Job Corps program in 2014 through WIOA, which provides, among other things, that "[t]here shall be within the Department of Labor a 'Job Corps.'" 29 U.S.C. § 3193. Congress further reiterated its support for Job Corps by appropriating funding for the program through at least June 30, 2026. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 138-677 (2025).

87.    Congress has delegated specific responsibilities to Defendants in implementing and operating the program. *Id.* §§ 3191–3212. Congress enacted specific provisions indicating that DOL must contract with external entities for the operation of the program. *Id.* § 3197. Congress also requires applicants to pass background checks before entering the program. *Id.* § 3195(b)(1)(C). And Congress has also carefully delineated the scope of DOL's authority to shut

down Job Corps campuses through certain procedural requirements. *See id.* § 3209(j). Prior to closing any Job Corps center, DOL is required to announce the proposed closure in the Federal Register, allow a reasonable comment period of up to 30 days, and notify the local Member of Congress in advance. *See id.* Congress has further mandated DOL to establish written criteria to determine when a center is to be closed and how to carry out the closure. *Id.* § 3211(c).

88.     Defendants' actions aimed at eliminating the Job Corps program are contrary to law and exceed Defendants' statutory authority.

89.     Nothing in the governing statute authorizes DOL to close *all* privately run Job Corps centers. And in any event, DOL did not publish an announcement relating to the closure of a center in the Federal Register. DOL likewise did not follow any written criteria in making its shutdown decision. Defendants' actions are not in accordance with, and exceed their statutory authority under, 29 U.S.C. §§ 3209(j) and 3211(c). And they have contravened DOL's own regulations governing the closure of Job Corps centers. An agency is "bound by its own regulations," *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks omitted), and an agency's failure to follow them is "contrary to the law," *Fuller v. Winter*, 538 F. Supp. 2d 179, 191 (D.D.C. 2008) (internal quotation marks omitted).

## COUNT TWO

**Violation of the Administrative Procedure Act–5 U.S.C. § 706(2)(A)**
**Contrary to Law–Impoundment Control Act**
(***Against All Defendants***)

90.     Plaintiffs restate and reallege paragraphs 1-83 as if fully set forth herein.

91.     Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A). Moreover, while proceedings are

ongoing "a reviewing court may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights." *Id.* § 705.

92.    Congress has funded Job Corps through at least June 30, 2026. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 138-677 (2025).

93.    The Impoundment Control Act of 1974 explicitly prohibits the Executive Branch from impounding appropriated funds unless the Executive Branch sends a special message to Congress detailing a request to rescind or reserve funds and Congress then passes a recission bill rescinding the funding. 2 U.S.C. § 681 *et seq.*

94.    By delaying spending or outright refusing to spend funds that Congress has allocated for the Job Corps program, Defendants have acted contrary to the Impoundment Control Act.

## COUNT THREE

### Violation of the Administrative Procedure Act–5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious
### (*Against All Defendants*)

95.    Plaintiffs restate and reallege paragraphs 1-83 as if fully set forth herein.

96.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Moreover, while proceedings are ongoing "a reviewing court may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights." *Id.* § 705.

97.    Agency action is arbitrary and capricious when an agency does not engage in reasoned decision making during the adoption or alteration of its policies. "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational

connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).

98.     Defendants have failed to do so here at every stage of the process. They abruptly halted background checks, barring applicants from enrolling at Job Corps centers. DOL's official announcement and its subsequent attempt to close all privately operated Job Corps campuses and to terminate all National Training Contractors contained no lawful justification for its action. Further, Defendants have failed to consider the severe, adverse consequences of their decision on students, staff, and operators of the Job Corps (as well as the communities Job Corps serves), including the substantial reliance interests of Plaintiffs and other stakeholders.

99.     Defendants' closure of all privately operated Job Corps centers and its other actions aimed at eliminating the Job Corps program were not the product of reasoned decision making and were arbitrary and capricious.

## COUNT FOUR

### Violation of the Administrative Procedure Act–5 U.S.C. § 706(2)(D)
### Failure to Observe Procedure Required by Law
### (*Against All Defendants*)

100.    Plaintiffs restate and reallege paragraphs 1-83 as if fully set forth here.

101.    Under the APA, a court shall "hold unlawful and set aside agency action" taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Moreover, while proceedings are ongoing "a reviewing court may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights." *Id.* § 705.

102.    Congress has carefully delineated the scope of DOL's authority to shut down Job Corps campuses through certain procedural requirements. *See* 29 U.S.C. § 3209(j). Prior to closing

any Job Corps center, DOL is required to announce the proposed closure in the Federal Register, allow a comment period of up to 30 days, and notify the local Member of Congress in advance. *See id.* Congress has further mandated that DOL establish written criteria to determine when a center is to be closed and how to carry out the closure. *Id.* § 3211(c).

103.    Defendants failed to follow the procedures required by 29 U.S.C. §§ 3209(j) and 3211(c) prior to closing all privately operated Job Corps centers.

## COUNT FIVE

### Ultra Vires
### (*Against All Defendants*)

104.    Plaintiffs restate and reallege paragraphs 1-83 as if set forth here.

105.    *First*, there is no statute, constitutional provision, or other source of law that authorizes DOL's actions to effect the wholesale elimination of the Job Corps program. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."). The equitable power of federal courts to enjoin "violations of federal law by federal officials," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015), includes cases in which a federal officer has acted unconstitutionally as well as cases in which the officer has acted "beyond th[e] limitations" set by federal statute, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

106.    *Second*, Defendants failed to follow statutory and regulatory requirements imposed on them for closing *any* Job Corps center and, during the period that DOL halted processing of background checks, for ensuring that *all* Job Corps applicants had passed a background check.

107.    *Third*, Defendants' impoundment of funds appropriated by Congress violates the Impoundment Control Act of 1974.

108.    Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' *ultra vires* actions.

## COUNT SIX

### Separation of Powers
### (*Against All Defendants*)

109.    Plaintiffs restate and reallege paragraphs 1-83 as if set forth here.

110.    Congress is responsible for appropriating federal funds. U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). This exclusive power of the purse is "a bulwark of the Constitution's separation of powers among the three branches of the National Government." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.); *see also Biden v. Nebraska*, 600 U.S. 477, 505 (2023) ("Among Congress's most important authorities is its control of the purse."). The Constitution also allocates to Congress the exclusive power to legislate. U.S. Const. art. I, § 1; *see Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

111.    The President must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Where Congress has legislated on point under express and exclusive constitutional authority, Congress's power is at its apex—and the executive branch's "power is at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

112.    Congress has instructed that there "shall" be a "national" Job Corps program, and has appropriated funds, through June 2026, in accordance with that mandate. It has outlined specific requirements and restrictions regarding Defendants' execution of the Job Corps program. 29 U.S.C. §§ 3197, 3211.

32

113.    Defendants' actions violate the separation of powers between Congress and the executive branch, improperly arrogating legislative and appropriations powers to DOL that the Constitution reserves to Congress.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

a.  Declare unlawful and enjoin, both preliminarily and permanently, Defendants' actions aimed at eliminating the Job Corps program, including but not limited to prohibiting Defendants from halting background checks and the issuance of termination and non-renewal notices and stop work orders by DOL starting on May 29, 2025;

b.  Set aside Defendants' actions aimed at eliminating the Job Corps program, including but not limited to halting background checks and the issuance of termination and non-renewal notices and stop work orders by DOL starting on May 29, 2025, pursuant to 5 U.S.C. § 706, and issue a stay to preserve Plaintiffs' status and rights pending the conclusion of this litigation pursuant to 5 U.S.C. § 705.

c.  Order Defendants to take steps necessary to resume the functioning of the Job Corps program operations.

d.  Award Plaintiffs costs, reasonable attorneys' fees, and other disbursements as appropriate; and

e.  Grant such other relief as the Court deems necessary, just, and proper.

Dated: September 18, 2025
New York, NY


*[Signature blocks on following page.]*

/s/ Benjamin D. White
Benjamin D. White, Esq.
Michael L. Bloch, Esq.
Cristina Alvarez
Arielle Gerber, Esq.**
BLOCH & WHITE LLP
152 West 57th Street, 8th Floor
New York, NY 10019
Tel.: (212) 901-3825
bwhite@blochwhite.com
mbloch@blochwhite.com
agerber@blochwhite.com
calvarez@blochwhite.com

*Counsel for Plaintiffs Jocelyn Rivera, Darius Harris and Daysha Quinones*

/s/ Tiffinay Pagni, Esq.
Tiffinay Pagni, Esq. (admitted *pro hac vice*)
Vice-President & General Counsel
ADAMS AND ASSOCIATES, INC.
6151 Lakeside Drive, Ste. 1000
Reno, NV 89511
Tel.: (775) 348-0900
tpagni@adamsaai.com

*Counsel for Plaintiffs Adams and Associates, Inc. and Education & Training Resources, LLC*

/s/ Carla M. Siegel
Carla M. Siegel (admitted *pro hac vice*)
General Counsel
INTERNATIONAL ASSOCIATION OF MACHINISTS
AND AEROSPACE WORKERS, AFL-CIO
9000 Machinists Place
Upper Marlboro, MD 20772
Tel.: (301) 967-4510
csiegel@iamaw.org

*Counsel for Plaintiff Transportation Communications Union/IAM*

/s/ Maximillian L. Feldman
Maximillian L. Feldman
Disha Verma
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY10118
Tel.: (212) 763-0883
Fax: (212) 564-0883
mfeldman@heckerfink.com
dverma@heckerfink.com

Amy Jeffress (admitted *pro hac vice*)
Minahil Khan (admitted *pro hac vice*)
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Tel.: (212) 763-0883
Fax: (212) 564-0883
ajeffress@heckerfink.com
mkhan@heckerfink.com

*Counsel for Plaintiff National Job Corps Association*

/s/ Daniel J. Strouse
Daniel J. Strouse (*pro hac vice* pending)
CORDATIS LLP
1011 Arlington Blvd. Suite 375
Arlington, VA 22209
Tel.: (202) 342-2550
dstrouse@cordatislaw.com

*Counsel for Plaintiff Alternate Perspectives, Inc. and LifeSkills Connection Inc.*

/s/ Ambika J. Biggs
Ambika J. Biggs (admitted *pro hac vice*)
HIRSCHLER FLEISCHER, A PROFESSIONAL
CORPORATION
1676 International Drive, Suite 1350
Tysons, VA 22102
Tel.: (703) 584-8361
Fax: (703) 584-8901 abiggs@hirschlerlaw.com

*Counsel for Plaintiff Strategix Management, LLC*

/s/ Jenny Beene-Skuban*
Jenny Beene-Skuban*
Associate General Counsel, US
ADVANCED PERSONNEL MANAGEMENT
9510 Ormsby Station Road, Suite 104
Louisville, KY 40223
Tel.: (502) 630-9942
Jenny.beene-skuban@apmnet.us

*Counsel for Plaintiffs Arbor E&T LLC and Dynamic Educational Systems, Inc.*

/s/ Paiten Taylor-Qualls*
Paiten Taylor-Qualls*
CHEROKEE NATION
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 1533
Tahlequah, OK 74464
Tel.: (918) 458-6998
paiten-qualls@cherokee.org

*Counsel for Plaintiff Talking Leaves Job Corps Center*

/s/ Michael S. Gottlieb*
Michael S. Gottlieb, Esquire*
MOMENTUM LAW GROUP
9211 Corporate Blvd., Suite 350
Rockville, MD 20850
Tel.: 301-658-2205x101
michael@momentumlawyers.com

*Counsel for Plaintiff The Bizzell Group, LLC*

/s/ Tyler Bugden*
Timothy M. Medcoff*
Tyler B. Bugden*
FARHANG & MEDCOFF, PLLC
100 S. Church Avenue, Suite 100
Tucson, AZ 85701
Tel.: (520) 214-2000
Fax: (520) 214-2001
tmedcoff@farhangmedcoff.com
tbugden@farhangmedcoff.com

*Counsel for Serrato Corporation*

/s/ Bruce R. Ewing
Bruce R. Ewing
DORSEY & WHITNEY LLP
51 W. 52nd Street
New York, NY 10019
Tel.: (212) 415-9206
Fax: (212) 953-7201
ewing.bruce@dorsey.com

Alex P. Hontos*
Eric J. Weisenburger*
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55401
Tel.: (612) 340-2600
Fax: (612) 340-2868
hontos.alex@dorsey.com
weisenburger.eric@dorsey.com

*Counsel for Plaintiff Management & Training Corporation*

/s/ Ryan P. Waid
Ryan P. Waid, General Counsel*
ENDLESS HORIZONS, INC.
3586 Horizons Way
Rockingham, VA 22802
Tel.: (540)246-2030
waidr@horizonsva.com

*Counsel for Plaintiff Horizons Youth Services, L.C.*

/s/ Amanda G. Alexander*
Amanda G. Alexander*
ALEXANDER LAW, P.A.
Post Office Box 1664
Jackson, MS 39215
Tel.: (601) 968-8571
aga@alexanderlawpa.com

*Counsel for Plaintiffs Distinction, LLC and MINACT, Inc.*

/s/ Matthew E. Feinberg*
Matthew E. Feinberg, Esq.*
mfeinberg@pilieromazza.com
PILIEROMAZZA PLLC
1001 G Street NW, Suite 1100
Washington, DC 20001
Tel.: (202) 857-1000
Fax: (202) 857-0200

*Counsel for Plaintiff EXCEED, LLC*

/s/ Amy Laderberg O'Sullivan*
Amy Laderberg O'Sullivan*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
Tel.: (202) 624-2563
aosullivan@crowell.com

/s/ Allyson McKinstry
Allyson McKinstry
CROWELL & MORING LLP
Two Manhattan West, 375 Ninth Avenue
New York, NY 10001
Tel.: (212) 803-4061
amckinstry@crowell.com

*Counsel for Plaintiffs Chugach Training and
Educational Solutions, LLC; Human Learning
Systems, LLC; and ParadigmWorks Group, Inc.*

/s/ Thomas K. David, Esq.*
Thomas K. David, Esq.*
RESTON LAW GROUP, LLP
2100 Reston Parkway
Suite 450
Reston, VA 20191
Tel.: (703) 483-2810
tdavid@restonlaw.com

*Counsel for Plaintiffs Covenant Learning
Solutions, LLC; Insights Training Group, LLC;
and Heritage Services Corporation*

/s/ Martin Peters*
Martin Peters, General Counsel*
ECKERD YOUTH ALTERNATIVES, INC.
100 Starcrest Drive
Clearwater, FL 33765
Tel.: (727) 461-2990
mpeters@eckerd.org

*Counsel for Plaintiff Eckerd Youth Alternatives,
Inc.*

/s/ Rebecca Fiebig
Rebecca Fiebig
Craig Smith*
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
Tel.: (202) 719-7000
rfiebig@wiley.law
csmith@wiley.law

*Counsel for Plaintiff Career Systems
Development Corporation*

*\* Pro hac vice application forthcoming*
*\*\* Admission forthcoming*