**Cc:** ███ - OPA ███████ Frazier, Susan (Lori) - ETA ███████
**Subject:** RE: Timely: Adding Report to Website

Also, embargo is lifted, so please make this link live (and shareable) as soon as possible.

Thank you!

**From:** Parella, Courtney E - OPA
**Sent:** Friday, April 25, 2025 12:40 PM
**To:** ███████ - OASAM OCIO ███████; ███████ - OASAM OCIO

**Cc:** ███ OPA ███████ Frazier, Susan (Lori) - ETA ███████
**Subject:** RE: Timely: Adding Report to Website

That works great as .xls. Thank you, ███. Can we please actually move it above the other two bullets?

Here's description text for it:
The *Job Corps Transparency Report* delivers a granular, data-centric examination of program expenditures and efficiency metrics, aggregating unmanipulated financial data and performance evaluations produced by the Department's National Job Corps Office. This report specifically analyzes the most recently available metrics from program year 2023, including cost per enrollee and cost per graduate.

Really appreciate the timeliness here!

**From:** ███████ - OASAM OCIO ███████
**Sent:** Friday, April 25, 2025 12:36 PM
**To:** Parella, Courtney E - OPA ███████ - OASAM OCIO

**Cc:** ███ OPA ███████ Frazier, Susan (Lori) - ETA ███████
**Subject:** RE: Timely: Adding Report to Website

All, I am not sure who has drupal rights to review but please see the draft link below. I have provided a screen shot below. It will download as an xls file in your downloads folder and we can also note that if you would like with (.xls). Let me know if it needs to be a zip file download and we can change. I can walk everyone through in teams if need be.

https://edit.dol.gov/node/138088/latest



OASAM/Office of the Chief Information Officer
U.S. Department of Labor

**From:** Parella, Courtney E - OPA
**Sent:** Friday, April 25, 2025 12:13 PM
**To:** ████████ - OASAM OCIO < ████████ > ████████ - OASAM OCIO
████████
**Cc:** ████████ ████████ Frazier, Susan (Lori) - ETA ████████
**Subject:** Timely: Adding Report to Website

Hi, ████████ – Got another timely request here for you that I'm hoping to have done in the next half hour, if possible.

We need an excel report added to the DOL website please. The attached Excel sheet from ETA (Lori Cc'd here has already cleared) should be added near the bottom of the Job Corps Publications, Plans and Reports page as a new bullet titled: ***Job Corps Transparency Report***. The report is attached. Is the best way to accomplish this by uploading the report as a downloadable zip file link?

Link can go above or below these two bullets, pictured here in red:

> CTT-10

> MPO-35

> POMS-10

> POMS-10R

- Job Corps Materials Masterplace ☐

  The Job Corps Materials Marketplace is a central location for all things Job Corps marketing. Here you can find general recruitment materials, industry-specific recruitment materials, regional information, Safety Hotline materials, and other useful information and recruitment toolkits.

- Health and Wellness Support Services

  This site provides the Job Corps community with information and resources to support the health and well-being of Job Corps students and includes topics involving disabilities, food and nutrition, health and wellness, and Healthy Eating and LifeStyles (HEALS).

Scroll to Top ⊕

Thanks so much,

**Courtney Parella**
Acting Assistant Secretary
Office of Public Affairs
U.S. Department of Labor
Mobile:



Message

**From:**        Walter, Courtney E - OSEC

**Sent:**        4/29/2025 10:59:44 PM
**To:**          Laco, Marek S - ETA
**Subject:**     FW: ATTACHMENT: PCC - Job Corps
**Attachments:** DPC PCC_ETA Job Corps Program Overview and Operational Framework 4.28.25.docx

**From:** Frazier, Susan (Lori) - ETA
**Sent:** Tuesday, April 29, 2025 5:17 PM
**To:** Han, Jihun A - OSEC                        Walter, Courtney E - OSEC
**Subject:** RE: ATTACHMENT: PCC - Job Corps

Good afternoon, Jihun and Courtney-

Here ya go! Let me know if you need additional information.

Thanks!

**Lori Frazier Bearden** |
United States Department of Labor
Acting Assistant Secretary
Employment and Training Administration
200 Constitution Avenue Suite S-2307
Washington, D.C. 20210
C: 



**From:** Han, Jihun A - OSEC
**Sent:** Monday, April 28, 2025 3:42 PM
**To:** Frazier, Susan (Lori) - ETA                        Walter, Courtney E - OSEC <
**Subject:** RE: PCC - Job Corps

Thank you!

**Jihun Han**
Chief of Staff
Office of the Secretary
U.S. Department of Labor
C:



**From:** Frazier, Susan (Lori) - ETA ███████████
**Sent:** Monday, April 28, 2025 3:05 PM
**To:** Walter, Courtney E - OSEC ███████████
**Cc:** Han, Jihun A - OSEC ███████
**Subject:** RE: PCC - Job Corps

Definitely! I'll have something to you by Wednesday morning.

Thank you,
Lori

**Lori Frazier Bearden** |
United States Department of Labor
Acting Assistant Secretary
Employment and Training Administration
200 Constitution Avenue Suite S-2307
Washington, D.C. 20210
C: ███████████



**From:** Walter, Courtney E - OSEC ███████████
**Sent:** Monday, April 28, 2025 2:49 PM
**To:** Frazier, Susan (Lori) - ETA ███████████
**Cc:** Han, Jihun A - OSEC ███████████
**Subject:** PCC - Job Corps

Hi Lori —

The Domestic Policy Council would like to have a Policy Coordinating Committee meeting on Job Corps this upcoming Thursday. In advance, DOL was asked to put together a brief paper with an overview of the program, the lay of the land, and where things are currently situated. It might be helpful to incorporate some of the work that Miles is doing.

Wells asked for it on Wednesday, so if you can pull something together by Wednesday morning, that would be great.

Let me know if you have any questions and thank you!

Courtney

**Courtney E. Walter**
Senior Counselor, Office of the Secretary
U.S. Department of Labor
o: ███████████

m: ███████████
████████████████████

**U.S. Department of Labor**    Assistant Secretary for
Employment and Training
Washington, D.C. 20210



**INFORMATION**

**April 29, 2025**

**MEMORANDUM FOR THE [SECRETARY or DEPUTY SECRETARY]**

**FROM:**    **LORI FRAZIER BEARDEN**
**Acting Assistant Secretary**
**Employment and Training Administration**

**SUBJECT:**    **Overview of the Job Corps Program and Operational Framework**

---

**EXECUTIVE SUMMARY**

This memorandum provides an informational overview of the Job Corps program, a
federal program administered by the U.S. Department of Labor (DOL). It outlines the
program's purpose, eligibility criteria, center types, performance management,
demonstration authority, contracting mechanisms, real property management and
disposal, the recent transparency data report, and cost savings measures implemented.
**This memorandum is informational only; no action is requested.**

**BACKGROUND AND ANALYSIS**

## I. Purpose and Administration

Job Corps, established under the Economic Opportunity Act of 1964 (Public Law 88-
452), is the nation's largest federally funded residential education and vocational training
program. Today, Job Corps operates 119 centers across all 50 states, the District of
Columbia, and Puerto Rico. Since its inception, the program has served over three million
youth and young adults.  Currently authorized under the Workforce Innovation and
Opportunity Act (WIOA), Title I, Subtitle C (codified at 29 U.S.C. § 3191 et seq.), Job
Corps is funded through annual Congressional appropriations, with an average budget of
approximately $1.6 billion for center operations since 2017. The program provides
academic education, career technical training, career transition services, and residential
support to thousands of students each year.

The Office of Job Corps (OJC) within ETA oversees the program and is comprised of
staff at the National Office with six regional offices.  In total, OJC employs 80 federal
full-time equivalent staff. The program is funded through three distinct accounts: $1.6
billion for Operations, which supports center operations contracts and U.S. Department of
Agriculture (USDA) Forest Service Civilian Conservation Centers for residential
services, academics, counseling, and career technical training; $33 million for

Administration, which funds federal staffing, travel, and training at the National and Regional Offices; and $123 million for Construction, Rehabilitation, and Acquisition (CRA), which supports facility acquisition, construction, and rehabilitation nationwide.

## II. Eligibility Criteria

Admissions Counselors are hired under center operations contracts to assess applicant eligibility for the program.  As outlined in 29 U.S.C. § 3194 (or pursuant to other sections in WIOA, as noted), applicants must:

- Be between 16 and 24 years old at enrollment (with allowances for up to 20% of enrollees aged 22–24 and waivers for individuals with disabilities).
- Meet low-income criteria.
- Face one or more barriers to education and employment, such as being basic skills deficient, a school dropout, homeless, a foster child, or requiring additional education or training to obtain and retain employment.
- Demonstrate a need for additional education, training, or support to secure and maintain employment
- Not fall within one of WIOA's special limitations on selection in 29 U.S.C. § 3195(b).
- Consistent with the nondiscrimination prohibition against certain noncitizens located at 29 U.S.C. § 3248(a)(5), be either a U.S. citizen; a lawfully admitted permanent resident alien, refugee, asylee, parolee, or other alien who has been authorized by the Department of Homeland Security to work in the United States; or a resident of a U.S. territory.

Job Corps' eligibility criteria are outlined in more detail in the Policy and Requirements Handbook Exhibit 1-1.

## III. Center Types and Operations

Job Corps centers operate under three models. Contracted centers are managed by private organizations or state and local agencies through competitive procurement. Civilian Conservation Centers (CCCs) are operated by the USDA Forest Service, focusing on conservation training and disaster response in rural areas. Additionally, some centers are operated by Indian tribes through agreements to serve Indians.[1]

A majority of centers are operated by contractors via competitively awarded contracts, with approximately 13,000 contractor staff.  In addition, 24 Civilian Conservation Centers (CCC) are operated by the USDA Forest Service via an interagency agreement and are staffed with 1,100 federal employees.

- *Civilian Conservation Centers (CCCs***)**

---

[1] Currently Job Corps' Talking Leaves Job Corps Center is operated by Cherokee Nation.

000167

**Overview**: CCCs are a subset of Job Corps centers focused on natural resource conservation and public land management. They offer unique training opportunities in forestry, firefighting, and conservation, contributing to both workforce development and environmental stewardship.

**Governance and Funding**: CCCs operate under an **interagency agreement** between the Department of Labor and the USDA. While the Forest Service manages daily operations, DOL provides funding and oversight to ensure alignment with Job Corps standards and objectives.

**Legislative Considerations**: In 2019, proposals to close several CCCs were met with bipartisan opposition that, in part, included assertions as to their importance to rural economies and conservation efforts. Subsequent enacted appropriations laws included provisions prohibiting appropriated funds from being used to (1) alter or terminate the Interagency Agreement between DOL and USDA and (2) close any of the Civilian Conservation Centers, except if such closure is necessary to prevent the endangerment of the health and safety of the students.

## V. Performance Management

**Performance Indicators**: Under 29 U.S.C. § 3209, Job Corps centers are evaluated based on the primary indicators of performance applicable to all programs authorized by WIOA, including: 1) placement in employment, education, or training (2nd and 4th quarter after exit), 2) credential attainment, 3) measurable skill gains, 4) median earnings, and 5) retention in employment or education.

**Job Corps Center Closure Criteria**

Per 29 U.S.C. § 3209(j), prior to the closure of any Job Corps center, "the Secretary shall ensure—
(1) that the proposed decision to close the center is announced in advance to the general public through publication in the Federal Register or other appropriate means;
(2) the establishment of a reasonable comment period, not to exceed 30 days, for interested individuals to submit written comments to the Secretary; and
(3) that the Member of Congress who represents the district in which such center is located is notified within a reasonable period of time in advance of any final decision to close the center."

Historically DOL has announced the closure criteria it is using to close any given center through publishing those criteria in the FRN and, occasionally, requesting comments on the criteria. This means over time the closure criteria have not been static – DOL has added criteria to address the policy direction and need for a rationale to close a center at a given time. Closure criteria have varied over time, including considerations of chronic

3

low performance, an evaluation of effort required to maintain high-quality education, and other considerations to determine whether to close a center.[2]

If a decision is made to close a center, then the decision and basis for the decision must be documented at least internally. The process to complete a closure can be a costly, time-consuming process as operations at the center are wound down, personal property is dealt with, and any real property issues are addressed.

## VI. Demonstration Authority

**Legal Framework**: Under 29 U.S.C. § 3206(a), the Secretary of Labor is authorized to carry out experimental, research, or demonstration projects relating to carrying out the Job Corps program. The statute also provides the Secretary the authority to waive any provisions of the WIOA section on Job Corps that the Secretary finds would prevent her from carrying out the projects. If the Secretary determines that such waiver is necessary, the statute requires 90-days advance written notification to the Committee on Education and the Workforce of the House of Representatives and the Committee on Health, Education, Labor, and Pensions of the Senate.

**Purpose and Implementation**: The demonstration authority allows the Department of Labor to pilot innovative approaches to education and vocational training relating to carrying out the Job Corps program. These projects aim to enhance program effectiveness, address emerging workforce needs, and improve service delivery to participants.[3]

## VII. Contracting Mechanisms

**Firm Fixed-Price Contracts (FFP)**: OJC began transitioning to the FFP model in 2019 and has a few remaining contracts to transition from cost-reimbursable to FFP. Under FFP agreements, contractors are paid a set amount for delivering specified services, regardless of actual costs incurred. FFP contracts offer some advantages for government operations by providing cost predictability, which helps agencies better manage budgets and fiscal planning. These contracts also incentivize contractors to operate efficiently, since maintaining profitability depends on managing resources within the agreed price.[4]

---

[2] See example of closure criteria for Ouachita Civilian Conservation Center in Arkansas, 81 FR 43250 (July 1, 2016), https://www.federalregister.gov/documents/2016/07/01/2016-15603/final-notice-of-job-corps-center-for-closure

[3] An illustrative example of this authority in action is the Job Corps Scholars Program, a demonstration project that provided eligible youth aged 16–24 the opportunity to enroll in career technical training programs at twenty-six accredited public colleges.

[4] The advantages of a firm fixed price contract type is recognized by Federal Acquisition Regulation FAR 16.202-1, which states: "[a] firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties."

000169

However, successful execution of FFP contracts requires careful attention to a few important considerations. Defining the scope of work with precision is critical to prevent scope creep[5] and maintain contractor accountability. Additionally, because contractors bear the financial risk of cost overruns, there is a possibility that service quality could be affected if risks are not properly managed.

Having selected the FFP contract type, DOL faced a new challenge during the COVID pandemic. Under an FFP contract, agencies have little or no visibility on the contractor's costs. As enrollment numbers dropped due to COVID, any cost savings did not automatically translate into reduced FFP payments by DOL. DOL did negotiate a "take back" mechanism for low OBS, but these were limited given DOL's understanding that a large portion of operational costs (e.g., salaries and facilities) are impervious to changes in enrollment. Plus, a reduction in the FFP amounts would be subject to negotiation and could be grounds for dispute and litigation absent contractor agreement.

## VIII. Real Property Management and Disposal

While most DOL office spaces are leased through GSA, Job Corps centers are exceptions, as they are directly owned or leased by the DOL.  Job Corps controls over 90% of the Department of Labor's building stock.  The legal status of the Job Corps facilities is broken down into four categories: 1) DOL owned, 2) DOL direct leased, 3) a combination of DOL owned and direct leased, and 4) Civilian Conservation Centers (CCCs). Of all the Job Corps centers, 58 are owned, 34 are leased, seven are a mixture of owned and leased, and 24 are on land owned by the USDA or United States Department of the Interior (DOI) and operated as CCCs. Two Centers on the list (Gainesville and Homestead) have been closed, but DOL still owns the property which is now excess and currently going through the disposal process with GSA.

Job Corps center contractors manage government-furnished property (GFP) on-site. These contractors are also required to maintain accurate inventories using systems like the Electronic Property Management System (EPMS) and the Fleet Tracking Management System (FTMS). Regular audits and adherence to federal property management regulations, including those from the Federal Acquisition Regulation (FAR) and GSA policies, ensure accountability and proper stewardship.[6]

The OJC currently has an unfunded, deferred construction, rehabilitation and acquisition (CRA) backlog estimated to be $1.6 billion. Job Corps defines its unfunded CRA backlog as the total of the non-recurring costs to restore and renovate facilities (structures and buildings) and systems (e.g., heating ventilation, air conditioning, sewage, water, or electrical) to, or as close to, their original capacity, efficiency, and capability, and for

---

[5] Under the Changes clauses in the contracts, FAR 52.243-1, *Changes-Fixed Price*, the contractors are entitled to additional compensation if the agency directs them to perform work not required by the contract which increases their costs of performance.

[6] See Job Corps' Policy and Requirements Handbook Appendix 505 Admin and Management of Job Corps Contractor-Held Government-Furnished Property.pdf

000170

which insufficient funding is currently available to complete the work. This amount represents more than 2,200 structures located on 5,600 acres.  Over the past several years, the cost associated with correcting property deficiencies has increased by more than 50 percent.

More than 43 percent of the Job Corps' portfolio by square footage is more than 50 years old.  In 2024, Job Corps estimated that in five years, 119 additional buildings comprising nearly 1,135,000 gross square feet would reach the age of 50, which will result in those buildings becoming subject to compliance with the historic preservation regulations when undergoing renovations.  CRA funding is critical to the success of the Job Corps program because healthy and safe facilities contribute to an effective learning environment.

### *General Disposal Requirements for Job Corps Centers*

When a Job Corps center is closed or realigned, the U.S. Department of Labor (DOL), historically in coordination with the General Services Administration (GSA), follows federal regulations to dispose of real property and assets. The disposal process must comply with the Federal Property and Administrative Services Act, GSA's Federal Management Regulation (FMR), and applicable Department of Labor policies. Generally, disposal involves several key steps:

- **Property Assessment:** The DOL evaluates whether real property (land, buildings, equipment) is excess to agency needs.
- **Declaration as Excess:** Property no longer needed is officially declared "excess" and reported to GSA for broader federal screening.
- **Federal and Public Screening:** GSA offers excess property to other federal agencies first. If no agency claims it, it is made available to state, local governments, nonprofits, or educational institutions under specific public benefit conveyance programs.
- **Public Sale:** If there is no federal or public entity interest, the property is sold to the public, typically through online auctions or sealed bids.
- **Environmental Compliance:** Before disposal, environmental assessments must be conducted to ensure compliance with laws like the National Environmental Policy Act (NEPA) and to address any hazardous materials or cleanup requirements.
- **Proceeds:** Revenue from property sales is generally returned to the U.S. Treasury unless specific statutory authority allows reuse within the program.

Separately, contractor-held personal property (such as equipment, vehicles, and supplies) must be disposed of following federal acquisition regulations (FAR Subpart 45.6) and DOL property management policies, ensuring proper accountability and financial closeout.

## IX. DOL Transparency Report

000171

On April 25, 2025, the U.S. Department of Labor's Employment and Training Administration released the 2025 Job Corps Transparency Report, providing a detailed analysis of the financial performance and operational costs of the Job Corps Program.

Below is a summary of the overall findings from PY2023[7]:
- Average Graduation Rate:
  - Traditional: 32%
  - WIOA Definition: 38%
- Average Cost Per Enrollee (Regardless of Length of Stay): $49,769.53
- Average Cost Per Student Per Year (Average PY23 Headcount): $80,284.65
- Average Total Cost Per Graduate:
  - Traditional: $187,653
  - WIOA Definition: $155,600
- Job Corps participants earn $16,695 annually on average, post separation
- Average of Highest Center Costs per Graduate (Traditional Data):
  - The 10 least efficient programs average $512,800 dollars per graduate
  - The top 50 least efficient programs average $319,085 per graduate
- Average of Highest Center Costs per Graduate (WIOA Data):
  - The 10 least efficient programs average $385,370 per graduate
  - The top 50 least efficient programs average $252,285 per graduate

## X. Job Corps PY 2024 and 2025 Cost Savings Efforts

In Program Year (PY) 24, the Office of Job Corps implemented a series of aggressive cost savings initiatives to mitigate an anticipated operating deficit and set a foundation for long-term program sustainability. These efforts were informed by a comprehensive review of all expenditures against statutory and regulatory minimum requirements.

PY 24 cost-saving strategies resulted in savings of over $120 million, that included:

- **De-scoping Requests for Proposals (RFPs) and Center Contracts:**
  Job Corps systematically reviewed the Policy and Requirements Handbook (PRH) to identify and remove non-mandatory program requirements, allowing for the negotiation with contractors to modify the contracts to reduce the future contract prices. This de-scoping focused on aligning center operations strictly to statutory obligations, thus reducing unnecessary expenditures. This included policy revisions to eliminate Evening and Weekend Studies requirements, remove non-mandatory oral health services, remove mandatory Career Transition Services (CTS) for those who did not complete the program, and reduce nursing and trainee employee assistance program hours back to pre-COVID levels. These

---

[7] The Job Corps Transparency Report's metrics distinguish between two definitions of the term "graduate": one reflecting traditional program completion in good standing (Traditional), and another using the statutory criteria from Workforce Innovation and Opportunity Act Sec. 116, Sec. 142, which counts individuals who attain a diploma or Career Technical Training completion while enrolled but do not complete the full program.

000172

targeted changes directly contributed to operating cost reductions without undermining core program services.

In Program Year (PY) 25, the Job Corps program faces a projected operating deficit of up to $213 million. To address this shortfall, the Department is contemplating several strategies to augment amounts carried forward from PY24 mitigation efforts (estimated at $130 million):  prioritizing cost-saving actions at centers with expiring contracts and suspending operations at underperforming centers, including deploying the following:

- **Trade and Program Restructuring:** Job Corps conducted a national evaluation of trade offerings across centers, using labor market information and program performance ratings. Underutilized or duplicative trades are targeted for elimination or consolidation, and Continuous Improvement Plans (CIPs) will be deployed for lower-performing programs.
- **Long-Term Sustainability Risk Analysis and Right-Sizing Initiatives:** A new facilities, performance, and sustainability risk assessment tool was developed to prioritize centers for potential suspension of operations based on performance and fiscal sustainability. This risk-driven "Right-Sizing" initiative focused on gradually shifting to a need-based model (e.g., one to three residential centers per state) projecting long-term savings of up to $337.72 million.
- **Cost Avoidance in USDA Forest Service Centers:** For USDA-operated centers, Job Corps reviewed CCC funding formulas to avoid overpayment for vacant student slots, resulting in a projected $2 million cost avoidance for PY 25.

**IMPORTANT DATES**
N/A

**OTHER DOL AGENCIES INVOLVED**
N/A

**OTHER FEDERAL AGENCIES INVOLVED**

White House Domestic Policy Council

**CONGRESSIONAL INTEREST**
NA.

**CONTACT**

Erin McGee, Acting Administrator, Office of Job Corps ████████████

**ATTACHMENTS**

Provide a vertical list of attachments under this header in the following format:
N/A

000173

Message

| | |
|---|---|
| **From**: | Walter, Courtney E - OSEC |
| **Sent**: | 4/30/2025 12:59:46 PM |
| **To**: | King, Wells C. EOP/WHO |
| **CC**: | Han, Jihun A - OSEC |
| **Subject**: | Tomorrow's PCC - Job Corps |
| **Attachments**: | DPC PCC_ETA Job Corps Program Overview and Operational Framework 4.30.25.docx |

Hi Wells –

See attached as you requested.  Please let us know if you need more.  I'll be joining the meeting, along with Lori Frazier Bearden (ETA) and Miles Collins (DOGE).

Thank you!

Courtney

**Courtney E. Walter**
Senior Counselor, Office of the Secretary
U.S. Department of Labor
o:
m:

**U.S. Department of Labor**     Assistant Secretary for
Employment and Training
Washington, D.C.  20210



INFORMATION

**April 30, 2025**

**BRIEFING MEMORANDUM FOR THE WHITE HOUSE DOMESTIC POLICY COUNCIL**

FROM:     **LORI FRAZIER BEARDEN**
**Acting Assistant Secretary**
**Employment and Training Administration**

SUBJECT:     **Overview of the Job Corps Program and Operational Framework**

---

**EXECUTIVE SUMMARY**

This is a briefing memorandum for an upcoming Domestic Policy Council meeting. The memorandum provides an overview of the Job Corps program, a federal program administered by the U.S. Department of Labor (DOL). It outlines the program's purpose, eligibility criteria, center types, performance management, demonstration authority, contracting mechanisms, real property management and disposal, the recent transparency data report, and cost savings measures implemented. **This memorandum is informational only; no action is requested.**

**BACKGROUND AND ANALYSIS**

# I. Purpose and Administration

Job Corps, established under the Economic Opportunity Act of 1964 (Public Law 88-452), is the nation's largest federally funded residential education and vocational training program. Today, Job Corps operates 119 centers across all 50 states, the District of Columbia, and Puerto Rico. Since its inception, the program has served over three million youth and young adults.  Currently authorized under the Workforce Innovation and Opportunity Act (WIOA), Title I, Subtitle C (codified at 29 U.S.C. § 3191 et seq.), Job Corps is funded through annual Congressional appropriations, with an average budget of approximately $1.6 billion for center operations since 2017. The program provides academic education, career technical training, career transition services, and residential support to thousands of students each year.

The Office of Job Corps (OJC) within ETA oversees the program and is comprised of staff at the National Office with six regional offices.  In total, OJC employs 80 federal full-time equivalent staff. The program is funded through three distinct accounts: $1.6 billion for Operations, which supports center operations contracts and U.S. Department of

Agriculture (USDA) Forest Service Civilian Conservation Centers for residential services, academics, counseling, and career technical training; $33 million for Administration, which funds federal staffing, travel, and training at the National and Regional Offices; and $123 million for Construction, Rehabilitation, and Acquisition (CRA), which supports facility acquisition, construction, and rehabilitation nationwide.

## II. Eligibility Criteria

Admissions Counselors are hired under center operations contracts to assess applicant eligibility for the program. As outlined in 29 U.S.C. § 3194 (or pursuant to other sections in WIOA, as noted), applicants must:

- Be between 16 and 24 years old at enrollment (with allowances for up to 20% of enrollees aged 22–24 and waivers for individuals with disabilities).
- Meet low-income criteria.
- Face one or more barriers to education and employment, such as being basic skills deficient, a school dropout, homeless, a foster child, or requiring additional education or training to obtain and retain employment.
- Demonstrate a need for additional education, training, or support to secure and maintain employment
- Not fall within one of WIOA's special limitations on selection in 29 U.S.C. § 3195(b).
- Consistent with the nondiscrimination prohibition against certain noncitizens located at 29 U.S.C. § 3248(a)(5), be either a U.S. citizen; a lawfully admitted permanent resident alien, refugee, asylee, parolee, or other alien who has been authorized by the Department of Homeland Security to work in the United States; or a resident of a U.S. territory.

Job Corps' eligibility criteria are outlined in more detail in the Policy and Requirements Handbook Exhibit 1-1.

## III. Center Types and Operations

Job Corps centers operate under three models. Contracted centers are managed by private organizations or state and local agencies through competitive procurement. Civilian Conservation Centers (CCCs) are operated by the USDA Forest Service, focusing on conservation training and disaster response in rural areas. Additionally, some centers are operated by Indian tribes through agreements to serve Indians.[1]

A majority of centers are operated by contractors via competitively awarded contracts, with approximately 13,000 contractor staff. In addition, 24 Civilian Conservation Centers (CCC) are operated by the USDA Forest Service via an interagency agreement and are staffed with 1,100 federal employees.

---

[1] Currently Job Corps' Talking Leaves Job Corps Center is operated by Cherokee Nation.

000176

- *Civilian Conservation Centers (CCCs***)**

**Overview**: CCCs are a subset of Job Corps centers focused on natural resource conservation and public land management. They offer unique training opportunities in forestry, firefighting, and conservation, contributing to both workforce development and environmental stewardship.

**Governance and Funding**: CCCs operate under an **interagency agreement** between the Department of Labor and the USDA. While the Forest Service manages daily operations, DOL provides funding and oversight to ensure alignment with Job Corps standards and objectives.

**Legislative Considerations**: In 2019, proposals to close several CCCs were met with bipartisan opposition that, in part, included assertions as to their importance to rural economies and conservation efforts. Subsequent enacted appropriations laws included provisions prohibiting appropriated funds from being used to (1) alter or terminate the Interagency Agreement between DOL and USDA and (2) close any of the Civilian Conservation Centers, except if such closure is necessary to prevent the endangerment of the health and safety of the students.

# V. Performance Management

**Performance Indicators**: Under 29 U.S.C. § 3209, Job Corps centers are evaluated based on the primary indicators of performance applicable to all programs authorized by WIOA, including: 1) placement in employment, education, or training (2nd and 4th quarter after exit), 2) credential attainment, 3) measurable skill gains, 4) median earnings, and 5) retention in employment or education.

**Job Corps Center Closure Criteria**

Per 29 U.S.C. § 3209(j), prior to the closure of any Job Corps center, "the Secretary shall ensure—
(1) that the proposed decision to close the center is announced in advance to the general public through publication in the Federal Register or other appropriate means;
(2) the establishment of a reasonable comment period, not to exceed 30 days, for interested individuals to submit written comments to the Secretary; and
(3) that the Member of Congress who represents the district in which such center is located is notified within a reasonable period of time in advance of any final decision to close the center."

Historically DOL has announced the closure criteria it is using to close any given center through publishing those criteria in the FRN and, occasionally, requesting comments on the criteria. This means over time the closure criteria have not been static – DOL has added criteria to address the policy direction and need for a rationale to close a center at a given time. Closure criteria have varied over time, including considerations of chronic

3

low performance, an evaluation of effort required to maintain high-quality education, and other considerations to determine whether to close a center.[2]

If a decision is made to close a center, then the decision and basis for the decision must be documented at least internally. The process to complete a closure can be a costly, time-consuming process as operations at the center are wound down, personal property is dealt with, and any real property issues are addressed.

## VI. Demonstration Authority

**Legal Framework**: Under 29 U.S.C. § 3206(a), the Secretary of Labor is authorized to carry out experimental, research, or demonstration projects relating to carrying out the Job Corps program. The statute also provides the Secretary the authority to waive any provisions of the WIOA section on Job Corps that the Secretary finds would prevent her from carrying out the projects. If the Secretary determines that such waiver is necessary, the statute requires 90-days advance written notification to the Committee on Education and the Workforce of the House of Representatives and the Committee on Health, Education, Labor, and Pensions of the Senate.

**Purpose and Implementation**: The demonstration authority allows the Department of Labor to pilot innovative approaches to education and vocational training relating to carrying out the Job Corps program. These projects aim to enhance program effectiveness, address emerging workforce needs, and improve service delivery to participants.[3]

## VII. Contracting Mechanisms

**Firm Fixed-Price Contracts (FFP)**: OJC began transitioning to the FFP model in 2019 and has a few remaining contracts to transition from cost-reimbursable to FFP. Under FFP agreements, contractors are paid a set amount for delivering specified services, regardless of actual costs incurred. FFP contracts offer some advantages for government operations by providing cost predictability, which helps agencies better manage budgets and fiscal planning. These contracts also incentivize contractors to operate efficiently, since maintaining profitability depends on managing resources within the agreed price.[4]

---

[2] See example of closure criteria for Ouachita Civilian Conservation Center in Arkansas, 81 FR 43250 (July 1, 2016), https://www.federalregister.gov/documents/2016/07/01/2016-15603/final-notice-of-job-corps-center-for-closure

[3] An illustrative example of this authority in action is the Job Corps Scholars Program, a demonstration project that provided eligible youth aged 16–24 the opportunity to enroll in career technical training programs at twenty-six accredited public colleges.

[4] The advantages of a firm fixed price contract type is recognized by Federal Acquisition Regulation FAR 16.202-1, which states: "[a] firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties."

000178

However, successful execution of FFP contracts requires careful attention to a few important considerations. Defining the scope of work with precision is critical to prevent scope creep[5] and maintain contractor accountability. Additionally, because contractors bear the financial risk of cost overruns, there is a possibility that service quality could be affected if risks are not properly managed.

Having selected the FFP contract type, DOL faced a new challenge during the COVID pandemic. Under an FFP contract, agencies have little or no visibility on the contractor's costs. As enrollment numbers dropped due to COVID, any cost savings did not automatically translate into reduced FFP payments by DOL. DOL did negotiate a "take back" mechanism for low OBS, but these were limited given DOL's understanding that a large portion of operational costs (e.g., salaries and facilities) are impervious to changes in enrollment. Plus, a reduction in the FFP amounts would be subject to negotiation and could be grounds for dispute and litigation absent contractor agreement.

## VIII. Real Property Management and Disposal

While most DOL office spaces are leased through GSA, Job Corps centers are exceptions, as they are directly owned or leased by the DOL.  Job Corps controls over 90% of the Department of Labor's building stock.  The legal status of the Job Corps facilities is broken down into four categories: 1) DOL owned, 2) DOL direct leased, 3) a combination of DOL owned and direct leased, and 4) Civilian Conservation Centers (CCCs). Of all the Job Corps centers, 58 are owned, 34 are leased, seven are a mixture of owned and leased, and 24 are on land owned by the USDA or United States Department of the Interior (DOI) and operated as CCCs. Two Centers on the list (Gainesville and Homestead) have been closed, but DOL still owns the property which is now excess and currently going through the disposal process with GSA.

Job Corps center contractors manage government-furnished property (GFP) on-site. These contractors are also required to maintain accurate inventories using systems like the Electronic Property Management System (EPMS) and the Fleet Tracking Management System (FTMS). Regular audits and adherence to federal property management regulations, including those from the Federal Acquisition Regulation (FAR) and GSA policies, ensure accountability and proper stewardship.[6]

The OJC currently has an unfunded, deferred construction, rehabilitation and acquisition (CRA) backlog estimated to be $1.6 billion. Job Corps defines its unfunded CRA backlog as the total of the non-recurring costs to restore and renovate facilities (structures and buildings) and systems (e.g., heating ventilation, air conditioning, sewage, water, or electrical) to, or as close to, their original capacity, efficiency, and capability, and for

---

[5] Under the Changes clauses in the contracts, FAR 52.243-1, *Changes-Fixed Price*, the contractors are entitled to additional compensation if the agency directs them to perform work not required by the contract which increases their costs of performance.
[6] See Job Corps' Policy and Requirements Handbook Appendix 505 Admin and Management of Job Corps Contractor-Held Government-Furnished Property.pdf

000179

which insufficient funding is currently available to complete the work. This amount represents more than 2,200 structures located on 5,600 acres. Over the past several years, the cost associated with correcting property deficiencies has increased by more than 50 percent.

More than 43 percent of the Job Corps' portfolio by square footage is more than 50 years old. In 2024, Job Corps estimated that in five years, 119 additional buildings comprising nearly 1,135,000 gross square feet would reach the age of 50, which will result in those buildings becoming subject to compliance with the historic preservation regulations when undergoing renovations. CRA funding is critical to the success of the Job Corps program because healthy and safe facilities contribute to an effective learning environment.

### General Disposal Requirements for Job Corps Centers

When a Job Corps center is closed or realigned, the U.S. Department of Labor (DOL), historically in coordination with the General Services Administration (GSA), follows federal regulations to dispose of real property and assets. The disposal process must comply with the Federal Property and Administrative Services Act, GSA's Federal Management Regulation (FMR), and applicable Department of Labor policies. Generally, disposal involves several key steps:

- **Property Assessment:** The DOL evaluates whether real property (land, buildings, equipment) is excess to agency needs.
- **Declaration as Excess:** Property no longer needed is officially declared "excess" and reported to GSA for broader federal screening.
- **Federal and Public Screening:** GSA offers excess property to other federal agencies first. If no agency claims it, it is made available to state, local governments, nonprofits, or educational institutions under specific public benefit conveyance programs.
- **Public Sale:** If there is no federal or public entity interest, the property is sold to the public, typically through online auctions or sealed bids.
- **Environmental Compliance:** Before disposal, environmental assessments must be conducted to ensure compliance with laws like the National Environmental Policy Act (NEPA) and to address any hazardous materials or cleanup requirements.
- **Proceeds:** Revenue from property sales is generally returned to the U.S. Treasury unless specific statutory authority allows reuse within the program.

Separately, contractor-held personal property (such as equipment, vehicles, and supplies) must be disposed of following federal acquisition regulations (FAR Subpart 45.6) and DOL property management policies, ensuring proper accountability and financial closeout.

## IX. DOL Transparency Report

000180

On April 25, 2025, the U.S. Department of Labor's Employment and Training Administration released the 2025 Job Corps Transparency Report, providing a detailed analysis of the financial performance and operational costs of the Job Corps Program.

Below is a summary of the overall findings from PY2023[7]:
- Average Graduation Rate:
  - Traditional: 32%
  - WIOA Definition: 38%
- Average Cost Per Enrollee (Regardless of Length of Stay): $49,769.53
- Average Cost Per Student Per Year (Average PY23 Headcount): $80,284.65
- Average Total Cost Per Graduate:
  - Traditional: $187,653
  - WIOA Definition: $155,600
- Job Corps participants earn $16,695 annually on average, post separation
- Average of Highest Center Costs per Graduate (Traditional Data):
  - The 10 least efficient programs average $512,800 dollars per graduate
  - The top 50 least efficient programs average $319,085 per graduate
- Average of Highest Center Costs per Graduate (WIOA Data):
  - The 10 least efficient programs average $385,370 per graduate
  - The top 50 least efficient programs average $252,285 per graduate

## X. Job Corps PY 2024 and 2025 Cost Savings Efforts

In Program Year (PY) 24, the Office of Job Corps implemented a series of aggressive cost savings initiatives to mitigate an anticipated operating deficit and set a foundation for long-term program sustainability. These efforts were informed by a comprehensive review of all expenditures against statutory and regulatory minimum requirements.

PY 24 cost-saving strategies resulted in savings of over $120 million, that included:

- **De-scoping Requests for Proposals (RFPs) and Center Contracts:**
  Job Corps systematically reviewed the Policy and Requirements Handbook (PRH) to identify and remove non-mandatory program requirements, allowing for the negotiation with contractors to modify the contracts to reduce the future contract prices. This de-scoping focused on aligning center operations strictly to statutory obligations, thus reducing unnecessary expenditures. This included policy revisions to eliminate Evening and Weekend Studies requirements, remove non-mandatory oral health services, remove mandatory Career Transition Services (CTS) for those who did not complete the program, and reduce nursing and trainee employee assistance program hours back to pre-COVID levels. These

---

[7] The Job Corps Transparency Report's metrics distinguish between two definitions of the term "graduate": one reflecting traditional program completion in good standing (Traditional), and another using the statutory criteria from Workforce Innovation and Opportunity Act Sec. 116, Sec. 142, which counts individuals who attain a diploma or Career Technical Training completion while enrolled but do not complete the full program.

000181

targeted changes directly contributed to operating cost reductions without undermining core program services.

In Program Year (PY) 25, the Job Corps program faces a projected operating deficit of up to $213 million. To address this shortfall, the Department is contemplating several strategies to augment amounts carried forward from PY24 mitigation efforts (estimated at $130 million): prioritizing cost-saving actions at centers with expiring contracts and suspending operations at underperforming centers, including deploying the following:

- **Trade and Program Restructuring:** Job Corps conducted a national evaluation of trade offerings across centers, using labor market information and program performance ratings. Underutilized or duplicative trades are targeted for elimination or consolidation, and Continuous Improvement Plans (CIPs) will be deployed for lower-performing programs.
- **Long-Term Sustainability Risk Analysis and Right-Sizing Initiatives:** A new facilities, performance, and sustainability risk assessment tool was developed to prioritize centers for potential suspension of operations based on performance and fiscal sustainability. This risk-driven "Right-Sizing" initiative focused on gradually shifting to a need-based model (e.g., one to three residential centers per state) projecting long-term savings of up to $337.72 million.
- **Cost Avoidance in USDA Forest Service Centers:** For USDA-operated centers, Job Corps reviewed CCC funding formulas to avoid overpayment for vacant student slots, resulting in a projected $2 million cost avoidance for PY 25.

**CONTACT**

Erin McGee, Acting Administrator, Office of Job Corps, █████████████

**ATTACHMENTS**
:
N/A

000182

Message

| | |
|---|---|
| **From:** | McGee, Erin L - ETA |
| **Sent:** | 4/30/2025 8:38:01 AM |
| **To:** | Frazier, Susan (Lori) - ETA |
| **CC:** | Laco, Marek S - ETA |
| **Subject:** | RE: Request: Job Corps by Tuesday COB 4/28 |
| **Attachments:** | DPC PCC_ETA Job Corps Program Overview and Operational Framework 4.30.25.docx |

Yes, here you go! See you soon.

**From:** Frazier, Susan (Lori) - ETA
**Sent:** Wednesday, April 30, 2025 6:56 AM
**To:** McGee, Erin L - ETA
**Cc:** Laco, Marek S - ETA
**Subject:** Re: Request: Job Corps by Tuesday COB 4/28

Thank you! This is great. Can we please repurpose this as a memorandum that will be going out of the building? So not to Secretary or Dep. This will be a briefing memorandum for the Domestic Policy Council meeting.

I appreciate your hard work on this.
Lori

**Lori Frazier Bearden** |
United States Department of Labor
Deputy Assistant Secretary
Employment and Training Administration
200 Constitution Avenue Suite S-2307
Washington, D.C. 20210
O

**From:** McGee, Erin L - ETA
**Sent:** Tuesday, April 29, 2025 4:38 PM
**To:** Frazier, Susan (Lori) - ETA
**Cc:**                            - ETA <                                          - SOL
Laco, Marek S - ETA                                             - ETA                              Paprocki,
Michael J - ETA <                          >; Smith, Samuel S - ETA
**Subject:** RE: Request: Job Corps by Tuesday COB 4/28

Lori, good afternoon, here is the briefing memo in advance of the Domestic Policy Council meeting on Thursday of this week. We added the number of leased and owned facilities per your request. A huge thanks to
copied here, OJC's Division Chief for Policy who pulled this together so quickly as well as
(also copied here) and the ETLS team for their quick review and feedback.

If you have questions or edits before sending this tomorrow morning, please let us know!

Erin

**Erin McGee**
Acting Administrator
ETA/Office of Job Corps
U.S. Department of Labor
███████ (mobile)

---

**From:** Frazier, Susan (Lori) - ETA ███████████████████████
**Sent:** Monday, April 28, 2025 4:10 PM
**To:** McGee, Erin L - ETA ██████████████████
**Subject:** RE: Request: Job Corp by Tuesday COB 4/28

Thank you! For this deliverable, a memo style document would be perfect. Including a portion of the transparency report summary would probably be good too, since this may be part of the new interest.

---

**From:** McGee, Erin L - ETA ████████████████
**Sent:** Monday, April 28, 2025 4:02 PM
**To:** Frazier, Susan (Lori) - ETA ███████
**Cc:** Laco, Marek S - ETA █████████████ Smith, Samuel S - ETA ████████████████████████
ETA ███████ Paprocki, Michael J - ETA ██████████████
**Subject:** RE: Request: Job Corp by Tuesday COB 4/28

Lori, hi, message received. We'll get started. Imagining a 2-page document with basic facts on the following:

1. Basic facts on authorization
2. Demographic that we serve, # of centers, locations
3. Program Structure/ delivery (contractors and USDA FS)
   1. FFP Contracts
   2. Interagency Agreement; rider preventing funds to be spent on closure
4. Demo Authority
5. Performance and Closure Criteria
6. PY24 shortfall and how we've addressed it
7. PY25 shortfall is larger, and we'll have to do more, such as...

If okay, we can include a Job Corps 101-style PPT deck as background.

Erin

---

**From:** Frazier, Susan (Lori) - ETA ███████████████████
**Sent:** Monday, April 28, 2025 3:27 PM
**To:** McGee, Erin L - ETA ███████
**Cc:** Laco, Marek S - ETA ███████████ Smith, Samuel S - ETA ██████████████████ Moreno, Gabriel -
ETA ████████ Paprocki, Michael J - ETA ███████████
**Subject:** Request: Job Corp by Tuesday COB 4/28

Good afternoon- Erin:

- The Domestic Policy Council would like to have a Policy Coordinating Committee (PCC) meeting on Job Corps this upcoming Thursday.

- DOL was asked to put together a brief paper with an overview of the program, the lay of the land, and where things are currently situated.

If you can help pull something together by tomorrow, COB, that would be great!

Thank you and let me know if you have any questions.

Lori

**Lori Frazier Bearden** |
United States Department of Labor
Acting Assistant Secretary
Employment and Training Administration
200 Constitution Avenue Suite S-2307
Washington, D.C. 20210
C: 



**U.S. Department of Labor**     Assistant Secretary for
Employment and Training
Washington, D.C.  20210



INFORMATION

**April 30, 2025**

**BRIEFING MEMORANDUM FOR THE WHITE HOUSE DOMESTIC POLICY COUNCIL**

FROM:     **LORI FRAZIER BEARDEN**
**Acting Assistant Secretary**
**Employment and Training Administration**

SUBJECT:     **Overview of the Job Corps Program and Operational Framework**

---

**EXECUTIVE SUMMARY**

This is a briefing memorandum for an upcoming Domestic Policy Council meeting. The memorandum provides an overview of the Job Corps program, a federal program administered by the U.S. Department of Labor (DOL). It outlines the program's purpose, eligibility criteria, center types, performance management, demonstration authority, contracting mechanisms, real property management and disposal, the recent transparency data report, and cost savings measures implemented. **This memorandum is informational only; no action is requested.**

**BACKGROUND AND ANALYSIS**

# I. Purpose and Administration

Job Corps, established under the Economic Opportunity Act of 1964 (Public Law 88-452), is the nation's largest federally funded residential education and vocational training program. Today, Job Corps operates 119 centers across all 50 states, the District of Columbia, and Puerto Rico. Since its inception, the program has served over three million youth and young adults.  Currently authorized under the Workforce Innovation and Opportunity Act (WIOA), Title I, Subtitle C (codified at 29 U.S.C. § 3191 et seq.), Job Corps is funded through annual Congressional appropriations, with an average budget of approximately $1.6 billion for center operations since 2017. The program provides academic education, career technical training, career transition services, and residential support to thousands of students each year.

The Office of Job Corps (OJC) within ETA oversees the program and is comprised of staff at the National Office with six regional offices.  In total, OJC employs 80 federal full-time equivalent staff. The program is funded through three distinct accounts: $1.6 billion for Operations, which supports center operations contracts and U.S. Department of

Agriculture (USDA) Forest Service Civilian Conservation Centers for residential services, academics, counseling, and career technical training; $33 million for Administration, which funds federal staffing, travel, and training at the National and Regional Offices; and $123 million for Construction, Rehabilitation, and Acquisition (CRA), which supports facility acquisition, construction, and rehabilitation nationwide.

## II. Eligibility Criteria

Admissions Counselors are hired under center operations contracts to assess applicant eligibility for the program.  As outlined in 29 U.S.C. § 3194 (or pursuant to other sections in WIOA, as noted), applicants must:

- Be between 16 and 24 years old at enrollment (with allowances for up to 20% of enrollees aged 22–24 and waivers for individuals with disabilities).
- Meet low-income criteria.
- Face one or more barriers to education and employment, such as being basic skills deficient, a school dropout, homeless, a foster child, or requiring additional education or training to obtain and retain employment.
- Demonstrate a need for additional education, training, or support to secure and maintain employment
- Not fall within one of WIOA's special limitations on selection in 29 U.S.C. § 3195(b).
- Consistent with the nondiscrimination prohibition against certain noncitizens located at 29 U.S.C. § 3248(a)(5), be either a U.S. citizen; a lawfully admitted permanent resident alien, refugee, asylee, parolee, or other alien who has been authorized by the Department of Homeland Security to work in the United States; or a resident of a U.S. territory.

Job Corps' eligibility criteria are outlined in more detail in the Policy and Requirements Handbook Exhibit 1-1.

## III. Center Types and Operations

Job Corps centers operate under three models. Contracted centers are managed by private organizations or state and local agencies through competitive procurement. Civilian Conservation Centers (CCCs) are operated by the USDA Forest Service, focusing on conservation training and disaster response in rural areas. Additionally, some centers are operated by Indian tribes through agreements to serve Indians.[1]

A majority of centers are operated by contractors via competitively awarded contracts, with approximately 13,000 contractor staff.  In addition, 24 Civilian Conservation Centers (CCC) are operated by the USDA Forest Service via an interagency agreement and are staffed with 1,100 federal employees.

---

[1] Currently Job Corps' Talking Leaves Job Corps Center is operated by Cherokee Nation.

000187

- *Civilian Conservation Centers (CCCs)*

**Overview**: CCCs are a subset of Job Corps centers focused on natural resource conservation and public land management. They offer unique training opportunities in forestry, firefighting, and conservation, contributing to both workforce development and environmental stewardship.

**Governance and Funding**: CCCs operate under an **interagency agreement** between the Department of Labor and the USDA. While the Forest Service manages daily operations, DOL provides funding and oversight to ensure alignment with Job Corps standards and objectives.

**Legislative Considerations**: In 2019, proposals to close several CCCs were met with bipartisan opposition that, in part, included assertions as to their importance to rural economies and conservation efforts. Subsequent enacted appropriations laws included provisions prohibiting appropriated funds from being used to (1) alter or terminate the Interagency Agreement between DOL and USDA and (2) close any of the Civilian Conservation Centers, except if such closure is necessary to prevent the endangerment of the health and safety of the students.

# V. Performance Management

**Performance Indicators**: Under 29 U.S.C. § 3209, Job Corps centers are evaluated based on the primary indicators of performance applicable to all programs authorized by WIOA, including: 1) placement in employment, education, or training (2nd and 4th quarter after exit), 2) credential attainment, 3) measurable skill gains, 4) median earnings, and 5) retention in employment or education.

**Job Corps Center Closure Criteria**

Per 29 U.S.C. § 3209(j), prior to the closure of any Job Corps center, "the Secretary shall ensure—
(1) that the proposed decision to close the center is announced in advance to the general public through publication in the Federal Register or other appropriate means;
(2) the establishment of a reasonable comment period, not to exceed 30 days, for interested individuals to submit written comments to the Secretary; and
(3) that the Member of Congress who represents the district in which such center is located is notified within a reasonable period of time in advance of any final decision to close the center."

Historically DOL has announced the closure criteria it is using to close any given center through publishing those criteria in the FRN and, occasionally, requesting comments on the criteria. This means over time the closure criteria have not been static – DOL has added criteria to address the policy direction and need for a rationale to close a center at a given time. Closure criteria have varied over time, including considerations of chronic

3

low performance, an evaluation of effort required to maintain high-quality education, and other considerations to determine whether to close a center.[2]

If a decision is made to close a center, then the decision and basis for the decision must be documented at least internally. The process to complete a closure can be a costly, time-consuming process as operations at the center are wound down, personal property is dealt with, and any real property issues are addressed.

## VI. Demonstration Authority

**Legal Framework**: Under 29 U.S.C. § 3206(a), the Secretary of Labor is authorized to carry out experimental, research, or demonstration projects relating to carrying out the Job Corps program. The statute also provides the Secretary the authority to waive any provisions of the WIOA section on Job Corps that the Secretary finds would prevent her from carrying out the projects. If the Secretary determines that such waiver is necessary, the statute requires 90-days advance written notification to the Committee on Education and the Workforce of the House of Representatives and the Committee on Health, Education, Labor, and Pensions of the Senate.

**Purpose and Implementation**: The demonstration authority allows the Department of Labor to pilot innovative approaches to education and vocational training relating to carrying out the Job Corps program. These projects aim to enhance program effectiveness, address emerging workforce needs, and improve service delivery to participants.[3]

## VII. Contracting Mechanisms

**Firm Fixed-Price Contracts (FFP)**: OJC began transitioning to the FFP model in 2019 and has a few remaining contracts to transition from cost-reimbursable to FFP. Under FFP agreements, contractors are paid a set amount for delivering specified services, regardless of actual costs incurred. FFP contracts offer some advantages for government operations by providing cost predictability, which helps agencies better manage budgets and fiscal planning. These contracts also incentivize contractors to operate efficiently, since maintaining profitability depends on managing resources within the agreed price.[4]

---

[2] See example of closure criteria for Ouachita Civilian Conservation Center in Arkansas, 81 FR 43250 (July 1, 2016), https://www.federalregister.gov/documents/2016/07/01/2016-15603/final-notice-of-job-corps-center-for-closure

[3] An illustrative example of this authority in action is the Job Corps Scholars Program, a demonstration project that provided eligible youth aged 16–24 the opportunity to enroll in career technical training programs at twenty-six accredited public colleges.

[4] The advantages of a firm fixed price contract type is recognized by Federal Acquisition Regulation FAR 16.202-1, which states: "[a] firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties."

000189

However, successful execution of FFP contracts requires careful attention to a few important considerations. Defining the scope of work with precision is critical to prevent scope creep[5] and maintain contractor accountability. Additionally, because contractors bear the financial risk of cost overruns, there is a possibility that service quality could be affected if risks are not properly managed.

Having selected the FFP contract type, DOL faced a new challenge during the COVID pandemic. Under an FFP contract, agencies have little or no visibility on the contractor's costs. As enrollment numbers dropped due to COVID, any cost savings did not automatically translate into reduced FFP payments by DOL. DOL did negotiate a "take back" mechanism for low OBS, but these were limited given DOL's understanding that a large portion of operational costs (e.g., salaries and facilities) are impervious to changes in enrollment. Plus, a reduction in the FFP amounts would be subject to negotiation and could be grounds for dispute and litigation absent contractor agreement.

## VIII. Real Property Management and Disposal

While most DOL office spaces are leased through GSA, Job Corps centers are exceptions, as they are directly owned or leased by the DOL.  Job Corps controls over 90% of the Department of Labor's building stock.  The legal status of the Job Corps facilities is broken down into four categories: 1) DOL owned, 2) DOL direct leased, 3) a combination of DOL owned and direct leased, and 4) Civilian Conservation Centers (CCCs). Of all the Job Corps centers, 58 are owned, 34 are leased, seven are a mixture of owned and leased, and 24 are on land owned by the USDA or United States Department of the Interior (DOI) and operated as CCCs. Two Centers on the list (Gainesville and Homestead) have been closed, but DOL still owns the property which is now excess and currently going through the disposal process with GSA.

Job Corps center contractors manage government-furnished property (GFP) on-site. These contractors are also required to maintain accurate inventories using systems like the Electronic Property Management System (EPMS) and the Fleet Tracking Management System (FTMS). Regular audits and adherence to federal property management regulations, including those from the Federal Acquisition Regulation (FAR) and GSA policies, ensure accountability and proper stewardship.[6]

The OJC currently has an unfunded, deferred construction, rehabilitation and acquisition (CRA) backlog estimated to be $1.6 billion. Job Corps defines its unfunded CRA backlog as the total of the non-recurring costs to restore and renovate facilities (structures and buildings) and systems (e.g., heating ventilation, air conditioning, sewage, water, or electrical) to, or as close to, their original capacity, efficiency, and capability, and for

---

[5] Under the Changes clauses in the contracts, FAR 52.243-1, *Changes-Fixed Price*, the contractors are entitled to additional compensation if the agency directs them to perform work not required by the contract which increases their costs of performance.
[6] See Job Corps' Policy and Requirements Handbook Appendix 505 Admin and Management of Job Corps Contractor-Held Government-Furnished Property.pdf

5

000190

which insufficient funding is currently available to complete the work. This amount represents more than 2,200 structures located on 5,600 acres. Over the past several years, the cost associated with correcting property deficiencies has increased by more than 50 percent.

More than 43 percent of the Job Corps' portfolio by square footage is more than 50 years old. In 2024, Job Corps estimated that in five years, 119 additional buildings comprising nearly 1,135,000 gross square feet would reach the age of 50, which will result in those buildings becoming subject to compliance with the historic preservation regulations when undergoing renovations. CRA funding is critical to the success of the Job Corps program because healthy and safe facilities contribute to an effective learning environment.

### General Disposal Requirements for Job Corps Centers

When a Job Corps center is closed or realigned, the U.S. Department of Labor (DOL), historically in coordination with the General Services Administration (GSA), follows federal regulations to dispose of real property and assets. The disposal process must comply with the Federal Property and Administrative Services Act, GSA's Federal Management Regulation (FMR), and applicable Department of Labor policies. Generally, disposal involves several key steps:

- **Property Assessment:** The DOL evaluates whether real property (land, buildings, equipment) is excess to agency needs.
- **Declaration as Excess:** Property no longer needed is officially declared "excess" and reported to GSA for broader federal screening.
- **Federal and Public Screening:** GSA offers excess property to other federal agencies first. If no agency claims it, it is made available to state, local governments, nonprofits, or educational institutions under specific public benefit conveyance programs.
- **Public Sale:** If there is no federal or public entity interest, the property is sold to the public, typically through online auctions or sealed bids.
- **Environmental Compliance:** Before disposal, environmental assessments must be conducted to ensure compliance with laws like the National Environmental Policy Act (NEPA) and to address any hazardous materials or cleanup requirements.
- **Proceeds:** Revenue from property sales is generally returned to the U.S. Treasury unless specific statutory authority allows reuse within the program.

Separately, contractor-held personal property (such as equipment, vehicles, and supplies) must be disposed of following federal acquisition regulations (FAR Subpart 45.6) and DOL property management policies, ensuring proper accountability and financial closeout.

## IX. DOL Transparency Report

6

On April 25, 2025, the U.S. Department of Labor's Employment and Training Administration released the 2025 Job Corps Transparency Report, providing a detailed analysis of the financial performance and operational costs of the Job Corps Program.

Below is a summary of the overall findings from PY2023[7]:
- Average Graduation Rate:
  - Traditional: 32%
  - WIOA Definition: 38%
- Average Cost Per Enrollee (Regardless of Length of Stay): $49,769.53
- Average Cost Per Student Per Year (Average PY23 Headcount): $80,284.65
- Average Total Cost Per Graduate:
  - Traditional: $187,653
  - WIOA Definition: $155,600
- Job Corps participants earn $16,695 annually on average, post separation
- Average of Highest Center Costs per Graduate (Traditional Data):
  - The 10 least efficient programs average $512,800 dollars per graduate
  - The top 50 least efficient programs average $319,085 per graduate
- Average of Highest Center Costs per Graduate (WIOA Data):
  - The 10 least efficient programs average $385,370 per graduate
  - The top 50 least efficient programs average $252,285 per graduate

## X. Job Corps PY 2024 and 2025 Cost Savings Efforts

In Program Year (PY) 24, the Office of Job Corps implemented a series of aggressive cost savings initiatives to mitigate an anticipated operating deficit and set a foundation for long-term program sustainability. These efforts were informed by a comprehensive review of all expenditures against statutory and regulatory minimum requirements.

PY 24 cost-saving strategies resulted in savings of over $120 million, that included:

- **De-scoping Requests for Proposals (RFPs) and Center Contracts:**
  Job Corps systematically reviewed the Policy and Requirements Handbook (PRH) to identify and remove non-mandatory program requirements, allowing for the negotiation with contractors to modify the contracts to reduce the future contract prices. This de-scoping focused on aligning center operations strictly to statutory obligations, thus reducing unnecessary expenditures. This included policy revisions to eliminate Evening and Weekend Studies requirements, remove non-mandatory oral health services, remove mandatory Career Transition Services (CTS) for those who did not complete the program, and reduce nursing and trainee employee assistance program hours back to pre-COVID levels. These

---

[7] The Job Corps Transparency Report's metrics distinguish between two definitions of the term "graduate": one reflecting traditional program completion in good standing (Traditional), and another using the statutory criteria from Workforce Innovation and Opportunity Act Sec. 116, Sec. 142, which counts individuals who attain a diploma or Career Technical Training completion while enrolled but do not complete the full program.

000192

targeted changes directly contributed to operating cost reductions without undermining core program services.

In Program Year (PY) 25, the Job Corps program faces a projected operating deficit of up to $213 million. To address this shortfall, the Department is contemplating several strategies to augment amounts carried forward from PY24 mitigation efforts (estimated at $130 million):  prioritizing cost-saving actions at centers with expiring contracts and suspending operations at underperforming centers, including deploying the following:

- **Trade and Program Restructuring:** Job Corps conducted a national evaluation of trade offerings across centers, using labor market information and program performance ratings. Underutilized or duplicative trades are targeted for elimination or consolidation, and Continuous Improvement Plans (CIPs) will be deployed for lower-performing programs.
- **Long-Term Sustainability Risk Analysis and Right-Sizing Initiatives:** A new facilities, performance, and sustainability risk assessment tool was developed to prioritize centers for potential suspension of operations based on performance and fiscal sustainability. This risk-driven "Right-Sizing" initiative focused on gradually shifting to a need-based model (e.g., one to three residential centers per state) projecting long-term savings of up to $337.72 million.
- **Cost Avoidance in USDA Forest Service Centers:** For USDA-operated centers, Job Corps reviewed CCC funding formulas to avoid overpayment for vacant student slots, resulting in a projected $2 million cost avoidance for PY 25.

**CONTACT**

Erin McGee, Acting Administrator, Office of Job Corps, ███████████

**ATTACHMENTS**
:
N/A

Message

| | |
|---|---|
| **From:** | McGee, Erin L - ETA ████ |
| **Sent:** | 5/1/2025 9:20:47 AM |
| **To:** | |
| **CC:** | Frazier, Susan (Lori) - ETA ████ |
| **Subject:** | TO PRINT for Acting ASET DPC meeting this afternoon |
| **Attachments:** | USDA FS Background and Approps Rider 5.1.25.docx; NOTES for DPC_DOL ETA Meeting on Job Corps 5.1.25.docx |

████, hi, here are the two files that Lori asked me to send down to be printed for her afternoon WH meeting. I believe she wants to create folders but do not know now many copies. Thanks!

Erin

**Erin McGee**
**Acting Administrator**
ETA/Office of Job Corps
U.S. Department of Labor
████ (mobile)

**USDA FS Background and Appropriations Rider**

Since Job Corps became a DOL program in 1973, the Secretary of Labor has been authorized to enter into agreements with other federal agencies (as well as with state and local agencies and private organizations) to operate Job Corps centers. CETA, § 407(a); *see* WIOA, 29 U.S.C. § 3197(a)(1)(A). Most center operators are selected on a competitive basis. *See* WIOA, 29 U.S.C. § 3197(a)(2). However, Congress also specifically provided that Job Corps centers "shall" (or, beginning in 1998, "may") include Civilian Conservation Centers (CCCs), which are to be "located primarily in rural areas" and which must provide, in addition to the usual Job Corps training, "programs of work experience to conserve, develop, or manage public natural resources or public recreational areas or to develop community projects in the public interest." *Id.* § 3197(d)(1). At present, WIOA specifies that CCCs may be "operated under an agreement between the Secretary of Labor and the Secretary of Agriculture." *Id.*

WIOA requires all Job Corps centers, including CCCs, to meet expected levels of performance regarding certain indicators (e.g., the proportion of participants who are in education activities, training activities, or unsubsidized employment at certain intervals after exiting the program). *Id.* § 3209(c)(1); *see id.* § 3141(b)(2)(A)(ii). Centers that fail to do so are placed on performance improvement plans developed and implemented by the Secretary of Labor; such plans may include steps ranging from providing the center with technical assistance to changing the center's management staff to closing the center.[1] *Id.* § 3209(f)(2).

Between 2014 and 2018, DOL closed three CCCs because of their chronic low performance: Treasure Lake CCC, *see* 79 FR 61099 (Oct. 9, 2014); Ouachita CCC, *see* 81 FR 43250 (July 1, 2016); and Golconda CCC, *see* 82 FR 44842 (Sept. 26, 2017), https://www.doleta.gov/ Announcements/Closure-of-the-Golconda-Job-Corps-Center.cfm. In May 2019, USDA notified DOL that it intended to withdraw from the role of operating Job Corps centers, and soon thereafter, DOL proposed to deactivate nine CCCs and take over the remaining ones from USDA.[2] Job Corps Center Proposal for Deactivation, 84 FR 25071, 25072 (May 30, 2019).

However, a bipartisan group of Senators and members of Congress immediately expressed their opposition to both departments' decisions, and the agencies soon reversed course. *See* Letter from Congress to Secretary of Agriculture Sonny Perdue and Secretary of Labor Alexander Acosta, 19.06.05 DOL USDA CCC Closure Letter_Final.pdf (house.gov) (June 5, 2019) (arguing that CCCs "provide essential capacity for the U.S. Forest Service to fulfill its mission and provide economic opportunities in rural areas"); GAO Report, Job Corps: DOL Should Provide Greater Transparency in Communicating Its Rationale for Closure Decisions, https://www.gao.gov/assets/gao-20-240r.pdf (Apr. 14, 2020). *Since those events, each DOL appropriations act has included a rider prohibiting funds from being used to (1) alter or terminate the Interagency Agreement between Labor and the Department of Agriculture*; (2)

---

[1] Before any Job Corps center may be closed, DOL must provide public notice and an opportunity to comment on the decision, as well as notify the member of Congress in whose district the center is located. 29 U.S.C. § 3209(j).
[2] DOL provided the following rationale for selecting the nine CCCs for deactivation: "Some of the centers suffer from a variety of problems, including operating under-capacity, not achieving long-term student outcomes, and operating in an inefficient manner. Others are located in close proximity to other higher-performing centers where increasing the student capacity of the nearby center would better serve students." Job Corps Center Proposal for Deactivation, 84 FR 25071, 25073 (May 30, 2019).

close any of the Civilian Conservation Centers, except if such closure is necessary to prevent the endangerment of the health and safety of the students. *See, e.g.*, Department of Labor Appropriations Act of 2023, § 115(1). Congress continues to pay considerable attention to CCCs. *See, e.g.*, Letter from Senators to Secretary of Labor Marty Walsh, Secretary of Interior Deb Haaland, and Secretary of Agriculture Tom Vilsack, Job Corps CCCs (FINAL).pdf (senate.gov) (Aug. 17, 2022) (urging the agencies "to provide additional programming and support" for CCCs).

Presently, out of the more than 120 Job Corps centers operating around the country, 24 are CCCs operated by the Forest Service. Job Corps Civilian Conservation Centers | US Forest Service (usda.gov). A 2008 interagency agreement (IAA) between USDA and DOL governs the funding, establishment, and operation of CCCs.[3] *See* App. A; section I.C, *infra*. With the exception of salaries of Forest Service employees of CCCs,[4] Congress appropriates no funds to USDA for its operation of CCCs; DOL transfers all CCC funding to USDA from ETA's appropriations. *See* 20 C.F.R. 670.320(b); IAA secs. III.C, III.E.

In its operation of CCCs, the Forest Service, like any other Job Corps center operator, is required to comply with the Job Corps Policies and Requirements Handbook (PRH) developed by DOL's Office of Job Corps. *See, e.g.*, IAA secs. III.A(1), III.C.(1), III.H(6); *see* https://prh.jobcorps.gov/.

---

[3] The annual appropriations riders that restrict closure of CCCs also prohibit altering or terminating the IAA. See, e.g., Department of Labor Appropriations Act of 2023, § 115(1).

[4] For example, Congress specified that the funds appropriated to the Forest Service for FY 2023 "shall be available to pay, from a single account, the base salary and expenses of employees who carry out functions funded by other accounts for . . . Job Corps," among other programs. Department of the Interior, Environment, and Related Agencies Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4808 (2022).

**NOTES FOR THE WHITE HOUSE DOMESTIC POLICY COUNCIL**

- Student Onboard Strength as of April 24, 2025:  25,892
- Federal Contractor/Center Staff:  ~12,000
- USDA Forest Service Federal Employees at Job Corps Centers: 1,100
- National Training Contractors:  8 organizations; 449 Instructors plus ~50 additional Regional coordinators and other Administrative personnel

| NTC Contractor | Technical Education Program | No. of Instructors |
|---|---|---|
| United Brotherhood of Carpenters and Joiners (UBCJA) | • Carpentry, Pre-Apprentice | 113 |
| United Auto Workers (UAW) | • Maintenance - Light Repair, Pre-Apprentice<br>• Advanced Automobile Service Technology, Pre-Apprentice<br>• Advanced MHDT Suspension and Steering, Pre-Apprentice<br>• Advanced Collision Repair and Refinish - Damage Analysis and Estimating, Pre-Apprentice | 35 |
| Transportation Communication Union/International Association of Machinists and Aerospace Workers (TCU-IAM) | • Transportation Service Workers:<br>• Rail Mechanical Service/Carmen<br>• Rail Freight Service<br>• Airline Service<br>• Inland Waterway Service<br>• Rail Passenger Service<br>• Mass Transit/Highway Service | 24 |
| National Plastering Industry's Joint Apprenticeship Trust Fund (NPIJATF) | • Cement Masonry, Pre-Apprentice<br>• Plastering, Pre-Apprentice | 45 |
| International Union of Painters and Allied Trades (IUPAT) | • Painting, Pre-Apprentice<br>• Glazing, Pre-Apprentice<br>• Sign, Billboard, and Display, Pre-Apprentice<br>• Floor Covering Installation, Pre-Apprentice | 41 |
| International Union of Operating Engineers (IUOE) | • Heavy Construction Equipment Mechanic, Pre-Apprentice<br>• Heavy Equipment Operations, Pre-Apprentice<br>• Maintenance Repairer Helper - Stationary Engineering, Pre-Apprentice | 35 |
| International Masonry Institute (IMI) | • Bricklayer, Pre-Apprentice<br>• Tile Setting, Pre-Apprentice | 34 |
| Home Builders Institute (HBI) | • Electrical, Pre-Apprentice<br>• Plumbing, Pre-Apprentice<br>• Building Construction Technology, Pre-Apprentice<br>• HVAC, Pre-Apprentice<br>• Plumbing, Pre-Apprentice | 122 |

Message

| | |
|---|---|
| **From**: | Han, Jihun A - OSEC ███████████████████████████ |
| **Sent**: | 5/1/2025 5:50:08 PM |
| **To**: | Walter, Courtney E - OSEC ███████████ Weisshaar, David M. EOP/OMB |
| | Collins, Miles B - OSEC █████████████ Frazier, Susan (Lori) - ETA |
| **CC**: | Bomberger, Melissa B. EOP/OMB ████████████████ Branson, Michael D. EOP/OMB |
| | Katz, Anne M. EOP/OMB ████████ |
| **Subject**: | Re: Scheduling Time for Follow-Up Meeting on Job Corps |

Hi all,

3 pm works great for me if that works for everyone!

Jihun

**Jihun Han**
Chief of Staff
Office of the Secretary
U.S. Department of Labor
C: ███████████

**From:** Walter, Courtney E - OSEC ███████████████
**Sent:** Thursday, May 1, 2025 5:49:14 PM
**To:** Weisshaar, David M. EOP/OMB ███████████████ ; Collins, Miles B - OSEC
████████ Frazier, Susan (Lori) - ETA ███████████ Han, Jihun A - OSEC

**Cc:** Bomberger, Melissa B. EOP/OMB ███████████ Branson, Michael D. EOP/OMB
████████ Katz, Anne M. EOP/OMB < ████
**Subject:** RE: Scheduling Time for Follow-Up Meeting on Job Corps

Thanks all!  Looping in our Chief of Staff, Jihun Han, who would like to join.

**From:** Weisshaar, David M. EOP/OMB ████████████████
**Sent:** Thursday, May 1, 2025 5:35 PM
**To:** Walter, Courtney E - OSEC ████████████ Collins, Miles B - OSEC ██████████████ Frazier,
Susan (Lori) - ETA ████
**Cc:** Bomberger, Melissa B. EOP/OMB ███████████ Branson, Michael D. EOP/OMB
████████ ; Katz, Anne M. EOP/OMB < ████
**Subject:** Scheduling Time for Follow-Up Meeting on Job Corps

**INFO ONLY: This email originated outside the Department of Labor but from a validated government source. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report" button on your email toolbar.**

Hi all,

It was great to see you all today.

Found below are some times that the OMB team is free tomorrow for a follow-up conversation:

- 12:30-1
- 3-5

If you can let us know which of these work on your end, Annie from our team will send along a meeting invite.

Thanks!

Best,
David


David Weisshaar
Labor Branch
U.S. Office of Management and Budget

Message

| | |
|---|---|
| **From:** | Frazier, Susan (Lori) - ETA ████████████████████ |
| **Sent:** | 4/23/2025 8:51:47 AM |
| **To:** | McGee, Erin L - ETA ████████    Laco, Marek S - ETA ████████ |
| **CC:** | ████████ - ETA ████████ |
| **Subject:** | RE: OJC - OSEC Prep Info Requests 4.22.25 |

Good morning,
Thank you, Erin. This is very helpful. Reviewing now.

**From:** McGee, Erin L - ETA ████████
**Sent:** Wednesday, April 23, 2025 7:19 AM
**To:** Laco, Marek S - ETA ████████    Frazier, Susan (Lori) - ETA ████████
**Cc:** ████████ - ETA ████████
**Subject:** OJC - OSEC Prep Info Requests 4.22.25

Good morning, Marek and Lori, following up on our meeting yesterday end of day. In the interest of time, I am sending several files now and will follow up with the various downsizing options as soon as I can this morning. This first email includes items 1-4 below. I'll send 5 and 6 as soon as able this morning. I do need to get with our Budget Director on a few things but the good news is that we located the original right sizing PPT deck.

1. PY24 Center Pause Rationale – ETLS informed. Explains how we used OY timing plus the sustainability tool plus other real-time factors to arrive at the two centers to pause in Dec 2024.
2. Job Corps Demo Concepts (new, 3 ideas)
3. Basic Activities and Timelines to Suspend Ctr Ops 4.23.25
4. Detailed Process to Effectuate Pause in Center Operations (2024 steps)
5. Recent Demonstration Projects and Outcomes (JC Scholars Program, Louisiana National Guard Youth Challenge, State of Idaho)
6. Right-Sizing Options

I know there's not much time, but if you need more or different, let us know.

Thank you,
Erin

**Erin McGee**
**Acting Administrator**
ETA/Office of Job Corps
U.S. Department of Labor

Appointment

| | |
|---|---|
| **To:** | Sonderling, Keith E - OSEC ▮▮▮▮▮▮▮▮▮▮; Laco, Marek S - ETA ▮▮▮▮▮▮▮▮ Frazier, Susan (Lori) - ETA ▮▮▮▮▮▮▮ Walter, Courtney E - OSEC ▮▮▮▮▮▮▮ Timmons, Luke B1 - ETA ▮▮▮▮▮▮▮ |

**Attachments:** OSEC Policy Planning Meeting 5-2-2025.docx

**Start**: 5/2/2025 6:30:00 PM
**End**: 5/2/2025 7:00:00 PM
**Show Time As**: Busy

**Recurrence**: (none)

**Required Attendees**: Laco, Marek S - ETA; Frazier, Susan (Lori) - ETA; Walter, Courtney E - OSEC; Timmons, Luke B1 - ETA

**Title**: ETA Weekly Agency Management Meeting

**Location**: Office of the Deputy Secretary

**Duration**: 30-minutes

**Topic/ Purpose of Meeting**: Weekly discussion on agency matters.

**Meeting Attendees**:

- Marek Laco

- Lori Frazier

**Staffing KES:** Courtney Walter

**Notes**: Please have all briefing materials to ▮▮▮▮▮▮▮▮▮ 48-Hours in advance of the meeting.

*Internal Use Only*
*Confidential and Deliberative*

## MEMORANDUM FOR THE OFFICE OF THE SECRETARY

Policy Planning Meeting



**From:**              **Lori Frazier Bearden, Acting Assistant Secretary**
                       ***Employment and Training Administration***

**Meeting Date:**      May 2nd, 2025

**Agency Attendees:**  **Lori Frazier Bearden, Marek Laco, Luke Timmons**

**Programmatic Updates**:



- Job Corps: ETA is engaged in ongoing discussions about the status of the Job Corps program. Numerous Job Corps center operator contracts are currently or soon to be up for renewal. The Job Corps program faces a projected operating deficit of up to $213 million for Program Year (PY) 2025.



*Internal Use Only*
*Confidential and Deliberative*



*Internal Use Only*
*Confidential and Deliberative*



**Media Inquiries / Press Releases:**

- Job Corps Transparency Report (Link)

*Internal Use Only*
*Confidential and Deliberative*



Appointment

| | |
|---|---|
| **To:** | Sonderling, Keith E - OSEC ███████████; Laco, Marek S - ETA ███████████ Frazier, Susan (Lori) - ETA ███████████ Walter, Courtney E - OSEC ███████████ Timmons, Luke B1 - ETA ███████ |

**Attachments:** OSEC Policy Planning Meetings Template (002).docx

**Start**: 5/2/2025 6:30:00 PM
**End**: 5/2/2025 7:00:00 PM
**Show Time As**: Busy

**Recurrence**: (none)

**Required Attendees**: Laco, Marek S - ETA; Frazier, Susan (Lori) - ETA; Walter, Courtney E - OSEC; Timmons, Luke B1 - ETA

**Attaching an updated PPM Memo**

**Title**: ETA Weekly Agency Management Meeting

**Location**: Office of the Deputy Secretary

**Duration**: 30-minutes

**Topic/ Purpose of Meeting**: Weekly discussion on agency matters.

**Meeting Attendees**:

- Marek Laco

- Lori Frazier

**Staffing KES:** Courtney Walter

**Notes**: Please have all briefing materials to ███████████ 48-Hours in advance of the meeting.

*Internal Use Only*
*Confidential and Deliberative*

## MEMORANDUM FOR THE OFFICE OF THE SECRETARY

Policy Planning Meeting



| | |
|---|---|
| **From:** | **Lori Frazier Bearden, Acting Assistant Secretary** |
| | ***Employment and Training Administration*** |
| **Meeting Date:** | May 2nd, 2025 |
| **Agency Attendees:** | **Lori Frazier Bearden, Marek Laco, Luke Timmons** |

**Programmatic Updates**:



- Job Corps: Attended PCC Job Corps on 5/2. Nine (9) Job Corps center operator contracts and One (1) caregiver contract are currently operating with a 2-week extension. On-going efforts to address deficiencies. Job Corps program faces a projected operating deficit of up to $213 million for Program Year (PY) 2025.

*Internal Use Only*
*Confidential and Deliberative*



*Internal Use Only*
*Confidential and Deliberative*



**Media Inquiries / Press Releases**:

- Job Corps Transparency Report (Link)

*Internal Use Only*
*Confidential and Deliberative*





Message

| | |
|---|---|
| **From:** | Frazier, Susan (Lori) - ETA ███████████████████████████ |
| **Sent:** | 5/4/2025 3:53:23 PM |
| **To:** | Han, Jihun A - OSEC ████████████████ |
| **Subject:** | DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum |
| **Attachments:** | EMBARGOED DRAFT_ETA Job Corps Program Decision Memo.docx |

Here you go! The DRAFT operational plan is only 2 pages, but I included an Appendix for reference. I am sure there will be some edits. There are also a few decision points in it.

Thanks!
Lori

**Lori Frazier Bearden** |
United States Department of Labor
Acting Assistant Secretary
Employment and Training Administration
200 Constitution Avenue Suite S-2307
Washington, D.C. 20210
C: ████████████



**U.S. Department of Labor**     Assistant Secretary for
Employment and Training
Washington, D.C. 20210



<strong>DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE</strong>

**May 4, 2025**

**DECISION MEMORANDUM**

**SUBJECT:    Job Corps Program and Pausing Center Operations**

---

**PURPOSE:** To reach consensus on pausing Job Corp center operations and return every student safely and timely to their home of record by the end of the program year June 30th

**DECISION POINT:** Pause all Job Corp centers including USDA Conservation Corp Centers (CCCs)? Or leave the 24 USDA untouched?

**PROPOSED OPERATIONAL PLAN:** (1) Pause all Job Corp center operations (including 24 USDA CCCs) immediately to allow adequate transition plans for mobilizing students. **(2)** Centers will execute a "Suspension of Operations" Plan. (3) Formal Closure (4) Funding Actions and Program Possibilities

**PHASE 1: PAUSE ALL JOB CORP CENTER OPERATIONS**

- ➢ **Action 1:** OSEC will communicate the operational plan with USDA Secretary. USDA center staff (24 centers) will be directed to operationalize their "Suspension of Operations" plan to transfer students to home of record.
  - o Cannot provide a full Reduction in Force (RIF) because some center staff are needed to manage facilities.

- ➢ **Action 2:** ETA will terminate 99 contracts with center operators using the "Termination for Convenience of the Government".
  - o No explanation needed for "convenience". Do not use "transparency report" for rationale.
    - ▪ Pausing all centers eliminates debate over indiscriminately choosing, performance measures and safety criteria
  - o ETA leadership will brief limited Job Corp federal staff including Contracting Officer Representative (COR).
  - o OJC Staff will issue brief email notice minutes in advance to Job Corp Center Operators/Job Corp Association/Labor Unions of the termination notices
  - o OJC staff will issue a Termination of Inconvenience effective X date and require by X date what needs to be completed (i.e. implement the Center Operations Pause and transition students to home of record.).
  - o ETA leadership will ensure COR understands negotiation role to negotiate termination fees and needed program costs that are applicable to transition

        students and successfully stop operations. This will include up to 3-4 months of continued contract operations such as facility and property management, records retention, secure data and transportation fleet.
- o Center Operators will operationalize "Suspension of Operations" plan.
- ➢ **Action 3:** DOL OSEC will operate a communication plan in conjunction with other executive leadership.
- ➢ **Action 4:** ETA will provide targeted response for Job Corp center staff (employment services, job fairs, unemployment compensation, dislocated worker funding)
- ➢ **Action 5:** ETA will provide students with alternative program options such as Apprenticeship opportunities, Armed Service recruiters, etc..
- ➢ **Action 6**: "Caretaker" contracts will be executed to maintain facilities until leases expire. Owned properties will require on-going caretaker contracts.

## PHASE 2: FORMAL CLOSURES

- ➢ **Action 1:** ETA will publish a Federal Register Notice as required by WIOA sec.159 providing advance notice of center closures.
- ➢ **Action 2: Decision point**: USDA centers are not operated by contract, but rather an interagency agreement between DOL and USDA. USDA centers are owned and cannot be closed using enacted appropriations unless to prevent endangerment of health/safety and cannot terminate the interagency agreement.
- ➢ **Action 3:** DOL in conjunction with GSA follows federal regulations for general disposal requirements complying with Federal Property Administrative Services Act, GSA's Federal Management Regulation (FMR), and USDOL policies.

## PHASE 3: FUNDING ACTIONS AND PROGRAM REBIRTH POSSIBILITIES

- ➢ **Action 1: Decision Point-** Appropriated program funds could be returned to U.S. Treasury or using the Demonstration Authority under 29 U.S.C.3206(a), launch the rebirth of a Job Corp program that provides funding to the states to carry out education and vocational training to this at-risk population.
- ➢ **Action 2: Decision Point-** Legislation is still in place. Regulatory and statutory cleanup to keep USDA programs operating and birth a new program.

- ➢ **Create – America First Job Corp Program. Ideas could include:**
- o Establish Demonstration Grants to the States
- o Designate centers for Shipbuilding Technical Education
- o Meet with Union Heads to discuss how all union labor work will be moved from closing centers to the 24 USDA Centers/ trade-up for future forest workers/Ensure Labor Union staff are connected to the USDA sites for employment.
- o Create Apprenticeship Programs for Forestry, Carpentry at USDA sites.
- o Create a partnership with Community colleges to provide the Job Corp without brick-and-mortar sites
- o Allocate the PY25 Funds to states to operationalize State Job Corp programs, also a peacekeeping tactic.

000213

## APPENDIX
## BRIEF SUMMARY

**Background & Analysis:** Job Corps, established under the Economic Opportunity Act of 1964 (Public Law 88-452), is the nation's largest federally funded residential education and vocational training program.

| | |
|---|---|
| **Operational PY24 Budget:** | $1.6 Billion |

**Center Operations:**

- Total Job Corp Centers (all 50 states, Puerto Rico, and DC):     123
- Of the 123, number operated by contract:     99
- Of the 123, number operated by USDA:     24
- Number of centers currently paused[1]:     4
- Owned Job Corp Centers:     58
- Leased Job Corp Centers:     34
- USDA Centers owned by Forest Service:     24

**Administration:**

- Office of Job Corps (OJC) federal FTE within ETA and regional offices:     80
- Student Onboard Strength as of April 24, 2025:     25,892
- Federal Contractor/Job Center Staff:     12,000
- USDA Forest Service Federal Employees at Job Corps Centers:     1,100
- National Training Contractors[2] (union organizations):     8
  - Instructors:     449
  - Regional coordinators and other administrative personnel     50+

**Program Performance Failures, Facility Sustainability, and Excessive Costs:** The Job Corp program cannot continue to operate services at its current capacity. The program is in a financial crisis and has remained at the high risk of violating the Anti-deficiency Act (ADA)[3].

- The Job Corps budget has remained largely flat at $1.6 billion since 2018.
- If adjusted for inflation, the budget would have to exceed $2 billion in 2024 to continue operations.
- Job Corps was operating at a deficit for PY 24—approximately $140 million—several actions to save approximately $119 million including the pausing of centers, cancelling contracts, and reducing costs have allowed the current operations to reach the end of this program year June 30th.

---

[1] Woodstock (MD), Whitney Young (KY), Penobscot (ME), Loring (ME)
[2] See Appendix
[3] ADA Act- The Antideficiency Act prohibits federal employees from making or authorizing an expenditure from, or creating or authorizing an obligation under, any appropriation or fund in excess of the amount available in the appropriation or fund unless authorized by law. 31 U.S.C. § 1341 (a) (1) (A).

000214

- PY25- Operating deficit could grow up to $213 million if mitigation strategies do not continue

## BACKGROUND AND ANALYSIS

## I. Purpose and Administration

. Since its inception, the program has served over three million youth and young adults. Currently authorized under the Workforce Innovation and Opportunity Act (WIOA), Title I, Subtitle C (codified at 29 U.S.C. § 3191 et seq.), Job Corps is funded through annual Congressional appropriations, with an average budget of approximately $1.6 billion for center operations since 2017. The program provides academic education, career technical training, career transition services, and residential support to thousands of students each year.

The Office of Job Corps (OJC) within ETA oversees the program and is comprised of staff at the National Office with six regional offices. In total, OJC employs 80 federal full-time equivalent staff. The program is funded through three distinct accounts: $1.6 billion for Operations, which supports center operations contracts and U.S. Department of Agriculture (USDA) Forest Service Civilian Conservation Centers for residential services, academics, counseling, and career technical training; $33 million for Administration, which funds federal staffing, travel, and training at the National and Regional Offices; and $123 million for Construction, Rehabilitation, and Acquisition (CRA), which supports facility acquisition, construction, and rehabilitation nationwide.

## II. Eligibility Criteria

Admissions Counselors are hired under center operations contracts to assess applicant eligibility for the program. As outlined in 29 U.S.C. § 3194 (or pursuant to other sections in WIOA, as noted), applicants must:

- Be between 16 and 24 years old at enrollment (with allowances for up to 20% of enrollees aged 22–24 and waivers for individuals with disabilities).
- Meet low-income criteria.
- Face one or more barriers to education and employment, such as being basic skills deficient, a school dropout, homeless, a foster child, or requiring additional education or training to obtain and retain employment.
- Demonstrate a need for additional education, training, or support to secure and maintain employment
- Not fall within one of WIOA's special limitations on selection in 29 U.S.C. § 3195(b).
- Consistent with the nondiscrimination prohibition against certain noncitizens located at 29 U.S.C. § 3248(a)(5), be either a U.S. citizen; a lawfully admitted permanent resident alien, refugee, asylee, parolee, or other alien who has been authorized by the Department of Homeland Security to work in the United States; or a resident of a U.S. territory.

4

Job Corps' eligibility criteria are outlined in more detail in the Policy and Requirements Handbook Exhibit 1-1.

## III. Center Types and Operations

Job Corps centers operate under three models. Contracted centers are managed by private organizations or state and local agencies through competitive procurement. Civilian Conservation Centers (CCCs) are operated by the USDA Forest Service, focusing on conservation training and disaster response in rural areas. Additionally, some centers are operated by Indian tribes through agreements to serve Indians.[4]

A majority of centers are operated by contractors via competitively awarded contracts, with approximately 13,000 contractor staff.  In addition, 24 Civilian Conservation Centers (CCC) are operated by the USDA Forest Service via an interagency agreement and are staffed with 1,100 federal employees.

- *Civilian Conservation Centers (CCCs)*

**Overview**: CCCs are a subset of Job Corps centers focused on natural resource conservation and public land management. They offer unique training opportunities in forestry, firefighting, and conservation, contributing to both workforce development and environmental stewardship.

**Governance and Funding**: CCCs operate under an **interagency agreement** between the Department of Labor and the USDA. While the Forest Service manages daily operations, DOL provides funding and oversight to ensure alignment with Job Corps standards and objectives.

**Legislative Considerations**: In 2019, proposals to close several CCCs were met with bipartisan opposition that, in part, included assertions as to their importance to rural economies and conservation efforts. Subsequent enacted appropriations laws included provisions prohibiting appropriated funds from being used to (1) alter or terminate the Interagency Agreement between DOL and USDA and (2) close any of the Civilian Conservation Centers, except if such closure is necessary to prevent the endangerment of the health and safety of the students.

## V. Performance Management

**Performance Indicators**: Under 29 U.S.C. § 3209, Job Corps centers are evaluated based on the primary indicators of performance applicable to all programs authorized by WIOA, including: 1) placement in employment, education, or training (2nd and 4th quarter after exit), 2) credential attainment, 3) measurable skill gains, 4) median earnings, and 5) retention in employment or education.

---

[4] Currently Job Corps' Talking Leaves Job Corps Center is operated by Cherokee Nation.

000216

**Job Corps Center Closure Criteria**

Per 29 U.S.C. § 3209(j), prior to the closure of any Job Corps center, "the Secretary shall ensure—
(1) that the proposed decision to close the center is announced in advance to the general public through publication in the Federal Register or other appropriate means;
(2) the establishment of a reasonable comment period, not to exceed 30 days, for interested individuals to submit written comments to the Secretary; and
(3) that the Member of Congress who represents the district in which such center is located is notified within a reasonable period of time in advance of any final decision to close the center."

Historically DOL has announced the closure criteria it is using to close any given center through publishing those criteria in the FRN and, occasionally, requesting comments on the criteria. This means over time the closure criteria have not been static – DOL has added criteria to address the policy direction and need for a rationale to close a center at a given time. Closure criteria have varied over time, including considerations of chronic low performance, an evaluation of effort required to maintain high-quality education, and other considerations to determine whether to close a center.[5]

If a decision is made to close a center, then the decision and basis for the decision must be documented at least internally. The process to complete a closure can be a costly, time-consuming process as operations at the center are wound down, personal property is dealt with, and any real property issues are addressed.

## VI. Demonstration Authority

**Legal Framework**: Under 29 U.S.C. § 3206(a), the Secretary of Labor is authorized to carry out experimental, research, or demonstration projects relating to carrying out the Job Corps program. The statute also provides the Secretary the authority to waive any provisions of the WIOA section on Job Corps that the Secretary finds would prevent her from carrying out the projects. If the Secretary determines that such waiver is necessary, the statute requires 90-days advance written notification to the Committee on Education and the Workforce of the House of Representatives and the Committee on Health, Education, Labor, and Pensions of the Senate.

**Purpose and Implementation**: The demonstration authority allows the Department of Labor to pilot innovative approaches to education and vocational training relating to carrying out the Job Corps program. These projects aim to enhance program effectiveness, address emerging workforce needs, and improve service delivery to participants.[6]

---

[5] See example of closure criteria for Ouachita Civilian Conservation Center in Arkansas, 81 FR 43250 (July 1, 2016), https://www.federalregister.gov/documents/2016/07/01/2016-15603/final-notice-of-job-corps-center-for-closure

[6] An illustrative example of this authority in action is the Job Corps Scholars Program, a demonstration project that provided eligible youth aged 16–24 the opportunity to enroll in career technical training programs at twenty-six accredited public colleges.

000217

## VII. Contracting Mechanisms

**Firm Fixed-Price Contracts (FFP)**: OJC began transitioning to the FFP model in 2019 and has a few remaining contracts to transition from cost-reimbursable to FFP. Under FFP agreements, contractors are paid a set amount for delivering specified services, regardless of actual costs incurred. FFP contracts offer some advantages for government operations by providing cost predictability, which helps agencies better manage budgets and fiscal planning. These contracts also incentivize contractors to operate efficiently, since maintaining profitability depends on managing resources within the agreed price.[7] However, successful execution of FFP contracts requires careful attention to a few important considerations. Defining the scope of work with precision is critical to prevent scope creep[8] and maintain contractor accountability. Additionally, because contractors bear the financial risk of cost overruns, there is a possibility that service quality could be affected if risks are not properly managed.

Having selected the FFP contract type, DOL faced a new challenge during the COVID pandemic. Under an FFP contract, agencies have little or no visibility on the contractor's costs. As enrollment numbers dropped due to COVID, any cost savings did not automatically translate into reduced FFP payments by DOL. DOL did negotiate a "take back" mechanism for low OBS, but these were limited given DOL's understanding that a large portion of operational costs (e.g., salaries and facilities) are impervious to changes in enrollment. Plus, a reduction in the FFP amounts would be subject to negotiation and could be grounds for dispute and litigation absent contractor agreement.

## VIII. Real Property Management and Disposal

While most DOL office spaces are leased through GSA, Job Corps centers are exceptions, as they are directly owned or leased by the DOL. Job Corps controls over 90% of the Department of Labor's building stock. The legal status of the Job Corps facilities is broken down into four categories: 1) DOL owned, 2) DOL direct leased, 3) a combination of DOL owned and direct leased, and 4) Civilian Conservation Centers (CCCs). Of all the Job Corps centers, 58 are owned, 34 are leased, seven are a mixture of owned and leased, and 24 are on land owned by the USDA or United States Department of the Interior (DOI) and operated as CCCs. Two Centers on the list (Gainesville and Homestead) have been closed, but DOL still owns the property which is now excess and currently going through the disposal process with GSA.

---

[7] The advantages of a firm fixed price contract type is recognized by Federal Acquisition Regulation FAR 16.202-1, which states: "[a] firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties."

[8] Under the Changes clauses in the contracts, FAR 52.243-1, *Changes-Fixed Price*, the contractors are entitled to additional compensation if the agency directs them to perform work not required by the contract which increases their costs of performance.

000218

Job Corps center contractors manage government-furnished property (GFP) on-site. These contractors are also required to maintain accurate inventories using systems like the Electronic Property Management System (EPMS) and the Fleet Tracking Management System (FTMS). Regular audits and adherence to federal property management regulations, including those from the Federal Acquisition Regulation (FAR) and GSA policies, ensure accountability and proper stewardship.[9]

The OJC currently has an unfunded, deferred construction, rehabilitation and acquisition (CRA) backlog estimated to be $1.6 billion. Job Corps defines its unfunded CRA backlog as the total of the non-recurring costs to restore and renovate facilities (structures and buildings) and systems (e.g., heating ventilation, air conditioning, sewage, water, or electrical) to, or as close to, their original capacity, efficiency, and capability, and for which insufficient funding is currently available to complete the work. This amount represents more than 2,200 structures located on 5,600 acres.  Over the past several years, the cost associated with correcting property deficiencies has increased by more than 50 percent.

More than 43 percent of the Job Corps' portfolio by square footage is more than 50 years old.  In 2024, Job Corps estimated that in five years, 119 additional buildings comprising nearly 1,135,000 gross square feet would reach the age of 50, which will result in those buildings becoming subject to compliance with the historic preservation regulations when undergoing renovations.  CRA funding is critical to the success of the Job Corps program because healthy and safe facilities contribute to an effective learning environment.

### General Disposal Requirements for Job Corps Centers

When a Job Corps center is closed or realigned, the U.S. Department of Labor (DOL), historically in coordination with the General Services Administration (GSA), follows federal regulations to dispose of real property and assets. The disposal process must comply with the Federal Property and Administrative Services Act, GSA's Federal Management Regulation (FMR), and applicable Department of Labor policies.
Generally, disposal involves several key steps:
- **Property Assessment:** The DOL evaluates whether real property (land, buildings, equipment) is excess to agency needs.
- **Declaration as Excess:** Property no longer needed is officially declared "excess" and reported to GSA for broader federal screening.
- **Federal and Public Screening:** GSA offers excess property to other federal agencies first. If no agency claims it, it is made available to state, local governments, nonprofits, or educational institutions under specific public benefit conveyance programs.
- **Public Sale:** If there is no federal or public entity interest, the property is sold to the public, typically through online auctions or sealed bids.
- **Environmental Compliance:** Before disposal, environmental assessments must be conducted to ensure compliance with laws like the National Environmental Policy Act (NEPA) and to address any hazardous materials or cleanup requirements.

---

[9] See Job Corps' Policy and Requirements Handbook Appendix 505 Admin and Management of Job Corps Contractor-Held Government-Furnished Property.pdf

000219

- **Proceeds:** Revenue from property sales is generally returned to the U.S. Treasury unless specific statutory authority allows reuse within the program.

Separately, contractor-held personal property (such as equipment, vehicles, and supplies) must be disposed of following federal acquisition regulations (FAR Subpart 45.6) and DOL property management policies, ensuring proper accountability and financial closeout.

## IX. DOL Transparency Report

On April 25, 2025, the U.S. Department of Labor's Employment and Training Administration released the 2025 Job Corps Transparency Report, providing a detailed analysis of the financial performance and operational costs of the Job Corps Program.

Below is a summary of the overall findings from PY2023[10]:
- Average Graduation Rate:
  - Traditional: 32%
  - WIOA Definition: 38%
- Average Cost Per Enrollee (Regardless of Length of Stay): $49,769.53
- Average Cost Per Student Per Year (Average PY23 Headcount): $80,284.65
- Average Total Cost Per Graduate:
  - Traditional: $187,653
  - WIOA Definition: $155,600
- Job Corps participants earn $16,695 annually on average, post separation
- Average of Highest Center Costs per Graduate (Traditional Data):
  - The 10 least efficient programs average $512,800 dollars per graduate
  - The top 50 least efficient programs average $319,085 per graduate
- Average of Highest Center Costs per Graduate (WIOA Data):
  - The 10 least efficient programs average $385,370 per graduate
  - The top 50 least efficient programs average $252,285 per graduate

## X. Job Corps PY 2024 and 2025 Cost Savings Efforts

In Program Year (PY) 24, the Office of Job Corps implemented a series of aggressive cost savings initiatives to mitigate an anticipated operating deficit and set a foundation for long-term program sustainability. These efforts were informed by a comprehensive review of all expenditures against statutory and regulatory minimum requirements.

---

[10] The Job Corps Transparency Report's metrics distinguish between two definitions of the term "graduate": one reflecting traditional program completion in good standing (Traditional), and another using the statutory criteria from Workforce Innovation and Opportunity Act Sec. 116, Sec. 142, which counts individuals who attain a diploma or Career Technical Training completion while enrolled but do not complete the full program.

000220

PY 24 cost-saving strategies resulted in savings of over $120 million, that included:

- **De-scoping Requests for Proposals (RFPs) and Center Contracts:**
  Job Corps systematically reviewed the Policy and Requirements Handbook (PRH) to
  identify and remove non-mandatory program requirements, allowing for the negotiation
  with contractors to modify the contracts to reduce the future contract prices. This de-
  scoping focused on aligning center operations strictly to statutory obligations, thus
  reducing unnecessary expenditures. This included policy revisions to eliminate Evening
  and Weekend Studies requirements, remove non-mandatory oral health services, remove
  mandatory Career Transition Services (CTS) for those who did not complete the
  program, and reduce nursing and trainee employee assistance program hours back to pre-
  COVID levels. These targeted changes directly contributed to operating cost reductions
  without undermining core program services.

**In Program Year (PY) 25, the Job Corps program faces a projected operating deficit of up
to $213 million.** To address this shortfall, the Department is contemplating several strategies to
augment amounts carried forward from PY24 mitigation efforts (estimated at $130 million):
prioritizing cost-saving actions at centers with expiring contracts and suspending operations at
underperforming centers, including deploying the following:

- **Trade and Program Restructuring:** Job Corps conducted a national evaluation of trade
  offerings across centers, using labor market information and program performance
  ratings. Underutilized or duplicative trades are targeted for elimination or consolidation,
  and Continuous Improvement Plans (CIPs) will be deployed for lower-performing
  programs.
- **Long-Term Sustainability Risk Analysis and Right-Sizing Initiatives:** A new
  facilities, performance, and sustainability risk assessment tool was developed to prioritize
  centers for potential suspension of operations based on performance and fiscal
  sustainability. This risk-driven "Right-Sizing" initiative focused on gradually shifting to a
  need-based model (e.g., one to three residential centers per state) projecting long-term
  savings of up to $337.72 million.
- **Cost Avoidance in USDA Forest Service Centers:** For USDA-operated centers, Job
  Corps reviewed CCC funding formulas to avoid overpayment for vacant student slots,
  resulting in a projected $2 million cost avoidance for PY 25.

**Union Labor**

| NTC Contractor | Technical Education Program | No. of Instructors |
|---|---|---|
| United Brotherhood of Carpenters and Joiners (UBCJA) | • Carpentry, Pre-Apprentice | 113 |
| United Auto Workers (UAW) | • Maintenance - Light Repair, Pre-Apprentice | 35 |

10

| NTC Contractor | Technical Education Program | No. of Instructors |
|---|---|---|
| | • Advanced Automobile Service Technology, Pre-Apprentice<br>• Advanced MHDT Suspension and Steering, Pre-Apprentice<br>• Advanced Collision Repair and Refinish - Damage Analysis and Estimating, Pre-Apprentice | |
| Transportation Communication Union/International Association of Machinists and Aerospace Workers (TCU-IAM) | • Transportation Service Workers:<br>• Rail Mechanical Service/Carmen<br>• Rail Freight Service<br>• Airline Service<br>• Inland Waterway Service<br>• Rail Passenger Service<br>• Mass Transit/Highway Service | 24 |
| National Plastering Industry's Joint Apprenticeship Trust Fund (NPIJATF) | • Cement Masonry, Pre-Apprentice<br>• Plastering, Pre-Apprentice | 45 |
| International Union of Painters and Allied Trades (IUPAT) | • Painting, Pre-Apprentice<br>• Glazing, Pre-Apprentice<br>• Sign, Billboard, and Display, Pre-Apprentice<br>• Floor Covering Installation, Pre-Apprentice | 41 |
| International Union of Operating Engineers (IUOE) | • Heavy Construction Equipment Mechanic, Pre-Apprentice<br>• Heavy Equipment Operations, Pre-Apprentice<br>• Maintenance Repairer Helper - Stationary Engineering, Pre-Apprentice | 35 |
| International Masonry Institute (IMI) | • Bricklayer, Pre-Apprentice<br>• Tile Setting, Pre-Apprentice | 34 |
| Home Builders Institute (HBI) | • Electrical, Pre-Apprentice<br>• Plumbing, Pre-Apprentice<br>• Building Construction Technology, Pre-Apprentice<br>• HVAC, Pre-Apprentice<br>• Plumbing, Pre-Apprentice | 122 |

11

Message

| | |
|---|---|
| **From:** | Han, Jihun A - OSEC |
| **Sent:** | 5/4/2025 4:51:24 PM |
| **To:** | Walter, Courtney E - OSEC ▮▮▮ Wright, Rebecca - OSEC ▮ |
| **Subject:** | Fw: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum |
| **Attachments:** | EMBARGOED DRAFT_ETA Job Corps Program Decision Memo.docx |

Get Outlook for iOS

**From:** Frazier, Susan (Lori) - ETA ▮▮▮
**Sent:** Sunday, May 4, 2025 3:53:23 PM
**To:** Han, Jihun A - OSEC ▮▮▮
**Subject:** DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

Here you go! The DRAFT operational plan is only 2 pages, but I included an Appendix for reference. I am sure there will be some edits. There are also a few decision points in it.

Thanks!
Lori

**Lori Frazier Bearden |**
United States Department of Labor
Acting Assistant Secretary
Employment and Training Administration
200 Constitution Avenue Suite S-2307
Washington, D.C. 20210
C: ▮▮▮



**U.S. Department of Labor**          Assistant Secretary for
                                      Employment and Training
                                      Washington, D.C. 20210



<strong>DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE</strong>

**May 4, 2025**

**DECISION MEMORANDUM**

**SUBJECT:   Job Corps Program and Pausing Center Operations**

---

**PURPOSE:** To reach consensus on pausing Job Corp center operations and return every student safely and timely to their home of record by the end of the program year June 30th

**DECISION POINT:** Pause all Job Corp centers including USDA Conservation Corp Centers (CCCs)? Or leave the 24 USDA untouched?

**PROPOSED OPERATIONAL PLAN:** (1) Pause all Job Corp center operations (including 24 USDA CCCs) immediately to allow adequate transition plans for mobilizing students. **(2)** Centers will execute a "Suspension of Operations" Plan. (3) Formal Closure (4) Funding Actions and Program Possibilities

## PHASE 1: PAUSE ALL JOB CORP CENTER OPERATIONS

- ➢ **Action 1:** OSEC will communicate the operational plan with USDA Secretary. USDA center staff (24 centers) will be directed to operationalize their "Suspension of Operations" plan to transfer students to home of record.
    - ○ Cannot provide a full Reduction in Force (RIF) because some center staff are needed to manage facilities.

- ➢ **Action 2:** ETA will terminate 99 contracts with center operators using the "Termination for Convenience of the Government".
    - ○ No explanation needed for "convenience". Do not use "transparency report" for rationale.
        - ▪ Pausing all centers eliminates debate over indiscriminately choosing, performance measures and safety criteria
    - ○ ETA leadership will brief limited Job Corp federal staff including Contracting Officer Representative (COR).
    - ○ OJC Staff will issue brief email notice minutes in advance to Job Corp Center Operators/Job Corp Association/Labor Unions of the termination notices
    - ○ OJC staff will issue a Termination of Inconvenience effective X date and require by X date what needs to be completed (i.e. implement the Center Operations Pause and transition students to home of record.).
    - ○ ETA leadership will ensure COR understands negotiation role to negotiate termination fees and needed program costs that are applicable to transition

students and successfully stop operations. This will include up to 3-4 months of continued contract operations such as facility and property management, records retention, secure data and transportation fleet.
- o Center Operators will operationalize "Suspension of Operations" plan.
- ➢ **Action 3:** DOL OSEC will operate a communication plan in conjunction with other executive leadership.
- ➢ **Action 4:** ETA will provide targeted response for Job Corp center staff (employment services, job fairs, unemployment compensation, dislocated worker funding)
- ➢ **Action 5:** ETA will provide students with alternative program options such as Apprenticeship opportunities, Armed Service recruiters, etc..
- ➢ **Action 6**: "Caretaker" contracts will be executed to maintain facilities until leases expire. Owned properties will require on-going caretaker contracts.

## PHASE 2: FORMAL CLOSURES

- ➢ **Action 1:** ETA will publish a Federal Register Notice as required by WIOA sec.159 providing advance notice of center closures.
- ➢ **Action 2: Decision point**: USDA centers are not operated by contract, but rather an interagency agreement between DOL and USDA. USDA centers are owned and cannot be closed using enacted appropriations unless to prevent endangerment of health/safety and cannot terminate the interagency agreement.
- ➢ **Action 3:** DOL in conjunction with GSA follows federal regulations for general disposal requirements complying with Federal Property Administrative Services Act, GSA's Federal Management Regulation (FMR), and USDOL policies.

## PHASE 3: FUNDING ACTIONS AND PROGRAM REBIRTH POSSIBILITIES

- ➢ **Action 1: Decision Point-** Appropriated program funds could be returned to U.S. Treasury or using the Demonstration Authority under 29 U.S.C.3206(a), launch the rebirth of a Job Corp program that provides funding to the states to carry out education and vocational training to this at-risk population.
- ➢ **Action 2: Decision Point-** Legislation is still in place. Regulatory and statutory cleanup to keep USDA programs operating and birth a new program.

- ➢ **Create – America First Job Corp Program. Ideas could include:**
  - o Establish Demonstration Grants to the States
  - o Designate centers for Shipbuilding Technical Education
  - o Meet with Union Heads to discuss how all union labor work will be moved from closing centers to the 24 USDA Centers/ trade-up for future forest workers/Ensure Labor Union staff are connected to the USDA sites for employment.
  - o Create Apprenticeship Programs for Forestry, Carpentry at USDA sites.
  - o Create a partnership with Community colleges to provide the Job Corp without brick-and-mortar sites
  - o Allocate the PY25 Funds to states to operationalize State Job Corp programs, also a peacekeeping tactic.

000225

## APPENDIX
## BRIEF SUMMARY

**Background & Analysis:** Job Corps, established under the Economic Opportunity Act of 1964 (Public Law 88-452), is the nation's largest federally funded residential education and vocational training program.

**Operational PY24 Budget:**                                               $1.6 Billion
**Center Operations:**
- Total Job Corp Centers (all 50 states, Puerto Rico, and DC):      123
- Of the 123, number operated by contract:                         99
- Of the 123, number operated by USDA:                             24
- Number of centers currently paused[1]:                           4
- Owned Job Corp Centers:                                          58
- Leased Job Corp Centers:                                         34
- USDA Centers owned by Forest Service:                            24

**Administration:**
- Office of Job Corps (OJC) federal FTE within ETA and regional offices:   80
- Student Onboard Strength as of April 24, 2025:                   25,892
- Federal Contractor/Job Center Staff:                            12,000
- USDA Forest Service Federal Employees at Job Corps Centers:      1,100
- National Training Contractors[2] (union organizations):          8
  - Instructors:                                                  449
  - Regional coordinators and other administrative personnel      50+

**Program Performance Failures, Facility Sustainability, and Excessive Costs:** The Job Corp program cannot continue to operate services at its current capacity. The program is in a financial crisis and has remained at the high risk of violating the Anti-deficiency Act (ADA)[3].

- The Job Corps budget has remained largely flat at $1.6 billion since 2018.
- If adjusted for inflation, the budget would have to exceed $2 billion in 2024 to continue operations.
- Job Corps was operating at a deficit for PY 24—approximately $140 million—several actions to save approximately $119 million including the pausing of centers, cancelling contracts, and reducing costs have allowed the current operations to reach the end of this program year June 30th.
- PY25- Operating deficit could grow up to $213 million if mitigation strategies do not continue

---

[1] Woodstock (MD), Whitney Young (KY), Penobscot (ME), Loring (ME)
[2] See Appendix
[3] ADA Act- The Antideficiency Act prohibits federal employees from making or authorizing an expenditure from, or creating or authorizing an obligation under, any appropriation or fund in excess of the amount available in the appropriation or fund unless authorized by law. 31 U.S.C. § 1341 (a) (1) (A).

3

000226

## BACKGROUND AND ANALYSIS

## I. Purpose and Administration

. Since its inception, the program has served over three million youth and young adults. Currently authorized under the Workforce Innovation and Opportunity Act (WIOA), Title I, Subtitle C (codified at 29 U.S.C. § 3191 et seq.), Job Corps is funded through annual Congressional appropriations, with an average budget of approximately $1.6 billion for center operations since 2017. The program provides academic education, career technical training, career transition services, and residential support to thousands of students each year.

The Office of Job Corps (OJC) within ETA oversees the program and is comprised of staff at the National Office with six regional offices.  In total, OJC employs 80 federal full-time equivalent staff. The program is funded through three distinct accounts: $1.6 billion for Operations, which supports center operations contracts and U.S. Department of Agriculture (USDA) Forest Service Civilian Conservation Centers for residential services, academics, counseling, and career technical training; $33 million for Administration, which funds federal staffing, travel, and training at the National and Regional Offices; and $123 million for Construction, Rehabilitation, and Acquisition (CRA), which supports facility acquisition, construction, and rehabilitation nationwide.

## II. Eligibility Criteria

Admissions Counselors are hired under center operations contracts to assess applicant eligibility for the program.  As outlined in 29 U.S.C. § 3194 (or pursuant to other sections in WIOA, as noted), applicants must:

- Be between 16 and 24 years old at enrollment (with allowances for up to 20% of enrollees aged 22–24 and waivers for individuals with disabilities).
- Meet low-income criteria.
- Face one or more barriers to education and employment, such as being basic skills deficient, a school dropout, homeless, a foster child, or requiring additional education or training to obtain and retain employment.
- Demonstrate a need for additional education, training, or support to secure and maintain employment
- Not fall within one of WIOA's special limitations on selection in 29 U.S.C. § 3195(b).
- Consistent with the nondiscrimination prohibition against certain noncitizens located at 29 U.S.C. § 3248(a)(5), be either a U.S. citizen; a lawfully admitted permanent resident alien, refugee, asylee, parolee, or other alien who has been authorized by the Department of Homeland Security to work in the United States; or a resident of a U.S. territory.

Job Corps' eligibility criteria are outlined in more detail in the Policy and Requirements Handbook Exhibit 1-1.

000227

## III. Center Types and Operations

Job Corps centers operate under three models. Contracted centers are managed by private organizations or state and local agencies through competitive procurement. Civilian Conservation Centers (CCCs) are operated by the USDA Forest Service, focusing on conservation training and disaster response in rural areas. Additionally, some centers are operated by Indian tribes through agreements to serve Indians.[4]

A majority of centers are operated by contractors via competitively awarded contracts, with approximately 13,000 contractor staff.  In addition, 24 Civilian Conservation Centers (CCC) are operated by the USDA Forest Service via an interagency agreement and are staffed with 1,100 federal employees.

- *Civilian Conservation Centers (CCCs*)

**Overview**: CCCs are a subset of Job Corps centers focused on natural resource conservation and public land management. They offer unique training opportunities in forestry, firefighting, and conservation, contributing to both workforce development and environmental stewardship.

**Governance and Funding**: CCCs operate under an **interagency agreement** between the Department of Labor and the USDA. While the Forest Service manages daily operations, DOL provides funding and oversight to ensure alignment with Job Corps standards and objectives.

**Legislative Considerations**: In 2019, proposals to close several CCCs were met with bipartisan opposition that, in part, included assertions as to their importance to rural economies and conservation efforts. Subsequent enacted appropriations laws included provisions prohibiting appropriated funds from being used to (1) alter or terminate the Interagency Agreement between DOL and USDA and (2) close any of the Civilian Conservation Centers, except if such closure is necessary to prevent the endangerment of the health and safety of the students.

## V. Performance Management

**Performance Indicators**: Under 29 U.S.C. § 3209, Job Corps centers are evaluated based on the primary indicators of performance applicable to all programs authorized by WIOA, including: 1) placement in employment, education, or training (2nd and 4th quarter after exit), 2) credential attainment, 3) measurable skill gains, 4) median earnings, and 5) retention in employment or education.

**Job Corps Center Closure Criteria**

Per 29 U.S.C. § 3209(j), prior to the closure of any Job Corps center, "the Secretary shall ensure—
(1) that the proposed decision to close the center is announced in advance to the general public through publication in the Federal Register or other appropriate means;

---

[4] Currently Job Corps' Talking Leaves Job Corps Center is operated by Cherokee Nation.

000228

(2) the establishment of a reasonable comment period, not to exceed 30 days, for interested individuals to submit written comments to the Secretary; and
(3) that the Member of Congress who represents the district in which such center is located is notified within a reasonable period of time in advance of any final decision to close the center."

Historically DOL has announced the closure criteria it is using to close any given center through publishing those criteria in the FRN and, occasionally, requesting comments on the criteria. This means over time the closure criteria have not been static – DOL has added criteria to address the policy direction and need for a rationale to close a center at a given time. Closure criteria have varied over time, including considerations of chronic low performance, an evaluation of effort required to maintain high-quality education, and other considerations to determine whether to close a center.[5]

If a decision is made to close a center, then the decision and basis for the decision must be documented at least internally. The process to complete a closure can be a costly, time-consuming process as operations at the center are wound down, personal property is dealt with, and any real property issues are addressed.

## VI. Demonstration Authority

**Legal Framework**: Under 29 U.S.C. § 3206(a), the Secretary of Labor is authorized to carry out experimental, research, or demonstration projects relating to carrying out the Job Corps program. The statute also provides the Secretary the authority to waive any provisions of the WIOA section on Job Corps that the Secretary finds would prevent her from carrying out the projects. If the Secretary determines that such waiver is necessary, the statute requires 90-days advance written notification to the Committee on Education and the Workforce of the House of Representatives and the Committee on Health, Education, Labor, and Pensions of the Senate.

**Purpose and Implementation**: The demonstration authority allows the Department of Labor to pilot innovative approaches to education and vocational training relating to carrying out the Job Corps program. These projects aim to enhance program effectiveness, address emerging workforce needs, and improve service delivery to participants.[6]

## VII. Contracting Mechanisms

**Firm Fixed-Price Contracts (FFP)**: OJC began transitioning to the FFP model in 2019 and has a few remaining contracts to transition from cost-reimbursable to FFP. Under FFP agreements, contractors are paid a set amount for delivering specified services, regardless of actual costs incurred. FFP contracts offer some advantages for government operations by providing cost

---

[5] See example of closure criteria for Ouachita Civilian Conservation Center in Arkansas, 81 FR 43250 (July 1, 2016), https://www.federalregister.gov/documents/2016/07/01/2016-15603/final-notice-of-job-corps-center-for-closure
[6] An illustrative example of this authority in action is the Job Corps Scholars Program, a demonstration project that provided eligible youth aged 16–24 the opportunity to enroll in career technical training programs at twenty-six accredited public colleges.

6

predictability, which helps agencies better manage budgets and fiscal planning. These contracts also incentivize contractors to operate efficiently, since maintaining profitability depends on managing resources within the agreed price.[7] However, successful execution of FFP contracts requires careful attention to a few important considerations. Defining the scope of work with precision is critical to prevent scope creep[8] and maintain contractor accountability. Additionally, because contractors bear the financial risk of cost overruns, there is a possibility that service quality could be affected if risks are not properly managed.

Having selected the FFP contract type, DOL faced a new challenge during the COVID pandemic. Under an FFP contract, agencies have little or no visibility on the contractor's costs. As enrollment numbers dropped due to COVID, any cost savings did not automatically translate into reduced FFP payments by DOL. DOL did negotiate a "take back" mechanism for low OBS, but these were limited given DOL's understanding that a large portion of operational costs (e.g., salaries and facilities) are impervious to changes in enrollment. Plus, a reduction in the FFP amounts would be subject to negotiation and could be grounds for dispute and litigation absent contractor agreement.

## VIII. Real Property Management and Disposal

While most DOL office spaces are leased through GSA, Job Corps centers are exceptions, as they are directly owned or leased by the DOL. Job Corps controls over 90% of the Department of Labor's building stock. The legal status of the Job Corps facilities is broken down into four categories: 1) DOL owned, 2) DOL direct leased, 3) a combination of DOL owned and direct leased, and 4) Civilian Conservation Centers (CCCs). Of all the Job Corps centers, 58 are owned, 34 are leased, seven are a mixture of owned and leased, and 24 are on land owned by the USDA or United States Department of the Interior (DOI) and operated as CCCs. Two Centers on the list (Gainesville and Homestead) have been closed, but DOL still owns the property which is now excess and currently going through the disposal process with GSA.

Job Corps center contractors manage government-furnished property (GFP) on-site. These contractors are also required to maintain accurate inventories using systems like the Electronic Property Management System (EPMS) and the Fleet Tracking Management System (FTMS). Regular audits and adherence to federal property management regulations, including those from the Federal Acquisition Regulation (FAR) and GSA policies, ensure accountability and proper stewardship.[9]

---

[7] The advantages of a firm fixed price contract type is recognized by Federal Acquisition Regulation FAR 16.202-1, which states: "[a] firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties."

[8] Under the Changes clauses in the contracts, FAR 52.243-1, *Changes-Fixed Price*, the contractors are entitled to additional compensation if the agency directs them to perform work not required by the contract which increases their costs of performance.

[9] See Job Corps' Policy and Requirements Handbook Appendix 505 Admin and Management of Job Corps Contractor-Held Government-Furnished Property.pdf

000230

The OJC currently has an unfunded, deferred construction, rehabilitation and acquisition (CRA) backlog estimated to be $1.6 billion. Job Corps defines its unfunded CRA backlog as the total of the non-recurring costs to restore and renovate facilities (structures and buildings) and systems (e.g., heating ventilation, air conditioning, sewage, water, or electrical) to, or as close to, their original capacity, efficiency, and capability, and for which insufficient funding is currently available to complete the work. This amount represents more than 2,200 structures located on 5,600 acres. Over the past several years, the cost associated with correcting property deficiencies has increased by more than 50 percent.

More than 43 percent of the Job Corps' portfolio by square footage is more than 50 years old. In 2024, Job Corps estimated that in five years, 119 additional buildings comprising nearly 1,135,000 gross square feet would reach the age of 50, which will result in those buildings becoming subject to compliance with the historic preservation regulations when undergoing renovations. CRA funding is critical to the success of the Job Corps program because healthy and safe facilities contribute to an effective learning environment.

### *General Disposal Requirements for Job Corps Centers*

When a Job Corps center is closed or realigned, the U.S. Department of Labor (DOL), historically in coordination with the General Services Administration (GSA), follows federal regulations to dispose of real property and assets. The disposal process must comply with the Federal Property and Administrative Services Act, GSA's Federal Management Regulation (FMR), and applicable Department of Labor policies.
Generally, disposal involves several key steps:

- **Property Assessment:** The DOL evaluates whether real property (land, buildings, equipment) is excess to agency needs.
- **Declaration as Excess:** Property no longer needed is officially declared "excess" and reported to GSA for broader federal screening.
- **Federal and Public Screening:** GSA offers excess property to other federal agencies first. If no agency claims it, it is made available to state, local governments, nonprofits, or educational institutions under specific public benefit conveyance programs.
- **Public Sale:** If there is no federal or public entity interest, the property is sold to the public, typically through online auctions or sealed bids.
- **Environmental Compliance:** Before disposal, environmental assessments must be conducted to ensure compliance with laws like the National Environmental Policy Act (NEPA) and to address any hazardous materials or cleanup requirements.
- **Proceeds:** Revenue from property sales is generally returned to the U.S. Treasury unless specific statutory authority allows reuse within the program.

Separately, contractor-held personal property (such as equipment, vehicles, and supplies) must be disposed of following federal acquisition regulations (FAR Subpart 45.6) and DOL property management policies, ensuring proper accountability and financial closeout.

8

## IX. DOL Transparency Report

On April 25, 2025, the U.S. Department of Labor's Employment and Training Administration released the 2025 Job Corps Transparency Report, providing a detailed analysis of the financial performance and operational costs of the Job Corps Program.

Below is a summary of the overall findings from PY2023[10]:
- Average Graduation Rate:
  - Traditional: 32%
  - WIOA Definition: 38%
- Average Cost Per Enrollee (Regardless of Length of Stay): $49,769.53
- Average Cost Per Student Per Year (Average PY23 Headcount): $80,284.65
- Average Total Cost Per Graduate:
  - Traditional: $187,653
  - WIOA Definition: $155,600
- Job Corps participants earn $16,695 annually on average, post separation
- Average of Highest Center Costs per Graduate (Traditional Data):
  - The 10 least efficient programs average $512,800 dollars per graduate
  - The top 50 least efficient programs average $319,085 per graduate
- Average of Highest Center Costs per Graduate (WIOA Data):
  - The 10 least efficient programs average $385,370 per graduate
  - The top 50 least efficient programs average $252,285 per graduate

## X. Job Corps PY 2024 and 2025 Cost Savings Efforts

In Program Year (PY) 24, the Office of Job Corps implemented a series of aggressive cost savings initiatives to mitigate an anticipated operating deficit and set a foundation for long-term program sustainability. These efforts were informed by a comprehensive review of all expenditures against statutory and regulatory minimum requirements.

PY 24 cost-saving strategies resulted in savings of over $120 million, that included:

- **De-scoping Requests for Proposals (RFPs) and Center Contracts:**
  Job Corps systematically reviewed the Policy and Requirements Handbook (PRH) to identify and remove non-mandatory program requirements, allowing for the negotiation with contractors to modify the contracts to reduce the future contract prices. This de-scoping focused on aligning center operations strictly to statutory obligations, thus reducing unnecessary expenditures. This included policy revisions to eliminate Evening and Weekend Studies requirements, remove non-mandatory oral health services, remove mandatory Career Transition Services (CTS) for those who did not complete the program, and reduce nursing and trainee employee assistance program hours back to pre-

---

[10] The Job Corps Transparency Report's metrics distinguish between two definitions of the term "graduate": one reflecting traditional program completion in good standing (Traditional), and another using the statutory criteria from Workforce Innovation and Opportunity Act Sec. 116, Sec. 142, which counts individuals who attain a diploma or Career Technical Training completion while enrolled but do not complete the full program.

000232

COVID levels. These targeted changes directly contributed to operating cost reductions without undermining core program services.

**In Program Year (PY) 25, the Job Corps program faces a projected operating deficit of up to $213 million.** To address this shortfall, the Department is contemplating several strategies to augment amounts carried forward from PY24 mitigation efforts (estimated at $130 million): prioritizing cost-saving actions at centers with expiring contracts and suspending operations at underperforming centers, including deploying the following:

- **Trade and Program Restructuring:** Job Corps conducted a national evaluation of trade offerings across centers, using labor market information and program performance ratings. Underutilized or duplicative trades are targeted for elimination or consolidation, and Continuous Improvement Plans (CIPs) will be deployed for lower-performing programs.
- **Long-Term Sustainability Risk Analysis and Right-Sizing Initiatives:** A new facilities, performance, and sustainability risk assessment tool was developed to prioritize centers for potential suspension of operations based on performance and fiscal sustainability. This risk-driven "Right-Sizing" initiative focused on gradually shifting to a need-based model (e.g., one to three residential centers per state) projecting long-term savings of up to $337.72 million.
- **Cost Avoidance in USDA Forest Service Centers:** For USDA-operated centers, Job Corps reviewed CCC funding formulas to avoid overpayment for vacant student slots, resulting in a projected $2 million cost avoidance for PY 25.

## Union Labor

| NTC Contractor | Technical Education Program | No. of Instructors |
|---|---|---|
| United Brotherhood of Carpenters and Joiners (UBCJA) | • Carpentry, Pre-Apprentice | 113 |
| United Auto Workers (UAW) | • Maintenance - Light Repair, Pre-Apprentice<br>• Advanced Automobile Service Technology, Pre-Apprentice<br>• Advanced MHDT Suspension and Steering, Pre-Apprentice<br>• Advanced Collision Repair and Refinish - Damage Analysis and Estimating, Pre-Apprentice | 35 |
| Transportation Communication Union/International Association of Machinists and Aerospace Workers (TCU-IAM) | • Transportation Service Workers:<br>• Rail Mechanical Service/Carmen<br>• Rail Freight Service<br>• Airline Service<br>• Inland Waterway Service<br>• Rail Passenger Service<br>• Mass Transit/Highway Service | 24 |

10

000233

| NTC Contractor | Technical Education Program | No. of Instructors |
|---|---|---|
| National Plastering Industry's Joint Apprenticeship Trust Fund (NPIJATF) | • Cement Masonry, Pre-Apprentice<br>• Plastering, Pre-Apprentice | 45 |
| International Union of Painters and Allied Trades (IUPAT) | • Painting, Pre-Apprentice<br>• Glazing, Pre-Apprentice<br>• Sign, Billboard, and Display, Pre-Apprentice<br>• Floor Covering Installation, Pre-Apprentice | 41 |
| International Union of Operating Engineers (IUOE) | • Heavy Construction Equipment Mechanic, Pre-Apprentice<br>• Heavy Equipment Operations, Pre-Apprentice<br>• Maintenance Repairer Helper - Stationary Engineering, Pre-Apprentice | 35 |
| International Masonry Institute (IMI) | • Bricklayer, Pre-Apprentice<br>• Tile Setting, Pre-Apprentice | 34 |
| Home Builders Institute (HBI) | • Electrical, Pre-Apprentice<br>• Plumbing, Pre-Apprentice<br>• Building Construction Technology, Pre-Apprentice<br>• HVAC, Pre-Apprentice<br>• Plumbing, Pre-Apprentice | 122 |

11

000234

Message

| | |
|---|---|
| **From:** | Han, Jihun A - OSEC |
| **Sent:** | 5/4/2025 4:31:05 PM |
| **To:** | Parella, Courtney E - OPA |
| **Subject:** | Fw: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum |
| **Attachments:** | EMBARGOED DRAFT_ETA Job Corps Program Decision Memo.docx |

Get Outlook for iOS

**From:** Frazier, Susan (Lori) - ETA
**Sent:** Sunday, May 4, 2025 3:53:23 PM
**To:** Han, Jihun A - OSEC
**Subject:** DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

Here you go! The DRAFT operational plan is only 2 pages, but I included an Appendix for reference. I am sure there will be some edits. There are also a few decision points in it.

Thanks!
Lori

**Lori Frazier Bearden |**
United States Department of Labor
Acting Assistant Secretary
Employment and Training Administration
200 Constitution Avenue Suite S-2307
Washington, D.C. 20210
C:



**U.S. Department of Labor**      Assistant Secretary for
Employment and Training
Washington, D.C. 20210



## DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE

**May 4, 2025**

**DECISION MEMORANDUM**

**SUBJECT:   Job Corps Program and Pausing Center Operations**

**PURPOSE:** To reach consensus on pausing Job Corp center operations and return every student safely and timely to their home of record by the end of the program year June 30th

**DECISION POINT:** Pause all Job Corp centers including USDA Conservation Corp Centers (CCCs)? Or leave the 24 USDA untouched?

**PROPOSED OPERATIONAL PLAN:** (1) Pause all Job Corp center operations (including 24 USDA CCCs) immediately to allow adequate transition plans for mobilizing students. (2) Centers will execute a "Suspension of Operations" Plan. (3) Formal Closure (4) Funding Actions and Program Possibilities

## PHASE 1: PAUSE ALL JOB CORP CENTER OPERATIONS

- ➢ **Action 1:** OSEC will communicate the operational plan with USDA Secretary. USDA center staff (24 centers) will be directed to operationalize their "Suspension of Operations" plan to transfer students to home of record.
  - o Cannot provide a full Reduction in Force (RIF) because some center staff are needed to manage facilities.

- ➢ **Action 2:** ETA will terminate 99 contracts with center operators using the "Termination for Convenience of the Government".
  - o No explanation needed for "convenience". Do not use "transparency report" for rationale.
    - ▪ Pausing all centers eliminates debate over indiscriminately choosing, performance measures and safety criteria
  - o ETA leadership will brief limited Job Corp federal staff including Contracting Officer Representative (COR).
  - o OJC Staff will issue brief email notice minutes in advance to Job Corp Center Operators/Job Corp Association/Labor Unions of the termination notices
  - o OJC staff will issue a Termination of Inconvenience effective X date and require by X date what needs to be completed (i.e. implement the Center Operations Pause and transition students to home of record.).
  - o ETA leadership will ensure COR understands negotiation role to negotiate termination fees and needed program costs that are applicable to transition

students and successfully stop operations. This will include up to 3-4 months of continued contract operations such as facility and property management, records retention, secure data and transportation fleet.
- o   Center Operators will operationalize "Suspension of Operations" plan.
- ➢ **Action 3:** DOL OSEC will operate a communication plan in conjunction with other executive leadership.
- ➢ **Action 4:** ETA will provide targeted response for Job Corp center staff (employment services, job fairs, unemployment compensation, dislocated worker funding)
- ➢ **Action 5:** ETA will provide students with alternative program options such as Apprenticeship opportunities, Armed Service recruiters, etc..
- ➢ **Action 6**: "Caretaker" contracts will be executed to maintain facilities until leases expire. Owned properties will require on-going caretaker contracts.

## PHASE 2: FORMAL CLOSURES

- ➢ **Action 1:** ETA will publish a Federal Register Notice as required by WIOA sec.159 providing advance notice of center closures.
- ➢ **Action 2: Decision point**: USDA centers are not operated by contract, but rather an interagency agreement between DOL and USDA. USDA centers are owned and cannot be closed using enacted appropriations unless to prevent endangerment of health/safety and cannot terminate the interagency agreement.
- ➢ **Action 3:** DOL in conjunction with GSA follows federal regulations for general disposal requirements complying with Federal Property Administrative Services Act, GSA's Federal Management Regulation (FMR), and USDOL policies.

## PHASE 3: FUNDING ACTIONS AND PROGRAM REBIRTH POSSIBILITIES

- ➢ **Action 1: Decision Point-** Appropriated program funds could be returned to U.S. Treasury or using the Demonstration Authority under 29 U.S.C.3206(a), launch the rebirth of a Job Corp program that provides funding to the states to carry out education and vocational training to this at-risk population.
- ➢ **Action 2: Decision Point-** Legislation is still in place. Regulatory and statutory cleanup to keep USDA programs operating and birth a new program.

- ➢ **Create – America First Job Corp Program. Ideas could include:**
  - o   Establish Demonstration Grants to the States
  - o   Designate centers for Shipbuilding Technical Education
  - o   Meet with Union Heads to discuss how all union labor work will be moved from closing centers to the 24 USDA Centers/ trade-up for future forest workers/Ensure Labor Union staff are connected to the USDA sites for employment.
  - o   Create Apprenticeship Programs for Forestry, Carpentry at USDA sites.
  - o   Create a partnership with Community colleges to provide the Job Corp without brick-and-mortar sites
  - o   Allocate the PY25 Funds to states to operationalize State Job Corp programs, also a peacekeeping tactic.

000237

## APPENDIX
## BRIEF SUMMARY

**Background & Analysis:** Job Corps, established under the Economic Opportunity Act of 1964 (Public Law 88-452), is the nation's largest federally funded residential education and vocational training program.

**Operational PY24 Budget:**                                  $1.6 Billion
**Center Operations:**

- Total Job Corp Centers (all 50 states, Puerto Rico, and DC):      123
- Of the 123, number operated by contract:                99
- Of the 123, number operated by USDA:                24
- Number of centers currently paused[1]:                4
- Owned Job Corp Centers:                        58
- Leased Job Corp Centers:                        34
- USDA Centers owned by Forest Service:                24

**Administration:**

- Office of Job Corps (OJC) federal FTE within ETA and regional offices:  80
- Student Onboard Strength as of April 24, 2025:            25,892
- Federal Contractor/Job Center Staff:                12,000
- USDA Forest Service Federal Employees at Job Corps Centers:      1,100
- National Training Contractors[2] (union organizations):        8
  - Instructors:                            449
  - Regional coordinators and other administrative personnel      50+

**Program Performance Failures, Facility Sustainability, and Excessive Costs:** The Job Corp program cannot continue to operate services at its current capacity. The program is in a financial crisis and has remained at the high risk of violating the Anti-deficiency Act (ADA)[3].

- The Job Corps budget has remained largely flat at $1.6 billion since 2018.
- If adjusted for inflation, the budget would have to exceed $2 billion in 2024 to continue operations.
- Job Corps was operating at a deficit for PY 24—approximately $140 million—several actions to save approximately $119 million including the pausing of centers, cancelling contracts, and reducing costs have allowed the current operations to reach the end of this program year June 30th.
- PY25- Operating deficit could grow up to $213 million if mitigation strategies do not continue

---

[1] Woodstock (MD), Whitney Young (KY), Penobscot (ME), Loring (ME)
[2] See Appendix
[3] ADA Act- The Antideficiency Act prohibits federal employees from making or authorizing an expenditure from, or creating or authorizing an obligation under, any appropriation or fund in excess of the amount available in the appropriation or fund unless authorized by law. 31 U.S.C. § 1341 (a) (1) (A).

3

**BACKGROUND AND ANALYSIS**

## I. Purpose and Administration

. Since its inception, the program has served over three million youth and young adults. Currently authorized under the Workforce Innovation and Opportunity Act (WIOA), Title I, Subtitle C (codified at 29 U.S.C. § 3191 et seq.), Job Corps is funded through annual Congressional appropriations, with an average budget of approximately $1.6 billion for center operations since 2017. The program provides academic education, career technical training, career transition services, and residential support to thousands of students each year.

The Office of Job Corps (OJC) within ETA oversees the program and is comprised of staff at the National Office with six regional offices. In total, OJC employs 80 federal full-time equivalent staff. The program is funded through three distinct accounts: $1.6 billion for Operations, which supports center operations contracts and U.S. Department of Agriculture (USDA) Forest Service Civilian Conservation Centers for residential services, academics, counseling, and career technical training; $33 million for Administration, which funds federal staffing, travel, and training at the National and Regional Offices; and $123 million for Construction, Rehabilitation, and Acquisition (CRA), which supports facility acquisition, construction, and rehabilitation nationwide.

## II. Eligibility Criteria

Admissions Counselors are hired under center operations contracts to assess applicant eligibility for the program. As outlined in 29 U.S.C. § 3194 (or pursuant to other sections in WIOA, as noted), applicants must:

- Be between 16 and 24 years old at enrollment (with allowances for up to 20% of enrollees aged 22–24 and waivers for individuals with disabilities).
- Meet low-income criteria.
- Face one or more barriers to education and employment, such as being basic skills deficient, a school dropout, homeless, a foster child, or requiring additional education or training to obtain and retain employment.
- Demonstrate a need for additional education, training, or support to secure and maintain employment
- Not fall within one of WIOA's special limitations on selection in 29 U.S.C. § 3195(b).
- Consistent with the nondiscrimination prohibition against certain noncitizens located at 29 U.S.C. § 3248(a)(5), be either a U.S. citizen; a lawfully admitted permanent resident alien, refugee, asylee, parolee, or other alien who has been authorized by the Department of Homeland Security to work in the United States; or a resident of a U.S. territory.

Job Corps' eligibility criteria are outlined in more detail in the Policy and Requirements Handbook Exhibit 1-1.

000239

## III. Center Types and Operations

Job Corps centers operate under three models. Contracted centers are managed by private organizations or state and local agencies through competitive procurement. Civilian Conservation Centers (CCCs) are operated by the USDA Forest Service, focusing on conservation training and disaster response in rural areas. Additionally, some centers are operated by Indian tribes through agreements to serve Indians.[4]

A majority of centers are operated by contractors via competitively awarded contracts, with approximately 13,000 contractor staff.  In addition, 24 Civilian Conservation Centers (CCC) are operated by the USDA Forest Service via an interagency agreement and are staffed with 1,100 federal employees.

- *Civilian Conservation Centers (CCCs*)

**Overview**: CCCs are a subset of Job Corps centers focused on natural resource conservation and public land management. They offer unique training opportunities in forestry, firefighting, and conservation, contributing to both workforce development and environmental stewardship.

**Governance and Funding**: CCCs operate under an **interagency agreement** between the Department of Labor and the USDA. While the Forest Service manages daily operations, DOL provides funding and oversight to ensure alignment with Job Corps standards and objectives.

**Legislative Considerations**: In 2019, proposals to close several CCCs were met with bipartisan opposition that, in part, included assertions as to their importance to rural economies and conservation efforts. Subsequent enacted appropriations laws included provisions prohibiting appropriated funds from being used to (1) alter or terminate the Interagency Agreement between DOL and USDA and (2) close any of the Civilian Conservation Centers, except if such closure is necessary to prevent the endangerment of the health and safety of the students.

## V. Performance Management

**Performance Indicators**: Under 29 U.S.C. § 3209, Job Corps centers are evaluated based on the primary indicators of performance applicable to all programs authorized by WIOA, including: 1) placement in employment, education, or training (2nd and 4th quarter after exit), 2) credential attainment, 3) measurable skill gains, 4) median earnings, and 5) retention in employment or education.

**Job Corps Center Closure Criteria**

Per 29 U.S.C. § 3209(j), prior to the closure of any Job Corps center, "the Secretary shall ensure—
(1) that the proposed decision to close the center is announced in advance to the general public through publication in the Federal Register or other appropriate means;

---

[4] Currently Job Corps' Talking Leaves Job Corps Center is operated by Cherokee Nation.

000240

(2) the establishment of a reasonable comment period, not to exceed 30 days, for interested individuals to submit written comments to the Secretary; and
(3) that the Member of Congress who represents the district in which such center is located is notified within a reasonable period of time in advance of any final decision to close the center."

Historically DOL has announced the closure criteria it is using to close any given center through publishing those criteria in the FRN and, occasionally, requesting comments on the criteria. This means over time the closure criteria have not been static – DOL has added criteria to address the policy direction and need for a rationale to close a center at a given time. Closure criteria have varied over time, including considerations of chronic low performance, an evaluation of effort required to maintain high-quality education, and other considerations to determine whether to close a center.[5]

If a decision is made to close a center, then the decision and basis for the decision must be documented at least internally. The process to complete a closure can be a costly, time-consuming process as operations at the center are wound down, personal property is dealt with, and any real property issues are addressed.

## VI. Demonstration Authority

**Legal Framework**: Under 29 U.S.C. § 3206(a), the Secretary of Labor is authorized to carry out experimental, research, or demonstration projects relating to carrying out the Job Corps program. The statute also provides the Secretary the authority to waive any provisions of the WIOA section on Job Corps that the Secretary finds would prevent her from carrying out the projects. If the Secretary determines that such waiver is necessary, the statute requires 90-days advance written notification to the Committee on Education and the Workforce of the House of Representatives and the Committee on Health, Education, Labor, and Pensions of the Senate.

**Purpose and Implementation**: The demonstration authority allows the Department of Labor to pilot innovative approaches to education and vocational training relating to carrying out the Job Corps program. These projects aim to enhance program effectiveness, address emerging workforce needs, and improve service delivery to participants.[6]

## VII. Contracting Mechanisms

**Firm Fixed-Price Contracts (FFP)**: OJC began transitioning to the FFP model in 2019 and has a few remaining contracts to transition from cost-reimbursable to FFP. Under FFP agreements, contractors are paid a set amount for delivering specified services, regardless of actual costs incurred. FFP contracts offer some advantages for government operations by providing cost

---

[5] See example of closure criteria for Ouachita Civilian Conservation Center in Arkansas, 81 FR 43250 (July 1, 2016), https://www.federalregister.gov/documents/2016/07/01/2016-15603/final-notice-of-job-corps-center-for-closure

[6] An illustrative example of this authority in action is the Job Corps Scholars Program, a demonstration project that provided eligible youth aged 16–24 the opportunity to enroll in career technical training programs at twenty-six accredited public colleges.

6

predictability, which helps agencies better manage budgets and fiscal planning. These contracts also incentivize contractors to operate efficiently, since maintaining profitability depends on managing resources within the agreed price.[7] However, successful execution of FFP contracts requires careful attention to a few important considerations. Defining the scope of work with precision is critical to prevent scope creep[8] and maintain contractor accountability. Additionally, because contractors bear the financial risk of cost overruns, there is a possibility that service quality could be affected if risks are not properly managed.

Having selected the FFP contract type, DOL faced a new challenge during the COVID pandemic. Under an FFP contract, agencies have little or no visibility on the contractor's costs. As enrollment numbers dropped due to COVID, any cost savings did not automatically translate into reduced FFP payments by DOL. DOL did negotiate a "take back" mechanism for low OBS, but these were limited given DOL's understanding that a large portion of operational costs (e.g., salaries and facilities) are impervious to changes in enrollment. Plus, a reduction in the FFP amounts would be subject to negotiation and could be grounds for dispute and litigation absent contractor agreement.

## VIII. Real Property Management and Disposal

While most DOL office spaces are leased through GSA, Job Corps centers are exceptions, as they are directly owned or leased by the DOL.  Job Corps controls over 90% of the Department of Labor's building stock.  The legal status of the Job Corps facilities is broken down into four categories: 1) DOL owned, 2) DOL direct leased, 3) a combination of DOL owned and direct leased, and 4) Civilian Conservation Centers (CCCs). Of all the Job Corps centers, 58 are owned, 34 are leased, seven are a mixture of owned and leased, and 24 are on land owned by the USDA or United States Department of the Interior (DOI) and operated as CCCs. Two Centers on the list (Gainesville and Homestead) have been closed, but DOL still owns the property which is now excess and currently going through the disposal process with GSA.

Job Corps center contractors manage government-furnished property (GFP) on-site. These contractors are also required to maintain accurate inventories using systems like the Electronic Property Management System (EPMS) and the Fleet Tracking Management System (FTMS). Regular audits and adherence to federal property management regulations, including those from the Federal Acquisition Regulation (FAR) and GSA policies, ensure accountability and proper stewardship.[9]

---

[7] The advantages of a firm fixed price contract type is recognized by Federal Acquisition Regulation FAR 16.202-1, which states: "[a] firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties."

[8] Under the Changes clauses in the contracts, FAR 52.243-1, *Changes-Fixed Price*, the contractors are entitled to additional compensation if the agency directs them to perform work not required by the contract which increases their costs of performance.

[9] See Job Corps' Policy and Requirements Handbook Appendix 505 Admin and Management of Job Corps Contractor-Held Government-Furnished Property.pdf

7

The OJC currently has an unfunded, deferred construction, rehabilitation and acquisition (CRA) backlog estimated to be $1.6 billion. Job Corps defines its unfunded CRA backlog as the total of the non-recurring costs to restore and renovate facilities (structures and buildings) and systems (e.g., heating ventilation, air conditioning, sewage, water, or electrical) to, or as close to, their original capacity, efficiency, and capability, and for which insufficient funding is currently available to complete the work. This amount represents more than 2,200 structures located on 5,600 acres.  Over the past several years, the cost associated with correcting property deficiencies has increased by more than 50 percent.

More than 43 percent of the Job Corps' portfolio by square footage is more than 50 years old.  In 2024, Job Corps estimated that in five years, 119 additional buildings comprising nearly 1,135,000 gross square feet would reach the age of 50, which will result in those buildings becoming subject to compliance with the historic preservation regulations when undergoing renovations.  CRA funding is critical to the success of the Job Corps program because healthy and safe facilities contribute to an effective learning environment.

### General Disposal Requirements for Job Corps Centers

When a Job Corps center is closed or realigned, the U.S. Department of Labor (DOL), historically in coordination with the General Services Administration (GSA), follows federal regulations to dispose of real property and assets. The disposal process must comply with the Federal Property and Administrative Services Act, GSA's Federal Management Regulation (FMR), and applicable Department of Labor policies.
Generally, disposal involves several key steps:

- **Property Assessment:** The DOL evaluates whether real property (land, buildings, equipment) is excess to agency needs.
- **Declaration as Excess:** Property no longer needed is officially declared "excess" and reported to GSA for broader federal screening.
- **Federal and Public Screening:** GSA offers excess property to other federal agencies first. If no agency claims it, it is made available to state, local governments, nonprofits, or educational institutions under specific public benefit conveyance programs.
- **Public Sale:** If there is no federal or public entity interest, the property is sold to the public, typically through online auctions or sealed bids.
- **Environmental Compliance:** Before disposal, environmental assessments must be conducted to ensure compliance with laws like the National Environmental Policy Act (NEPA) and to address any hazardous materials or cleanup requirements.
- **Proceeds:** Revenue from property sales is generally returned to the U.S. Treasury unless specific statutory authority allows reuse within the program.

Separately, contractor-held personal property (such as equipment, vehicles, and supplies) must be disposed of following federal acquisition regulations (FAR Subpart 45.6) and DOL property management policies, ensuring proper accountability and financial closeout.

000243

## IX. DOL Transparency Report

On April 25, 2025, the U.S. Department of Labor's Employment and Training Administration released the 2025 Job Corps Transparency Report, providing a detailed analysis of the financial performance and operational costs of the Job Corps Program.

Below is a summary of the overall findings from PY2023[10]:
- Average Graduation Rate:
  - o Traditional: 32%
  - o WIOA Definition: 38%
- Average Cost Per Enrollee (Regardless of Length of Stay): $49,769.53
- Average Cost Per Student Per Year (Average PY23 Headcount): $80,284.65
- Average Total Cost Per Graduate:
  - o Traditional: $187,653
  - o WIOA Definition: $155,600
- Job Corps participants earn $16,695 annually on average, post separation
- Average of Highest Center Costs per Graduate (Traditional Data):
  - o The 10 least efficient programs average $512,800 dollars per graduate
  - o The top 50 least efficient programs average $319,085 per graduate
- Average of Highest Center Costs per Graduate (WIOA Data):
  - o The 10 least efficient programs average $385,370 per graduate
  - o The top 50 least efficient programs average $252,285 per graduate

## X. Job Corps PY 2024 and 2025 Cost Savings Efforts

In Program Year (PY) 24, the Office of Job Corps implemented a series of aggressive cost savings initiatives to mitigate an anticipated operating deficit and set a foundation for long-term program sustainability. These efforts were informed by a comprehensive review of all expenditures against statutory and regulatory minimum requirements.

PY 24 cost-saving strategies resulted in savings of over $120 million, that included:

- **De-scoping Requests for Proposals (RFPs) and Center Contracts:**
  Job Corps systematically reviewed the Policy and Requirements Handbook (PRH) to identify and remove non-mandatory program requirements, allowing for the negotiation with contractors to modify the contracts to reduce the future contract prices. This de-scoping focused on aligning center operations strictly to statutory obligations, thus reducing unnecessary expenditures. This included policy revisions to eliminate Evening and Weekend Studies requirements, remove non-mandatory oral health services, remove mandatory Career Transition Services (CTS) for those who did not complete the program, and reduce nursing and trainee employee assistance program hours back to pre-

---

[10] The Job Corps Transparency Report's metrics distinguish between two definitions of the term "graduate": one reflecting traditional program completion in good standing (Traditional), and another using the statutory criteria from Workforce Innovation and Opportunity Act Sec. 116, Sec. 142, which counts individuals who attain a diploma or Career Technical Training completion while enrolled but do not complete the full program.

COVID levels. These targeted changes directly contributed to operating cost reductions without undermining core program services.

**In Program Year (PY) 25, the Job Corps program faces a projected operating deficit of up to $213 million.** To address this shortfall, the Department is contemplating several strategies to augment amounts carried forward from PY24 mitigation efforts (estimated at $130 million): prioritizing cost-saving actions at centers with expiring contracts and suspending operations at underperforming centers, including deploying the following:

- **Trade and Program Restructuring:** Job Corps conducted a national evaluation of trade offerings across centers, using labor market information and program performance ratings. Underutilized or duplicative trades are targeted for elimination or consolidation, and Continuous Improvement Plans (CIPs) will be deployed for lower-performing programs.
- **Long-Term Sustainability Risk Analysis and Right-Sizing Initiatives:** A new facilities, performance, and sustainability risk assessment tool was developed to prioritize centers for potential suspension of operations based on performance and fiscal sustainability. This risk-driven "Right-Sizing" initiative focused on gradually shifting to a need-based model (e.g., one to three residential centers per state) projecting long-term savings of up to $337.72 million.
- **Cost Avoidance in USDA Forest Service Centers:** For USDA-operated centers, Job Corps reviewed CCC funding formulas to avoid overpayment for vacant student slots, resulting in a projected $2 million cost avoidance for PY 25.

## Union Labor

| NTC Contractor | Technical Education Program | No. of Instructors |
|---|---|---|
| United Brotherhood of Carpenters and Joiners (UBCJA) | • Carpentry, Pre-Apprentice | 113 |
| United Auto Workers (UAW) | • Maintenance - Light Repair, Pre-Apprentice<br>• Advanced Automobile Service Technology, Pre-Apprentice<br>• Advanced MHDT Suspension and Steering, Pre-Apprentice<br>• Advanced Collision Repair and Refinish - Damage Analysis and Estimating, Pre-Apprentice | 35 |
| Transportation Communication Union/International Association of Machinists and Aerospace Workers (TCU-IAM) | • Transportation Service Workers:<br>• Rail Mechanical Service/Carmen<br>• Rail Freight Service<br>• Airline Service<br>• Inland Waterway Service<br>• Rail Passenger Service<br>• Mass Transit/Highway Service | 24 |

000245

| NTC Contractor | Technical Education Program | No. of Instructors |
|---|---|---|
| National Plastering Industry's Joint Apprenticeship Trust Fund (NPIJATF) | • Cement Masonry, Pre-Apprentice<br>• Plastering, Pre-Apprentice | 45 |
| International Union of Painters and Allied Trades (IUPAT) | • Painting, Pre-Apprentice<br>• Glazing, Pre-Apprentice<br>• Sign, Billboard, and Display, Pre-Apprentice<br>• Floor Covering Installation, Pre-Apprentice | 41 |
| International Union of Operating Engineers (IUOE) | • Heavy Construction Equipment Mechanic, Pre-Apprentice<br>• Heavy Equipment Operations, Pre-Apprentice<br>• Maintenance Repairer Helper - Stationary Engineering, Pre-Apprentice | 35 |
| International Masonry Institute (IMI) | • Bricklayer, Pre-Apprentice<br>• Tile Setting, Pre-Apprentice | 34 |
| Home Builders Institute (HBI) | • Electrical, Pre-Apprentice<br>• Plumbing, Pre-Apprentice<br>• Building Construction Technology, Pre-Apprentice<br>• HVAC, Pre-Apprentice<br>• Plumbing, Pre-Apprentice | 122 |

11

000246

Message

| | |
|---|---|
| **From:** | Frazier, Susan (Lori) - ETA ███████████████████████████ |
| **Sent:** | 5/5/2025 9:38:05 AM |
| **To:** | Han, Jihun A – OSEC ███████████  Walter, Courtney E - OSEC ██████ |
| **Subject:** | RE: Could we please cancel this Job Corp media contract? |

Completely agree. Thank you!

**Lori Frazier Bearden** |
United States Department of Labor
Acting Assistant Secretary
Employment and Training Administration
200 Constitution Avenue Suite S-2307
Washington, D.C. 20210
C: ███████



**From:** Han, Jihun A - OSEC <████████████████>
**Sent:** Monday, May 5, 2025 9:34 AM
**To:** Frazier, Susan (Lori) - ETA ████████████  Walter, Courtney E - OSEC <████████████████>
**Subject:** RE: Could we please cancel this Job Corp media contract?

Yeah lets pause this action until we get through our PCC with the WH. Don't want to get ahead of them at this moment on this.

**Jihun Han**
Chief of Staff
Office of the Secretary
U.S. Department of Labor
C: ███████



**From:** Frazier, Susan (Lori) - ETA ████████████████
**Sent:** Monday, May 5, 2025 9:31 AM
**To:** Han, Jihun A – OSEC ████████████  Walter, Courtney E - OSEC ████████████
**Subject:** FW: Could we please cancel this Job Corp media contract?

Good morning-
For your awareness - since this may ruffle some feathers. This is a Job Corp contract cancellation for website/media. We could pause this action due to the timing. Please advise.

**Thanks!**
**Lori**

**From:** Frazier, Susan (Lori) - ETA
**Sent:** Friday, May 2, 2025 11:26 AM
**To:** Collins, Miles B - OSEC ███████████ Campbell, Carl V - OASAM OSPE ████

███████████ Laco, Marek S - ETA ███████ Han, Jihun A - OSEC ████████
**Cc:** Youngs, Bridget M - OSEC ███████████; Walter, Courtney E - OSEC ██████
**Subject:** RE: Could we please cancel this contract?

Copying @Han, Jihun A - OSEC

The following close-out actions will happen today per Jihun's guidance.

**ACTIONS:**
- Job Corp staff will meet with contractor/staff to discuss close-out deliverables/intellectual property (commercials/physical electronic videos) and ensure that the Job Corp website does not go down.

- OSPE will issue a "termination for convenience" of government.

- Notices will be sent to federal staff that the website updates will no longer be active at this time.

**FLAGGED FOR AWARENESS:**
- The McNeely Pigott is a member Job Corp Association.

**Lori Frazier Bearden** |
United States Department of Labor
Acting Assistant Secretary
Employment and Training Administration
200 Constitution Avenue Suite S-2307
Washington, D.C. 20210
C: ████████



**From:** Collins, Miles B - OSEC ███████████
**Sent:** Friday, May 2, 2025 10:24 AM
**To:** Campbell, Carl V - OASAM OSPE ███████████ ███████████ - OASAM OSPE

███████████████ - OASAM OSPE ████████████ Youngs, Bridget M - OSEC
████████ Frazier, Susan (Lori) - ETA ████████ Laco, Marek S - ETA
███████████

**Subject:** RE: Could we please cancel this contract?

Looping in +@Frazier, Susan (Lori) - ETA +@Laco, Marek S - ETA for approval per Carl's request.

Thanks - Miles

**From:** Collins, Miles B - OSEC
**Sent:** Friday, May 2, 2025 10:19 AM
**To:** Campbell, Carl V - OASAM OSPE ████████████████ OASAM OSPE
████████████ - OASAM OSPE ████████████ Youngs, Bridget M - OSEC
███████████

**Subject:** Could we please cancel this contract?

## Could we please cancel this contract effective immediately?

**Contract Number**
1605C2-24-F-00023
**Contract Description**
Provide a brief overview of the services or goods provided.
The Strategic Communications and Marketing Support Services contract provides comprehensive internal and external communications support to the U.S. Department of Labor's Office of Job Corps. The primary objectives of the contract are 1) to support nationwide brand awareness and a positive public image for Job Corps, and 2) to generate prospective student leads in support of the program's onboard strength. The primary target audience for the work is economically disadvantaged young people ages 16–24, with secondary target audiences including subsets of the primary audience, current students, employers, workforce development systems, influencers and operator staff.
**Agency**
ETA
**Subagency**
OJC
**Invoice Number**
10355
**Invoice Date**
This is the date on the invoice
Mar 31, 2025
**Invoice Amount**
In U.S. Dollars
███████████

**Invoice Received Date**
This is the date the COR received the invoice in their inbox.
Apr 24, 2025
**Invoice Payment Explanation**
Confirm the accuracy of the invoice, the recommendation to accept the performance, and the recommendation to approve the payment. This explanation should include a description of the goods or services received and confirmation that these goods or services are consistent with the terms of the contract (e.g., purchase of 100 staplers were delivered and in acceptable working condition, a specified deliverable, or a monthly payment under an established contract)
Based on my review of the invoice, I recommend acceptance and approval for payment, as it is in line with obligated funding for the contract. For this invoice period, the contractor managed the program's brand and

messaging, handled digital content (e.g., national and center paid media campaigns, e-mail and text marketing, social media, national and center websites, and videos), developed and updated marketing materials, managed success stories, conducted staff training webinars, and completed a variety of data and reporting activities.

**Please note that approval of payments will not be conditioned on this response, but this information is necessary in accordance with Departmental priorities and promoting efficiency. Failure to submit this information may delay approvals and increase costs to DOL agencies.**

**Invoice Payment Justification**

An explanation as to the nature of the goods or services and provide why they are essential or necessary. This should address these questions:

- Who required or benefitted from these services,
- What specific purpose or function did the service provide,
- Where the services were utilized,
- Why services were critical to the agency's mission or operations

The services provided under Job Corps' Strategic Communications and Marketing Support Services Contract achieved the objectives of supporting brand awareness and generating prospective student leads—39,037 prospects in March. All target audiences were reached. The contract is critical to the agency's mission by ensuring those the agency serves are aware of and understand program offerings.

**Invoice Due Date**

May 1, 2025

**Invoice Paid On**

(not paid)

Message

| From: | Youngs, Bridget M - OSEC ████████████████████████████████ ██████████████████████████████ |
|---|---|
| **Sent**: | 5/5/2025 12:51:05 PM |
| **To**: | Collins, Miles B - OSEC ████████████████ |
| **Subject**: | RE: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum |
| **Attachments**: | EMBARGOED DRAFT_ETA Job Corps Program Decision Memo_DOGE Edits.docx |

**From:** Collins, Miles B - OSEC ████████████████████
**Sent:** Monday, May 5, 2025 10:51 AM
**To:** Youngs, Bridget M – OSEC ████████████
**Subject:** FW: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

**From:** Frazier, Susan (Lori) - ETA ████████████████
**Sent:** Monday, May 5, 2025 10:43 AM
**To:** Collins, Miles B - OSEC ████████████████████
**Subject:** FW: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

**From:** Frazier, Susan (Lori) - ETA
**Sent:** Sunday, May 4, 2025 3:53 PM
**To:** Han, Jihun A - OSEC ████████████████
**Subject:** DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

Here you go! The DRAFT operational plan is only 2 pages, but I included an Appendix for reference. I am sure there will be some edits. There are also a few decision points in it.

Thanks!
Lori

**Lori Frazier Bearden |**
United States Department of Labor
Acting Assistant Secretary
Employment and Training Administration
200 Constitution Avenue Suite S-2307
Washington, D.C. 20210
C: 



000252

**U.S. Department of Labor**     Assistant Secretary for
Employment and Training
Washington, D.C. 20210



### DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE

**May 4, 2025**

**DECISION MEMORANDUM**

**SUBJECT:    Job Corps Program and Pausing Center Operations**

**PURPOSE:** To reach consensus on pausing Job Corp center operations and return every student safely and timely to their home of record by the end of the program year June 30th

**DECISION POINT:** Pause all Job Corp centers including USDA Conservation Corp Centers (CCCs)? Or leave the 24 USDA untouched?

**PROPOSED OPERATIONAL PLAN:** (1) Pause Immediately cease all Job Corp center operations (including 24 USDA CCCs) immediately to allow adequate transition plans for mobilizing students. (2) Centers will execute a "Suspension of Operations" Plan. (3) Return funds to Treasury. (3) Formal Closure (4) Funding Actions and Program Possibilities

## PHASE 1: PAUSE ALL JOB CORP CENTER OPERATIONS

➤ **Action 1:** OSEC will communicate the operational plan with USDA Secretary. USDA center staff (24 centers) will be directed to operationalize their "Suspension of Operations" plan to transfer students to home of record.

  o Cannot provide a full Reduction in Force (RIF) because some center staff are needed to manage facilities.

➤ **Action 2:** ETA will terminate 99 contracts with center operators using the "Termination for Convenience of the Government".

  o No explanation needed for "convenience". Do not use "transparency report" for rationale.

  • Pausing all centers eliminates debate over indiscriminately choosing; performance measures and safety criteria

  o ETA leadership will brief limited Job Corp federal staff including Contracting Officer Representative (COR).

  o OJC Staff will issue brief email notice minutes in advance to all Job Corp Center Operators/Job Corp Association/Labor Unions minutes ahead of the termination notices below.

  o OJC staff will issue a Termination of Inconvenience effective X August 15thdate and require by X date what needs to be completed (i.e. implementation of the Center Operations Pause and transition students to home of record by June 30th.).

---

*Formatted: Font: Bold*

*Formatted: Indent: Left: 0.5", No bullets or numbering*

*Formatted: Indent: Left: 0.5", Widow/Orphan control, Adjust space between Latin and Asian text, Adjust space between Asian text and numbers, Tab stops: Not at 0" + 0.5" + 1" + 1.5" + 2" + 2.5" + 3" + 3.5" + 4" + 4.5" + 5" + 5.5" + 6" + 6.5"*

*Formatted*

*Formatted: Superscript*

- o **Operations wind-down to commence immediately with final operations date of June 30, 2025.** | Formatted: Font: Bold
Formatted
   - o ETA leadership will ensure COR understands negotiation role to negotiate termination fees and needed program costs that are applicable to transition students and successfully stop operations. This will include ~~up to 3 4 6~~ 12 ~~months~~ weeks of continued contract operations such as facility and property management, records retention, secure data and transportation fleet.
   - o Center Operators will operationalize "Suspension of Operations" plan.
- ➢ **Action 3:** DOL OSEC will operate a communication plan in conjunction with other executive leadership.
- ➢ ~~Action 4:~~ ETA will provide targeted response for Job Corp center staff (employment services, job fairs, unemployment compensation, dislocated worker funding).
- ➢ ~~Action 5:~~ ETA will provide students with alternative program options such as Apprenticeship opportunities, Armed Service recruiters, etc.
- ➢ **Action 6:** "Caretaker" contracts will be executed to maintain facilities until leases expire. Owned properties will require on-going caretaker contracts until .

## PHASE 2: FORMAL CLOSURES

- ➢ **Action 1:** ETA will publish a Federal Register Notice as required by WIOA sec.159 providing advance notice of center closures.
- ➢ **Action 2:** ~~Decision point:~~ DOL and USDSA will renegotiate necessary interagency agreements to ~~USDA centers are not operated by contract, but rather an interagency agreement between DOL and USDA. USDA centers are owned and cannot be closed using enacted appropriations unless to~~ prevent endangerment of health/safety ~~and cannot terminate the interagency agreement~~.
- ➢ **Action 3:** DOL in conjunction with GSA follows federal regulations for general disposal requirements complying with Federal Property Administrative Services Act, GSA's Federal Management Regulation (FMR), and USDOL policies.

## PHASE 3: FUNDING ACTIONS AND PROGRAM REBIRTH POSSIBILITIES

- ➢ **Action 1:** ~~Decision Point~~ Appropriated program funds could be returned to U.S. Treasury ~~or using the Demonstration Authority under 29 U.S.C.3206(a), launch the rebirth of a Job Corp program that provides funding to the states to carry out education and vocational training to this at-risk population~~.

2

> ~~**Action 2: Decision Point-** Legislation is still in place. Regulatory and statutory cleanup to keep USDA programs operating and birth a new program.~~

> ~~**Create – America First Job Corp Program. Ideas could include:**~~
>> o ~~Establish Demonstration Grants to the States~~
>> o ~~Designate centers for Shipbuilding Technical Education~~
>> o ~~Meet with Union Heads to discuss how all union labor work will be moved from closing centers to the 24 USDA Centers/ trade-up for future forest workers/Ensure Labor Union staff are connected to the USDA sites for employment.~~
>> o ~~Create Apprenticeship Programs for Forestry, Carpentry at USDA sites.~~
>> o ~~Create a partnership with Community colleges to provide the Job Corp without brick-and-mortar sites~~
>> o ~~Allocate the PY25 Funds to states to operationalize State Job Corp programs, also a peacekeeping tactic.~~

## APPENDIX
## BRIEF SUMMARY

**Background & Analysis:** Job Corps, established under the Economic Opportunity Act of 1964 (Public Law 88-452), is the nation's largest federally funded residential education and vocational training program.

**Operational PY24 Budget:**                                    $1.6 Billion
**Center Operations:**

- Total Job Corp Centers (all 50 states, Puerto Rico, and DC):      123
- Of the 123, number operated by contract:                          99
- Of the 123, number operated by USDA:                              24
- Number of centers currently paused[1]:                            4
- Owned Job Corp Centers:                                           58
- Leased Job Corp Centers:                                          34
- USDA Centers owned by Forest Service:                             24

**Administration:**

- Office of Job Corps (OJC) federal FTE within ETA and regional offices:   80
- Student Onboard Strength as of April 24, 2025:                           25,892
- Federal Contractor/Job Center Staff:                                     12,000
- USDA Forest Service Federal Employees at Job Corps Centers:              1,100
- National Training Contractors[2] (union organizations):                 8
    - o Instructors:                                                      449
    - o Regional coordinators and other administrative personnel          50+

---

[1] Woodstock (MD), Whitney Young (KY), Penobscot (ME), Loring (ME)
[2] See Appendix

3

**Program Performance Failures, Facility Sustainability, and Excessive Costs:** The Job Corp program cannot continue to operate services at its current capacity. The program is in a financial crisis and has remained at the high risk of violating the Anti-deficiency Act (ADA)[3].

- The Job Corps budget has remained largely flat at $1.6 billion since 2018.
- If adjusted for inflation, the budget would have to exceed $2 billion in 2024 to continue operations.
- Job Corps was operating at a deficit for PY 24—approximately $140 million—several actions to save approximately $119 million including the pausing of centers, cancelling contracts, and reducing costs have allowed the current operations to reach the end of this program year June 30th.
- PY25- Operating deficit could grow up to $213 million if mitigation strategies do not continue

## BACKGROUND AND ANALYSIS

### I. Purpose and Administration

=Since its inception, the program has served over three million youth and young adults. Currently authorized under the Workforce Innovation and Opportunity Act (WIOA), Title I, Subtitle C (codified at 29 U.S.C. § 3191 et seq.), Job Corps is funded through annual Congressional appropriations, with an average budget of approximately $1.6 billion for center operations since 2017. The program provides academic education, career technical training, career transition services, and residential support to thousands of students each year.

The Office of Job Corps (OJC) within ETA oversees the program and is comprised of staff at the National Office with six regional offices. In total, OJC employs 80 federal full-time equivalent staff. The program is funded through three distinct accounts: $1.6 billion for Operations, which supports center operations contracts and U.S. Department of Agriculture (USDA) Forest Service Civilian Conservation Centers for residential services, academics, counseling, and career technical training; $33 million for Administration, which funds federal staffing, travel, and training at the National and Regional Offices; and $123 million for Construction, Rehabilitation, and Acquisition (CRA), which supports facility acquisition, construction, and rehabilitation nationwide.

### II. Eligibility Criteria

Admissions Counselors are hired under center operations contracts to assess applicant eligibility for the program. As outlined in 29 U.S.C. § 3194 (or pursuant to other sections in WIOA, as noted), applicants must:

---

[3] ADA Act- The Antideficiency Act prohibits federal employees from making or authorizing an expenditure from, or creating or authorizing an obligation under, any appropriation or fund in excess of the amount available in the appropriation or fund unless authorized by law. 31 U.S.C. § 1341 (a) (1) (A).

4

- Be between 16 and 24 years old at enrollment (with allowances for up to 20% of enrollees aged 22–24 and waivers for individuals with disabilities).
- Meet low-income criteria.
- Face one or more barriers to education and employment, such as being basic skills deficient, a school dropout, homeless, a foster child, or requiring additional education or training to obtain and retain employment.
- Demonstrate a need for additional education, training, or support to secure and maintain employment
- Not fall within one of WIOA's special limitations on selection in 29 U.S.C. § 3195(b).
- Consistent with the nondiscrimination prohibition against certain noncitizens located at 29 U.S.C. § 3248(a)(5), be either a U.S. citizen; a lawfully admitted permanent resident alien, refugee, asylee, parolee, or other alien who has been authorized by the Department of Homeland Security to work in the United States; or a resident of a U.S. territory.

Job Corps' eligibility criteria are outlined in more detail in the Policy and Requirements Handbook Exhibit 1-1.

## III. Center Types and Operations

Job Corps centers operate under three models. Contracted centers are managed by private organizations or state and local agencies through competitive procurement. Civilian Conservation Centers (CCCs) are operated by the USDA Forest Service, focusing on conservation training and disaster response in rural areas. Additionally, some centers are operated by Indian tribes through agreements to serve Indians.[4]

A majority of centers are operated by contractors via competitively awarded contracts, with approximately 13,000 contractor staff.  In addition, 24 Civilian Conservation Centers (CCC) are operated by the USDA Forest Service via an interagency agreement and are staffed with 1,100 federal employees.

- *Civilian Conservation Centers (CCCs)*

**Overview**: CCCs are a subset of Job Corps centers focused on natural resource conservation and public land management. They offer unique training opportunities in forestry, firefighting, and conservation, contributing to both workforce development and environmental stewardship.

**Governance and Funding**: CCCs operate under an **interagency agreement** between the Department of Labor and the USDA. While the Forest Service manages daily operations, DOL provides funding and oversight to ensure alignment with Job Corps standards and objectives.

**Legislative Considerations**: In 2019, proposals to close several CCCs were met with bipartisan opposition that, in part, included assertions as to their importance to rural economies and

---

[4] Currently Job Corps' Talking Leaves Job Corps Center is operated by Cherokee Nation.

5

000257

conservation efforts. Subsequent enacted appropriations laws included provisions prohibiting appropriated funds from being used to (1) alter or terminate the Interagency Agreement between DOL and USDA and (2) close any of the Civilian Conservation Centers, except if such closure is necessary to prevent the endangerment of the health and safety of the students.

## V. Performance Management

**Performance Indicators**: Under 29 U.S.C. § 3209, Job Corps centers are evaluated based on the primary indicators of performance applicable to all programs authorized by WIOA, including: 1) placement in employment, education, or training (2nd and 4th quarter after exit), 2) credential attainment, 3) measurable skill gains, 4) median earnings, and 5) retention in employment or education.

**Job Corps Center Closure Criteria**

Per 29 U.S.C. § 3209(j), prior to the closure of any Job Corps center, "the Secretary shall ensure—
(1) that the proposed decision to close the center is announced in advance to the general public through publication in the Federal Register or other appropriate means;
(2) the establishment of a reasonable comment period, not to exceed 30 days, for interested individuals to submit written comments to the Secretary; and
(3) that the Member of Congress who represents the district in which such center is located is notified within a reasonable period of time in advance of any final decision to close the center."

Historically DOL has announced the closure criteria it is using to close any given center through publishing those criteria in the FRN and, occasionally, requesting comments on the criteria. This means over time the closure criteria have not been static – DOL has added criteria to address the policy direction and need for a rationale to close a center at a given time. Closure criteria have varied over time, including considerations of chronic low performance, an evaluation of effort required to maintain high-quality education, and other considerations to determine whether to close a center.[5]

If a decision is made to close a center, then the decision and basis for the decision must be documented at least internally. The process to complete a closure can be a costly, time-consuming process as operations at the center are wound down, personal property is dealt with, and any real property issues are addressed.

## VI. Demonstration Authority

**Legal Framework**: Under 29 U.S.C. § 3206(a), the Secretary of Labor is authorized to carry out experimental, research, or demonstration projects relating to carrying out the Job Corps program. The statute also provides the Secretary the authority to waive any provisions of the WIOA section on Job Corps that the Secretary finds would prevent her from carrying out the projects. If

---

[5] See example of closure criteria for Ouachita Civilian Conservation Center in Arkansas, 81 FR 43250 (July 1, 2016), https://www.federalregister.gov/documents/2016/07/01/2016-15603/final-notice-of-job-corps-center-for-closure

000258

the Secretary determines that such waiver is necessary, the statute requires 90-days advance written notification to the Committee on Education and the Workforce of the House of Representatives and the Committee on Health, Education, Labor, and Pensions of the Senate.

**Purpose and Implementation**: The demonstration authority allows the Department of Labor to pilot innovative approaches to education and vocational training relating to carrying out the Job Corps program. These projects aim to enhance program effectiveness, address emerging workforce needs, and improve service delivery to participants.[6]

# VII. Contracting Mechanisms

**Firm Fixed-Price Contracts (FFP)**: OJC began transitioning to the FFP model in 2019 and has a few remaining contracts to transition from cost-reimbursable to FFP. Under FFP agreements, contractors are paid a set amount for delivering specified services, regardless of actual costs incurred. FFP contracts offer some advantages for government operations by providing cost predictability, which helps agencies better manage budgets and fiscal planning. These contracts also incentivize contractors to operate efficiently, since maintaining profitability depends on managing resources within the agreed price.[7] However, successful execution of FFP contracts requires careful attention to a few important considerations. Defining the scope of work with precision is critical to prevent scope creep[8] and maintain contractor accountability. Additionally, because contractors bear the financial risk of cost overruns, there is a possibility that service quality could be affected if risks are not properly managed.

Having selected the FFP contract type, DOL faced a new challenge during the COVID pandemic. Under an FFP contract, agencies have little or no visibility on the contractor's costs. As enrollment numbers dropped due to COVID, any cost savings did not automatically translate into reduced FFP payments by DOL. DOL did negotiate a "take back" mechanism for low OBS, but these were limited given DOL's understanding that a large portion of operational costs (e.g., salaries and facilities) are impervious to changes in enrollment. Plus, a reduction in the FFP amounts would be subject to negotiation and could be grounds for dispute and litigation absent contractor agreement.

# VIII. Real Property Management and Disposal

---

[6] An illustrative example of this authority in action is the Job Corps Scholars Program, a demonstration project that provided eligible youth aged 16–24 the opportunity to enroll in career technical training programs at twenty-six accredited public colleges.

[7] The advantages of a firm fixed price contract type is recognized by Federal Acquisition Regulation FAR 16.202-1, which states: "[a] firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties."

[8] Under the Changes clauses in the contracts, FAR 52.243-1, *Changes-Fixed Price*, the contractors are entitled to additional compensation if the agency directs them to perform work not required by the contract which increases their costs of performance.

7

While most DOL office spaces are leased through GSA, Job Corps centers are exceptions, as they are directly owned or leased by the DOL. Job Corps controls over 90% of the Department of Labor's building stock. The legal status of the Job Corps facilities is broken down into four categories: 1) DOL owned, 2) DOL direct leased, 3) a combination of DOL owned and direct leased, and 4) Civilian Conservation Centers (CCCs). Of all the Job Corps centers, 58 are owned, 34 are leased, seven are a mixture of owned and leased, and 24 are on land owned by the USDA or United States Department of the Interior (DOI) and operated as CCCs. Two Centers on the list (Gainesville and Homestead) have been closed, but DOL still owns the property which is now excess and currently going through the disposal process with GSA.

Job Corps center contractors manage government-furnished property (GFP) on-site. These contractors are also required to maintain accurate inventories using systems like the Electronic Property Management System (EPMS) and the Fleet Tracking Management System (FTMS). Regular audits and adherence to federal property management regulations, including those from the Federal Acquisition Regulation (FAR) and GSA policies, ensure accountability and proper stewardship.[9]

The OJC currently has an unfunded, deferred construction, rehabilitation and acquisition (CRA) backlog estimated to be $1.6 billion. Job Corps defines its unfunded CRA backlog as the total of the non-recurring costs to restore and renovate facilities (structures and buildings) and systems (e.g., heating ventilation, air conditioning, sewage, water, or electrical) to, or as close to, their original capacity, efficiency, and capability, and for which insufficient funding is currently available to complete the work. This amount represents more than 2,200 structures located on 5,600 acres. Over the past several years, the cost associated with correcting property deficiencies has increased by more than 50 percent.

More than 43 percent of the Job Corps' portfolio by square footage is more than 50 years old. In 2024, Job Corps estimated that in five years, 119 additional buildings comprising nearly 1,135,000 gross square feet would reach the age of 50, which will result in those buildings becoming subject to compliance with the historic preservation regulations when undergoing renovations. CRA funding is critical to the success of the Job Corps program because healthy and safe facilities contribute to an effective learning environment.

*General Disposal Requirements for Job Corps Centers*

When a Job Corps center is closed or realigned, the U.S. Department of Labor (DOL), historically in coordination with the General Services Administration (GSA), follows federal regulations to dispose of real property and assets. The disposal process must comply with the Federal Property and Administrative Services Act, GSA's Federal Management Regulation (FMR), and applicable Department of Labor policies.
Generally, disposal involves several key steps:
- **Property Assessment:** The DOL evaluates whether real property (land, buildings, equipment) is excess to agency needs.

---

[9] See Job Corps' Policy and Requirements Handbook Appendix 505 Admin and Management of Job Corps Contractor-Held Government-Furnished Property.pdf

- **Declaration as Excess:** Property no longer needed is officially declared "excess" and reported to GSA for broader federal screening.
- **Federal and Public Screening:** GSA offers excess property to other federal agencies first. If no agency claims it, it is made available to state, local governments, nonprofits, or educational institutions under specific public benefit conveyance programs.
- **Public Sale:** If there is no federal or public entity interest, the property is sold to the public, typically through online auctions or sealed bids.
- **Environmental Compliance:** Before disposal, environmental assessments must be conducted to ensure compliance with laws like the National Environmental Policy Act (NEPA) and to address any hazardous materials or cleanup requirements.
- **Proceeds:** Revenue from property sales is generally returned to the U.S. Treasury unless specific statutory authority allows reuse within the program.

Separately, contractor-held personal property (such as equipment, vehicles, and supplies) must be disposed of following federal acquisition regulations (FAR Subpart 45.6) and DOL property management policies, ensuring proper accountability and financial closeout.


## IX. DOL Transparency Report

On April 25, 2025, the U.S. Department of Labor's Employment and Training Administration released the 2025 Job Corps Transparency Report, providing a detailed analysis of the financial performance and operational costs of the Job Corps Program.

Below is a summary of the overall findings from PY2023[10]:
- Average Graduation Rate:
  - Traditional: 32%
  - WIOA Definition: 38%
- Average Cost Per Enrollee (Regardless of Length of Stay): $49,769.53
- Average Cost Per Student Per Year (Average PY23 Headcount): $80,284.65
- Average Total Cost Per Graduate:
  - Traditional: $187,653
  - WIOA Definition: $155,600
- Job Corps participants earn $16,695 annually on average, post separation
- Average of Highest Center Costs per Graduate (Traditional Data):
  - The 10 least efficient programs average $512,800 dollars per graduate
  - The top 50 least efficient programs average $319,085 per graduate
- Average of Highest Center Costs per Graduate (WIOA Data):
  - The 10 least efficient programs average $385,370 per graduate
  - The top 50 least efficient programs average $252,285 per graduate

---

[10] The Job Corps Transparency Report's metrics distinguish between two definitions of the term "graduate": one reflecting traditional program completion in good standing (Traditional), and another using the statutory criteria from Workforce Innovation and Opportunity Act Sec. 116, Sec. 142, which counts individuals who attain a diploma or Career Technical Training completion while enrolled but do not complete the full program.

9

**X. Job Corps PY 2024 and 2025 Cost Savings Efforts**

In Program Year (PY) 24, the Office of Job Corps implemented a series of aggressive cost savings initiatives to mitigate an anticipated operating deficit and set a foundation for long-term program sustainability. These efforts were informed by a comprehensive review of all expenditures against statutory and regulatory minimum requirements.

PY 24 cost-saving strategies resulted in savings of over $120 million, that included:

- **De-scoping Requests for Proposals (RFPs) and Center Contracts:**
  Job Corps systematically reviewed the Policy and Requirements Handbook (PRH) to identify and remove non-mandatory program requirements, allowing for the negotiation with contractors to modify the contracts to reduce the future contract prices. This de-scoping focused on aligning center operations strictly to statutory obligations, thus reducing unnecessary expenditures. This included policy revisions to eliminate Evening and Weekend Studies requirements, remove non-mandatory oral health services, remove mandatory Career Transition Services (CTS) for those who did not complete the program, and reduce nursing and trainee employee assistance program hours back to pre-COVID levels. These targeted changes directly contributed to operating cost reductions without undermining core program services.

**In Program Year (PY) 25, the Job Corps program faces a projected operating deficit of up to $213 million.** To address this shortfall, the Department is contemplating several strategies to augment amounts carried forward from PY24 mitigation efforts (estimated at $130 million): prioritizing cost-saving actions at centers with expiring contracts and suspending operations at underperforming centers, including deploying the following:

- **Trade and Program Restructuring:** Job Corps conducted a national evaluation of trade offerings across centers, using labor market information and program performance ratings. Underutilized or duplicative trades are targeted for elimination or consolidation, and Continuous Improvement Plans (CIPs) will be deployed for lower-performing programs.
- **Long-Term Sustainability Risk Analysis and Right-Sizing Initiatives:** A new facilities, performance, and sustainability risk assessment tool was developed to prioritize centers for potential suspension of operations based on performance and fiscal sustainability. This risk-driven "Right-Sizing" initiative focused on gradually shifting to a need-based model (e.g., one to three residential centers per state) projecting long-term savings of up to $337.72 million.

10

- **Cost Avoidance in USDA Forest Service Centers:** For USDA-operated centers, Job Corps reviewed CCC funding formulas to avoid overpayment for vacant student slots, resulting in a projected $2 million cost avoidance for PY 25.

**Union Labor**

| NTC Contractor | Technical Education Program | No. of Instructors |
|---|---|---|
| United Brotherhood of Carpenters and Joiners (UBCJA) | • Carpentry, Pre-Apprentice | 113 |
| United Auto Workers (UAW) | • Maintenance - Light Repair, Pre-Apprentice<br>• Advanced Automobile Service Technology, Pre-Apprentice<br>• Advanced MHDT Suspension and Steering, Pre-Apprentice<br>• Advanced Collision Repair and Refinish - Damage Analysis and Estimating, Pre-Apprentice | 35 |
| Transportation Communication Union/International Association of Machinists and Aerospace Workers (TCU-IAM) | • Transportation Service Workers:<br>• Rail Mechanical Service/Carmen<br>• Rail Freight Service<br>• Airline Service<br>• Inland Waterway Service<br>• Rail Passenger Service<br>• Mass Transit/Highway Service | 24 |
| National Plastering Industry's Joint Apprenticeship Trust Fund (NPIJATF) | • Cement Masonry, Pre-Apprentice<br>• Plastering, Pre-Apprentice | 45 |
| International Union of Painters and Allied Trades (IUPAT) | • Painting, Pre-Apprentice<br>• Glazing, Pre-Apprentice<br>• Sign, Billboard, and Display, Pre-Apprentice<br>• Floor Covering Installation, Pre-Apprentice | 41 |
| International Union of Operating Engineers (IUOE) | • Heavy Construction Equipment Mechanic, Pre-Apprentice<br>• Heavy Equipment Operations, Pre-Apprentice<br>• Maintenance Repairer Helper - Stationary Engineering, Pre-Apprentice | 35 |
| International Masonry Institute (IMI) | • Bricklayer, Pre-Apprentice<br>• Tile Setting, Pre-Apprentice | 34 |
| Home Builders Institute (HBI) | • Electrical, Pre-Apprentice<br>• Plumbing, Pre-Apprentice<br>• Building Construction Technology, Pre-Apprentice<br>• HVAC, Pre-Apprentice<br>• Plumbing, Pre-Apprentice | 122 |

11

Message

**From:** Frazier, Susan (Lori) - ETA ████████████████████████████

**Sent:** 5/5/2025 5:17:54 PM
**To:** Laco, Marek S - ETA ████████████ Timmons, Luke B1 - ETA ████████████
**Subject:** FW: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum
**Attachments:** EMBARGOED DRAFT_ETA Job Corps Program Decision Memo_V3.docx

**Lori Frazier Bearden** |
United States Department of Labor
Acting Assistant Secretary
Employment and Training Administration
200 Constitution Avenue Suite S-2307
Washington, D.C. 20210
C: ████████████



**From:** Frazier, Susan (Lori) - ETA
**Sent:** Monday, May 5, 2025 5:01 PM
**To:** Youngs, Bridget M - OSEC ████████████████████ Collins, Miles B - OSEC ████████████████ Han,
Jihun A - OSEC ████████████ Parella, Courtney E - OPA ████████████████ Walter, Courtney E -
OSEC ████████████████
**Subject:** RE: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

Great teamwork!! All changes accepted and attached for final review.

Thanks!
Lori

**Lori Frazier Bearden** |
United States Department of Labor
Acting Assistant Secretary
Employment and Training Administration
200 Constitution Avenue Suite S-2307
Washington, D.C. 20210
C: ████████████



**From:** Youngs, Bridget M - OSEC ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Monday, May 5, 2025 1:05 PM
**To:** Collins, Miles B - OSEC ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Frazier, Susan (Lori) - ETA ▮▮▮▮▮▮▮▮▮ Han, Jihun A
- OSEC ▮▮▮▮▮▮▮▮▮▮▮ Parella, Courtney E - OPA ▮▮▮▮▮▮▮▮▮▮▮; Walter, Courtney E - OSEC
▮▮▮▮▮▮▮▮▮▮

**Subject:** RE: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

Thanks Lori & Miles! Edits as of 1300 attached.

**From:** Collins, Miles B - OSEC ▮▮▮▮▮▮▮▮▮▮
**Sent:** Monday, May 5, 2025 1:01 PM
**To:** Frazier, Susan (Lori) - ETA ▮▮▮▮▮▮▮▮▮▮ Han, Jihun A - OSEC ▮▮▮▮▮▮▮▮▮ Parella, Courtney
E - OPA ▮▮▮▮▮▮▮▮▮▮▮ Walter, Courtney E - OSEC ▮▮▮▮▮▮▮▮▮ Youngs, Bridget M -
OSEC ▮▮▮▮▮▮▮▮
**Subject:** RE: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

This is great! Thank you for putting this together! We have made some suggested edits to add clarity on a few
points. Please LMK if you are good with the edits.

+@Han, Jihun A - OSEC +@Parella, Courtney E - OPA +@Walter, Courtney E - OSEC

**From:** Frazier, Susan (Lori) - ETA ▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Monday, May 5, 2025 10:43 AM
**To:** Collins, Miles B - OSEC ▮▮▮▮▮▮▮▮
**Subject:** FW: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

**From:** Frazier, Susan (Lori) - ETA
**Sent:** Sunday, May 4, 2025 3:53 PM
**To:** Han, Jihun A - OSEC ▮▮▮▮▮▮▮▮▮▮
**Subject:** DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

Here you go! The DRAFT operational plan is only 2 pages, but I included an Appendix for reference. I am sure
there will be some edits. There are also a few decision points in it.

Thanks!
Lori

**Lori Frazier Bearden** |
United States Department of Labor
Acting Assistant Secretary
Employment and Training Administration

200 Constitution Avenue Suite S-2307
Washington, D.C. 20210
C: 



**U.S. Department of Labor**    Assistant Secretary for
Employment and Training
Washington, D.C. 20210



<b>DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE</b>

**May 4, 2025**

**DECISION MEMORANDUM**

**SUBJECT:    Job Corps Program and Pausing Center Operations**

**PURPOSE:** To reach consensus on pausing Job Corp center operations and return every student safely and timely to their home of record by the end of the program year June 30th

**OPERATIONAL PLAN:** (1) Immediately cease all Job Corp center operations (including 24 USDA CCCs) to allow adequate transition plans for mobilizing students. (2) Centers will execute a "Suspension of Operations" Plan. (3) Return funds to Treasury.


## PHASE 1: PAUSE ALL JOB CORP CENTER OPERATIONS

> **Action 1:** OSEC will communicate the operational plan with USDA Secretary. USDA center staff (24 centers) will be directed to operationalize their "Suspension of Operations" plan to transfer students to home of record.
> **Action 2:** ETA will terminate 99 contracts with center operators using the "Termination for Convenience of the Government."
>   - ETA leadership will brief limited Job Corp federal staff including Contracting Officer Representative (COR).
>   - OJC Staff will issue brief email notices to all Job Corp Center Operators/Job Corp Association/Labor Unions minutes ahead of the termination notices below.
>   - OJC staff will issue a Termination of Inconvenience effective August 15th and require implementation of Center Operations Pause and transition students to home of record by June 30th.
>     - Operations wind-down to commence immediately with final operations date of June 30, 2025.
>   - ETA leadership will ensure COR understands negotiation role to negotiate termination fees and needed program costs that are applicable to transition students and successfully stop operations. This will include Wednesday, May 14th at 4:30PM 6-12 weeks of continued contract operations such as facility and property management, records retention, secure data and transportation fleet.
>   - Center Operators will operationalize "Suspension of Operations" plan.
> **Action 3:** DOL OSEC will operate a communication plan in conjunction with other executive leadership.
> **Action 4:** ETA will provide targeted response for Job Corp center staff (employment services, job fairs, unemployment compensation, dislocated worker funding). ETA will

provide students with alternative program options such as Apprenticeship opportunities, Armed Service recruiters, etc.

➢ **Action 5**: "Caretaker" contracts will be executed to maintain facilities until leases expire. Note that some leases will be terminated.

## PHASE 2: FORMAL CLOSURES

➢ **Action 1:** ETA will publish a Federal Register Notice as required by WIOA sec.159 providing advance notice of center closures.

➢ **Action 2:** DOL and UDSA will renegotiate necessary interagency agreements to prevent endangerment of health/safety.

➢ **Action 3:** DOL in conjunction with GSA follows federal regulations for general disposal requirements complying with Federal Property Administrative Services Act, GSA's Federal Management Regulation (FMR), and USDOL policies.

000268

# APPENDIX
# BRIEF SUMMARY

**Background & Analysis:** Job Corps, established under the Economic Opportunity Act of 1964 (Public Law 88-452), is the nation's largest federally funded residential education and vocational training program.

| | |
|---|---|
| **Operational PY24 Budget:** | $1.6 Billion |

**Center Operations:**

- Total Job Corp Centers (all 50 states, Puerto Rico, and DC):    123
- Of the 123, number operated by contract:    99
- Of the 123, number operated by USDA:    24
- Number of centers currently paused[1]:    4
- Owned Job Corp Centers:    58
- Leased Job Corp Centers:    34
- USDA Centers owned by Forest Service:    24

**Administration:**

- Office of Job Corps (OJC) federal FTE within ETA and regional offices:    80
- Student Onboard Strength as of April 24, 2025:    25,892
- Federal Contractor/Job Center Staff:    12,000
- USDA Forest Service Federal Employees at Job Corps Centers:    1,100
- National Training Contractors[2] (union organizations):    8
  - Instructors:    449
  - Regional coordinators and other administrative personnel    50+

**Program Performance Failures, Facility Sustainability, and Excessive Costs:** The Job Corp program cannot continue to operate services at its current capacity. The program is in a financial crisis and has remained at the high risk of violating the Anti-deficiency Act (ADA)[3].

- The Job Corps budget has remained largely flat at $1.6 billion since 2018.
- If adjusted for inflation, the budget would have to exceed $2 billion in 2024 to continue operations.
- Job Corps was operating at a deficit for PY 24—approximately $140 million—several actions to save approximately $119 million including the pausing of centers, cancelling contracts, and reducing costs have allowed the current operations to reach the end of this program year June 30th.

---

[1] Woodstock (MD), Whitney Young (KY), Penobscot (ME), Loring (ME)
[2] See Appendix
[3] ADA Act- The Antideficiency Act prohibits federal employees from making or authorizing an expenditure from, or creating or authorizing an obligation under, any appropriation or fund in excess of the amount available in the appropriation or fund unless authorized by law. 31 U.S.C. § 1341 (a) (1) (A).

- PY25- Operating deficit could grow up to $213 million if mitigation strategies do not continue

**BACKGROUND AND ANALYSIS**

## I. Purpose and Administration

Since its inception, the program has served over three million youth and young adults. Currently authorized under the Workforce Innovation and Opportunity Act (WIOA), Title I, Subtitle C (codified at 29 U.S.C. § 3191 et seq.), Job Corps is funded through annual Congressional appropriations, with an average budget of approximately $1.6 billion for center operations since 2017. The program provides academic education, career technical training, career transition services, and residential support to thousands of students each year.

The Office of Job Corps (OJC) within ETA oversees the program and is comprised of staff at the National Office with six regional offices. In total, OJC employs 80 federal full-time equivalent staff. The program is funded through three distinct accounts: $1.6 billion for Operations, which supports center operations contracts and U.S. Department of Agriculture (USDA) Forest Service Civilian Conservation Centers for residential services, academics, counseling, and career technical training; $33 million for Administration, which funds federal staffing, travel, and training at the National and Regional Offices; and $123 million for Construction, Rehabilitation, and Acquisition (CRA), which supports facility acquisition, construction, and rehabilitation nationwide.

## II. Eligibility Criteria

Admissions Counselors are hired under center operations contracts to assess applicant eligibility for the program. As outlined in 29 U.S.C. § 3194 (or pursuant to other sections in WIOA, as noted), applicants must:

- Be between 16 and 24 years old at enrollment (with allowances for up to 20% of enrollees aged 22–24 and waivers for individuals with disabilities).
- Meet low-income criteria.
- Face one or more barriers to education and employment, such as being basic skills deficient, a school dropout, homeless, a foster child, or requiring additional education or training to obtain and retain employment.
- Demonstrate a need for additional education, training, or support to secure and maintain employment
- Not fall within one of WIOA's special limitations on selection in 29 U.S.C. § 3195(b).
- Consistent with the nondiscrimination prohibition against certain noncitizens located at 29 U.S.C. § 3248(a)(5), be either a U.S. citizen; a lawfully admitted permanent resident alien, refugee, asylee, parolee, or other alien who has been authorized by the Department of Homeland Security to work in the United States; or a resident of a U.S. territory.

4

Job Corps' eligibility criteria are outlined in more detail in the Policy and Requirements Handbook Exhibit 1-1.

## III. Center Types and Operations

Job Corps centers operate under three models. Contracted centers are managed by private organizations or state and local agencies through competitive procurement. Civilian Conservation Centers (CCCs) are operated by the USDA Forest Service, focusing on conservation training and disaster response in rural areas. Additionally, some centers are operated by Indian tribes through agreements to serve Indians.[4]

A majority of centers are operated by contractors via competitively awarded contracts, with approximately 13,000 contractor staff.  In addition, 24 Civilian Conservation Centers (CCC) are operated by the USDA Forest Service via an interagency agreement and are staffed with 1,100 federal employees.

- *Civilian Conservation Centers (CCCs*)

**Overview**: CCCs are a subset of Job Corps centers focused on natural resource conservation and public land management. They offer unique training opportunities in forestry, firefighting, and conservation, contributing to both workforce development and environmental stewardship.

**Governance and Funding**: CCCs operate under an **interagency agreement** between the Department of Labor and the USDA. While the Forest Service manages daily operations, DOL provides funding and oversight to ensure alignment with Job Corps standards and objectives.

**Legislative Considerations**: In 2019, proposals to close several CCCs were met with bipartisan opposition that, in part, included assertions as to their importance to rural economies and conservation efforts. Subsequent enacted appropriations laws included provisions prohibiting appropriated funds from being used to (1) alter or terminate the Interagency Agreement between DOL and USDA and (2) close any of the Civilian Conservation Centers, except if such closure is necessary to prevent the endangerment of the health and safety of the students.

## V. Performance Management

**Performance Indicators**: Under 29 U.S.C. § 3209, Job Corps centers are evaluated based on the primary indicators of performance applicable to all programs authorized by WIOA, including: 1) placement in employment, education, or training (2nd and 4th quarter after exit), 2) credential attainment, 3) measurable skill gains, 4) median earnings, and 5) retention in employment or education.

---

[4] Currently Job Corps' Talking Leaves Job Corps Center is operated by Cherokee Nation.

000271

**Job Corps Center Closure Criteria**

Per 29 U.S.C. § 3209(j), prior to the closure of any Job Corps center, "the Secretary shall ensure—
(1) that the proposed decision to close the center is announced in advance to the general public through publication in the Federal Register or other appropriate means;
(2) the establishment of a reasonable comment period, not to exceed 30 days, for interested individuals to submit written comments to the Secretary; and
(3) that the Member of Congress who represents the district in which such center is located is notified within a reasonable period of time in advance of any final decision to close the center."

Historically DOL has announced the closure criteria it is using to close any given center through publishing those criteria in the FRN and, occasionally, requesting comments on the criteria. This means over time the closure criteria have not been static – DOL has added criteria to address the policy direction and need for a rationale to close a center at a given time. Closure criteria have varied over time, including considerations of chronic low performance, an evaluation of effort required to maintain high-quality education, and other considerations to determine whether to close a center.[5]

If a decision is made to close a center, then the decision and basis for the decision must be documented at least internally. The process to complete a closure can be a costly, time-consuming process as operations at the center are wound down, personal property is dealt with, and any real property issues are addressed.

# VI. Demonstration Authority

**Legal Framework**: Under 29 U.S.C. § 3206(a), the Secretary of Labor is authorized to carry out experimental, research, or demonstration projects relating to carrying out the Job Corps program. The statute also provides the Secretary the authority to waive any provisions of the WIOA section on Job Corps that the Secretary finds would prevent her from carrying out the projects. If the Secretary determines that such waiver is necessary, the statute requires 90-days advance written notification to the Committee on Education and the Workforce of the House of Representatives and the Committee on Health, Education, Labor, and Pensions of the Senate.

**Purpose and Implementation**: The demonstration authority allows the Department of Labor to pilot innovative approaches to education and vocational training relating to carrying out the Job Corps program. These projects aim to enhance program effectiveness, address emerging workforce needs, and improve service delivery to participants.[6]

---

[5] See example of closure criteria for Ouachita Civilian Conservation Center in Arkansas, 81 FR 43250 (July 1, 2016), https://www.federalregister.gov/documents/2016/07/01/2016-15603/final-notice-of-job-corps-center-for-closure

[6] An illustrative example of this authority in action is the Job Corps Scholars Program, a demonstration project that provided eligible youth aged 16–24 the opportunity to enroll in career technical training programs at twenty-six accredited public colleges.

000272

## VII. Contracting Mechanisms

**Firm Fixed-Price Contracts (FFP)**: OJC began transitioning to the FFP model in 2019 and has a few remaining contracts to transition from cost-reimbursable to FFP. Under FFP agreements, contractors are paid a set amount for delivering specified services, regardless of actual costs incurred. FFP contracts offer some advantages for government operations by providing cost predictability, which helps agencies better manage budgets and fiscal planning. These contracts also incentivize contractors to operate efficiently, since maintaining profitability depends on managing resources within the agreed price.[7] However, successful execution of FFP contracts requires careful attention to a few important considerations. Defining the scope of work with precision is critical to prevent scope creep[8] and maintain contractor accountability. Additionally, because contractors bear the financial risk of cost overruns, there is a possibility that service quality could be affected if risks are not properly managed.

Having selected the FFP contract type, DOL faced a new challenge during the COVID pandemic. Under an FFP contract, agencies have little or no visibility on the contractor's costs. As enrollment numbers dropped due to COVID, any cost savings did not automatically translate into reduced FFP payments by DOL. DOL did negotiate a "take back" mechanism for low OBS, but these were limited given DOL's understanding that a large portion of operational costs (e.g., salaries and facilities) are impervious to changes in enrollment. Plus, a reduction in the FFP amounts would be subject to negotiation and could be grounds for dispute and litigation absent contractor agreement.

## VIII. Real Property Management and Disposal

While most DOL office spaces are leased through GSA, Job Corps centers are exceptions, as they are directly owned or leased by the DOL. Job Corps controls over 90% of the Department of Labor's building stock. The legal status of the Job Corps facilities is broken down into four categories: 1) DOL owned, 2) DOL direct leased, 3) a combination of DOL owned and direct leased, and 4) Civilian Conservation Centers (CCCs). Of all the Job Corps centers, 58 are owned, 34 are leased, seven are a mixture of owned and leased, and 24 are on land owned by the USDA or United States Department of the Interior (DOI) and operated as CCCs. Two Centers on the list (Gainesville and Homestead) have been closed, but DOL still owns the property which is now excess and currently going through the disposal process with GSA.

---

[7] The advantages of a firm fixed price contract type is recognized by Federal Acquisition Regulation FAR 16.202-1, which states: "[a] firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties."

[8] Under the Changes clauses in the contracts, FAR 52.243-1, *Changes-Fixed Price*, the contractors are entitled to additional compensation if the agency directs them to perform work not required by the contract which increases their costs of performance.

000273

Job Corps center contractors manage government-furnished property (GFP) on-site. These contractors are also required to maintain accurate inventories using systems like the Electronic Property Management System (EPMS) and the Fleet Tracking Management System (FTMS). Regular audits and adherence to federal property management regulations, including those from the Federal Acquisition Regulation (FAR) and GSA policies, ensure accountability and proper stewardship.[9]

The OJC currently has an unfunded, deferred construction, rehabilitation and acquisition (CRA) backlog estimated to be $1.6 billion. Job Corps defines its unfunded CRA backlog as the total of the non-recurring costs to restore and renovate facilities (structures and buildings) and systems (e.g., heating ventilation, air conditioning, sewage, water, or electrical) to, or as close to, their original capacity, efficiency, and capability, and for which insufficient funding is currently available to complete the work. This amount represents more than 2,200 structures located on 5,600 acres.  Over the past several years, the cost associated with correcting property deficiencies has increased by more than 50 percent.

More than 43 percent of the Job Corps' portfolio by square footage is more than 50 years old.  In 2024, Job Corps estimated that in five years, 119 additional buildings comprising nearly 1,135,000 gross square feet would reach the age of 50, which will result in those buildings becoming subject to compliance with the historic preservation regulations when undergoing renovations.  CRA funding is critical to the success of the Job Corps program because healthy and safe facilities contribute to an effective learning environment.

### *General Disposal Requirements for Job Corps Centers*

When a Job Corps center is closed or realigned, the U.S. Department of Labor (DOL), historically in coordination with the General Services Administration (GSA), follows federal regulations to dispose of real property and assets. The disposal process must comply with the Federal Property and Administrative Services Act, GSA's Federal Management Regulation (FMR), and applicable Department of Labor policies.
Generally, disposal involves several key steps:
- **Property Assessment:** The DOL evaluates whether real property (land, buildings, equipment) is excess to agency needs.
- **Declaration as Excess:** Property no longer needed is officially declared "excess" and reported to GSA for broader federal screening.
- **Federal and Public Screening:** GSA offers excess property to other federal agencies first. If no agency claims it, it is made available to state, local governments, nonprofits, or educational institutions under specific public benefit conveyance programs.
- **Public Sale:** If there is no federal or public entity interest, the property is sold to the public, typically through online auctions or sealed bids.
- **Environmental Compliance:** Before disposal, environmental assessments must be conducted to ensure compliance with laws like the National Environmental Policy Act (NEPA) and to address any hazardous materials or cleanup requirements.

---

[9] See Job Corps' Policy and Requirements Handbook Appendix 505 Admin and Management of Job Corps Contractor-Held Government-Furnished Property.pdf

000274

- **Proceeds:** Revenue from property sales is generally returned to the U.S. Treasury unless specific statutory authority allows reuse within the program.

Separately, contractor-held personal property (such as equipment, vehicles, and supplies) must be disposed of following federal acquisition regulations (FAR Subpart 45.6) and DOL property management policies, ensuring proper accountability and financial closeout.

## IX. DOL Transparency Report

On April 25, 2025, the U.S. Department of Labor's Employment and Training Administration released the 2025 Job Corps Transparency Report, providing a detailed analysis of the financial performance and operational costs of the Job Corps Program.

Below is a summary of the overall findings from PY2023[10]:
- Average Graduation Rate:
  - Traditional: 32%
  - WIOA Definition: 38%
- Average Cost Per Enrollee (Regardless of Length of Stay): $49,769.53
- Average Cost Per Student Per Year (Average PY23 Headcount): $80,284.65
- Average Total Cost Per Graduate:
  - Traditional: $187,653
  - WIOA Definition: $155,600
- Job Corps participants earn $16,695 annually on average, post separation
- Average of Highest Center Costs per Graduate (Traditional Data):
  - The 10 least efficient programs average $512,800 dollars per graduate
  - The top 50 least efficient programs average $319,085 per graduate
- Average of Highest Center Costs per Graduate (WIOA Data):
  - The 10 least efficient programs average $385,370 per graduate
  - The top 50 least efficient programs average $252,285 per graduate

## X. Job Corps PY 2024 and 2025 Cost Savings Efforts

In Program Year (PY) 24, the Office of Job Corps implemented a series of aggressive cost savings initiatives to mitigate an anticipated operating deficit and set a foundation for long-term program sustainability. These efforts were informed by a comprehensive review of all expenditures against statutory and regulatory minimum requirements.

PY 24 cost-saving strategies resulted in savings of over $120 million, that included:

---

[10] The Job Corps Transparency Report's metrics distinguish between two definitions of the term "graduate": one reflecting traditional program completion in good standing (Traditional), and another using the statutory criteria from Workforce Innovation and Opportunity Act Sec. 116, Sec. 142, which counts individuals who attain a diploma or Career Technical Training completion while enrolled but do not complete the full program.

000275

- **De-scoping Requests for Proposals (RFPs) and Center Contracts:**
  Job Corps systematically reviewed the Policy and Requirements Handbook (PRH) to identify and remove non-mandatory program requirements, allowing for the negotiation with contractors to modify the contracts to reduce the future contract prices. This de-scoping focused on aligning center operations strictly to statutory obligations, thus reducing unnecessary expenditures. This included policy revisions to eliminate Evening and Weekend Studies requirements, remove non-mandatory oral health services, remove mandatory Career Transition Services (CTS) for those who did not complete the program, and reduce nursing and trainee employee assistance program hours back to pre-COVID levels. These targeted changes directly contributed to operating cost reductions without undermining core program services.

**In Program Year (PY) 25, the Job Corps program faces a projected operating deficit of up to $213 million.** To address this shortfall, the Department is contemplating several strategies to augment amounts carried forward from PY24 mitigation efforts (estimated at $130 million): prioritizing cost-saving actions at centers with expiring contracts and suspending operations at underperforming centers, including deploying the following:

- **Trade and Program Restructuring:** Job Corps conducted a national evaluation of trade offerings across centers, using labor market information and program performance ratings. Underutilized or duplicative trades are targeted for elimination or consolidation, and Continuous Improvement Plans (CIPs) will be deployed for lower-performing programs.
- **Long-Term Sustainability Risk Analysis and Right-Sizing Initiatives:** A new facilities, performance, and sustainability risk assessment tool was developed to prioritize centers for potential suspension of operations based on performance and fiscal sustainability. This risk-driven "Right-Sizing" initiative focused on gradually shifting to a need-based model (e.g., one to three residential centers per state) projecting long-term savings of up to $337.72 million.
- **Cost Avoidance in USDA Forest Service Centers:** For USDA-operated centers, Job Corps reviewed CCC funding formulas to avoid overpayment for vacant student slots, resulting in a projected $2 million cost avoidance for PY 25.

## Union Labor

| NTC Contractor | Technical Education Program | No. of Instructors |
|---|---|---|
| United Brotherhood of Carpenters and Joiners (UBCJA) | • Carpentry, Pre-Apprentice | 113 |
| United Auto Workers (UAW) | • Maintenance - Light Repair, Pre-Apprentice<br>• Advanced Automobile Service Technology, Pre-Apprentice<br>• Advanced MHDT Suspension and Steering, Pre-Apprentice | 35 |

10

| NTC Contractor | Technical Education Program | No. of Instructors |
|---|---|---|
|  | • Advanced Collision Repair and Refinish - Damage Analysis and Estimating, Pre-Apprentice |  |
| Transportation Communication Union/International Association of Machinists and Aerospace Workers (TCU-IAM) | • Transportation Service Workers:<br>• Rail Mechanical Service/Carmen<br>• Rail Freight Service<br>• Airline Service<br>• Inland Waterway Service<br>• Rail Passenger Service<br>• Mass Transit/Highway Service | 24 |
| National Plastering Industry's Joint Apprenticeship Trust Fund (NPIJATF) | • Cement Masonry, Pre-Apprentice<br>• Plastering, Pre-Apprentice | 45 |
| International Union of Painters and Allied Trades (IUPAT) | • Painting, Pre-Apprentice<br>• Glazing, Pre-Apprentice<br>• Sign, Billboard, and Display, Pre-Apprentice<br>• Floor Covering Installation, Pre-Apprentice | 41 |
| International Union of Operating Engineers (IUOE) | • Heavy Construction Equipment Mechanic, Pre-Apprentice<br>• Heavy Equipment Operations, Pre-Apprentice<br>• Maintenance Repairer Helper - Stationary Engineering, Pre-Apprentice | 35 |
| International Masonry Institute (IMI) | • Bricklayer, Pre-Apprentice<br>• Tile Setting, Pre-Apprentice | 34 |
| Home Builders Institute (HBI) | • Electrical, Pre-Apprentice<br>• Plumbing, Pre-Apprentice<br>• Building Construction Technology, Pre-Apprentice<br>• HVAC, Pre-Apprentice<br>• Plumbing, Pre-Apprentice | 122 |

11

Message

**From:** Han, Jihun A - OSEC █

**Sent:** 5/6/2025 4:15:18 PM
**To:** Chavez-DeRemer, Lori M - OSEC █                    █ Wright, Rebecca - OSEC █                    █
**Attachments:** EMBARGOED DRAFT_ETA Job Corps Program Decision Memo_V3.docx

**Jihun Han**
Chief of Staff
Office of the Secretary
U.S. Department of Labor
C: █



**U.S. Department of Labor**　　Assistant Secretary for
Employment and Training
Washington, D.C. 20210



## DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE

**May 4, 2025**

**DECISION MEMORANDUM**

**SUBJECT:**　**Job Corps Program and Pausing Center Operations**

**PURPOSE:** To reach consensus on pausing Job Corp center operations and return every student safely and timely to their home of record by the end of the program year June 30th

**OPERATIONAL PLAN:** (1) Immediately cease all Job Corp center operations (including 24 USDA CCCs) to allow adequate transition plans for mobilizing students. (2) Centers will execute a "Suspension of Operations" Plan. (3) Return funds to Treasury.

## PHASE 1: PAUSE ALL JOB CORP CENTER OPERATIONS

**Action 1:** OSEC will communicate the operational plan with USDA Secretary. USDA center staff (24 centers) will be directed to operationalize their "Suspension of Operations" plan to transfer students to home of record.

➤ **Action 2:** ETA will terminate 99 contracts with center operators using the "Termination for Convenience of the Government."
  o ETA leadership will brief limited Job Corp federal staff including Contracting Officer Representative (COR).
  o OJC Staff will issue brief email notices to all Job Corp Center Operators/Job Corp Association/Labor Unions minutes ahead of the termination notices below.
  o OJC staff will issue a Termination of Inconvenience effective August 15th and require implementation of Center Operations Pause and transition students to home of record by June 30th.
    o Operations wind-down to commence immediately with final operations date of June 30, 2025.
  o ETA leadership will ensure COR understands negotiation role to negotiate termination fees and needed program costs that are applicable to transition students and successfully stop operations. This will include Wednesday, May 14th at 4:30PM 6-12 weeks of continued contract operations such as facility and property management, records retention, secure data and transportation fleet.
  o Center Operators will operationalize "Suspension of Operations" plan.

➤ **Action 3:** DOL OSEC will operate a communication plan in conjunction with other executive leadership.

➤ **Action 4:** ETA will provide targeted response for Job Corp center staff (employment services, job fairs, unemployment compensation, dislocated worker funding). ETA will

provide students with alternative program options such as Apprenticeship opportunities, Armed Service recruiters, etc.

➢ **Action 5**: "Caretaker" contracts will be executed to maintain facilities until leases expire. Note that some leases will be terminated.

## PHASE 2: FORMAL CLOSURES

➢ **Action 1:** ETA will publish a Federal Register Notice as required by WIOA sec.159 providing advance notice of center closures.

➢ **Action 2:** DOL and UDSA will renegotiate necessary interagency agreements to prevent endangerment of health/safety.

➢ **Action 3:** DOL in conjunction with GSA follows federal regulations for general disposal requirements complying with Federal Property Administrative Services Act, GSA's Federal Management Regulation (FMR), and USDOL policies.

000280

# APPENDIX
## BRIEF SUMMARY

**Background & Analysis:** Job Corps, established under the Economic Opportunity Act of 1964 (Public Law 88-452), is the nation's largest federally funded residential education and vocational training program.

**Operational PY24 Budget:**                     $1.6 Billion
**Center Operations:**

- Total Job Corp Centers (all 50 states, Puerto Rico, and DC):       123
- Of the 123, number operated by contract:                           99
- Of the 123, number operated by USDA:                               24
- Number of centers currently paused[1]:                             4
- Owned Job Corp Centers:                                            58
- Leased Job Corp Centers:                                           34
- USDA Centers owned by Forest Service:                              24

**Administration:**

- Office of Job Corps (OJC) federal FTE within ETA and regional offices:   80
- Student Onboard Strength as of April 24, 2025:                           25,892
- Federal Contractor/Job Center Staff:                                     12,000
- USDA Forest Service Federal Employees at Job Corps Centers:              1,100
- National Training Contractors[2] (union organizations):                  8
  - Instructors:                                                          449
  - Regional coordinators and other administrative personnel              50+

**Program Performance Failures, Facility Sustainability, and Excessive Costs:** The Job Corp program cannot continue to operate services at its current capacity. The program is in a financial crisis and has remained at the high risk of violating the Anti-deficiency Act (ADA)[3].

- The Job Corps budget has remained largely flat at $1.6 billion since 2018.
- If adjusted for inflation, the budget would have to exceed $2 billion in 2024 to continue operations.
- Job Corps was operating at a deficit for PY 24—approximately $140 million—several actions to save approximately $119 million including the pausing of centers, cancelling contracts, and reducing costs have allowed the current operations to reach the end of this program year June 30th.

---

[1] Woodstock (MD), Whitney Young (KY), Penobscot (ME), Loring (ME)
[2] See Appendix
[3] ADA Act- The Antideficiency Act prohibits federal employees from making or authorizing an expenditure from, or creating or authorizing an obligation under, any appropriation or fund in excess of the amount available in the appropriation or fund unless authorized by law. 31 U.S.C. § 1341 (a) (1) (A).

000281

- PY25- Operating deficit could grow up to $213 million if mitigation strategies do not continue

## BACKGROUND AND ANALYSIS

## I. Purpose and Administration

Since its inception, the program has served over three million youth and young adults.  Currently authorized under the Workforce Innovation and Opportunity Act (WIOA), Title I, Subtitle C (codified at 29 U.S.C. § 3191 et seq.), Job Corps is funded through annual Congressional appropriations, with an average budget of approximately $1.6 billion for center operations since 2017. The program provides academic education, career technical training, career transition services, and residential support to thousands of students each year.

The Office of Job Corps (OJC) within ETA oversees the program and is comprised of staff at the National Office with six regional offices.  In total, OJC employs 80 federal full-time equivalent staff. The program is funded through three distinct accounts: $1.6 billion for Operations, which supports center operations contracts and U.S. Department of Agriculture (USDA) Forest Service Civilian Conservation Centers for residential services, academics, counseling, and career technical training; $33 million for Administration, which funds federal staffing, travel, and training at the National and Regional Offices; and $123 million for Construction, Rehabilitation, and Acquisition (CRA), which supports facility acquisition, construction, and rehabilitation nationwide.

## II. Eligibility Criteria

Admissions Counselors are hired under center operations contracts to assess applicant eligibility for the program.  As outlined in 29 U.S.C. § 3194 (or pursuant to other sections in WIOA, as noted), applicants must:

- Be between 16 and 24 years old at enrollment (with allowances for up to 20% of enrollees aged 22–24 and waivers for individuals with disabilities).
- Meet low-income criteria.
- Face one or more barriers to education and employment, such as being basic skills deficient, a school dropout, homeless, a foster child, or requiring additional education or training to obtain and retain employment.
- Demonstrate a need for additional education, training, or support to secure and maintain employment
- Not fall within one of WIOA's special limitations on selection in 29 U.S.C. § 3195(b).
- Consistent with the nondiscrimination prohibition against certain noncitizens located at 29 U.S.C. § 3248(a)(5), be either a U.S. citizen; a lawfully admitted permanent resident alien, refugee, asylee, parolee, or other alien who has been authorized by the Department of Homeland Security to work in the United States; or a resident of a U.S. territory.

4

Job Corps' eligibility criteria are outlined in more detail in the Policy and Requirements Handbook Exhibit 1-1.

## III. Center Types and Operations

Job Corps centers operate under three models. Contracted centers are managed by private organizations or state and local agencies through competitive procurement. Civilian Conservation Centers (CCCs) are operated by the USDA Forest Service, focusing on conservation training and disaster response in rural areas. Additionally, some centers are operated by Indian tribes through agreements to serve Indians.[4]

A majority of centers are operated by contractors via competitively awarded contracts, with approximately 13,000 contractor staff.  In addition, 24 Civilian Conservation Centers (CCC) are operated by the USDA Forest Service via an interagency agreement and are staffed with 1,100 federal employees.

- *Civilian Conservation Centers (CCCs*)

**Overview**: CCCs are a subset of Job Corps centers focused on natural resource conservation and public land management. They offer unique training opportunities in forestry, firefighting, and conservation, contributing to both workforce development and environmental stewardship.

**Governance and Funding**: CCCs operate under an **interagency agreement** between the Department of Labor and the USDA. While the Forest Service manages daily operations, DOL provides funding and oversight to ensure alignment with Job Corps standards and objectives.

**Legislative Considerations**: In 2019, proposals to close several CCCs were met with bipartisan opposition that, in part, included assertions as to their importance to rural economies and conservation efforts. Subsequent enacted appropriations laws included provisions prohibiting appropriated funds from being used to (1) alter or terminate the Interagency Agreement between DOL and USDA and (2) close any of the Civilian Conservation Centers, except if such closure is necessary to prevent the endangerment of the health and safety of the students.

## V. Performance Management

**Performance Indicators**: Under 29 U.S.C. § 3209, Job Corps centers are evaluated based on the primary indicators of performance applicable to all programs authorized by WIOA, including: 1) placement in employment, education, or training (2nd and 4th quarter after exit), 2) credential attainment, 3) measurable skill gains, 4) median earnings, and 5) retention in employment or education.

---

[4] Currently Job Corps' Talking Leaves Job Corps Center is operated by Cherokee Nation.

**Job Corps Center Closure Criteria**

Per 29 U.S.C. § 3209(j), prior to the closure of any Job Corps center, "the Secretary shall ensure—
(1) that the proposed decision to close the center is announced in advance to the general public through publication in the Federal Register or other appropriate means;
(2) the establishment of a reasonable comment period, not to exceed 30 days, for interested individuals to submit written comments to the Secretary; and
(3) that the Member of Congress who represents the district in which such center is located is notified within a reasonable period of time in advance of any final decision to close the center."

Historically DOL has announced the closure criteria it is using to close any given center through publishing those criteria in the FRN and, occasionally, requesting comments on the criteria. This means over time the closure criteria have not been static – DOL has added criteria to address the policy direction and need for a rationale to close a center at a given time. Closure criteria have varied over time, including considerations of chronic low performance, an evaluation of effort required to maintain high-quality education, and other considerations to determine whether to close a center.[5]

If a decision is made to close a center, then the decision and basis for the decision must be documented at least internally. The process to complete a closure can be a costly, time-consuming process as operations at the center are wound down, personal property is dealt with, and any real property issues are addressed.

# VI. Demonstration Authority

**Legal Framework**: Under 29 U.S.C. § 3206(a), the Secretary of Labor is authorized to carry out experimental, research, or demonstration projects relating to carrying out the Job Corps program. The statute also provides the Secretary the authority to waive any provisions of the WIOA section on Job Corps that the Secretary finds would prevent her from carrying out the projects. If the Secretary determines that such waiver is necessary, the statute requires 90-days advance written notification to the Committee on Education and the Workforce of the House of Representatives and the Committee on Health, Education, Labor, and Pensions of the Senate.

**Purpose and Implementation**: The demonstration authority allows the Department of Labor to pilot innovative approaches to education and vocational training relating to carrying out the Job Corps program. These projects aim to enhance program effectiveness, address emerging workforce needs, and improve service delivery to participants.[6]

---

[5] See example of closure criteria for Ouachita Civilian Conservation Center in Arkansas, 81 FR 43250 (July 1, 2016), https://www.federalregister.gov/documents/2016/07/01/2016-15603/final-notice-of-job-corps-center-for-closure
[6] An illustrative example of this authority in action is the Job Corps Scholars Program, a demonstration project that provided eligible youth aged 16–24 the opportunity to enroll in career technical training programs at twenty-six accredited public colleges.

000284

## VII. Contracting Mechanisms

**Firm Fixed-Price Contracts (FFP)**: OJC began transitioning to the FFP model in 2019 and has a few remaining contracts to transition from cost-reimbursable to FFP. Under FFP agreements, contractors are paid a set amount for delivering specified services, regardless of actual costs incurred. FFP contracts offer some advantages for government operations by providing cost predictability, which helps agencies better manage budgets and fiscal planning. These contracts also incentivize contractors to operate efficiently, since maintaining profitability depends on managing resources within the agreed price.[7] However, successful execution of FFP contracts requires careful attention to a few important considerations. Defining the scope of work with precision is critical to prevent scope creep[8] and maintain contractor accountability. Additionally, because contractors bear the financial risk of cost overruns, there is a possibility that service quality could be affected if risks are not properly managed.

Having selected the FFP contract type, DOL faced a new challenge during the COVID pandemic. Under an FFP contract, agencies have little or no visibility on the contractor's costs. As enrollment numbers dropped due to COVID, any cost savings did not automatically translate into reduced FFP payments by DOL. DOL did negotiate a "take back" mechanism for low OBS, but these were limited given DOL's understanding that a large portion of operational costs (e.g., salaries and facilities) are impervious to changes in enrollment. Plus, a reduction in the FFP amounts would be subject to negotiation and could be grounds for dispute and litigation absent contractor agreement.

## VIII. Real Property Management and Disposal

While most DOL office spaces are leased through GSA, Job Corps centers are exceptions, as they are directly owned or leased by the DOL. Job Corps controls over 90% of the Department of Labor's building stock. The legal status of the Job Corps facilities is broken down into four categories: 1) DOL owned, 2) DOL direct leased, 3) a combination of DOL owned and direct leased, and 4) Civilian Conservation Centers (CCCs). Of all the Job Corps centers, 58 are owned, 34 are leased, seven are a mixture of owned and leased, and 24 are on land owned by the USDA or United States Department of the Interior (DOI) and operated as CCCs. Two Centers on the list (Gainesville and Homestead) have been closed, but DOL still owns the property which is now excess and currently going through the disposal process with GSA.

---

[7] The advantages of a firm fixed price contract type is recognized by Federal Acquisition Regulation FAR 16.202-1, which states: "[a] firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties."

[8] Under the Changes clauses in the contracts, FAR 52.243-1, *Changes-Fixed Price*, the contractors are entitled to additional compensation if the agency directs them to perform work not required by the contract which increases their costs of performance.

000285

Job Corps center contractors manage government-furnished property (GFP) on-site. These contractors are also required to maintain accurate inventories using systems like the Electronic Property Management System (EPMS) and the Fleet Tracking Management System (FTMS). Regular audits and adherence to federal property management regulations, including those from the Federal Acquisition Regulation (FAR) and GSA policies, ensure accountability and proper stewardship.[9]

The OJC currently has an unfunded, deferred construction, rehabilitation and acquisition (CRA) backlog estimated to be $1.6 billion. Job Corps defines its unfunded CRA backlog as the total of the non-recurring costs to restore and renovate facilities (structures and buildings) and systems (e.g., heating ventilation, air conditioning, sewage, water, or electrical) to, or as close to, their original capacity, efficiency, and capability, and for which insufficient funding is currently available to complete the work. This amount represents more than 2,200 structures located on 5,600 acres.  Over the past several years, the cost associated with correcting property deficiencies has increased by more than 50 percent.

More than 43 percent of the Job Corps' portfolio by square footage is more than 50 years old.  In 2024, Job Corps estimated that in five years, 119 additional buildings comprising nearly 1,135,000 gross square feet would reach the age of 50, which will result in those buildings becoming subject to compliance with the historic preservation regulations when undergoing renovations.  CRA funding is critical to the success of the Job Corps program because healthy and safe facilities contribute to an effective learning environment.

### *General Disposal Requirements for Job Corps Centers*

When a Job Corps center is closed or realigned, the U.S. Department of Labor (DOL), historically in coordination with the General Services Administration (GSA), follows federal regulations to dispose of real property and assets. The disposal process must comply with the Federal Property and Administrative Services Act, GSA's Federal Management Regulation (FMR), and applicable Department of Labor policies.
Generally, disposal involves several key steps:
- **Property Assessment:** The DOL evaluates whether real property (land, buildings, equipment) is excess to agency needs.
- **Declaration as Excess:** Property no longer needed is officially declared "excess" and reported to GSA for broader federal screening.
- **Federal and Public Screening:** GSA offers excess property to other federal agencies first. If no agency claims it, it is made available to state, local governments, nonprofits, or educational institutions under specific public benefit conveyance programs.
- **Public Sale:** If there is no federal or public entity interest, the property is sold to the public, typically through online auctions or sealed bids.
- **Environmental Compliance:** Before disposal, environmental assessments must be conducted to ensure compliance with laws like the National Environmental Policy Act (NEPA) and to address any hazardous materials or cleanup requirements.

---

[9] See Job Corps' Policy and Requirements Handbook Appendix 505 Admin and Management of Job Corps Contractor-Held Government-Furnished Property.pdf

000286

- **Proceeds:** Revenue from property sales is generally returned to the U.S. Treasury unless specific statutory authority allows reuse within the program.

Separately, contractor-held personal property (such as equipment, vehicles, and supplies) must be disposed of following federal acquisition regulations (FAR Subpart 45.6) and DOL property management policies, ensuring proper accountability and financial closeout.

## IX. DOL Transparency Report

On April 25, 2025, the U.S. Department of Labor's Employment and Training Administration released the 2025 Job Corps Transparency Report, providing a detailed analysis of the financial performance and operational costs of the Job Corps Program.

Below is a summary of the overall findings from PY2023[10]:
- Average Graduation Rate:
  - Traditional: 32%
  - WIOA Definition: 38%
- Average Cost Per Enrollee (Regardless of Length of Stay): $49,769.53
- Average Cost Per Student Per Year (Average PY23 Headcount): $80,284.65
- Average Total Cost Per Graduate:
  - Traditional: $187,653
  - WIOA Definition: $155,600
- Job Corps participants earn $16,695 annually on average, post separation
- Average of Highest Center Costs per Graduate (Traditional Data):
  - The 10 least efficient programs average $512,800 dollars per graduate
  - The top 50 least efficient programs average $319,085 per graduate
- Average of Highest Center Costs per Graduate (WIOA Data):
  - The 10 least efficient programs average $385,370 per graduate
  - The top 50 least efficient programs average $252,285 per graduate

## X. Job Corps PY 2024 and 2025 Cost Savings Efforts

In Program Year (PY) 24, the Office of Job Corps implemented a series of aggressive cost savings initiatives to mitigate an anticipated operating deficit and set a foundation for long-term program sustainability. These efforts were informed by a comprehensive review of all expenditures against statutory and regulatory minimum requirements.

PY 24 cost-saving strategies resulted in savings of over $120 million, that included:

---

[10] The Job Corps Transparency Report's metrics distinguish between two definitions of the term "graduate": one reflecting traditional program completion in good standing (Traditional), and another using the statutory criteria from Workforce Innovation and Opportunity Act Sec. 116, Sec. 142, which counts individuals who attain a diploma or Career Technical Training completion while enrolled but do not complete the full program.

000287

- **De-scoping Requests for Proposals (RFPs) and Center Contracts:**
  Job Corps systematically reviewed the Policy and Requirements Handbook (PRH) to identify and remove non-mandatory program requirements, allowing for the negotiation with contractors to modify the contracts to reduce the future contract prices. This de-scoping focused on aligning center operations strictly to statutory obligations, thus reducing unnecessary expenditures. This included policy revisions to eliminate Evening and Weekend Studies requirements, remove non-mandatory oral health services, remove mandatory Career Transition Services (CTS) for those who did not complete the program, and reduce nursing and trainee employee assistance program hours back to pre-COVID levels. These targeted changes directly contributed to operating cost reductions without undermining core program services.

**In Program Year (PY) 25, the Job Corps program faces a projected operating deficit of up to $213 million.** To address this shortfall, the Department is contemplating several strategies to augment amounts carried forward from PY24 mitigation efforts (estimated at $130 million): prioritizing cost-saving actions at centers with expiring contracts and suspending operations at underperforming centers, including deploying the following:

- **Trade and Program Restructuring:** Job Corps conducted a national evaluation of trade offerings across centers, using labor market information and program performance ratings. Underutilized or duplicative trades are targeted for elimination or consolidation, and Continuous Improvement Plans (CIPs) will be deployed for lower-performing programs.
- **Long-Term Sustainability Risk Analysis and Right-Sizing Initiatives:** A new facilities, performance, and sustainability risk assessment tool was developed to prioritize centers for potential suspension of operations based on performance and fiscal sustainability. This risk-driven "Right-Sizing" initiative focused on gradually shifting to a need-based model (e.g., one to three residential centers per state) projecting long-term savings of up to $337.72 million.
- **Cost Avoidance in USDA Forest Service Centers:** For USDA-operated centers, Job Corps reviewed CCC funding formulas to avoid overpayment for vacant student slots, resulting in a projected $2 million cost avoidance for PY 25.

## Union Labor

| NTC Contractor | Technical Education Program | No. of Instructors |
|---|---|---|
| United Brotherhood of Carpenters and Joiners (UBCJA) | • Carpentry, Pre-Apprentice | 113 |
| United Auto Workers (UAW) | • Maintenance - Light Repair, Pre-Apprentice<br>• Advanced Automobile Service Technology, Pre-Apprentice<br>• Advanced MHDT Suspension and Steering, Pre-Apprentice | 35 |

10

| NTC Contractor | Technical Education Program | No. of Instructors |
|---|---|---|
| | • Advanced Collision Repair and Refinish - Damage Analysis and Estimating, Pre-Apprentice | |
| Transportation Communication Union/International Association of Machinists and Aerospace Workers (TCU-IAM) | • Transportation Service Workers:<br>• Rail Mechanical Service/Carmen<br>• Rail Freight Service<br>• Airline Service<br>• Inland Waterway Service<br>• Rail Passenger Service<br>• Mass Transit/Highway Service | 24 |
| National Plastering Industry's Joint Apprenticeship Trust Fund (NPIJATF) | • Cement Masonry, Pre-Apprentice<br>• Plastering, Pre-Apprentice | 45 |
| International Union of Painters and Allied Trades (IUPAT) | • Painting, Pre-Apprentice<br>• Glazing, Pre-Apprentice<br>• Sign, Billboard, and Display, Pre-Apprentice<br>• Floor Covering Installation, Pre-Apprentice | 41 |
| International Union of Operating Engineers (IUOE) | • Heavy Construction Equipment Mechanic, Pre-Apprentice<br>• Heavy Equipment Operations, Pre-Apprentice<br>• Maintenance Repairer Helper - Stationary Engineering, Pre-Apprentice | 35 |
| International Masonry Institute (IMI) | • Bricklayer, Pre-Apprentice<br>• Tile Setting, Pre-Apprentice | 34 |
| Home Builders Institute (HBI) | • Electrical, Pre-Apprentice<br>• Plumbing, Pre-Apprentice<br>• Building Construction Technology, Pre-Apprentice<br>• HVAC, Pre-Apprentice<br>• Plumbing, Pre-Apprentice | 122 |

000289

Message

| | |
|---|---|
| **From:** | Matz, Jillian - OASAM OSPE |
| **Sent:** | 5/6/2025 7:37:57 PM |
| **To:** | Frazier, Susan (Lori) - ETA ⬛ McGee, Erin L - ETA ⬛ |
| **Subject:** | RE: OJC TB |
| **Attachments:** | Memorandum Regarding Center Operations Period of Performance.pdf |
| **Flag:** | Follow up |

Hi Lori,

I am attaching a memorandum that I hope to touch on very briefly tomorrow regarding the period of performance for center operations contracts and decisions to be made concerning how to procure center contracts in the near future.

Sincerely,

Jill

-----Original Appointment-----
**From:** Frazier, Susan (Lori) - ETA ⬛
**Sent:** Tuesday, May 6, 2025 3:56 PM
**To:** Frazier, Susan (Lori) - ETA; McGee, Erin L - ETA; ⬛ ; Matz, Jillian - OASAM OSPE
**Subject:** OJC TB
**When:** Wednesday, May 7, 2025 9:30 AM-10:30 AM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Lori's Office; VTC-ETA-FPB-S2307-AS

# Microsoft Teams Need help?

## Join the meeting now

Meeting ID: 252 328 082 757 4
Passcode: e9sw7V2v

### Dial in by phone

⬛ , United States, Washington

Find a local number
Phone conference ID: 838 103 576#

### Join on a video conferencing device

Tenant key: ⬛

⬛

More info

For organizers: Meeting options | Reset dial-in PIN

Privacy and security

**U.S. Department of Labor**    **Office of the Senior Procurement Executive**
**Office of the Assistant Secretary for Management and Administration**
**Washington, D.C. 20210**



May 6, 2025

**MEMORANDUM FOR LORI FRAZIER**
      **Acting Assistant Secretary for Employment and Training**

Jillian Matz   Digitally signed by Jillian Matz
Date: 2025.05.06 19:35:53 -04'00'

**FROM:**      **JILLIAN MATZ**
           **Senior Director Job Corps Acquisition Services**

**SUBJECT:**   **Job Corps Center Operations Contracts Period of Performance**

**EXECUTIVE SUMMARY**

The Department of Labor (Department) procures Job Corps center operations in accordance with Section 147 of the Workforce Innovation and Opportunity Act (WIOA) (29 USC 3191), issuing solicitations to result in a contract with a period of performance that may include a two-year base period, and three, one-year option periods. Job Corps Acquisition Services (JCAS) seeks guidance regarding the preferred period of performance for Job Corps center operations contracts going forward so that it can adjust ongoing procurements to meet the agency's current needs, and so that it can coordinate with the Office of Job Corps (OJC) to adequately prepare for future procurements.

**BACKGROUND**

WIOA Section 147 stipulates that the Secretary of Labor may enter into an agreement to operate a Job Corps center and that the agreement's length "shall be for not more than a 2-year period. The Secretary may exercise any contractual option to renew the agreement in 1-year increments for not more than 3 additional years." Accordingly, the Department issues solicitations for Job Corps center operations for contracts with a period of performance that includes a two-year base period, and three, one-year option periods.

Presently, JCAS is procuring center operations for the Gary Job Corps Center, the Centennial Job Corps Center, and the Woodland Job Corps Center. The solicitation for these centers, which were issued prior to January 2025, contemplate contracts with a period of performance that includes a two-year base period, and three, one-year option periods. JCAS is nearing the end of the evaluation phase for these contracts and will seek to make an award soon. Changes to the resulting contract's period of performance that are contemplated during the pre-award phase of procurement must ideally be addressed with all companies that submitted a proposal before the award, to not cause DOL to encounter any future litigation or pricing changes which can often result in the case of post-award changes.

At the same time, during calendar year 2025, JCAS will work with OJC to prepare solicitations to procure center operations services for the Shriver, Detroit, New Hampshire, Springdale, Gulfport, Denison, Flint Genesee, BL Hooks, Little Rock, Dayton, Iroquois, Montgomery,

Keystone/Red Rock, Wilmington, Muhlenberg, Hubert Humphrey, Wind River, Albuquerque, Long Beach, Phoenix, Treasure Island, Exeter, Flint Hills, Joliet, Mississippi, North Texas, Pittsburgh, San Jose, Laredo, Roswell and Tongue Point Job Corps Centers.

## REQUEST FOR GUIDANCE

JCAS seeks guidance from the Department regarding the period of performance for Job Corps center operations contracts so that it can properly make any adjustments in ongoing procurements, and so that it can adequately prepare and timely execute upcoming procurements.

To facilitate this discussion, JCAS puts forth the following options:

**Option 1: Traditional/Status Quo** – Two-year base period, with three, one-year options. The total contract length is five years. This option is most consistent with congress' intent as articulated in WIOA and permits for the maximum length of time between possible procurements.

**Option 2:** One-year base period, with three, one-year options. Total contract length is four years. This option is somewhat consistent with congress' intent as articulated in WIOA but enables the Department with slightly more flexibility to exit the contract after one year without incurring termination expenses.

**Option 3:** Six-month base period, with three, one-year options. The total contract length is 3.5 years. This option is somewhat consistent with congress' intent as articulated in WIOA but enables the Department with considerably more flexibility to exit the contract after only six months without incurring termination expenses. A tradeoff of this option is that the flexibility comes at the expense of the length of the contract, because the Department would have to reprocure the center contract after only 3.5 years of performance. The risk associated with a contract with this period of performance is higher than the more stable traditional period of performance and thus the resulting price of this contract may be higher.

**Option 4:** Six-month base period, with one, six-month option and two, one-year options. Total contract length is 3 years. This option is not as consistent with congress' intent as articulated in WIOA but enables the Department with significant flexibility to exit the contract after only six months without incurring termination expenses, and even after the six-month base is complete, it provides the flexibility for the Department to enter an option of only six months in length. A tradeoff of this option is that the flexibility comes at the expense of the length of contract, because the Department would have to reprocure the center contract after only 3 years of performance. The risk associated with a contract with this period of performance is higher than the more stable traditional period of performance and thus the resulting price of this contract may be higher.

2

Message

| | |
|---|---|
| **From:** | Han, Jihun A - OSEC █ |
| **Sent:** | 5/7/2025 9:59:13 AM |
| **To:** | Britt, Aaron - OPA █ |
| **Subject:** | Fw: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum |
| **Attachments:** | EMBARGOED DRAFT_ETA Job Corps Program Decision Memo_V3.docx |

**Jihun Han**
Chief of Staff
Office of the Secretary
U.S. Department of Labor
C: █

---

**From:** Han, Jihun A - OSEC
**Sent:** Tuesday, May 6, 2025 10:12:14 AM
**To:** Burgese, Joseph C - OSEC █
**Subject:** FW: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

Would you print this out for me? My printer is jammed at the moment.

**Jihun Han**
Chief of Staff
Office of the Secretary
U.S. Department of Labor
C: █



**From:** Frazier, Susan (Lori) - ETA █
**Sent:** Monday, May 5, 2025 5:01 PM
**To:** Youngs, Bridget M - OSEC █    Collins, Miles B - OSEC █    Han,
Jihun A - OSEC █    Parella, Courtney E - OPA █    Walter, Courtney E -
OSEC █
**Subject:** RE: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

Great teamwork!! All changes accepted and attached for final review.

Thanks!
Lori

**Lori Frazier Bearden |**
United States Department of Labor

Acting Assistant Secretary
Employment and Training Administration
200 Constitution Avenue Suite S-2307
Washington, D.C. 20210
C: 



**From:** Youngs, Bridget M - OSEC ███████████████
**Sent:** Monday, May 5, 2025 1:05 PM
**To:** Collins, Miles B - OSEC ███████████  Frazier, Susan (Lori) - ETA ████████  Han, Jihun A
- OSEC ████████████; Parella, Courtney E - OPA <████████████████; Walter, Courtney E - OSEC

**Subject:** RE: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

Thanks Lori & Miles! Edits as of 1300 attached.

**From:** Collins, Miles B - OSEC ████████████
**Sent:** Monday, May 5, 2025 1:01 PM
**To:** Frazier, Susan (Lori) - ETA ████████  Han, Jihun A - OSEC <████████  Parella, Courtney
E - OPA ████████  Walter, Courtney E - OSEC ████████████  Youngs, Bridget M -
OSEC <█████████████████
**Subject:** RE: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

This is great! Thank you for putting this together! We have made some suggested edits to add clarity
on a few points. Please LMK if you are good with the edits.

+@Han, Jihun A - OSEC +@Parella, Courtney E - OPA +@Walter, Courtney E - OSEC

**From:** Frazier, Susan (Lori) - ETA ███████████
**Sent:** Monday, May 5, 2025 10:43 AM
**To:** Collins, Miles B - OSEC ████████
**Subject:** FW: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

**From:** Frazier, Susan (Lori) - ETA
**Sent:** Sunday, May 4, 2025 3:53 PM
**To:** Han, Jihun A - OSEC ████████████
**Subject:** DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

Here you go! The DRAFT operational plan is only 2 pages, but I included an Appendix for reference. I
am sure there will be some edits. There are also a few decision points in it.

Thanks!

Lori

**Lori Frazier Bearden |** 
United States Department of Labor
Acting Assistant Secretary
Employment and Training Administration
200 Constitution Avenue Suite S-2307
Washington, D.C. 20210
C: ███████████



**U.S. Department of Labor**     Assistant Secretary for
                                 Employment and Training
                                 Washington, D.C. 20210



### DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE

**May 4, 2025**

**DECISION MEMORANDUM**

**SUBJECT:   Job Corps Program and Pausing Center Operations**

**PURPOSE:** To reach consensus on pausing Job Corp center operations and return every student safely and timely to their home of record by the end of the program year June 30th

**OPERATIONAL PLAN:** (1) Immediately cease all Job Corp center operations (including 24 USDA CCCs) to allow adequate transition plans for mobilizing students. (2) Centers will execute a "Suspension of Operations" Plan. (3) Return funds to Treasury.

### PHASE 1: PAUSE ALL JOB CORP CENTER OPERATIONS

> **Action 1:** OSEC will communicate the operational plan with USDA Secretary. USDA center staff (24 centers) will be directed to operationalize their "Suspension of Operations" plan to transfer students to home of record.

> **Action 2:** ETA will terminate 99 contracts with center operators using the "Termination for Convenience of the Government."
>   - ETA leadership will brief limited Job Corp federal staff including Contracting Officer Representative (COR).
>   - OJC Staff will issue brief email notices to all Job Corp Center Operators/Job Corp Association/Labor Unions minutes ahead of the termination notices below.
>   - OJC staff will issue a Termination of Inconvenience effective August 15th and require implementation of Center Operations Pause and transition students to home of record by June 30th.
>       - Operations wind-down to commence immediately with final operations date of June 30, 2025.
>   - ETA leadership will ensure COR understands negotiation role to negotiate termination fees and needed program costs that are applicable to transition students and successfully stop operations. This will include Wednesday, May 14th at 4:30PM 6-12 weeks of continued contract operations such as facility and property management, records retention, secure data and transportation fleet.
>   - Center Operators will operationalize "Suspension of Operations" plan.

> **Action 3:** DOL OSEC will operate a communication plan in conjunction with other executive leadership.

> **Action 4:** ETA will provide targeted response for Job Corp center staff (employment services, job fairs, unemployment compensation, dislocated worker funding). ETA will

provide students with alternative program options such as Apprenticeship opportunities, Armed Service recruiters, etc.

➢ **Action 5**: "Caretaker" contracts will be executed to maintain facilities until leases expire. Note that some leases will be terminated.

## PHASE 2: FORMAL CLOSURES

➢ **Action 1:** ETA will publish a Federal Register Notice as required by WIOA sec.159 providing advance notice of center closures.

➢ **Action 2:** DOL and UDSA will renegotiate necessary interagency agreements to prevent endangerment of health/safety.

➢ **Action 3:** DOL in conjunction with GSA follows federal regulations for general disposal requirements complying with Federal Property Administrative Services Act, GSA's Federal Management Regulation (FMR), and USDOL policies.

2

# APPENDIX
# BRIEF SUMMARY

**Background & Analysis:** Job Corps, established under the Economic Opportunity Act of 1964 (Public Law 88-452), is the nation's largest federally funded residential education and vocational training program.

**Operational PY24 Budget:**                                              $1.6 Billion
**Center Operations:**

- Total Job Corp Centers (all 50 states, Puerto Rico, and DC):        123
- Of the 123, number operated by contract:                           99
- Of the 123, number operated by USDA:                               24
- Number of centers currently paused[1]:                             4
- Owned Job Corp Centers:                                            58
- Leased Job Corp Centers:                                           34
- USDA Centers owned by Forest Service:                              24

**Administration:**

- Office of Job Corps (OJC) federal FTE within ETA and regional offices:   80
- Student Onboard Strength as of April 24, 2025:                     25,892
- Federal Contractor/Job Center Staff:                              12,000
- USDA Forest Service Federal Employees at Job Corps Centers:       1,100
- National Training Contractors[2] (union organizations):          8
  - Instructors:                                                  449
  - Regional coordinators and other administrative personnel        50+

**Program Performance Failures, Facility Sustainability, and Excessive Costs:** The Job Corp program cannot continue to operate services at its current capacity. The program is in a financial crisis and has remained at the high risk of violating the Anti-deficiency Act (ADA)[3].

- The Job Corps budget has remained largely flat at $1.6 billion since 2018.
- If adjusted for inflation, the budget would have to exceed $2 billion in 2024 to continue operations.
- Job Corps was operating at a deficit for PY 24—approximately $140 million—several actions to save approximately $119 million including the pausing of centers, cancelling contracts, and reducing costs have allowed the current operations to reach the end of this program year June 30th.

---

[1] Woodstock (MD), Whitney Young (KY), Penobscot (ME), Loring (ME)
[2] See Appendix
[3] ADA Act- The Antideficiency Act prohibits federal employees from making or authorizing an expenditure from, or creating or authorizing an obligation under, any appropriation or fund in excess of the amount available in the appropriation or fund unless authorized by law. 31 U.S.C. § 1341 (a) (1) (A).

000299

- PY25- Operating deficit could grow up to $213 million if mitigation strategies do not continue

## BACKGROUND AND ANALYSIS

## I. Purpose and Administration

Since its inception, the program has served over three million youth and young adults. Currently authorized under the Workforce Innovation and Opportunity Act (WIOA), Title I, Subtitle C (codified at 29 U.S.C. § 3191 et seq.), Job Corps is funded through annual Congressional appropriations, with an average budget of approximately $1.6 billion for center operations since 2017. The program provides academic education, career technical training, career transition services, and residential support to thousands of students each year.

The Office of Job Corps (OJC) within ETA oversees the program and is comprised of staff at the National Office with six regional offices. In total, OJC employs 80 federal full-time equivalent staff. The program is funded through three distinct accounts: $1.6 billion for Operations, which supports center operations contracts and U.S. Department of Agriculture (USDA) Forest Service Civilian Conservation Centers for residential services, academics, counseling, and career technical training; $33 million for Administration, which funds federal staffing, travel, and training at the National and Regional Offices; and $123 million for Construction, Rehabilitation, and Acquisition (CRA), which supports facility acquisition, construction, and rehabilitation nationwide.

## II. Eligibility Criteria

Admissions Counselors are hired under center operations contracts to assess applicant eligibility for the program. As outlined in 29 U.S.C. § 3194 (or pursuant to other sections in WIOA, as noted), applicants must:

- Be between 16 and 24 years old at enrollment (with allowances for up to 20% of enrollees aged 22–24 and waivers for individuals with disabilities).
- Meet low-income criteria.
- Face one or more barriers to education and employment, such as being basic skills deficient, a school dropout, homeless, a foster child, or requiring additional education or training to obtain and retain employment.
- Demonstrate a need for additional education, training, or support to secure and maintain employment
- Not fall within one of WIOA's special limitations on selection in 29 U.S.C. § 3195(b).
- Consistent with the nondiscrimination prohibition against certain noncitizens located at 29 U.S.C. § 3248(a)(5), be either a U.S. citizen; a lawfully admitted permanent resident alien, refugee, asylee, parolee, or other alien who has been authorized by the Department of Homeland Security to work in the United States; or a resident of a U.S. territory.

4

Job Corps' eligibility criteria are outlined in more detail in the Policy and Requirements Handbook Exhibit 1-1.

## III. Center Types and Operations

Job Corps centers operate under three models. Contracted centers are managed by private organizations or state and local agencies through competitive procurement. Civilian Conservation Centers (CCCs) are operated by the USDA Forest Service, focusing on conservation training and disaster response in rural areas. Additionally, some centers are operated by Indian tribes through agreements to serve Indians.[4]

A majority of centers are operated by contractors via competitively awarded contracts, with approximately 13,000 contractor staff.  In addition, 24 Civilian Conservation Centers (CCC) are operated by the USDA Forest Service via an interagency agreement and are staffed with 1,100 federal employees.

- *Civilian Conservation Centers (CCCs*)

**Overview**: CCCs are a subset of Job Corps centers focused on natural resource conservation and public land management. They offer unique training opportunities in forestry, firefighting, and conservation, contributing to both workforce development and environmental stewardship.

**Governance and Funding**: CCCs operate under an **interagency agreement** between the Department of Labor and the USDA. While the Forest Service manages daily operations, DOL provides funding and oversight to ensure alignment with Job Corps standards and objectives.

**Legislative Considerations**: In 2019, proposals to close several CCCs were met with bipartisan opposition that, in part, included assertions as to their importance to rural economies and conservation efforts. Subsequent enacted appropriations laws included provisions prohibiting appropriated funds from being used to (1) alter or terminate the Interagency Agreement between DOL and USDA and (2) close any of the Civilian Conservation Centers, except if such closure is necessary to prevent the endangerment of the health and safety of the students.

## V. Performance Management

**Performance Indicators**: Under 29 U.S.C. § 3209, Job Corps centers are evaluated based on the primary indicators of performance applicable to all programs authorized by WIOA, including: 1) placement in employment, education, or training (2nd and 4th quarter after exit), 2) credential attainment, 3) measurable skill gains, 4) median earnings, and 5) retention in employment or education.

---

[4] Currently Job Corps' Talking Leaves Job Corps Center is operated by Cherokee Nation.

**Job Corps Center Closure Criteria**

Per 29 U.S.C. § 3209(j), prior to the closure of any Job Corps center, "the Secretary shall ensure—
(1) that the proposed decision to close the center is announced in advance to the general public through publication in the Federal Register or other appropriate means;
(2) the establishment of a reasonable comment period, not to exceed 30 days, for interested individuals to submit written comments to the Secretary; and
(3) that the Member of Congress who represents the district in which such center is located is notified within a reasonable period of time in advance of any final decision to close the center."

Historically DOL has announced the closure criteria it is using to close any given center through publishing those criteria in the FRN and, occasionally, requesting comments on the criteria. This means over time the closure criteria have not been static – DOL has added criteria to address the policy direction and need for a rationale to close a center at a given time. Closure criteria have varied over time, including considerations of chronic low performance, an evaluation of effort required to maintain high-quality education, and other considerations to determine whether to close a center.[5]

If a decision is made to close a center, then the decision and basis for the decision must be documented at least internally. The process to complete a closure can be a costly, time-consuming process as operations at the center are wound down, personal property is dealt with, and any real property issues are addressed.

## VI. Demonstration Authority

**Legal Framework**: Under 29 U.S.C. § 3206(a), the Secretary of Labor is authorized to carry out experimental, research, or demonstration projects relating to carrying out the Job Corps program. The statute also provides the Secretary the authority to waive any provisions of the WIOA section on Job Corps that the Secretary finds would prevent her from carrying out the projects. If the Secretary determines that such waiver is necessary, the statute requires 90-days advance written notification to the Committee on Education and the Workforce of the House of Representatives and the Committee on Health, Education, Labor, and Pensions of the Senate.

**Purpose and Implementation**: The demonstration authority allows the Department of Labor to pilot innovative approaches to education and vocational training relating to carrying out the Job Corps program. These projects aim to enhance program effectiveness, address emerging workforce needs, and improve service delivery to participants.[6]

---

[5] See example of closure criteria for Ouachita Civilian Conservation Center in Arkansas, 81 FR 43250 (July 1, 2016), https://www.federalregister.gov/documents/2016/07/01/2016-15603/final-notice-of-job-corps-center-for-closure

[6] An illustrative example of this authority in action is the Job Corps Scholars Program, a demonstration project that provided eligible youth aged 16–24 the opportunity to enroll in career technical training programs at twenty-six accredited public colleges.

6

## VII. Contracting Mechanisms

**Firm Fixed-Price Contracts (FFP)**: OJC began transitioning to the FFP model in 2019 and has a few remaining contracts to transition from cost-reimbursable to FFP. Under FFP agreements, contractors are paid a set amount for delivering specified services, regardless of actual costs incurred. FFP contracts offer some advantages for government operations by providing cost predictability, which helps agencies better manage budgets and fiscal planning. These contracts also incentivize contractors to operate efficiently, since maintaining profitability depends on managing resources within the agreed price.[7] However, successful execution of FFP contracts requires careful attention to a few important considerations. Defining the scope of work with precision is critical to prevent scope creep[8] and maintain contractor accountability. Additionally, because contractors bear the financial risk of cost overruns, there is a possibility that service quality could be affected if risks are not properly managed.

Having selected the FFP contract type, DOL faced a new challenge during the COVID pandemic. Under an FFP contract, agencies have little or no visibility on the contractor's costs. As enrollment numbers dropped due to COVID, any cost savings did not automatically translate into reduced FFP payments by DOL. DOL did negotiate a "take back" mechanism for low OBS, but these were limited given DOL's understanding that a large portion of operational costs (e.g., salaries and facilities) are impervious to changes in enrollment. Plus, a reduction in the FFP amounts would be subject to negotiation and could be grounds for dispute and litigation absent contractor agreement.

## VIII. Real Property Management and Disposal

While most DOL office spaces are leased through GSA, Job Corps centers are exceptions, as they are directly owned or leased by the DOL. Job Corps controls over 90% of the Department of Labor's building stock. The legal status of the Job Corps facilities is broken down into four categories: 1) DOL owned, 2) DOL direct leased, 3) a combination of DOL owned and direct leased, and 4) Civilian Conservation Centers (CCCs). Of all the Job Corps centers, 58 are owned, 34 are leased, seven are a mixture of owned and leased, and 24 are on land owned by the USDA or United States Department of the Interior (DOI) and operated as CCCs. Two Centers on the list (Gainesville and Homestead) have been closed, but DOL still owns the property which is now excess and currently going through the disposal process with GSA.

---

[7] The advantages of a firm fixed price contract type is recognized by Federal Acquisition Regulation FAR 16.202-1, which states: "[a] firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties."

[8] Under the Changes clauses in the contracts, FAR 52.243-1, *Changes-Fixed Price*, the contractors are entitled to additional compensation if the agency directs them to perform work not required by the contract which increases their costs of performance.

000303

Job Corps center contractors manage government-furnished property (GFP) on-site. These contractors are also required to maintain accurate inventories using systems like the Electronic Property Management System (EPMS) and the Fleet Tracking Management System (FTMS). Regular audits and adherence to federal property management regulations, including those from the Federal Acquisition Regulation (FAR) and GSA policies, ensure accountability and proper stewardship.[9]

The OJC currently has an unfunded, deferred construction, rehabilitation and acquisition (CRA) backlog estimated to be $1.6 billion. Job Corps defines its unfunded CRA backlog as the total of the non-recurring costs to restore and renovate facilities (structures and buildings) and systems (e.g., heating ventilation, air conditioning, sewage, water, or electrical) to, or as close to, their original capacity, efficiency, and capability, and for which insufficient funding is currently available to complete the work. This amount represents more than 2,200 structures located on 5,600 acres.  Over the past several years, the cost associated with correcting property deficiencies has increased by more than 50 percent.

More than 43 percent of the Job Corps' portfolio by square footage is more than 50 years old.  In 2024, Job Corps estimated that in five years, 119 additional buildings comprising nearly 1,135,000 gross square feet would reach the age of 50, which will result in those buildings becoming subject to compliance with the historic preservation regulations when undergoing renovations.  CRA funding is critical to the success of the Job Corps program because healthy and safe facilities contribute to an effective learning environment.

### *General Disposal Requirements for Job Corps Centers*

When a Job Corps center is closed or realigned, the U.S. Department of Labor (DOL), historically in coordination with the General Services Administration (GSA), follows federal regulations to dispose of real property and assets. The disposal process must comply with the Federal Property and Administrative Services Act, GSA's Federal Management Regulation (FMR), and applicable Department of Labor policies.
Generally, disposal involves several key steps:

- **Property Assessment:** The DOL evaluates whether real property (land, buildings, equipment) is excess to agency needs.
- **Declaration as Excess:** Property no longer needed is officially declared "excess" and reported to GSA for broader federal screening.
- **Federal and Public Screening:** GSA offers excess property to other federal agencies first. If no agency claims it, it is made available to state, local governments, nonprofits, or educational institutions under specific public benefit conveyance programs.
- **Public Sale:** If there is no federal or public entity interest, the property is sold to the public, typically through online auctions or sealed bids.
- **Environmental Compliance:** Before disposal, environmental assessments must be conducted to ensure compliance with laws like the National Environmental Policy Act (NEPA) and to address any hazardous materials or cleanup requirements.

---

[9] See Job Corps' Policy and Requirements Handbook Appendix 505 Admin and Management of Job Corps Contractor-Held Government-Furnished Property.pdf

000304

- **Proceeds:** Revenue from property sales is generally returned to the U.S. Treasury unless specific statutory authority allows reuse within the program.

Separately, contractor-held personal property (such as equipment, vehicles, and supplies) must be disposed of following federal acquisition regulations (FAR Subpart 45.6) and DOL property management policies, ensuring proper accountability and financial closeout.

## IX. DOL Transparency Report

On April 25, 2025, the U.S. Department of Labor's Employment and Training Administration released the 2025 Job Corps Transparency Report, providing a detailed analysis of the financial performance and operational costs of the Job Corps Program.

Below is a summary of the overall findings from PY2023[10]:
- Average Graduation Rate:
  - Traditional: 32%
  - WIOA Definition: 38%
- Average Cost Per Enrollee (Regardless of Length of Stay): $49,769.53
- Average Cost Per Student Per Year (Average PY23 Headcount): $80,284.65
- Average Total Cost Per Graduate:
  - Traditional: $187,653
  - WIOA Definition: $155,600
- Job Corps participants earn $16,695 annually on average, post separation
- Average of Highest Center Costs per Graduate (Traditional Data):
  - The 10 least efficient programs average $512,800 dollars per graduate
  - The top 50 least efficient programs average $319,085 per graduate
- Average of Highest Center Costs per Graduate (WIOA Data):
  - The 10 least efficient programs average $385,370 per graduate
  - The top 50 least efficient programs average $252,285 per graduate

## X. Job Corps PY 2024 and 2025 Cost Savings Efforts

In Program Year (PY) 24, the Office of Job Corps implemented a series of aggressive cost savings initiatives to mitigate an anticipated operating deficit and set a foundation for long-term program sustainability. These efforts were informed by a comprehensive review of all expenditures against statutory and regulatory minimum requirements.

PY 24 cost-saving strategies resulted in savings of over $120 million, that included:

---

[10] The Job Corps Transparency Report's metrics distinguish between two definitions of the term "graduate": one reflecting traditional program completion in good standing (Traditional), and another using the statutory criteria from Workforce Innovation and Opportunity Act Sec. 116, Sec. 142, which counts individuals who attain a diploma or Career Technical Training completion while enrolled but do not complete the full program.

000305

- **De-scoping Requests for Proposals (RFPs) and Center Contracts:**
  Job Corps systematically reviewed the Policy and Requirements Handbook (PRH) to
  identify and remove non-mandatory program requirements, allowing for the negotiation
  with contractors to modify the contracts to reduce the future contract prices. This de-
  scoping focused on aligning center operations strictly to statutory obligations, thus
  reducing unnecessary expenditures. This included policy revisions to eliminate Evening
  and Weekend Studies requirements, remove non-mandatory oral health services, remove
  mandatory Career Transition Services (CTS) for those who did not complete the
  program, and reduce nursing and trainee employee assistance program hours back to pre-
  COVID levels. These targeted changes directly contributed to operating cost reductions
  without undermining core program services.

**In Program Year (PY) 25, the Job Corps program faces a projected operating deficit of up
to $213 million.** To address this shortfall, the Department is contemplating several strategies to
augment amounts carried forward from PY24 mitigation efforts (estimated at $130 million):
prioritizing cost-saving actions at centers with expiring contracts and suspending operations at
underperforming centers, including deploying the following:

- **Trade and Program Restructuring:** Job Corps conducted a national evaluation of trade
  offerings across centers, using labor market information and program performance
  ratings. Underutilized or duplicative trades are targeted for elimination or consolidation,
  and Continuous Improvement Plans (CIPs) will be deployed for lower-performing
  programs.
- **Long-Term Sustainability Risk Analysis and Right-Sizing Initiatives:** A new
  facilities, performance, and sustainability risk assessment tool was developed to prioritize
  centers for potential suspension of operations based on performance and fiscal
  sustainability. This risk-driven "Right-Sizing" initiative focused on gradually shifting to a
  need-based model (e.g., one to three residential centers per state) projecting long-term
  savings of up to $337.72 million.
- **Cost Avoidance in USDA Forest Service Centers:** For USDA-operated centers, Job
  Corps reviewed CCC funding formulas to avoid overpayment for vacant student slots,
  resulting in a projected $2 million cost avoidance for PY 25.

## Union Labor

| NTC Contractor | Technical Education Program | No. of Instructors |
|---|---|---|
| United Brotherhood of Carpenters and Joiners (UBCJA) | • Carpentry, Pre-Apprentice | 113 |
| United Auto Workers (UAW) | • Maintenance - Light Repair, Pre-Apprentice<br>• Advanced Automobile Service Technology, Pre-Apprentice<br>• Advanced MHDT Suspension and Steering, Pre-Apprentice | 35 |

10

| NTC Contractor | Technical Education Program | No. of Instructors |
|---|---|---|
| | • Advanced Collision Repair and Refinish - Damage Analysis and Estimating, Pre-Apprentice | |
| Transportation Communication Union/International Association of Machinists and Aerospace Workers (TCU-IAM) | • Transportation Service Workers:<br>• Rail Mechanical Service/Carmen<br>• Rail Freight Service<br>• Airline Service<br>• Inland Waterway Service<br>• Rail Passenger Service<br>• Mass Transit/Highway Service | 24 |
| National Plastering Industry's Joint Apprenticeship Trust Fund (NPIJATF) | • Cement Masonry, Pre-Apprentice<br>• Plastering, Pre-Apprentice | 45 |
| International Union of Painters and Allied Trades (IUPAT) | • Painting, Pre-Apprentice<br>• Glazing, Pre-Apprentice<br>• Sign, Billboard, and Display, Pre-Apprentice<br>• Floor Covering Installation, Pre-Apprentice | 41 |
| International Union of Operating Engineers (IUOE) | • Heavy Construction Equipment Mechanic, Pre-Apprentice<br>• Heavy Equipment Operations, Pre-Apprentice<br>• Maintenance Repairer Helper - Stationary Engineering, Pre-Apprentice | 35 |
| International Masonry Institute (IMI) | • Bricklayer, Pre-Apprentice<br>• Tile Setting, Pre-Apprentice | 34 |
| Home Builders Institute (HBI) | • Electrical, Pre-Apprentice<br>• Plumbing, Pre-Apprentice<br>• Building Construction Technology, Pre-Apprentice<br>• HVAC, Pre-Apprentice<br>• Plumbing, Pre-Apprentice | 122 |

000307

Message

**From:** Han, Jihun A - OSEC ███████████████████████████████
███████████████████████████

**Sent:** 5/8/2025 3:44:30 PM
**To:** Chavez-DeRemer, Lori M - OSEC ███████████████████
**Subject:** Fw: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum
**Attachments:** EMBARGOED DRAFT_ETA Job Corps Program Decision Memo_V3.docx

**Jihun Han**
Chief of Staff
Office of the Secretary
U.S. Department of Labor
C: ███████████████

**From:** Frazier, Susan (Lori) - ETA ███████████████████
**Sent:** Monday, May 5, 2025 5:01:26 PM
**To:** Youngs, Bridget M - OSEC ███████████████████  Collins, Miles B - OSEC ███████████████████████  Han,
Jihun A - OSEC ███████████████████  Parella, Courtney E - OPA ████████████████████  Walter, Courtney E -
OSEC ███████████████████
**Subject:** RE: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

Great teamwork!! All changes accepted and attached for final review.

Thanks!
Lori

**Lori Frazier Bearden** |
United States Department of Labor
Acting Assistant Secretary
Employment and Training Administration
200 Constitution Avenue Suite S-2307
Washington, D.C. 20210
C: ███████████



**From:** Youngs, Bridget M - OSEC ███████████████████████
**Sent:** Monday, May 5, 2025 1:05 PM
**To:** Collins, Miles B - OSEC ███████████████████  Frazier, Susan (Lori) - ETA ███████████████████  Han, Jihun A
- OSEC ███████████████  Parella, Courtney E - OPA ███████████████████  Walter, Courtney E - OSEC
███████████████████

**Subject:** RE: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

Thanks Lori & Miles! Edits as of 1300 attached.

**From:** Collins, Miles B - OSEC ███████████████
**Sent:** Monday, May 5, 2025 1:01 PM
**To:** Frazier, Susan (Lori) - ETA ████████████████ Han, Jihun A - OSEC ███████████████; Parella, Courtney
E - OPA ████████████████ Walter, Courtney E - OSEC ████████████ Youngs, Bridget M -
OSEC ████████████
**Subject:** RE: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

This is great! Thank you for putting this together! We have made some suggested edits to add clarity
on a few points. Please LMK if you are good with the edits.

+@Han, Jihun A - OSEC +@Parella, Courtney E - OPA +@Walter, Courtney E - OSEC

**From:** Frazier, Susan (Lori) - ETA ████████████
**Sent:** Monday, May 5, 2025 10:43 AM
**To:** Collins, Miles B - OSEC ████████████
**Subject:** FW: DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

**From:** Frazier, Susan (Lori) - ETA
**Sent:** Sunday, May 4, 2025 3:53 PM
**To:** Han, Jihun A - OSEC ████████████
**Subject:** DRAFT-CONFIDENTIAL-PREDECISIONAL: Decision Memorandum

Here you go! The DRAFT operational plan is only 2 pages, but I included an Appendix for reference. I
am sure there will be some edits. There are also a few decision points in it.

Thanks!
Lori

**Lori Frazier Bearden** |
United States Department of Labor
Acting Assistant Secretary
Employment and Training Administration
200 Constitution Avenue Suite S-2307
Washington, D.C. 20210
C: 



**U.S. Department of Labor**     Assistant Secretary for
Employment and Training
Washington, D.C. 20210



## DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE

**May 4, 2025**

**DECISION MEMORANDUM**

**SUBJECT:   Job Corps Program and Pausing Center Operations**

**PURPOSE:** To reach consensus on pausing Job Corp center operations and return every student safely and timely to their home of record by the end of the program year June 30th

**OPERATIONAL PLAN:** (1) Immediately cease all Job Corp center operations (including 24 USDA CCCs) to allow adequate transition plans for mobilizing students. (2) Centers will execute a "Suspension of Operations" Plan. (3) Return funds to Treasury.

## PHASE 1: PAUSE ALL JOB CORP CENTER OPERATIONS

> **Action 1:** OSEC will communicate the operational plan with USDA Secretary. USDA center staff (24 centers) will be directed to operationalize their "Suspension of Operations" plan to transfer students to home of record.
> **Action 2:** ETA will terminate 99 contracts with center operators using the "Termination for Convenience of the Government."
>> o ETA leadership will brief limited Job Corp federal staff including Contracting Officer Representative (COR).
>> o OJC Staff will issue brief email notices to all Job Corp Center Operators/Job Corp Association/Labor Unions minutes ahead of the termination notices below.
>> o OJC staff will issue a Termination of Inconvenience effective August 15th and require implementation of Center Operations Pause and transition students to home of record by June 30th.
>>> o Operations wind-down to commence immediately with final operations date of June 30, 2025.
>> o ETA leadership will ensure COR understands negotiation role to negotiate termination fees and needed program costs that are applicable to transition students and successfully stop operations. This will include Wednesday, May 14th at 4:30PM 6-12 weeks of continued contract operations such as facility and property management, records retention, secure data and transportation fleet.
>> o Center Operators will operationalize "Suspension of Operations" plan.
> **Action 3:** DOL OSEC will operate a communication plan in conjunction with other executive leadership.
> **Action 4:** ETA will provide targeted response for Job Corp center staff (employment services, job fairs, unemployment compensation, dislocated worker funding). ETA will

provide students with alternative program options such as Apprenticeship opportunities, Armed Service recruiters, etc.

➢ **Action 5**: "Caretaker" contracts will be executed to maintain facilities until leases expire. Note that some leases will be terminated.

## PHASE 2: FORMAL CLOSURES

➢ **Action 1:** ETA will publish a Federal Register Notice as required by WIOA sec.159 providing advance notice of center closures.

➢ **Action 2:** DOL and UDSA will renegotiate necessary interagency agreements to prevent endangerment of health/safety.

➢ **Action 3:** DOL in conjunction with GSA follows federal regulations for general disposal requirements complying with Federal Property Administrative Services Act, GSA's Federal Management Regulation (FMR), and USDOL policies.

2

# APPENDIX
# BRIEF SUMMARY

**Background & Analysis:** Job Corps, established under the Economic Opportunity Act of 1964 (Public Law 88-452), is the nation's largest federally funded residential education and vocational training program.

| | |
|---|---|
| **Operational PY24 Budget:** | $1.6 Billion |

**Center Operations:**

- Total Job Corp Centers (all 50 states, Puerto Rico, and DC): 123
- Of the 123, number operated by contract: 99
- Of the 123, number operated by USDA: 24
- Number of centers currently paused[1]: 4
- Owned Job Corp Centers: 58
- Leased Job Corp Centers: 34
- USDA Centers owned by Forest Service: 24

**Administration:**

- Office of Job Corps (OJC) federal FTE within ETA and regional offices: 80
- Student Onboard Strength as of April 24, 2025: 25,892
- Federal Contractor/Job Center Staff: 12,000
- USDA Forest Service Federal Employees at Job Corps Centers: 1,100
- National Training Contractors[2] (union organizations): 8
  - Instructors: 449
  - Regional coordinators and other administrative personnel 50+

**Program Performance Failures, Facility Sustainability, and Excessive Costs:** The Job Corp program cannot continue to operate services at its current capacity. The program is in a financial crisis and has remained at the high risk of violating the Anti-deficiency Act (ADA)[3].

- The Job Corps budget has remained largely flat at $1.6 billion since 2018.
- If adjusted for inflation, the budget would have to exceed $2 billion in 2024 to continue operations.
- Job Corps was operating at a deficit for PY 24—approximately $140 million—several actions to save approximately $119 million including the pausing of centers, cancelling contracts, and reducing costs have allowed the current operations to reach the end of this program year June 30th.

---

[1] Woodstock (MD), Whitney Young (KY), Penobscot (ME), Loring (ME)
[2] See Appendix
[3] ADA Act- The Antideficiency Act prohibits federal employees from making or authorizing an expenditure from, or creating or authorizing an obligation under, any appropriation or fund in excess of the amount available in the appropriation or fund unless authorized by law. 31 U.S.C. § 1341 (a) (1) (A).

000312

- PY25- Operating deficit could grow up to $213 million if mitigation strategies do not continue

## BACKGROUND AND ANALYSIS

## I. Purpose and Administration

Since its inception, the program has served over three million youth and young adults.  Currently authorized under the Workforce Innovation and Opportunity Act (WIOA), Title I, Subtitle C (codified at 29 U.S.C. § 3191 et seq.), Job Corps is funded through annual Congressional appropriations, with an average budget of approximately $1.6 billion for center operations since 2017. The program provides academic education, career technical training, career transition services, and residential support to thousands of students each year.

The Office of Job Corps (OJC) within ETA oversees the program and is comprised of staff at the National Office with six regional offices.  In total, OJC employs 80 federal full-time equivalent staff. The program is funded through three distinct accounts: $1.6 billion for Operations, which supports center operations contracts and U.S. Department of Agriculture (USDA) Forest Service Civilian Conservation Centers for residential services, academics, counseling, and career technical training; $33 million for Administration, which funds federal staffing, travel, and training at the National and Regional Offices; and $123 million for Construction, Rehabilitation, and Acquisition (CRA), which supports facility acquisition, construction, and rehabilitation nationwide.

## II. Eligibility Criteria

Admissions Counselors are hired under center operations contracts to assess applicant eligibility for the program.  As outlined in 29 U.S.C. § 3194 (or pursuant to other sections in WIOA, as noted), applicants must:

- Be between 16 and 24 years old at enrollment (with allowances for up to 20% of enrollees aged 22–24 and waivers for individuals with disabilities).
- Meet low-income criteria.
- Face one or more barriers to education and employment, such as being basic skills deficient, a school dropout, homeless, a foster child, or requiring additional education or training to obtain and retain employment.
- Demonstrate a need for additional education, training, or support to secure and maintain employment
- Not fall within one of WIOA's special limitations on selection in 29 U.S.C. § 3195(b).
- Consistent with the nondiscrimination prohibition against certain noncitizens located at 29 U.S.C. § 3248(a)(5), be either a U.S. citizen; a lawfully admitted permanent resident alien, refugee, asylee, parolee, or other alien who has been authorized by the Department of Homeland Security to work in the United States; or a resident of a U.S. territory.

4

Job Corps' eligibility criteria are outlined in more detail in the Policy and Requirements Handbook Exhibit 1-1.

## III. Center Types and Operations

Job Corps centers operate under three models. Contracted centers are managed by private organizations or state and local agencies through competitive procurement. Civilian Conservation Centers (CCCs) are operated by the USDA Forest Service, focusing on conservation training and disaster response in rural areas. Additionally, some centers are operated by Indian tribes through agreements to serve Indians.[4]

A majority of centers are operated by contractors via competitively awarded contracts, with approximately 13,000 contractor staff.  In addition, 24 Civilian Conservation Centers (CCC) are operated by the USDA Forest Service via an interagency agreement and are staffed with 1,100 federal employees.

- *Civilian Conservation Centers (CCCs*)

**Overview**: CCCs are a subset of Job Corps centers focused on natural resource conservation and public land management. They offer unique training opportunities in forestry, firefighting, and conservation, contributing to both workforce development and environmental stewardship.

**Governance and Funding**: CCCs operate under an **interagency agreement** between the Department of Labor and the USDA. While the Forest Service manages daily operations, DOL provides funding and oversight to ensure alignment with Job Corps standards and objectives.

**Legislative Considerations**: In 2019, proposals to close several CCCs were met with bipartisan opposition that, in part, included assertions as to their importance to rural economies and conservation efforts. Subsequent enacted appropriations laws included provisions prohibiting appropriated funds from being used to (1) alter or terminate the Interagency Agreement between DOL and USDA and (2) close any of the Civilian Conservation Centers, except if such closure is necessary to prevent the endangerment of the health and safety of the students.

## V. Performance Management

**Performance Indicators**: Under 29 U.S.C. § 3209, Job Corps centers are evaluated based on the primary indicators of performance applicable to all programs authorized by WIOA, including: 1) placement in employment, education, or training (2nd and 4th quarter after exit), 2) credential attainment, 3) measurable skill gains, 4) median earnings, and 5) retention in employment or education.

---

[4] Currently Job Corps' Talking Leaves Job Corps Center is operated by Cherokee Nation.

5

**Job Corps Center Closure Criteria**

Per 29 U.S.C. § 3209(j), prior to the closure of any Job Corps center, "the Secretary shall ensure—
(1) that the proposed decision to close the center is announced in advance to the general public through publication in the Federal Register or other appropriate means;
(2) the establishment of a reasonable comment period, not to exceed 30 days, for interested individuals to submit written comments to the Secretary; and
(3) that the Member of Congress who represents the district in which such center is located is notified within a reasonable period of time in advance of any final decision to close the center."

Historically DOL has announced the closure criteria it is using to close any given center through publishing those criteria in the FRN and, occasionally, requesting comments on the criteria. This means over time the closure criteria have not been static – DOL has added criteria to address the policy direction and need for a rationale to close a center at a given time. Closure criteria have varied over time, including considerations of chronic low performance, an evaluation of effort required to maintain high-quality education, and other considerations to determine whether to close a center.[5]

If a decision is made to close a center, then the decision and basis for the decision must be documented at least internally. The process to complete a closure can be a costly, time-consuming process as operations at the center are wound down, personal property is dealt with, and any real property issues are addressed.

## VI. Demonstration Authority

**Legal Framework**: Under 29 U.S.C. § 3206(a), the Secretary of Labor is authorized to carry out experimental, research, or demonstration projects relating to carrying out the Job Corps program. The statute also provides the Secretary the authority to waive any provisions of the WIOA section on Job Corps that the Secretary finds would prevent her from carrying out the projects. If the Secretary determines that such waiver is necessary, the statute requires 90-days advance written notification to the Committee on Education and the Workforce of the House of Representatives and the Committee on Health, Education, Labor, and Pensions of the Senate.

**Purpose and Implementation**: The demonstration authority allows the Department of Labor to pilot innovative approaches to education and vocational training relating to carrying out the Job Corps program. These projects aim to enhance program effectiveness, address emerging workforce needs, and improve service delivery to participants.[6]

---

[5] See example of closure criteria for Ouachita Civilian Conservation Center in Arkansas, 81 FR 43250 (July 1, 2016), https://www.federalregister.gov/documents/2016/07/01/2016-15603/final-notice-of-job-corps-center-for-closure

[6] An illustrative example of this authority in action is the Job Corps Scholars Program, a demonstration project that provided eligible youth aged 16–24 the opportunity to enroll in career technical training programs at twenty-six accredited public colleges.

6

## VII. Contracting Mechanisms

**Firm Fixed-Price Contracts (FFP)**: OJC began transitioning to the FFP model in 2019 and has a few remaining contracts to transition from cost-reimbursable to FFP. Under FFP agreements, contractors are paid a set amount for delivering specified services, regardless of actual costs incurred. FFP contracts offer some advantages for government operations by providing cost predictability, which helps agencies better manage budgets and fiscal planning. These contracts also incentivize contractors to operate efficiently, since maintaining profitability depends on managing resources within the agreed price.[7] However, successful execution of FFP contracts requires careful attention to a few important considerations. Defining the scope of work with precision is critical to prevent scope creep[8] and maintain contractor accountability. Additionally, because contractors bear the financial risk of cost overruns, there is a possibility that service quality could be affected if risks are not properly managed.

Having selected the FFP contract type, DOL faced a new challenge during the COVID pandemic. Under an FFP contract, agencies have little or no visibility on the contractor's costs. As enrollment numbers dropped due to COVID, any cost savings did not automatically translate into reduced FFP payments by DOL. DOL did negotiate a "take back" mechanism for low OBS, but these were limited given DOL's understanding that a large portion of operational costs (e.g., salaries and facilities) are impervious to changes in enrollment. Plus, a reduction in the FFP amounts would be subject to negotiation and could be grounds for dispute and litigation absent contractor agreement.

## VIII. Real Property Management and Disposal

While most DOL office spaces are leased through GSA, Job Corps centers are exceptions, as they are directly owned or leased by the DOL. Job Corps controls over 90% of the Department of Labor's building stock. The legal status of the Job Corps facilities is broken down into four categories: 1) DOL owned, 2) DOL direct leased, 3) a combination of DOL owned and direct leased, and 4) Civilian Conservation Centers (CCCs). Of all the Job Corps centers, 58 are owned, 34 are leased, seven are a mixture of owned and leased, and 24 are on land owned by the USDA or United States Department of the Interior (DOI) and operated as CCCs. Two Centers on the list (Gainesville and Homestead) have been closed, but DOL still owns the property which is now excess and currently going through the disposal process with GSA.

---

[7] The advantages of a firm fixed price contract type is recognized by Federal Acquisition Regulation FAR 16.202-1, which states: "[a] firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties."

[8] Under the Changes clauses in the contracts, FAR 52.243-1, *Changes-Fixed Price*, the contractors are entitled to additional compensation if the agency directs them to perform work not required by the contract which increases their costs of performance.

000316

Job Corps center contractors manage government-furnished property (GFP) on-site. These contractors are also required to maintain accurate inventories using systems like the Electronic Property Management System (EPMS) and the Fleet Tracking Management System (FTMS). Regular audits and adherence to federal property management regulations, including those from the Federal Acquisition Regulation (FAR) and GSA policies, ensure accountability and proper stewardship.[9]

The OJC currently has an unfunded, deferred construction, rehabilitation and acquisition (CRA) backlog estimated to be $1.6 billion. Job Corps defines its unfunded CRA backlog as the total of the non-recurring costs to restore and renovate facilities (structures and buildings) and systems (e.g., heating ventilation, air conditioning, sewage, water, or electrical) to, or as close to, their original capacity, efficiency, and capability, and for which insufficient funding is currently available to complete the work. This amount represents more than 2,200 structures located on 5,600 acres.  Over the past several years, the cost associated with correcting property deficiencies has increased by more than 50 percent.

More than 43 percent of the Job Corps' portfolio by square footage is more than 50 years old.  In 2024, Job Corps estimated that in five years, 119 additional buildings comprising nearly 1,135,000 gross square feet would reach the age of 50, which will result in those buildings becoming subject to compliance with the historic preservation regulations when undergoing renovations.  CRA funding is critical to the success of the Job Corps program because healthy and safe facilities contribute to an effective learning environment.

### *General Disposal Requirements for Job Corps Centers*

When a Job Corps center is closed or realigned, the U.S. Department of Labor (DOL), historically in coordination with the General Services Administration (GSA), follows federal regulations to dispose of real property and assets. The disposal process must comply with the Federal Property and Administrative Services Act, GSA's Federal Management Regulation (FMR), and applicable Department of Labor policies.
Generally, disposal involves several key steps:
- **Property Assessment:** The DOL evaluates whether real property (land, buildings, equipment) is excess to agency needs.
- **Declaration as Excess:** Property no longer needed is officially declared "excess" and reported to GSA for broader federal screening.
- **Federal and Public Screening:** GSA offers excess property to other federal agencies first. If no agency claims it, it is made available to state, local governments, nonprofits, or educational institutions under specific public benefit conveyance programs.
- **Public Sale:** If there is no federal or public entity interest, the property is sold to the public, typically through online auctions or sealed bids.
- **Environmental Compliance:** Before disposal, environmental assessments must be conducted to ensure compliance with laws like the National Environmental Policy Act (NEPA) and to address any hazardous materials or cleanup requirements.

---

[9] See Job Corps' Policy and Requirements Handbook Appendix 505 Admin and Management of Job Corps Contractor-Held Government-Furnished Property.pdf

000317

- **Proceeds:** Revenue from property sales is generally returned to the U.S. Treasury unless specific statutory authority allows reuse within the program.

Separately, contractor-held personal property (such as equipment, vehicles, and supplies) must be disposed of following federal acquisition regulations (FAR Subpart 45.6) and DOL property management policies, ensuring proper accountability and financial closeout.

## IX. DOL Transparency Report

On April 25, 2025, the U.S. Department of Labor's Employment and Training Administration released the 2025 Job Corps Transparency Report, providing a detailed analysis of the financial performance and operational costs of the Job Corps Program.

Below is a summary of the overall findings from PY2023[10]:
- Average Graduation Rate:
  - Traditional: 32%
  - WIOA Definition: 38%
- Average Cost Per Enrollee (Regardless of Length of Stay): $49,769.53
- Average Cost Per Student Per Year (Average PY23 Headcount): $80,284.65
- Average Total Cost Per Graduate:
  - Traditional: $187,653
  - WIOA Definition: $155,600
- Job Corps participants earn $16,695 annually on average, post separation
- Average of Highest Center Costs per Graduate (Traditional Data):
  - The 10 least efficient programs average $512,800 dollars per graduate
  - The top 50 least efficient programs average $319,085 per graduate
- Average of Highest Center Costs per Graduate (WIOA Data):
  - The 10 least efficient programs average $385,370 per graduate
  - The top 50 least efficient programs average $252,285 per graduate

## X. Job Corps PY 2024 and 2025 Cost Savings Efforts

In Program Year (PY) 24, the Office of Job Corps implemented a series of aggressive cost savings initiatives to mitigate an anticipated operating deficit and set a foundation for long-term program sustainability. These efforts were informed by a comprehensive review of all expenditures against statutory and regulatory minimum requirements.

PY 24 cost-saving strategies resulted in savings of over $120 million, that included:

---

[10] The Job Corps Transparency Report's metrics distinguish between two definitions of the term "graduate": one reflecting traditional program completion in good standing (Traditional), and another using the statutory criteria from Workforce Innovation and Opportunity Act Sec. 116, Sec. 142, which counts individuals who attain a diploma or Career Technical Training completion while enrolled but do not complete the full program.

000318

- **De-scoping Requests for Proposals (RFPs) and Center Contracts:**
  Job Corps systematically reviewed the Policy and Requirements Handbook (PRH) to identify and remove non-mandatory program requirements, allowing for the negotiation with contractors to modify the contracts to reduce the future contract prices. This de-scoping focused on aligning center operations strictly to statutory obligations, thus reducing unnecessary expenditures. This included policy revisions to eliminate Evening and Weekend Studies requirements, remove non-mandatory oral health services, remove mandatory Career Transition Services (CTS) for those who did not complete the program, and reduce nursing and trainee employee assistance program hours back to pre-COVID levels. These targeted changes directly contributed to operating cost reductions without undermining core program services.

**In Program Year (PY) 25, the Job Corps program faces a projected operating deficit of up to $213 million.** To address this shortfall, the Department is contemplating several strategies to augment amounts carried forward from PY24 mitigation efforts (estimated at $130 million): prioritizing cost-saving actions at centers with expiring contracts and suspending operations at underperforming centers, including deploying the following:

- **Trade and Program Restructuring:** Job Corps conducted a national evaluation of trade offerings across centers, using labor market information and program performance ratings. Underutilized or duplicative trades are targeted for elimination or consolidation, and Continuous Improvement Plans (CIPs) will be deployed for lower-performing programs.
- **Long-Term Sustainability Risk Analysis and Right-Sizing Initiatives:** A new facilities, performance, and sustainability risk assessment tool was developed to prioritize centers for potential suspension of operations based on performance and fiscal sustainability. This risk-driven "Right-Sizing" initiative focused on gradually shifting to a need-based model (e.g., one to three residential centers per state) projecting long-term savings of up to $337.72 million.
- **Cost Avoidance in USDA Forest Service Centers:** For USDA-operated centers, Job Corps reviewed CCC funding formulas to avoid overpayment for vacant student slots, resulting in a projected $2 million cost avoidance for PY 25.

**Union Labor**

| NTC Contractor | Technical Education Program | No. of Instructors |
|---|---|---|
| United Brotherhood of Carpenters and Joiners (UBCJA) | • Carpentry, Pre-Apprentice | 113 |
| United Auto Workers (UAW) | • Maintenance - Light Repair, Pre-Apprentice<br>• Advanced Automobile Service Technology, Pre-Apprentice<br>• Advanced MHDT Suspension and Steering, Pre-Apprentice | 35 |

10

| NTC Contractor | Technical Education Program | No. of Instructors |
|---|---|---|
| | • Advanced Collision Repair and Refinish - Damage Analysis and Estimating, Pre-Apprentice | |
| Transportation Communication Union/International Association of Machinists and Aerospace Workers (TCU-IAM) | • Transportation Service Workers:<br>• Rail Mechanical Service/Carmen<br>• Rail Freight Service<br>• Airline Service<br>• Inland Waterway Service<br>• Rail Passenger Service<br>• Mass Transit/Highway Service | 24 |
| National Plastering Industry's Joint Apprenticeship Trust Fund (NPIJATF) | • Cement Masonry, Pre-Apprentice<br>• Plastering, Pre-Apprentice | 45 |
| International Union of Painters and Allied Trades (IUPAT) | • Painting, Pre-Apprentice<br>• Glazing, Pre-Apprentice<br>• Sign, Billboard, and Display, Pre-Apprentice<br>• Floor Covering Installation, Pre-Apprentice | 41 |
| International Union of Operating Engineers (IUOE) | • Heavy Construction Equipment Mechanic, Pre-Apprentice<br>• Heavy Equipment Operations, Pre-Apprentice<br>• Maintenance Repairer Helper - Stationary Engineering, Pre-Apprentice | 35 |
| International Masonry Institute (IMI) | • Bricklayer, Pre-Apprentice<br>• Tile Setting, Pre-Apprentice | 34 |
| Home Builders Institute (HBI) | • Electrical, Pre-Apprentice<br>• Plumbing, Pre-Apprentice<br>• Building Construction Technology, Pre-Apprentice<br>• HVAC, Pre-Apprentice<br>• Plumbing, Pre-Apprentice | 122 |

11

Message
_____

**From:**      McGee, Erin L - ETA ███████████████████████████████████████████

**Sent:**      5/8/2025 7:58:51 PM
**To:**        Frazier, Susan (Lori) - ETA ████████████████████
**CC:**        Matz, Jillian - OASAM OSPE ████████████
           ███████████████ Bernt, Matthew - SOL ██████    ██████ Koeppel, David R - SOL ████████
           ████████ Timmons, Luke B1 - ETA ████████████    ██████ Laco, Marek S - ETA ████████

**Subject:**   Draft, Pre-Decisional Job Corps materials for review
**Attachments:** DRAFT Pre-Decisional_Notice of Termination 5.8.25.docx; Draft Mockup of Separated Student Resource Page
           5.8.25.docx; Draft Pre-Decisional_Student and Center Staff Talking Points May 9.docx; Draft Pre-Decisional Fed staff
           comms May 9.docx; ASET to CoS Memo OJC Center Ops Contract Reimbursements 5.8.25.docx


Hi Lori, at your request, please find attached:

- Draft, Pre-Decisional Termination Notice and Related Materials
    o Mockup of Separated Student Resource Page
    o Draft Student and Center Staff Communication
    o Draft Communication to Federal Staff Supporting JC
- ASET to Chief of Staff Memo on Contract Reimbursement Funding

The draft termination notice and other related materials may be issued/used by the DOL Contracting Officer to terminate the Job Corps Center operations contracts.

These drafts were prepared at your direction, as a collaborative effort involving only ███████████████████
David Koeppel and Matt Bernt from SOL, and Jillian Matz from OSPE/JCAS.  Per your direction, aside from Jon Snare and Emily Su in SOL leadership, we have not communicated with anyone else on this initiative or on the preparation of these documents.

Note that the draft termination notice, as envisioned at this time (pre-decision), would be an immediate and complete termination of all 99 Job Corps Centers operated via a DOL contract.  The notices as drafted would direct contractors to perform certain shutdown activities, as necessary to ensure a safe, prompt and smooth cessation of work.  We anticipate that the Contracting Officer will need to issue further guidance/directives to the contractors, in particular regarding the ongoing protection and preservation of Federal facilities and property.  There would certainly be many other issues and concerns/questions to address there is a decision to move forward.

These documents are draft, pre-decisional documents, and include procurement sensitive information and attorney-client privileged information.

You indicated to us that there has not yet been a decision to proceed with the termination of the contracts, but you wanted DOL to be prepared to proceed if such a decision were reached by the Secretary's Office.  As we discussed, before any termination can be issued, we need a written directive from the Secretary to leadership in OASAM, directing the procurement action, and to you in ETA, directing the programmatic implementation.

We're available to answer any questions you may have.

Thank you,
Erin

**Erin McGee**
**Acting Administrator**
ETA/Office of Job Corps
U.S. Department of Labor
███████ (mobile)

*DRAFT/PRE-DECISIONAL/DELIBERATIVE*
*ATTORNEY-CLIENT COMMUNICATION*
*PROCUREMENT SENSITIVE*

This document is a proposed draft notice to contractors to be issued upon written confirmation by someone with appropriate authority to bind the Department of the decision to terminate the Job Corps contracts and operationalize the directive at the program level.

As requested, the proposed timeline is as follows:

- DOL issues decision to terminate contracts. Recommended memorandum from OSEC to ETA and OASAM leadership to complete by specific time.
  - All procurement authority for the Department is provided to the Secretary, who has delegated procurement authority to the Assistant Secretary for Administration and Management (ASAM).
    - The ASAM, as Chief Acquisition Officer, instructs OSPE to issue termination notice.
  - The Workforce Innovation and Opportunity Act provides authority to the Secretary of Labor to carry out the Job Corps program, and that authority has been delegated to the Assistant Secretary for Employment and Training (ASET).
    - The Acting ASET instructs Job Corps to initiate implementation plan, to include deactivating any JC websites, redirecting all JC websites to a JC resource page (likely on the ETA landing page), conducting a federal staff (JC/JCAS/OFA) call for notice/awareness only. Federal staff will be directed not to answer questions and to refer questions to a dedicated inbox.
- Termination letters issued:
  - Instruction sheet for students provided to Job Corps operators


[*date*]

[*name and title*]
[*contractor name*]
[Job Corps Center]
sent by email

NOTICE OF TERMINATION FOR CONVENIENCE – CONTRACT NO.

Dear [insert PO]:

(a) *Effective date of termination.* You are notified that Contract No. _____ (referred to as "the contract") is terminated completely for the Government's convenience

*DRAFT/PRE-DECISIONAL/DELIBERATIVE*
*ATTORNEY-CLIENT COMMUNICATION*
*PROCUREMENT SENSITIVE*

under the clause FAR 52.249-1, entitled *Termination for Convenience of the Government (Fixed Price)*.  The termination is effective immediately upon receipt of this Notice.

(b) *Cessation of work and notification to immediate subcontractors.* You shall take the following steps:

(1) Stop all work except for—

(i) Actions reasonably necessary, *as part of an safe, orderly and prompt shutdown of operations* at the Job Corps Center, to protect the life, health, and welfare of Job Corps students, and to carry out the orders of the Contracting Officer in this Notice, in Attachment 1 of this Notice, or in any future written order of the Contracting Officer;

(ii) Work-in-process that the Contracting Officer authorizes you in advance and in writing to continue (A) for safety precautions, (B) to clear or avoid damage to equipment, or (C) to prevent any other undue loss to the Government. (If you believe this authorization is necessary or advisable, immediately request written instruction from the Contracting Officer.)

(2) Place no further subcontracts or orders (referred to as subcontracts in this clause) for materials, services, or facilities, except as necessary to carry out the orders of the Contracting Officer in this Notice, in Attachment 1 of this Notice, or in any future written order of the Contracting Officer.

(3) Terminate all subcontracts to the extent they relate to the work terminated.  Furnish notice of termination to each immediate subcontractor and supplier that will be affected by this termination.  In the notice—

(i) Specify your Government contract number;

(ii) State whether the contract has been terminated completely or partially;

(iii) Provide instructions to stop all work, make no further shipments, place no further orders, and terminate all subcontracts under the contract, subject to the exceptions in subparagraph (1) above;

(iv) Provide instructions to submit any settlement proposal promptly; and

(v) Request that similar notices and instructions be given to its immediate subcontractors.

*DRAFT/PRE-DECISIONAL/DELIBERATIVE*
*ATTORNEY-CLIENT COMMUNICATION*
*PROCUREMENT SENSITIVE*

(4) Assign to the Government, if and as directed by the Contracting Officer, all right, title, and interest of the Contractor under the subcontracts terminated, in which case the Government shall have the right to settle or to pay any termination settlement proposal arising out of those terminations.

(5) With approval or ratification to the extent required by the Contracting Officer, settle all outstanding liabilities and termination settlement proposals arising from the termination of subcontracts; the approval or ratification will be final.

(6) As directed by the Contracting Officer, transfer title and deliver to the Government (i) the fabricated or unfabricated parts, work in process, completed work, supplies, and other material produced or acquired for the work terminated, and (ii) the completed or partially completed plans, drawings, information, and other property that, if the contract had been completed, would be required to be furnished to the Government.

(7) Take any action that may be necessary, or that the Contracting Officer may direct, for the protection and preservation of the property related to this contract that is in the possession of the Contractor and in which the Government has or may acquire an interest.

(8) Use your best efforts to sell, as directed or authorized by the Contracting Officer, any property of the types referred to in subparagraph (b)(6) of this clause; *provided,* however, that the Contractor (i) is not required to extend credit to any purchaser and (ii) may acquire the property under the conditions prescribed by, and at prices approved by, the Contracting Officer. The proceeds of any transfer or disposition will be applied to reduce any payments to be made by the Government under this contract, credited to the price or cost of the work, or paid in any other manner directed by the Contracting Officer.

(9) Keep adequate records of your compliance with subparagraphs (1) to (8) above showing the—

   (i) Date you received the Notice of Termination;

   (ii) Effective date of the termination; and

   (iii) Extent of completion of performance on the effective date.

(10) Notify the Contracting Officer of all pending legal proceedings that are based on subcontracts or purchase orders under the contract, or in which a lien has been or may be placed against termination inventory to be reported to the Government. Also, promptly notify the Contracting Officer of any such proceedings that are filed after receipt of this Notice.

*DRAFT/PRE-DECISIONAL/DELIBERATIVE*
*ATTORNEY-CLIENT COMMUNICATION*
*PROCUREMENT SENSITIVE*

(11) Take any other action required by the Contracting Officer in this Notice, in Attachment 1 to this Notice, or in any future written order of the Contracting Officer, or under the Termination clause in the contract.

(c) *Settlements with subcontractors.* You remain liable to your subcontractors and suppliers for proposals arising because of the termination of their subcontracts or orders. You are requested to settle these settlement proposals as promptly as possible. For purposes of reimbursement by the Government, settlements will be governed by the provisions of FAR Part 49.

(d) *Employees affected.* (1) If this termination, together with other outstanding terminations, will necessitate a significant reduction in your work force, you are urged to—

(i) Promptly inform the local State Employment Service of your reduction-in-force schedule in numbers and occupations, so that the Service can take timely action in assisting displaced workers;

(ii) Give affected employees maximum practical advance notice of the employment reduction and inform them of the facilities and services available to them through the local State Employment Service offices;

(iii) Advise affected employees to file applications with the State Employment Service to qualify for unemployment insurance, if necessary;

(iv) Inform officials of local unions having agreements with you of the impending reduction-in-force; and

(v) Inform the local Chamber of Commerce and other appropriate organizations which are prepared to offer practical assistance in finding employment for displaced workers of the impending reduction-in-force.

(2) If practicable, urge subcontractors to take similar actions to those described in subparagraph (1) above.

(e) *Compensation for Pre-Termination Work and Termination Settlement.* The Department will honor its obligation to pay for work satisfactorily performed prior to the effective date of this termination, in accordance with the terms of the contract. The costs of the termination, including the cost of shutdown activities ordered by the Contracting Officer in this Notice, in Attachment 1 of this Notice, or in any future written notice of the Contracting Officer, may be payable, as part of the termination settlement, in accordance with the terms of the termination clause, FAR 31.205-42, and other applicable procurement regulations.

(f) *Administration.* The contract administration office named in the contract will identify the Contracting Officer who will be in charge of the settlement of this termination. Please see

*DRAFT/PRE-DECISIONAL/DELIBERATIVE*
*ATTORNEY-CLIENT COMMUNICATION*
*PROCUREMENT SENSITIVE*

the attached Termination Settlement form (Attachment 2).  Completed Settlement forms shall be submitted to the Contracting Officer.

Matters not covered by this notice should be brought to the attention of the undersigned.  **All questions related to this notice, both of a contractual and a technical nature, shall be submitted in writing to the following email address:** JCPYFinancialExercise@dol.gov.

Please acknowledge receipt of this notice as provided below.

> **Jillian Matz**
> **Job Corps Acquisition Services**
> **Office of the Senior Procurement Executive**
> **200 Constitution Avenue, NW Washington DC 20210**
>
> **Acknowledgment of Notice**

The undersigned acknowledges receipt of a signed copy of this notice on _____, 20_____. Two signed copies of this notice are returned.

(Name of Contractor)
By
(Name)
(Title)

*DRAFT/PRE-DECISIONAL/DELIBERATIVE*
*ATTORNEY-CLIENT COMMUNICATION*
*PROCUREMENT SENSITIVE*

## ATTACHMENT 1 TO NOTICE OF TERMINATION

### Contracting Officer's Orders Regarding Orderly Shutdown of Center Operations

*As referenced in Section (b) above, the Contracting Officer orders that the contractor shall perform the following to effectuate safe, orderly, and prompt shutdown of center operations under the contract:*

1. **Responsibility to Maintain a Safe Center Environment**

   a. During the process of shutting down of operations, Center Operator must retain staff sufficient to ensure the safety of all students on center and carry out the Contracting Officer's orders.  If your staff is not necessary to accomplish the shutdown or to comply with the orders of the Contracting Officer, any costs related to their continued employment costs are hereby unallowable.

2. **Student Separations**

   a. Center Operator must take all necessary steps to ensure students are safely separated and transported to their home of record by midnight on May 13, 2025. No later than COB on May 12, 2025, submit to your COR a list of any students that will not arrive home by midnight on May 13, 2025, the rationale for why the May 13 deadline is not achievable for these students, and the plan and date for their separation and transportation to their home of record.

   b. While any student remains on center, in anticipation of a planned separation, the Center Operator must provide the students all basic needs (food, housing, necessary medical care, etc.)

   c. In the performance of student separation, Centers Operator must adhere to Policy and Requirements Handbook, Section 6.2, R4. Separations, specifically:

      i. Update all student accomplishments in CIS, including attainment of High School Diploma (HSD), High School Equivalency (HSE), career technical training certifications, and/or career technical training completion.

      ii. Notify parents/guardians of minor students regarding the student's separation status, date, and scheduled time of arrival home. Such notification must be documented.

      iii. Provide separating students with originals of any earned credentials and documentation of accomplishments.

      iv. Verify and update student address and alternate contacts.

*DRAFT/PRE-DECISIONAL/DELIBERATIVE*
*ATTORNEY-CLIENT COMMUNICATION*
*PROCUREMENT SENSITIVE*

> v. Separate all students using the code Administrative Separation with Reinstatement (ASWR).  Students should not be informed of the separation code.

d. Center Operator must direct students to depart the center with all personal belongings. There should be no expectation of transfer to another center or return to their current center.

e. Students who are on leave will not be permitted to return to center to gather their personal belongings.  Center Operator must pack these belongings and provide for their return to students in the most expedient manner possible.

f. Every departing student must be told, "*The US Department of Labor has decided to terminate all Job Corps operations contracts at this time.  The Department of Labor encourages you to visit your local one stop and is in the process of developing a resource page for separated students.*"

## 3. Property

a. Center Operator must take immediate action to secure valuable, walk-away non-expendable property and equipment in a safe and secure location for long-term storage.

b. No later than May 30, Center Operator must update their most recent annual physical inventory and submit this document to their COR and Contracting Officer.

c. As instructed by the Contracting Officer, transfer title and deliver to the Government all termination inventory, including subcontractor termination inventory that you have the right to take.  To settle your termination proposal, it will be necessary to establish that all prime and subcontractor termination inventory has been properly accounted for. For detailed information, see FAR Part 45, Government Property and Attachment 1 to this Notice.

d. While shutdown activities continue, Center Operator must provide property services as outlined in the Policy and Requirements Handbook (PRH) 5.6 Property.  The Contracting Officer expects to issue further direction on the retention and disposition of Government property and the cessation of property services.  The Center Operator should be prepared to continue to provide property services through June 30, 2025.

## 4. Student Records

a. Pursuant to Program Instruction Notice 22-03 Center Records Management, by December 31, 2022, all centers fully transitioned from paper records to electronic

*DRAFT/PRE-DECISIONAL/DELIBERATIVE*
*ATTORNEY-CLIENT COMMUNICATION*
*PROCUREMENT SENSITIVE*

records maintained in the CIS-3G e-Folder. Student health (and disability) records were also securely scanned by each center's Health and Wellness Center staff and uploaded to the e-Health Folder in CIS-3G. Since December 31, 2022, centers have been required to maintain electronic records. No later than May 30, 2025, contractors must certify that all regular student personnel records as defined in PRH 6.4, R17. Student Personnel File and Student Health Records (SHR) (i.e., health history and services) have been scanned and uploaded to the student e-Folder.

b. In addition, Center Operator must follow all records policies and procedures as set forth in PRH 6.4, including storing all hard copy federal records on center in a secure location.

## 5. Facilities Management

a. While shutdown activities continue, the Center Operator must provide facility management services as outlined in PRH 5.8 Facility Operations and Maintenance. The Contracting Office expects to issue further direction on the cessation of this work. The Center Operator should be prepared to continue facilities management services through June 30, 2025.

## 6. Safety and Security

a. While shutdown activities continue, the Center Operator must provide safety and security services as outlined in PRH 5.3 Safety and Security. The Contracting Office expects to issue further direction on the cessation of this work. The contractor should be prepared to continue safety and security services through June 30, 2025.

**All questions related to this notice, both of a contractual and a technical nature, shall be submitted in writing to the following email address:** JCPYFinancialExercise@dol.gov.

*DRAFT/PRE-DECISIONAL/DELIBERATIVE*
*ATTORNEY-CLIENT COMMUNICATION*
*PROCUREMENT SENSITIVE*

**Job Corps Student Resource Page**

*The US Department of Labor has decided to terminate Job Corps Center operations contracts. The Department encourages separated students and other interested parties to visit your local one stop and explore the resources on this page.*

- **CareerOneStop**
  CareerOneStop is a comprehensive website sponsored by the U.S. Department of Labor, offering a wide range of resources for job seekers, students, workers, and employers.

- **GetMyFuture**
  CareerOneStop GetMyFuture is a specific section within CareerOneStop, designed to help young adults aged 14 to 24 explore careers, find training and education options, and job search.

- **mySkills myFuture**
  CareerOneStop mySkills myFuture specifically focuses on matching skills from previous jobs to potential new careers, helping individuals explore career options based on their experience

- **My Next Move**
  My Next Move is an interactive tool for job seekers and students to learn more about their career options. My Next Move has tasks, skills, salary information, and more for over 900 different careers. Users can find careers through keyword search; by browsing industries that employ different types of workers; or through the O*NET Interest Profiler, a tool that offers personalized career suggestions based on a person's interests and level of work experience

- **ApprenticeshipUSA**
  Apprenticeship.gov is the one-stop source to connect career seekers, employers, and education partners with apprenticeship resources. Discover apprenticeships across industries, how programs are started by employers, and how to become an apprentice.

*DRAFT/PRE-DECISIONAL/DELIBERATIVE*
*ATTORNEY-CLIENT COMMUNICATION*
*PROCUREMENT SENSITIVE*

**TERMINATION FOR CONVENIENCE OF CENTER CONTRACTS – OFFICE OF JOB CORPS**
**TALKING POINTS FOR OPERATORS TO ADDRESS STUDENTS & CENTER STAFF**
**May 8, 2025**

---

**FOR Job Corps Center Staff:**

- Today, the Department of Labor has terminated the contract to operate this Job Corps Center. Human Resources will advise you with regards to how the termination affects your employment.

- The termination notice requires the center to arrange for transportation for students to their home of record.

- The Department of Labor has setup a dedicated email address for students, Job Corps staff, operators, any affected stakeholders – to submit questions. That email address is Assistance@jobcorps.org.

- Thank you for your service to Job Corps.


**FOR STUDENTS:**

- Today, the Department of Labor has terminated the contract to operate this Job Corps Center.

- The termination notice requires the center to arrange for transportation for students to their home of record.  Staff counselors will be reaching out to you individually to discuss next steps.

- The Department of Labor has setup a dedicated email address for students, Job Corps staff, operators, any affected stakeholders – to submit questions. That email address is Assistance@jobcorps.org.   You will also be hearing about this development on today's Mission Critical call.

- The Department of Labor encourages you to visit your local one stop and is in the process of developing a resource page for separated students.

*DRAFT/PRE-DECISIONAL/DELIBERATIVE*
*ATTORNEY-CLIENT COMMUNICATION*
*PROCUREMENT SENSITIVE*

**To be Shared Orally with Federal staff supporting Job Corps**

- On May 9, the Department decided to Terminate for Convenience all Job Corps Center Operations contracts.

- The Notice of Termination provided Technical Direction for Center Operators including on separating students by May 13, 2025.

- We expect that you may have questions and that there will be questions from center staff, Operators, and constituents.

- Regarding external communications, even to those you may have known for years, please direct all questions related to the Notice of Termination—both of a contractual and a technical nature—to be submitted in writing to the following email address: JCPYFinancialExercise@dol.gov. **You are expected to help direct questions to the above inbox and conduct yourself with the highest level of discretion and professionalism as we work on behalf of the Administration to complete this directed task.** Please do not editorialize, speculate, describe, or go "off script."

- At this time, I must also mention *DOL Guidance 25-037 | Unauthorized Communications* which reminds us all that DOL employees are not permitted to discuss DOL non-public, pre-decisional, or confidential information with anyone outside the Agency. This includes members of the press/media, former DOL employees, and other third parties and this guidance applies to all forms of communication, including informal conversations, emails, texts, and social media. Individuals who disclose confidential information or engage in unauthorized communications with the media may face serious legal consequences—including potential criminal penalties, depending on the nature of the information and the applicable laws—and may face immediate disciplinary actions, up to and including termination from the DOL.

- You are welcome to email me (Erin McGee) or Jillian Matz directly or set up time to talk on any questions that you may have. First and foremost, take care of yourself. Second, there still remains very important work to be done in the Office of Job Corps and the Job Corps community.

- Please note that this notice does not affect or otherwise impede an employee's right to communicate with Congress, Inspectors General, and Office of Special Counsel, pursuant to 5 U.S.C. § 2302(b)(13) (Whistleblower Protection Enhancement Act).

**U.S. Department of Labor**    Office of the Senior Procurement Executive
Office of the Assistant Secretary for Management and Administration
Washington, D.C. 20210



**DECISION**

May 8, 2025

**MEMORANDUM FOR THE CHIEF OF STAFF**

**FROM:**    **LORI FRAZIER BEARDEN**
**Acting Assistant Secretary for Employment and Training**

**SUBJECT:**    **Request for Approval of Job Corps Center Operations Contract**
**Reimbursements**

---

**EXECUTIVE SUMMARY**

In coordination with ETA's Office of Job Corps (OJC) and the Solicitor's Office (SOL), Job
Corps Acquisition Services (JCAS) within the Office of the Senior Procurement Executive
(OSPE) seeks authorization to obligate the funds necessary to cover costs already incurred and
work to be performed through June 30 for 26 Job Corps center operations contracts. This action
ensures that all Job Corps contracts are properly funded for work already performed, in
accordance with the terms and conditions of the contract, and to cover work through the end of
Program Year 2024.

**BACKGROUND/DISCUSSION**

For various reasons, the Department was not able to process the incremental funding and/or
formal contract modifications necessary to add funding to these contracts. Incumbent
contractors have continued to perform services pursuant to the terms and conditions of their
contract, but the contract delays have created challenges with the ability of the contractors to
submit an invoice and receive payment. We believe that the Department is liable to pay for this
work performed under the contracts in accordance with the pricing terms of the contract. Failure
to fund this work would likely result in significant additional costs for the Department, including
the cost of litigation and potentially interest. The following is a list of Center Operations
Contracts for which JCAS seeks to obligate funding for work already performed, in accordance
with the terms and conditions of the contract, and to cover work through the end of Program
Year 2024.

| Center/Contract Name | Contract Number | Funding Amount |
|---|---|---|
| Treasure Island Job Corps Center | 1605JW-21-C-0005 | $5,536,293 |
| Long Beach Job Corps Center* | 1605JW-21-C-0009 | $2,981,186 |
| Phoenix Job Corps Center* | 1605JW-21-C-0004 | $2,845,988 |

| Center/Contract Name | Contract Number | Funding Amount |
|---|---|---|
| Carl D. Perkins Job Corps Center* | 1630JE-21-C-0009 | $2,264,424 |
| Blue Ridge Job Corps Center* | 1605JE-22-C-0009 | $1,502,235 |
| Woodland Job Corps Center* | 1605JE-22-D-0011 | $4,477,981 |
| Whitney M. Young Center Caretaker | 1605JE-25-C-0001 | $567,735 |
| Delaware Valley Job Corps Center | 1605JE-22-C-0004 | $131,000 |
| Keystone/ Red Rock Job Corps Centers | 1605JE-21-C-0003 | $5,323,894 |
| Philadelphia Job Corps Center | 1605JE-22-C-0005 | $1,223,716 |
| Old Dominion Job Corps Center | 1605JE-22-C-0016 | $1,120,167 |
| Turner Job Corps Center | 1605JE-24-C-0013 | $3,561,717 |
| Wilmington Job Corps Center | 1605JE-21-C-0004 | $1,205,825 |
| Cassadaga Job Corps Center* | 1605JE-23-C-0009 | $2,545,344 |
| Albuquerque Job Corps Center* | 1605JW-21-C-0007 | $2,720,000 |
| Loring Job Corps Center | 1605JE-21-C-0010 | $2,055,327 |
| Ottumwa Job Corps Center | 1605JW-23-C-0005 | $879,779 |
| Paul Simon Chicago Job Corps Center* | 1605JW-22-C-0003 | $1,969,646 |
| Potomac Job Corps Center | 1605JE-21-C-0005 | $1,992,039 |
| Excelsior Springs Job Corps Center | 1605JW-22-C-0008 | $1,670,629 |
| Kittrell Job Corps Center | 1605JE-24-C-0014 | $809,160 |
| Roswell Job Corps Center | 1605JW-21-C-0003 | $360,954 |
| Hawaii Job Corps Center* | 1605JW-22-C-0007 | $2,357,179 |
| Flint Hills Job Corps Center | 1605JW-21-C-0015 | $735,064 |
| Gary Job Corps Center* | 1605JW-23-F-00004 | $9,982,731 |
| Whitney M. Young Center Caretaker** | 1605JE-25-C-0002 | $128,000 |

*Contractor working under Contracting Officer's email extension; approval request to also exercise option period through June 30, 2025.*

**Caretaker contract for paused center starts June 1, 2025.*

**OTHER DOL AGENCIES INVOLVED**

OSPE
SOL

**OTHER FEDERAL AGENCIES INVOLVED**

N/A

2

**CONTACT**

Erin McGee, Acting Administrator, Office of Job Corps, ████████

Jillian Matz, Head of Contracting Activity, Job Corps Acquisition Services, ████████

**DECISION**

**SUBJECT:** Request for Approval of Incremental Funding for Job Corps Center Operations Contracts

**RECOMMENDED COURSE OF ACTION:** The Employment and Training Administration recommends approval to obligate the funds necessary to cover costs already incurred and work to be performed through June 30 for 26 Job Corps center operations contracts.

Approved: _____

Date: _____

Let's Discuss: _____

Date: _____

COMMENTS:

3

Message

| | |
|---|---|
| **From:** | McGee, Erin L - ETA ████████████████████████████████ |
| **Sent:** | 5/9/2025 2:21:55 PM |
| **To:** | Frazier, Susan (Lori) - ETA ████████████ Laco, Marek S - ETA ████████████ ETA ████████████ |
| **CC:** | Timmons, Luke B1 - ETA ████████████████████ |
| **Subject:** | Job Corps Center Caretaker Cost projection assignment |
| **Attachments:** | Job Corps Center Caretaker Cost Projections 5.9.25.xlsx |

Lori and Marek, good afternoon, a little over a week ago, in light of the President's budget, we discussed the costs of the various types of facility caretaker service packages. Our facilities team created estimates for "Caretaker Basic" and "Caretaker Plus" based on size of Center (square footage of all buildings). I dropped it all in the underlined(attached spreadsheet) and did the math:

*Assuming caretaking for all 123 Centers (of different sizes):*

1. **Caretaker "Plus" model (described below) =** ████████████ annually
2. **Basic Caretaker model (see below) =** ████████████ annually

**Notes:**
- FTEs do not include or account for supervisors.
- Estimates include equipment costs for security (golf cart/gator)
- Personal Property control is included.
- Number of centers in each size category:
  - 11 centers are <100k GSF,
  - 91 between 100k and 250k,
  - 17 between 250k and 500k,
  - 1 between 500k and 750k - Turner
  - 3 greater than 750k – Earle C. Clements, Clearfield, and Gary

**Caretaker Basic (Closed Centers):** *Security, groundskeeping, and most basic maintenance of property*
- Provide security services for the campus on the XX-acre site having approximately XXX,000 GSF among X buildings, to protect against theft of government property and vandalism.
  - 24-7 security personnel, daily patrol of buildings and grounds
  - Controlled access to campus
  - Maintain effective liaison with local law enforcement and emergency services.
- Providing grounds maintenance to provide an attractive visual appearance.
- Receipt and Control of Property – The Contractor shall develop and maintain an inventory of all accountable and expendable property assigned to the center.

**Caretaker Plus (Paused Centers):** *Security plus Basic preventative maintenance and property management*
- All requirements in Caretaker Basic.
- Responsible for the proper operations of all HVAC equipment on campus to maintain air temperatures and air quality to include, but not limited to, maintaining setpoints, and changeover from heating to cooling and/or cooling to heating as applicable.
- Contractor shall engage qualified water quality and treatment sub-contractor to check and maintain chilled water chemical treatment bi-annually
- Monitoring and testing of plumbing systems at specific frequency
  - Visually examine all hot water heaters for any leaks monthly. Leaks shall be immediately reported to the COR and coordinated for repair.
  - Once a quarter the Contractor shall operate faucets at all bathrooms, kitchen, and service sinks for 30 seconds each to ensure P trap seals are maintained.

- Preventive and Corrective Maintenance – DOL will provide access to Brightly Asset Essentials, the Computerized Maintenance Management System (CMMS) to document, schedule, and perform preventive maintenance on all buildings systems and equipment
- System Winterization – The contractor must properly prepare and winterize all plumbing and sprinkler, and water filled systems to ensure protection from cold weather.

Happy to discuss next week or at your convenience.

Erin

**Erin McGee**
**Acting Administrator**
ETA/Office of Job Corps
U.S. Department of Labor

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Facility Size** | **Caretaker Plus** | **Basic Caretaker** | **No. of centers** | **Annual Costs for "Plus"** | **Annual cost for "Basic"** |
| 2 | less than 100k GSF | $ ▮ | $ ▮ | 11 | $ ▮ | $ ▮ |
| 3 | Between 100k and 250k GSF | $ ▮ | $ ▮ | 91 | $ ▮ | $ ▮ |
| 4 | Between 250k and 500k GSF | $ ▮ | $ ▮ | 17 | $ ▮ | $ ▮ |
| 5 | Between 500k and 750k GSF | $ ▮ | $ ▮ | 1 | $ ▮ | $ ▮ |
| 6 | Greater than 750k GSF | $ ▮ | $ ▮ | 3 | $ ▮ | $ ▮ |
| 7 | | | | | $ ▮ | $ ▮ |
| 8 | | | | | | |

```
FTEs do not include or account for supervisors.
Estimates include equipment costs for security
(golf cart/gator)
Personal Property control is included.
Size categories
11 centers are <100k GSF,
91 between 100k and 250k,
17 between 250k and 500k,
1 between 500k and 750k - Turner
```

**Caretaker Basic (Assumes Center is preparing for "Closure"):** *Security, groundskeeping, and most basic maintenance of property*
Provide security services for the campus on the XX-acre site having approximately XXX,000 GSF among X buildings, to protect against theft of government property and vandalism.
    24-7 security personnel, daily patrol of buildings and grounds
    Controlled access to campus
    Maintain effective liaison with local law enforcement and emergency services.
Providing grounds maintenance to provide an attractive visual appearance.
Receipt and Control of Property - The Contractor shall develop and maintain an inventory of all accountable and expendable property assigned to the center.

**Caretaker Plus (Assumes Center is Paused; more care taken to preserve for return to operation):** *Security plus Basic preventative maintenance and property management*
**All requirements in Caretaker Basic.**
Responsible for the proper operations of all HVAC equipment on campus to maintain air temperatures and air quality to include, but not limited to, maintaining setpoints, and changeover from heating to cooling and/or cooling to heating as applicable.
Contractor shall engage qualified water quality and treatment sub-contractor to check and maintain chilled water chemical treatment bi-annually
Monitoring and testing of plumbing systems at specific frequency
    Visually examine all hot water heaters for any leaks monthly. Leaks shall be
    immediately reported to the COR and coordinated for repair.
    Once a quarter the Contractor shall operate faucets at all bathrooms, kitchen,
    and service sinks for 30 seconds each to ensure P trap seals are maintained.
Preventive and Corrective Maintenance - DOL will provide access to Brightly Asset Essentials, the Computerized Maintenance Management System (CMMS) to document, schedule, and perform preventive maintenance on all buildings systems and equipment
System Winterization - The contractor must properly prepare and winterize all plumbing and sprinkler, and water filled systems to ensure protection from cold

Message

| | |
|---|---|
| **From:** | Walter, Courtney E - OSEC ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |
| **Sent:** | 5/10/2025 7:03:43 PM |
| **To:** | Wright, Rebecca - OSEC ▓▓▓▓▓▓▓ |
| **Subject:** | Fw: EMBARGOED DRAFT- PRE-DECISIONAL MEMO- Job Corp |
| **Attachments:** | EMBARGOED DRAFT_ETA Job Corps Program Decision Memo_V4.docx |

**Courtney E. Walter**
U.S. Department of Labor
▓▓▓▓▓▓

**From:** Frazier, Susan (Lori) - ETA ▓▓▓▓▓▓▓▓▓▓▓
**Sent:** Saturday, May 10, 2025 5:58:25 PM
**To:** Han, Jihun A - OSEC ▓▓▓▓▓▓▓▓▓▓▓▓ ; Walter, Courtney E - OSEC ▓▓▓▓▓▓▓▓▓▓▓ Parella,
Courtney E - OPA ▓▓▓▓▓▓▓
**Subject:** EMBARGOED DRAFT- PRE-DECISIONAL MEMO- Job Corp

Good afternoon, all-

Please find attached an EMBARGOED DRAFT- PRE-DECISIONAL MEMO- Job Corp. This is a working
document.

Thank you,
Lori

**Lori Frazier Bearden** |
United States Department of Labor
Acting Assistant Secretary
Employment and Training Administration
200 Constitution Avenue Suite S-2307
Washington, D.C. 20210
C: ▓▓▓▓▓▓



**U.S. Department of Labor**    Assistant Secretary for
Employment and Training
Washington, D.C. 20210



**DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE**

**May 10, 2025**

**DECISION MEMORANDUM**

**SUBJECT:    Job Corps Program and Pausing Center Operations**

---

**GOAL:** To cease operations at all Job Corp center sites to align with the Trump Administration's workforce priorities and proposed budget.

**PURPOSE OF MEMO:** To reach consensus on pausing Job Corp center operations and return every student safely and timely to their home of record by the end of the program year June 30th

**OPERATIONAL PLAN:** (1) Immediately cease all Job Corp center operations (including 24 USDA CCCs) to allow adequate transition plans for mobilizing students. (2) Centers will execute a "Suspension of Operations" Plan.

**PHASE 1: PAUSE ALL JOB CORP CENTER OPERATIONS**

> **Action 1:** OSEC will communicate the operational plan with USDA Secretary. USDA center staff (24 centers) will be directed to operationalize their "Suspension of Operations" plan to transfer students to home of record.

> **Action 2:** ETA will terminate 99 contracts with center operators using the "Termination for Convenience of the Government."

>> o ETA leadership will brief limited Job Corp federal staff including Contracting Officer Representative (COR).
>> o OJC Staff will issue brief email notices to all Job Corp center operators/Job Corp Association/Labor Unions minutes ahead of the termination notices.
>> o OJC staff will issue a Termination of Inconvenience effective August 15th and require implementation of Center Operations Pause and transition students to home of record by June 30th.
>>> o Operations wind-down to commence immediately with final operations date of June 30, 2025.
>> o ETA leadership will ensure COR understands negotiation role to negotiate termination fees and needed program costs that are applicable to transition students and successfully stop operations. This will include Wednesday, May 14th at 4:30PM 6-12 weeks of continued contract operations such as facility and property management, records retention, secure data and transportation fleet.
>> o Center Operators will operationalize "Suspension of Operations" plan.

DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE

➢ **Action 3:** DOL OSEC will operate a communication plan in conjunction with other executive leadership.

➢ **Action 4:** ETA will provide targeted response for Job Corp center staff (employment services, job fairs, unemployment compensation, dislocated worker funding). ETA will provide students with alternative program options such as Apprenticeship opportunities, Armed Service recruiters, etc. **(Appendix C)**

➢ **Action 5**: "Caretaker" contracts will be executed to maintain owned and leased facilities until leases expire. Note that some leases will be terminated**. (Appendix E)**

## PHASE 2: FORMAL CLOSURES

➢ **Action 1:** ETA will publish a Federal Register Notice as required by WIOA sec.159 providing advance notice of center closures. **(Appendix E)**

➢ **Action 2:** DOL and UDSA will renegotiate necessary interagency agreements to prevent endangerment of health/safety. **(Appendix E)**

➢ **Action 3:** DOL in conjunction with GSA follows federal regulations for general disposal requirements complying with Federal Property Administrative Services Act, GSA's Federal Management Regulation (FMR), and USDOL policies. **(Appendix E)**

2

DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE

# KEY SUMMARY OF POINTS

**THE GOAL OF THIS OPERATION:** To cease operations at all Job Corp center sites to align with the Trump Administration's workforce priorities and proposed budget.

**Critical Point of Understanding:** Long term plans of closures, program elimination, disposal of properties is a critical juncture of discussion for any future plans of the program.

**Proposed Plan:** The Department of Labor is proposing to PAUSE Job Corp center operations and return every student safely and timely to their home of record by the end of the program year June 30th.

**Operational Plan Goal:** (1) Immediately cease all Job Corp center operations (including 24 USDA CCCs) on May 16,2025 to allow adequate transition plans for mobilizing students and suspending Job Corp operations. (2) Execute "Caretaker" Contracts for Job Corp centers **(Appendix E).**

**Legal Authorities:**
- The Department of Labor is NOT eliminating the Job Corp Program.
  - o Congress has the legal authority to eliminate the Job Corp Program.

- The Department of Labor is NOT CLOSING Job Corp centers. "Closing" requires additional actions.
  - o DOL is PAUSING Job Corp Operations.

- The Department of Labor has the delegation of authority to cancel center operator contracts at the 99 centers which also includes contracts providing all program operations at 123 sites, including USDA sites.
  - o The Department of Labor has the delegation of authority to cancel contracts at the 24 USDA centers that fund program operations.

  - o Per 29 U.S.C. § 3209(j), prior to the closure of any Job Corps center, "the Secretary shall ensure"… all legal requirements are met to close centers. **(Appendix E).**

**Pausing Process:**
- Sufficient contracted staff are employed at the 99 centers with sufficient financial resources to return students to home of record and suspend operations by June 30th.
- There is sufficient USDA Forest Service/federal staff employed at their centers with sufficient financial resources to return students to home of record and suspend operations by June 30th.
  - o Because of termination of numerous large contracts, cost-saving measures have allowed for sufficient funds to wind down operations safely and securely.

**Job Loss:**
- Approximately 11,000 contract employees across the country and Puerto Rico.
- Potentially 1200 Forestry Service federal employees at USDA Centers

| | |
|---|---|
| **Timeline:** | APPENDIX A |
| **USDA Operational Plan:** | APPENDIX B |
| **Job Loss Operational Plan:** | APPENDIX C |
| **Centers' Transitional Services Operational Plan:** | APPENDIX D |
| **Summary and Background:** | APPENDIX E |
| **Interagency Agreement USDA & DOL** | APPENDIX E |

3

**DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE**

# APPENDIX A: OPERATIONAL TIMELINE

| | Complete by | Actions |
|---|---|---|
| | 5/6/25 | **PRE-OPERATIONAL PLAN BEGINS** |
| ✓ | 5/8/25 | **ETA** leadership will brief limited Job Corp federal staff, attorneys, including Contracting Officer Representative (COR) of operational plan. |
| ✓ | 5/10/2025 | **ETA and OJC** staff will develop a mockup for a Student Resource Page for Job Corp students |
| ✓ | 5/10/25 | **ETA and OJC** staff will develop draft Termination Notices for Center Operations to transition students and successfully stop operations. This will include 6-12 weeks of continued contract operations such as facility and property management, records retention, secure data and transportation fleet. |
| ✓ | 5/10/25 | **ETA and OJC** will develop communication for DOL federal staff supporting Job Corp program |
| ✓ | 5/10/25 | **ETA** will develop state by state summaries of each Job Corp center, congressional districts, staff and student body size for operational planning |
| ✓ | 5/10/25 | **ETA and OJC** staff will develop Center Staff Communication |
| ✓ | 5/15/2025 | **ETA** will develop a job loss plan for center staff to be implemented by Regional Offices |
| | 5/15/25 | **OPA** will develop a communication plan in conjunction with other external executive leadership. |
| | 5/15/25 | **OSEC** will communicate the operational plan with USDA Secretary |
| | 5/15/2025 | **ETA** leadership will read-on additional ETA/OJC/ASAM staff to operations |
| | 5/16/25 | **OPERATIONAL PLAN BEGINS** |
| | 5/16/25 | **OSEC** will send email communication directing the termination of OJC contracts to ETA's Delegation of Authority- Acting Assistant Secretary and the Assistant Secretary for Administration and Management (ASAM) |
| | 5/16/25 | **DOL OJC/OASAM** staff will terminate 99 contracts with center operators using the "Termination for Convenience of the Government." |
| | 5/16/2025 | **DOL OJC/ASSAM** staff will terminate all OJC operation contracts that fund direct program operations |
| | 5/16/25 | **DOL OJC** Staff will issue brief email notices to all Job Corp Center Operators/Job Corp Association/Labor Unions minutes ahead of the termination notices. |
| | 5/16/25 | Center Operators will operationalize "Suspension of Operations" plan. |
| | 5/16/25 | **OPA** will execute a communication plan in conjunction with other external executive leadership. |
| | | **ETA** will provide students with alternative program options such as Apprenticeship opportunities, Armed Service recruiters, etc. |
| | 5/19/25 | **OJC** students will begin returning to home of record |
| | 5/19/25- ongoing | **ETA** will provide targeted response for Job Corp center staff (employment services, job fairs, unemployment compensation, dislocated worker funding). |
| | 06/30/25 | **OJC** Center Operations will suspend. |
| | 07/01/25 | **CARETAKER CONTRACTS BEGIN** |
| | 07/01/2025 | Caretaker" contracts will be executed to maintain facilities until leases expire. Note that some leases will be terminated. |
| | TBD | **CENTER CLOSURE ACTIONS** |
| | TBD | ETA will publish a Federal Register Notice as required by WIOA sec.159 providing advance notice of center closures. |
| | TBD | DOL in conjunction with GSA follows federal regulations for general disposal requirements complying with Federal Property Administrative Services Act, GSA's Federal Management Regulation (FMR), and USDOL policies. |

4

**DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE**

# JOB CORP CENTER TIMELINES

| **Contract Termination for Convenience:** |
|---|

- Notification of Contract Termination
- Phase-out costs based on the current contract
- Staff severance to be paid in accordance with state requirements or operator established policies. **(30-days)**
- Negotiated final contract expenses. **(30-days)**
- Students transferred to the nearest center (If any are operating) that offers the same Technical Career Training as currently enrolled. **(Two weeks)**
- Implement the operator's phase-out plan to include the following:
  - Transitioning of all students' hard copy records. **(2 weeks)**
  - Scanning and uploading all student records into CIS. **(2-4 weeks)**
  - Complete 100% inventory of the GFE to include DOL approval and board of survey. **(4 weeks)**
  - Transition all utilities and other services to the caretaker contract. **(1 day)**
  - Finalize all outstanding CRA projects. **(Variable)**
  - Notify all contacted services of the ending of the contract. **(30 days)**
  - Transition the GSA owned vehicles. **(30 days)**
- Transferring of property for the centers that are being paused. **(90 days)**
- Complete staff off-boarding. **(30 days)**
- Establishing a caretaker contract for each center paused. **(120 days)**

5

DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE

# APPENDIX B: USDA Operational Plan

**ACTION 1: USDOL Secretary and USDA Secretary meet**

**Agenda:**

➤ Discuss joint USDA/DOL effort to cease Job Corp Operations.

➤ Communicate the DOL/USDA operational plan with USDA Secretary.

- Job Corp operations at USDA centers will be suspended through the termination of contracts on 5/16/2025.
- Immediate results: When eight union labor contracts are cancelled, USDA sites will not have Technical Education Program operations. **(Appendix E)**
- USDA center staff (24 centers) will be directed by DOL to operationalize their "Suspension of Operations" plan to transfer students to home of record.
- The 1,100 Forestry Service federal staff workers will continue operations until June 30th to ensure smooth suspension of operations and safe return of students to home of record.
- Forestry Service federal staff are paid from OJC budget. The USDA Secretary would take any actions to reduce personnel.
- Job Corp funds will be used to execute contracts to provide "caretaker contracts" to all USDA sites.

**ACTION 2: Secretary Press Considerations**

○ Joint statement? Joint Press release? Timing? Partnership with Unions joint press?

**ACTION 3: Workforce Training Program Possibilities – Peacekeeping with the Unions**

➤ **Decision Point-** Appropriated program funds could be returned to U.S. Treasury or using the Demonstration Authority under 29 U.S.C.3206(a), launch workforce program that carry out education and vocational training to this at-risk population at the 24 USDA sites

➤ **Decision Point-** Legislation is still in place. Keep USDA centers operating with unions contractors and birth a new workforce program.

➤ **Example – America First Workforce Program. Ideas could include:**
   ○ Designate centers for Shipbuilding Technical Education

   ○ Meet with Union Heads to discuss how all union labor work will be moved to the 24 USDA Centers/ trade-up for future forest workers/Ensure Labor Union staff are connected to the USDA sites for employment.

   ○ Create Apprenticeship Programs for Forestry, Carpentry at USDA sites.

6

DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE

# APPENDIX C:
# Job Loss and Student Resource Operational Plan

## Job Loss and Student Support:

1. A comprehensive list of severance pay and compensation packages will be compiled by DOL Job Corp staff to understand contract negotiation outcomes for staff.

2. All students who applied as "unaccompanied homeless youth" at time of application will be identified and connected with housing assistance. During pandemic, centers return students to home of record, and worked closely with this population's immediate needs.

3. Correspondence will be sent to all six (6) DOL Regional Administrators providing notification to the state's workforce system that Job Corp center operations have been terminated.

    *Immediate Action Requested:*
    o Any center with 50 or more employees to have rapid response teams on-site to provide immediate assistance, including resources and services for unemployment insurance benefits, re-employment, job search assistance, resume preparation, career counseling, and eligibility determination for training programs for timely and effective support.
    o Support services will also be provided to students who are still at the center.
    o States will be requested to provide job fair information and other employment related information to Job Corp center staff and students.

4. The DOL Job Corp website will provide links to resources for both employees and students.
5. The DOL National Job Corp Office in conjunction with Regional DOL Offices will distribute an email to Job Corp Center contractors an informational email with employment services and resources for unemployment insurance benefits to staff and students.

## Additional Student Resources:

1. Job Corp will establish a Job Corp Student Resource Page with information regarding employment and training, apprenticeship programs, armed service opportunities, and employers and email link to students.
2. The Office of Apprenticeship will provide information to the center operators via email to provide to students.
3. The Job Corp Office will partner with armed service recruiters to connect students with opportunities.

Students routinely return home for summer break and holidays.

7

000347

DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE

# APPENDIX D:
# Center Transitional Services Operational Plan:

**Step-by-Step to Realize Center Operations Pause**

**Step 1: Notify Stakeholders**
- JCAS notifies the Center Operator that the contract will not be renewed and that operations will be suspended. This must occur at least 30 days but ideally 45-60 days before the expiration of contract.
- The Center Operator informs employees, students, suppliers, clients, and other stakeholders of the closure decision.
- National Office establishes a dedicated email inbox for all questions related to the suspension of operations.
    - Must identify who will monitor and respond to all incoming inquiries and ensure all applicable staff (e.g., COR) have access to the inbox.

**Step 2: Develop a Suspension of Operations Plan**
- Regional Office establishes recurring weekly meetings with Regional Office staff, National Office staff, JCAS, center operator, and center leadership.
    - At the first weekly meeting, attendees will discuss key areas of focus for the suspension (e.g., student transfers, property, facility, etc.).
- Draft a detailed closure timeline with milestones and deadlines. Some set deadlines include:
    - 15 days before contract ends, the phase-out plan is implemented.
    - On last day of contract, the Caretaker contractor is on site for the handover.
- Regional Office will provide center/operator with checklists and forms to aid the organization of information during the suspension of operations, including:
    - Sample Contract Transition Checklist (See Attachment A - SAMPLE - Contract Transition Checklist)
    - Regional Office will provide Form 5-10 Job Corps Center Operator Transition – Facilities, Health/Safety, and Fleet Vehicle Checklist (See Attachment B - Form 5-10 Checklist)
    - Sample Standard Operating Procedure Action Checklist (See Attachment C - SAMPLE SOP Action Checklist)
- National Office will provide list of all GSA vehicles and L-tag vehicles assigned to the center.
- Regional Office will download center Master Property Inventory from JCRL (Job Corps Resource Library) and COR will provide the latest quarterly property certification from the center.

**Step 3: Communication**
- Center will provide Regional Office list of all student email addresses and parent/guardian email addresses for notification.

8

**DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE**

- Work with Communications/OPA to develop notification email to both parents and currently enrolled students to inform them of the suspension (See Attachment D - SAMPLE Parent-Guardian Notification)
- Coordinate with National Office staff for an approved script to be used for both the in-person and virtual meetings.
- National Office will develop a document of FAQs as a reference to use for staff and students.
- National Office will establish a dedicated email Inbox that will be provided to students to be monitored by the Regional staff. The COR, or designated official, will respond to questions from students and elevate questions to leadership if needed.
- If feasible, Regional Office personnel will travel to the impacted center to meet with all students to discuss the suspension of center operations; a follow-up virtual call should also be established for those students not available in person or for those with further questions.
  - o Office of Job Corps will draft and center will distribute approved email notification regarding the suspension of center operations to all students and parents/guardians of minor students.
- Regional and National Office staff will hold weekly Transition meetings to discuss ongoing status and identify any pending issues that need to be addressed.
- Region Office will notify local Office of Public Affairs of the upcoming suspension of center services and refer all media inquiries to them and the National Office.
- Media inquiries relating to staff can be addressed by the center operator (not federal employees); any other media requests should be directed to local OPA office, with notification to National Office.

**Step 4: Student Transfers when there are centers operational. If all centers' operations are paused, then students are to go to their home of record.**

- Students should be transferred based on their CTT choice and the center closest to their home that has availability. An explanation is required for any student deviating from their CTT choice.
  - o Preference will be to keep student within the same Region but can be transferred to centers outside of the Region based on CTT availability or other extenuating circumstances (e.g., live outside of the Region).
- Determine if ASWR will be an option – decision by National Office (1 year to return).
- For ACT (college) students, have plan of action for each student and ensure that case notes are kept up to date.
  - o Identify program they are enrolled in and college.
  - o Discuss options available to students who may be in mid-semester of ACT program.
- National Office will provide list of CTT programs and slot availability to the center as soon as possible.
  - o Regional Office will review and confirm the slot availability upon receipt.
- Center will provide list of all active students and include the following information: student name; ID; current age; HSD status; assigned CTT; CTT TAR completion % and

000349

DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE

City/State for their home of record (See Attachment E – Active Student Outcomes Status List).
- Center will provide list of all students on MSWR status, including: student name, ID, current age; HSD status; assigned CTT; CTT TAR completion %; City/State for their home of record; MSWR start/end date; include column if student has been compliant with the MSWR process; include any special circumstances known (i.e., has specific medical needs; health insurance issues, etc.
- Center personnel will contact each student individually to discuss options based on their CTT area, trade completion, individual concerns and openings (See Attachment F - SAMPLE CTT Crosswalk).
  - o Center will provide a list of potential transfer center locations based on the student discussion to the Regional Office for approval
  - o Preference will be given to retain students within the Region but can be placed outside of Region based on need/individual circumstances.
- Regional COR will confirm proposed student transfers according to their career technical trade choice and closest home location.
- Center will provide ongoing updates of the status of each identified active student until all students have either transferred or separated.
  - o Explanation should be provided on all students that have not either transferred or separated for each report submission update.
  - o Updates are required at minimum twice per week; Region will review and forward to National Office Staff.

**Step 5: Records Management**
- Retain records as per statutory requirements.
- Center personnel must confirm all student records are updated and uploaded in applicable CIS locations, including health/wellness records.
  - o Regional Office staff should confirm no remaining hard copy records during a site visit.
  - o Any noted records must be scanned into the applicable CIS location and the center must verity (via 3rd Party certification) that all hard copy files have been appropriately scanned. This confirmation must be sent to the Regional Office.
- Center must ensure all Training Achievement Records (TAR) are updated by instructors and students and all credential attainments have been updated in CIS prior to any transfer/separation.
- Center must identify any hard copy records remaining on center.
- Center books containing student accession/transfer numbers for the Federal Archives must be secured; books/documents will need to be shipped to the Regional Office for safe keeping and use in responding to records inquiries; (box contents need to be labeled for easy identification) no less than 2-weeks prior to the end of the contract.
- Centers must identify any active records requests in progress that will not be completed prior to the end of the contract.
  - o Regional Offices must be prepared to begin addressing all student records requests at minimum one-month prior to the contract end date, or other date as specified by the Regional Office.

10

DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE

- Centers must provide a list of all POCs (name, email; phone) for current (and all known) on-line HSD programs and/or co-enrollments with area high schools or Other Training Provider sites.
- As students transfer to new center locations, all hard copy medical records must be shipped to the receiving center in conjunction with student arrival to that center.
    - Documents must be securely packaged in accordance with HIPAA and Privacy Act regulations.
- Center accountability logs/sign-in sheets and other residential log books must be secured and labeled.
    - Operator must notify Region where the secured materials will be stored.
- Staff personnel records remain with the operator and is at their discretion on how to address.
- Center operator must cancel any center-specific licenses, permits, and certifications.

**Step 6: Outreach/Admissions and CTS Activities**
- National Office, in conjunction with Regional Office, will determine where applicant files and NEAP Workforce Development Areas (WDA) will be reassigned.
    - OA Quota goals may or may not be reassigned to another contract.
- Upon notification of suspension of operations, National Office will disable the OA Provider's ability to assign students to Center.
- Operator must provide a list of active applicant files and their current status; Those files will need to be transferred to the identified OA Provider as soon as possible.
    - Regional Office must initiate contractual modifications identifying any WDA changes or increase/decrease in OA quota goals; same action applies to center arrivals.
- OA Provider must make contact with all applicants to inform them of the pending changes and provide them with contact information for their newly assigned OA provider.
- CTS services will continue to be performed by the operator until no later than 15 days prior to the end of the contract, or based on other Regionally approved date.
- Contractor will provide a list of all active CTS caseloads for transfer to the identified CTS provider.
- National Office will work with JCDC on the transfer of identified CTS caseloads to the new CTS provider.

**Step 7: Facility Management**
- Center must identify all facility related concerns and ongoing projects; each project should identify the Deficiency number, amount funded, amount expensed to date, and the projected completion date to the Regional Office.
- Outgoing center operator must continue to maintain facility upkeep and preventative maintenance until the caretaker contract begins.
    - Center must coordinate with Regional Office/ESC staff regarding any new facility repairs to determine if necessary and if can be completed prior to the contract termination date.

11

DRAFT-CONFIDENTIAL-PREDECISONAL-DELIBERATIVE

- Regional Office will request access to Asset Essentials for the Caretaker operator during the transition process.
- Outgoing Center Operator must terminate leases or contracts for office spaces and utilities in accordance with the contract termination date.
- Arrange for the disposal or transfer of physical assets; coordinate with National Training Contractors to be on location to remove assets, under supervision.
- During transition process, caretaker operator and center operator will be on-site for property/facility assessment and hand-off of facility keys.
    - COR, or designated Regional staff, should be on site during final week of transition to address any potential issues and confirm facility status.
- Conduct a final walkthrough to ensure premises are vacated.

**Step 8: Property**
- With the exception of student Chromebooks and NTC owned property, ALL other remaining property will remain on center unless otherwise noted by the National or Regional Office. Center operators must secure all items in an orderly manner to the extent possible.
- Center must conduct a 100% audit of all property once they are notified of suspension of center operations.
- For NTC owned equipment, the NTC must arrange for the pick-up and transfer of NTC owned property prior to the contract end date.
    - NTC operator should coordinate with National Office POC on the reallocation of assets to other designated NTC sites.
- Where feasible, and in coordination with the Regional Office, property should be consolidated into identified locations that are secured and can also allow for easy access for accountability.
    - Computer equipment can be relocated into secured locations (can be by building or in single locations) - but must ensure that property is clearly accessible for inventory purposes.
    - Dorm/classroom televisions, smart boards or other external equipment can be consolidated into single areas (e.g., Dedicated classroom).
    - Dorm mattresses can be relocated to a dedicated space.
    - Kitchen equipment (pots/pans/dinnerware/etc.) needs to be secured and protected to the extent possible.
    - CTT tools/equipment should be secured and locked in the applicable CTT area, unless otherwise noted by the Region.
- Operators will ensure all leased property or products are returned to supplier.
    - Operator will provide a list to the Regional Office of all leased property that is being returned (e.g., washers/dryers; vending machines; postage meters, etc.).
- Center must assess operational status of student Chromebooks. The number of operational Chromebooks must be provided to the Region for distribution to other centers.
    - The contractor should collect all Chromebooks assigned to individual students.
- Regional Office staff will coordinate and identify the allocation of student Chromebooks to other centers.

000352